**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| HESTER MENDEZ and GILBERT MENDEZ, for themselves and on behalf of their minor children, PETER MENDEZ and JACK MENDEZ, | ) ) ) ) ) | No. 1:18-cv-05560 |
| Plaintiffs, | ) | |
| v. | ) ) | Judge John Z. Lee |
| | ) | Magistrate Judge Young B. Kim |
| THE CITY OF CHICAGO; Chicago police officers JOSEPH T. CAPELLO IV (star #10626); LIEUTENANT SAMUEL DARI (#603); MICHAEL W. DONNELLY (#13784); SERGEANT RUSSELL A. EGAN (#998); MICHAEL J. GUZMAN (#15911); JOSE M. HERNANDEZ (#15925); and ERIC M. SEHNER (#11641), | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | Jury Demanded |

**FOURTH AMENDED COMPLAINT**

**INTRODUCTION**

1.      Plaintiffs, by and through their attorney, Law Offices of Al Hofeld, Jr., LLC, bring this action against defendant City of Chicago pursuant to 42 U. S. C. § 1983 for traumatizing two little boys and their family, and state as follows:

2.      On November 7, 2017, while executing an invalid search warrant for the wrong apartment, Chicago police officers repeatedly pointed and held guns directly at Jack and Peter Mendez, ages 5 and 9, as well as at their mother and father in the boys' presence, while in the family's home. Officers' guns were loaded, and their fingers were on the triggers. Jack and Peter posed no apparent, actual or possible threat whatsoever to the officers. Peter cried and pleaded for officers not to shoot and kill his father.

1

3.  Officers also handcuffed the boys' father, Gilbert Mendez, and kept him in handcuffs, in front of his sons, throughout the duration of officers' search.  Officers never had a reason to arrest or handcuff Mr. Mendez, let alone keep him handcuffed after they became aware they had raided and searched the wrong apartment.  During this time, Jack and Peter cried and pleaded with officers not to take their father to jail.

4.  Upon entering the Mendezes' apartment, officers were screaming and cursing abusively at Mr. and Mrs. Mendez in the boys' presence.

5.  Even after learning they were in the wrong apartment, officers not only did not explain their mistake, but they continued their illegal search.  They found nothing illegal. They arrested and charged no one.  When they finished searching, they simply left.  On information and belief, officers never reported to the City of Chicago the damage they did to plaintiffs' apartment.

6.  In fine, Chicago police terrorized the innocent, Mendez family in their home for no reason.  Their actions toward Peter, Jack and their parents were not only the product of an easily avoidable mistake; they were totally unnecessary, unreasonable, and without any lawful justification.

7.  Nine months later, on the filing date of this complaint, Peter and Jack Mendez still suffer severe, emotional and psychological distress and injury as a direct result of their exposure to defendants' unnecessary and terrifying conduct.  Their deep distress and related symptoms constitute scars on their young psyches that may never fully heal.

## JURISDICTION AND VENUE

8.  This action arises under 42 U. S. C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U. S. 658 (1978).  This Court has jurisdiction

pursuant to 28 U. S. C. §§ 1331 and 1343.  The Court has supplemental jurisdiction of plaintiffs' state law claims.

9.      Venue is proper pursuant to 28 U. S. C. § 1391(b).  The underlying events occurred within the Northern District of Illinois; defendant City of Chicago is a municipal corporation located within the District; and all parties reside in the District.

## PARTIES

10.      At the time of all relevant events, plaintiff Jack Mendez was a five-year-old boy residing with his mother and father at 3557 S. Damen Avenue, 2nd floor, Chicago, Illinois, 60609.  On November 7, 2017, Jack was in kindergarten.

11.      At the time of all relevant events, plaintiff Peter Mendez was a nine-year-old boy residing with his mother and father at 3557 S. Damen Avenue, 2nd floor, Chicago, Illinois, 60609.  On November 7, 2017, Peter was in the 4th grade.

12.      Plaintiff Hester Mendez (or "Mrs. Mendez") is Peter and Jack's natural mother.  Plaintiff Gilbert Mendez (or "Mr. Mendez") is Peter and Jack's natural father.  At the time of all relevant events, Mr. and Mrs. Mendez also resided at 3557 S. Damen Avenue, 2nd floor, Chicago, Illinois, 60609.

13.      Mr. and Mrs. Mendez are U. S. citizens.  They are legally married.  At the time of all relevant events, Mr. Mendez worked full-time as a House Keeping Assistant for a prestigious hospital in Chicago.  Mrs. Mendez worked full-time as an Administrative Assistant for a major health insurance company in Chicago.

14.      Neither Mr. nor Mrs. Mendez have ever been arrested; neither have any criminal record of any kind.  Neither have ever been involved in any illegal activity.

15.     Mr. Mendez is Hispanic-American.  Mrs. Mendez is Native-American. They consider their sons to be Hispanic-American.

16.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

17.     At the time of all relevant events, defendant Joseph T. Capello IV (star #10626) was a Chicago police officer assigned to the Bureau of Patrol, 11th District.  He and presently unidentified Chicago police officers participated in obtaining the search warrant for the Mendez's apartment.  Chicago police officer and defendant Lieutenant Samuel Dari (star #603) approved the warrant, both pre- and post-execution.

18.     Officer Capello and the following Chicago police officers participated in the execution of the invalid search warrant inside plaintiffs' apartment on November 7, 2017: Michael J. Guzman (star #15911), Jose M. Hernandez (star #15925), Eric M. Sehner (star #11641), Sergeant Russell A. Egan (star #998), and Michael W. Donnelly (star #13784). Sergeant Egan was the search team supervisor and the supervising officer on the scene.

19.     On information and belief, the vast majority of officers who participated in the raid and search of plaintiffs' home on November 7, 2017, were Caucasian males.

20.     When Chicago police officers were present at plaintiffs' home on November 7, 2017, they were at all times acting under color of law and within the scope of their employment as officers of the Chicago Police Department ("CPD") for the City of Chicago.

### Overview:  CPD's M. O. is to Unnecessarily Use Force Against or in the Presence of Children

21.     Chicago police officers have a *de facto* policy, widespread custom or *M. O.* of unnecessarily using force against or in the presence of children (ages 0-14), which traumatizes them.

4

22.     The 2017 United States Department of Justice investigation into the Chicago Police Department ("CPD") concluded that CPD has a pattern and practice of using less-than-lethal, excessive force against children for non-criminal conduct.  (U. S. Dept. of Justice *Investigation of the Chicago Police Department*, Civil Rights Division and U. S. Attorney's Office for the Northern District of Illinois, Jan. 13, 2017, pp. 34-35).  In addition, the 2016 report of the mayoral-appointed Chicago Police Accountability Task Force ("PATF") contained related conclusions and recommended specific police reforms to improve police-youth interactions.

23.     None of the reforms that CPD has implemented or announced to date purport to remedy or address this problem.  The federal consent decree agreed to by the City of Chicago and the State of Illinois does not address it.

24.     CPD's recently revised use of force policy, GO3-02, does not require officers to avoid using unnecessary force against or in the presence of young children whenever possible and does not require officers to use a trauma-informed approach to the use of force in situations where some police force is necessary.

25.     Unlike other major U.S. metropolitan police departments - such as Cleveland, Indianapolis, Charlotte, Baltimore and others - CPD still does not provide any training or supervision to officers concerning youth brain development or the importance of preventing trauma to young children by utilizing a trauma-informed approach to the use-of-force in situations where children are present.

26.     The connection between trauma and mental and physical health in children's development is now well-established and well-understood.

27.     The effect of police use of force on poor, children of color of is known to be especially traumatic to them because many of them have already been subjected to multiple traumas in the communities and circumstances in which they live.

## FACTS RELATING TO ALL COUNTS

### *The Chicago Police Used Unreasonable and Unnecessary Force Against Peter and Jack Mendez and Against Their Parents in the Boys' Presence*

28.     At approximately 4:10PM on November 7, 2017, officer Capello swore out and obtained a search warrant authorizing the search of "Curtis Roberts" and "Patricka A. Cavazos" and of the premises at "3557 S. Damen Avenue, 2nd floor, Chicago, Cook County, Illinois." The warrant also authorized the seizure of illegal drugs, paraphernalia, cash, records of illegal drug transactions, and residency documents.

29.     The three-story, multiunit, family building at 3557 S. Damen contained three units, one each on the first, second and third floors. The intended targets of the warrant, Curtis Roberts and Patricka Cavazos, lived on the third-floor, not the second-floor. The search warrant inaccurately assumed that the targets lived on the second-floor; they never lived in the second-floor apartment. Plaintiffs alone lived in the three-bedroom apartment located on the second floor for several years preceding the warrant.

30.     Moreover, the targets of the warrant had no contact whatsoever with plaintiffs' apartment or plaintiffs, other than to occasionally pass them as neighbors. Plaintiffs had noticed that they did not seem to work and that they drove a BMW and a Mercedes that they would park on the street.

31.     As detailed below, officer Capello and other officers involved in obtaining the search warrant performed no independent investigation or surveillance to verify that the apartment number given them by a John Doe confidential informant was accurate. At all times,

defendant officers lacked probable cause for a warrant to search plaintiffs' apartment, the second-floor apartment.

32. In fact, defendant officer Cappello has a pattern and practice of performing inadequate investigations leading to search warrants that lack probable cause, including a failure to independently verify information provided by informants. He has a related background and history of failing to understand how to competently perform basic police investigations, including investigations underlying search warrants, and failing to understand and utilize basic, police procedures applicable to children.

33. Moreover, the defendant officers involved in obtaining and executing the residential search warrant took no steps to determine whether children resided in the second floor apartment or to avoid entering that apartment and executing the warrant at a time when children were likely to be present.

### *Officers Enter the Wrong Apartment and Point Guns at the Children and Their Parents*

34. Bodycam video from four of the approximately seven officers who entered plaintiffs' apartment exists and corroborates plaintiffs' detailed allegations below. (FCRL 1, 2, 3, 5, and 7). This number includes one body cam video that appears to be incomplete. (FCRL 7). The remaining three officers were also wearing bodycams – a fact which is visible from existing bodycam videos – but the City of Chicago has not produced videos from these bodycams and, as of October 17, 2018, claims not to know whether or not they exist.

35. Crucially, the "missing" bodycam footage is from the bodycams of officers who were with or near Mrs. Mendez and Peter and Jack Mendez in the living room at the time that plaintiffs allege officers pointed guns at the children.

36. In fact, defendant officer Cappello checked out a working body camera before the raid on November 7, 2017, but failed to wear and activate it during the raid on plaintiffs' home, contrary to CPD's official mandate that officers wear them during law enforecement events, including the execution of search warrants.

37. In the days before and after the raid, there were other instances when officer Cappello was on duty, had a working body camera, and failed to wear and/or activate it. CPD did not discipline him for these infractions or even open an internal complaint.

38. Similarly, defendant Sergeant Egan checked out a working body camera before the raid of plaintiffs' home on November 7, 2017, but failed to activate it during the raid. CPD did not discipline him for this infraction or even open an internal complaint.

39. Similarly, defendant Guzman activated his body camera during the raid of plaintiffs' home but turned it on late, with result that it did not capture key events during the crucial, initial moments of the raid. CPD did not discipline him for this infraction or even open an internal complaint.

40. At approximately 6:30 or 7:00PM on November 7, 2018, Jack and Peter were playing on the wood floor in the hallway. Five-year-old Jack was laying on the floor directly in front of the front door to the apartment. Peter was playing near him, a few feet away, across the narrow hall from the front door.

41. Without warning, Chicago police officers rammed once and broken open the front door to the Mendez's apartment and charged inside, guns drawn and pointed at everyone they saw. They did not knock-and-announce their presence first and give plaintiffs an opportunity to open the door.

42.     At that moment, Jack and Peter leapt up and scattered; they ran down the front hallway that led to the living room, where their mother had been watching TV.  Two or three officers rushed after them.  At least one of the officers who pursued them pointed a gun at the children's backs.

43.     At the moment officers broke through the front door and entered, Mr. Mendez was walking through the kitchen, near the front door.  Several officers charged at him with guns pointed directly at him, including a large, assault-type rifle, and shouted repeatedly (in essence and not *verbatim*), "Get down" and "Get the fuck down!" and "Don't make me shoot you!"  Once down on the floor, officers shouted at him to get "facedown" and "shut up!"  Mr. Mendez fully complied.  While he was face-down on the kitchen floor, officers surrounded him and pointed guns downward at his prone body.

44.     As Mr. Mendez was getting down to the kitchen floor, straight ahead of him in his line of sight he glimpsed his sons running down the hallway toward the living room with an officer chasing behind them and holding a large gun pointed directly at their backs.  The gun was approximately five feet from their bodies.

45.     As Peter was running away, he glanced behind him at the commotion and saw his father get face-down on the floor, with officers standing around him and pointing guns down at him.  He heard what police shouted at his father; both boys did.

46.     The terrifying image of this moment is forever burned into Peter's memory.

47.     When the officers chasing Peter and Jack entered the living room, Mrs. Mendez was standing by the middle window.  After hearing noise, she had gotten up from the couch where she was watching TV.  One officer shouted at her (in essence and not *verbatim*),

9

"Get the fuck on the floor!"  This officer pointed a large gun directly at her while repeatedly shouting this command.

48.     At least one officer in the living room pointed a gun at Mrs. Mendez.

49.     A moment before officers rushed into the living room, Peter and Jack had run into the living room, past their mother, to the couch along the far wall and were balled up next to each other in fetal position in the corner of the couch, cowering and visibly shaking. Their teeth were chattering audibly.  Peter and Jack saw officers pointing guns at their mother, who was complying with officers' commands to get down on the floor while trying to gather her sons and keep them safe.

50.     As Mrs. Mendez got down on the living room floor, she was concerned about her sons, who were screaming (in essence and not *verbatim*), "mommy, mommy, what's going on?  Why are the police here?"  She told Peter to get down on the floor with her; he did. She got partway up from the floor to pull Jack, who would not move by himself, off the couch and down onto the floor beside her.  An officer yelled at her for making this move.  She held her sons' hands.

51.     After Mrs. Mendez and her sons were lying on the living room floor, an officer with a large pistol stood in front of them and continued to point the gun directly at her and her sons for several seconds.

52.     Mrs. Mendez began asking officers what they were doing in her home. "What is this about?  I need to know."  An officer responded (in essence and not *verbatim*), "We have a warrant… That's all you need to know" and "We'll get to it when we get to it."

53.     The entire time they were in the apartment, officers never presented a search warrant to the Mendezes or told them why they were at their apartment in particular.

10

54.     After he got down on the kitchen floor, officers handcuffed Mr. Mendez's arms behind his back.  Mr. Mendez, who was face down on the floor, felt a knee in his back and saw officers' shoes in his peripheral vision.  Officers then held him down on the floor and questioned him.  During this time, officers also searched him.

55.     During the whole time Mr. Mendez was pinned to the kitchen floor, Jack and Peter were screaming hysterically for their father and pleading with officers non-stop (in essence and not *verbatim*), "Don't shoot my daddy," "don't kill my daddy," "don't hurt my daddy," "why do you have my dad?"  Mr. Mendez heard his sons screaming from his position on the kitchen floor at the opposite end of the apartment.

56.     After he was handcuffed and heard an officer shout "clear," Mr. Mendez started asking officers if he could go and calm his boys in the front room.  Officers walked Mr. Mendez to the living room at gun point, fingers on the trigger.

57.     Once in the living room, officers put Mr. Mendez at the end of one couch, apart from his family, who, by that time, was seated on the other couch in the room.  Officers would not let Mr. Mendez sit with his family.  When he passed his sons for a moment, they bear-hugged their father and held onto him tightly.  Mr. Mendez was unable to hug them back and give them physical comfort because officers kept handcuffs on him.

58.     After Mr. Mendez was left sitting in handcuffs in the living room in front of his sons, Peter and Jack began asking (in essence and not *verbatim*), "Why do you have my dad in handcuffs?"  "Are you going to take him to jail?"  And they pleaded with officers (in essence and not *verbatim*):  "Please don't hurt him," "Don't beat him," "Don't take him to jail," "He didn't do anything."

***Officers Continue to Search the Wrong Apartment***
***and Keep Mr. Mendez Handcuffed, Even After They Had Notice***

59.     Multiple instances in multiple bodycam videos from the incident show that, shortly after the search began, officers became aware that they were in the wrong apartment and that, after they were aware, they continued searching anyway and continued to keep Mr. Mendez in handcuffs.  (*See, e.g.*, FCRL 1, 59:36; FCRL 2, 54:51, 55:41 ("Wrong fucking apartment") and 58:71; FCRL 3, 59:34; FCRL 5, 53:22, 54:33, 59:10, 59:33 ("Finish searching, guys"), and 1:00:11 ("Take him out of cuffs"); and FCRL 7, 51:17, 55:42 ("He gave us the wrong apartment.  Remember the pictures… I think its upstairs") and 58:08).

60.     While the family was sequestered in the living room, officers searched throughout the apartment.  On that date, the Mendezes were in the process of packing their belongings for a move to a new apartment, and most of their things were already packed up in boxes lined up in the hallway and other places.

61.     Throughout the raid and search, Mrs. Mendez kept asking officers why they were in her apartment.  They would not answer her.

62.     Before executing the warrant, officer Capello and at least one other officer in the Mendezes' apartment had seen photos of the warrant's two targets (and the warrant contained detailed physical descriptions of the targets).

63.     From the moment they entered the apartment and saw plaintiffs, all officers plainly saw that the physical characteristics and appearance of Mr. and Mrs. Mendez differed dramatically from those of the two targets.  Among other things, the female named in the warrant was 5'8"; Mrs. Mendez was a mere 5'1."

64.     After officers had been searching for several minutes, Sgt. Egan set down a piece of paper on top of a box in the living room before continuing to search.  Mrs. Mendez walked over and picked up the piece of paper, walked back to the couch, sat down again, and

read it.  It turned out to be a copy of the search warrant for "Curtis Roberts" and "Patricka A. Cavazos."

65.     Mrs. Mendez then immediately told officers they were in the wrong apartment and that the people listed in the warrant live upstairs in the third-floor apartment.

66.     The supervising officer tried to take back the copy of the warrant that Ms. Mendez had picked up.  She said (in essence and not *verbatim*), "Oh no, I'm keeping this.  This is my copy."

67.     Later, officers physically described the people they were looking for.  In response, Mrs. Mendez said (in essence and not *verbatim*), "I know exactly who you are looking for, and they live upstairs.  I'm telling you, you have the wrong apartment."

68.     At one point, as Mrs. Mendez was describing the people upstairs, she saw an officer look away, put his head down, and shake his head, saying "aw man… O Fuck," as he appeared to realize that officers were, in fact, not in the apartment of the intended targets of the warrant.

69.     However, instead of immediately suspending their search and leaving, officers continued searching the Mendez's apartment.  Additionally, officers continued to keep Mr. Mendez in handcuffs and physically separated from his family.  Moreover, they kept questioning Mr. and Mrs. Mendez.  Officers continued to do all of these things long after they were well-aware that they lacked probable cause to enter and search plaintiffs' apartment and detain plaintiffs.

70.     Mrs. Mendez asked officers (in essence and not *verbatim*), "if you have the wrong apartment, why are you continuing to search?"

71.     Officers did not find any contraband in plaintiff's apartment.  Officers did not arrest, charge or issue a citation to any plaintiff.

72.     After being present in and thoroughly searching the Mendezes' apartment, officers left the building.[1]  Immediately before they left, they removed the handcuffs from Mr. Mendez.

73.     Before they left the apartment, officers did not offer any explanation for their mistake.  They never introduced themselves or gave their names or phone numbers for future questions, concerns or complaints that Mr. and Mrs. Mendez may have wanted to make about entering and searching the wrong apartment.

74.     During the entry and search, officers broke open the inner and outer front entry doors on the ground level of the building, the front door to the Mendez's apartment, and the closet door in their bedroom.  However, on information and belief, defendant officers did not make any City Claims Notification, as required by CPD Special Order S04-19.

75.     Before they left, officers did not explain how the Mendezes could arrange to have the City repair the damage to their apartment.  No one from the City ever contacted the Mendezes or, on information and belief, their landlord or came to inspect or make repairs.  On information and belief, plaintiffs' landlord had to make and pay for all repairs of damage caused by the officers' breaches.

76.     The supervising officer was one of the last officers to leave.  He did not provide any name or phone number for plaintiffs or their landlord to contact the City of Chicago regarding damage or repairs.

---

[1] On information and belief, the Chicago Police Department did not ever execute a search warrant for the 3rd floor apartment on that date, any subsequent date, or for the persons listed in the warrant.  Criminal history reports for both individuals reflect that neither individual was criminally charged on or after November 7, 2017.

77.     On November 7, 2017, officers terrorized a totally innocent family and departed, leaving behind all of the damage, physical and psychological, for others to cope with in the days, weeks, and years to come.

### *Officers' Uses of Force Against Jack and Peter and Against Their Parents in the Boys' Presence Was Totally Unnecessary*

78.     Peter and Jack presented absolutely no threat, real or apparent, to the police officers entering into and searching their home.

79.     Even though they presented no threat, officers repeatedly pointed their guns at them, and other officers did not ask the officers pointing guns at the children to stop doing it.

80.     Mr. Mendez presented absolutely no threat, real or apparent, to the police officers entering into and searching his home, especially after the apartment was secured.

81.     Even though he presented no threat, officers repeatedly pointed guns at Mr. Mendez and kept him handcuffed, and other officers did not ask their fellow officers to stop pointing guns at him.

82.     In particular, Mr. Mendez did not pose any threat to officers after they discovered that he was not the male target named in the search warrant and that officers were in the wrong apartment.

83.     After officers discovered that the warrant was obtained for the wrong apartment, they lacked all probable cause to arrest Mr. Mendez and to keep him in handcuffs.

84.     Similarly, Mrs. Mendez presented absolutely no threat, real or apparent, to the officers who entered and searched her home.

85.     Even though she presented no threat, officers repeatedly pointed guns at her, and other officers did not ask their fellow officers to stop pointing guns at her.

86. Mr. and Mrs. Mendez have been harmed by the unnecessary pointing of guns, the unlawful detention, and the unlawful search of their homes.

### Officers' Unnecessary Uses of Force Traumatized Peter and Jack

87. Chicago police officers' terrorizing conduct toward Peter and Jack Mendez and toward their mother and father in the boys' presence caused Peter and Jack immediate, severe and lasting emotional and psychological distress and injury.

88. In addition to witnessing uses of force and threats of imminent violence against themselves and their parents, the boys were also subject to officers shouting and cursing commands and to their mother's understandable distress. This made for one, big, fast, chaotic, unnecessary scene of terror.

89. Prior to November 7, 2017, Peter and Jack were happy, healthy boys in a close, loving family. Prior to this date, they had suffered no emotional or psychological trauma of any kind in their lives. That changed on November 7, 2017 with defendant's actions.

90. Throughout their encounter with police, Jack and Peter were terrified, crying, and pleading with officers. For several minutes, based upon what he witnessed Peter believed officers were going to shoot and kill his father. Next, the boys believed that their handcuffed father was going to be taken away from them to jail.

91. Throughout the encounter, the boys felt their hearts pounding in their chests. Both children (and their parents) had trouble sleeping that night and on many subsequent nights. (Mrs. Mendez has a heart murmur, and was put under severe stress that evening but declined to seek emergency medical treatment in order to care for her shaken sons.)

92. Ever since the incident, Jack and Peter have continued to re-live, in various ways, how terrified they were that day.

93.     Both boys now live with recurring nightmares about the incident.

94.     Peter has recurrent flashbacks of officers surrounding his father with guns pointed down at him.  This image is permanently burned into his memory.  Peter is afraid to be by himself in any place, even to walk to the bathroom by himself at home before bedtime.

95.     When Peter tries to talk about the incident, he physically shakes.  He appears compelled to talk about the incident extremely quickly, appears to display overwhelming anxiety, and has to take breaks.

96.     Until recently, Peter had held his emotions about the incident inside and had not talked much about the incident.  Ever since the incident, he has had trouble going to the bathroom regularly.

97.     Jack regularly asks his parents out of the blue if the police are coming back.  Whenever either of the boys sees police officers or a police car or hears a siren, he is overcome with feelings of anxiety and fear and re-lives memories of the event.  Jack asks in response, "They're not coming here, right daddy?"

98.     Since the incident, Jack's verbal communication is very poor.  He talks about the incident only with great difficulty.  Since the incident, he is easily shaken by ordinary noises and startles easily.

99.     Jack has struggled with significant behavioral problems in school as a consequence of the incident.  After the incident, he would not do his schoolwork.  He would flinch at and investigate all the noises he heard and would hide in coat closets.  He is now hyperactive.

100.    After the incident, almost every day Jack's parents received phone calls at work from his school about his behavior.  It reached the point where the school would just place Jack in the office for the entire day.

101.    Mr. and Mrs. Mendez had to remove Jack from the school because it lacked the resources to help him.

102.    Before the incident, Jack received smiley face stickers at school for good behavior almost every day.  Since the incident, he has not received any.

103.    Jack did not have any trouble in school before the incident.

104.    Before the incident, Jack was outgoing and friendly.  Since the incident, he has only wanted to be by himself.

105.    Peter and Jack exhibited none of these behaviors prior to November 7, 2017.  Jack, especially, is now a different kid.  This is the direct result of officers' conduct on November 7, 2017.

106.    Peter and Jack now continue to experience and exhibit, unabated, these and other signs of severe emotional and psychological trauma and distress.

107.    On information and belief, both boys either have, or have many of the symptoms of, severe Post-Traumatic Stress Disorder.

108.    As a direct result of officers' conduct, both children are now receiving psychiatric treatment and counseling for their trauma inflicted by the Chicago police.

109.    Both now require high quality, long-term, costly, psychological care and counseling in order to cope with the long-term, psychological injuries caused by defendants' terrorizing display of unnecessary force.

110.    Officers' shocking actions of repeatedly pointing and training loaded guns at close range on five- and nine-year-old little boys, pointing guns at close range at their parents in front of the boys, and keeping their father handcuffed unnecessarily in front of the boys, constituted serious abuses of power and authority.

111.    Officers' actions – including their inaction in the form of failing to intervene to request that fellow officers stop using excessive force - were directed towards *five- and nine-year-old children*.  The boys' sensitivity and vulnerability to such trauma-inducing violence was or should have been known to officers.

112.    Officers' conduct was undertaken pursuant to, and is part of a long-standing and widespread pattern and practice, *de facto* policy or *MO* of Chicago police officer use of excessive force that includes the use of unnecessary force against and/or in the presence of children.

### COUNT I – 42 U. S. C. § 1983 *MONELL* POLICY CLAIM
### AGAINST THE CITY OF CHICAGO (Plaintiffs Peter and Jack Mendez only)

113.    Plaintiffs Peter and Jack Mendez re-allege all paragraphs 1-112 above and incorporate them into this count, including the *Monell*-related allegations of paragraphs 21-27 and 35-38.  They assert this claim against defendant City of Chicago.

114.    Defendant officers' use of excessive force against and in the presence of Peter and Jack Mendez was directly and proximately caused by one or more of the following three, specific, long-standing, interrelated, *failures* of official policy, *lack* of official policy, *de facto* policies, widespread practices, and/or customs of the City of Chicago:  1) a pattern and practice of using unnecessary or excessive force against children (ages 0-14); 2) a systemic failure to investigate and discipline and/or otherwise correct allegations/incidents of officer excessive force against children; and 3) an absence of official policy and training to avoid the

unnecessary or excessive use of force against and in the presence of children. Each of these policies existed for more than five years prior to November 7, 2017 ("the *Monell* period").

115.     First, defendant City of Chicago has a long-standing, pervasive practice and custom of failing to adequately investigate, intervene with and discipline or otherwise correct officers for the use of excessive force involving children (ages 0-14), including unnecessary force directed at children and/or at adult family members in the presence of children.

116.     This set of City's widespread practices or customs directly encouraged, authorized and caused officers' conduct toward Peter and Jack Mendez. The City's historical failure, leading up to November 7, 2017, to properly intervene in, investigate and discipline officer excessive force, especially excessive force against or in the presence of young children, caused officers to act without appropriate restraints in the presence of Peter and Jack.

117.     The City was on notice of each of these failures of official policy from the specific conclusions reached by and the data contained in the 2017 U. S. Department of Justice investigative report and the 2016 PATF report (citations above).

118.     Second, defendant officers' conduct towards and in the presence of Peter and Jack was undertaken as a direct consequence of defendant City of Chicago's long-standing failure to have *any* affirmative, official policies and/or training explicitly requiring officers to avoid using unnecessary or excessive force against children or against their adult relatives in the children's presence whenever possible.

119.     Even after the findings of the U. S. Department of Justice investigation and the Mayor's PATF were known to City policy makers, the City failed to implement or announce implementation of any reforms that purported to remedy the pattern and practice of

unnecessary use of force against and/or in the presence of children, a failure which amounted to a deliberate choice not to take action to prevent the violation of plaintiffs' constitutional rights. City and CPD's failure to implement these explicit policies, reforms and priorities was a cause of the injuries to Peter and Jack Mendez. This lack of official policies, training reforms includes:

a. The continued absence of any provision in CPD's official use of force policy that would explicitly guide or require officers to avoid using force against or in the presence of children, or to use a trauma-informed approach to the use of force in situations where children are present and some force may necessary;

b. CPD's continued failure to add, in its official use-of-force training curriculum and/or its on-the-job training and supervision of officers, any explicit guidance or requirement that officers should avoid using force against or in the presence of children, or to use a trauma-informed approach to the use of force in situations where children are present and some force may be necessary;

d. CPD's continued failure to require officers seeking residential search warrants to make reasonable efforts before obtaining and/or executing the warrant to determine, through investigation and surveillance, (a) whether children reside in the residence, (b) to avoid entry and search at times when children are likely to be present (c) to de-escalate themselves or change tactics when they unexpectedly encounter young children, and/or (d) to take other precautions to avoid traumatizing children, such as avoiding placing parents and grandparents in handcuffs in the children's presence;

e. CPD's rebuff, both before and since the U. S. Department of Justice and PATF reports were released, of national and local legal and/or community organizations that have offered to provide training on trauma-informed policing with children

and/or offered model use-of-force policies that included explicit provision for avoiding the unnecessary use of force against and in the presence of children; and

> f.     City's and CPD's refusal or failure to propose or agree to any explicit protections for children from excessive force or any provisions requiring a trauma-informed approach to policing children in the federal consent decree it negotiated with the State of Illinois.

120.    Third, the City's lack of official policies to protect children from unnecessary officer use of force, combined with its failure to hold accountable officers who use unnecessary force involving children, have resulted in a *de facto* City policy and practice of using unnecessary or unreasonable force against young children and/or in their presence, as concluded by the U. S. Department of Justice investigation into the Chicago Police Department and the PATF.  The excessive force used against or in the presence of Peter and Jack Mendez was an example of and the result of this *de facto* policy.

121.    Through their combined failures, before and after notice, to enact official policies that protect children from unnecessary force and to hold accountable officers who use excessive force against children, the City has led police officers to be confident that such actions are acceptable and will not be challenged, investigated or disciplined by CPD, CPD's Bureau of Internal Affairs ("BIA"), the Chicago Police Board, the Independent Police Review Authority ("IPRA") or the Civilian Office of Police Accountability ("COPA").  These past failures directly authorized, encouraged and emboldened defendant officers' conduct against and in the presence of Peter and Jack, providing them a general license to use excessive force involving children whenever it suits them.

122.     Through their combined failures, before and after notice, to enact official policies protecting children from unnecessary force and to hold accountable officers who use excessive force against children, final City of Chicago policy-makers – including the Superintendent of police, the Administrator of IPRA (now COPA), the head of CPD's BIA, the Mayor, and the Chicago City Council – condoned, approved, facilitated, encouraged and perpetuated a *de facto* City policy and practice of unnecessary or excessive force against or in the presence of young children.

123.     During all times relevant to the incident involving Peter and Jack Mendez, a "code of silence" pervaded the police accountability system in Chicago, including CPD's BIA, the Chicago Police Board, IPRA and COPA, contributing to these agencies' collective failure to properly investigate and discipline officer excessive force, including excessive force against children.  Defendant officers' conduct toward Peter and Jack, including their failure to intervene and failure to report the actions of their colleagues, was the direct result of the long-standing and systematic code of silence at work in the City's police investigative and disciplinary systems.

124.     By means of its pervasive customs and practices above and its failures, after notice, to remedy officers' use of unnecessary force against and/or in the presence of young children, defendant City of Chicago has manifested and manifests deliberate indifference to the deprivation of Peter and Jack Mendez's constitutional rights.

125.     One or more of these three polices, practices and customs collectively, directly and proximately caused the violations of Peter and Jack's constitutional rights set forth above and below and the resulting injuries, such that the City of Chicago is liable for officers' use of excessive force against them and/or in their presence.

***The City of Chicago's <u>De Facto</u> Policies Resulted in Violations of Peter and Jack Mendez's Constitutional Right to be Free of Unnecessary or Excessive Force***

126.     Officers' conduct toward each Peter and Jack constituted excessive force, in violation of their rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

127.     Under the circumstances, officers' displays of force against and in the presence of young children was totally unnecessary, unreasonable and unjustifiable.

128.     Under the circumstances, officers' uses of force against Mr. and Mrs. Mendez, undertaken in the presence of and witnessed by Peter and Jack, was totally unnecessary, unreasonable and unjustifiable.

129.     Officers failed to intervene to stop any use of force.

130.     Officers' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Peter and Jack's constitutional rights.

131.     Officers' misconduct was undertaken with malice, willfulness, and recklessness indifference to the rights of others.

132.     The officers' misconduct was undertaken pursuant to and as the direct and proximate result of the Defendant City of Chicago's *de facto* policy, failures of official policy, absences of affirmative policy, and pervasive, long-standing practices and customs, as set forth above, such that defendant City of Chicago is liable for officers' use of unnecessary force against and in the presence of Peter and Jack.

133.     As the direct and proximate result of officers' misconduct, plaintiffs Peter and Jack Mendez have suffered and continue to suffer severe, long-term emotional and mental distress and trauma, including lasting or permanent psychological injury.

134.     One or more officers had a reasonable opportunity to prevent or stop the violations of Peter and Jack's constitutional rights but stood by and failed to take any action.

24

135.    Officers' inactions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to Peter and Jack's constitutional rights.

136.    As set forth above, the officer misconduct was undertaken pursuant to the *de facto* policies, long-standing and pervasive practices and customs of defendant City of Chicago, such that the City of Chicago is also liable for officers' failure to intervene.

137.    As the direct and proximate result of officers' misconduct, Peter and Jack Mendez suffered and continue to suffer injury and harm.

### COUNT II – UNLAWFUL SEARCH – INVALID WARRANT
### - 42 U. S. C. § 1983 (All Plaintiffs)

138.    Plaintiffs re-allege paragraphs 1 – 109 above and incorporate them into this count.  All plaintiffs assert this claim against defendant officers Capello, Dari, Guzman and any other as yet unknown officers who participated in obtaining the search warrant for plaintiffs' apartment.

139.    These officers unreasonably obtained or approved a search warrant for plaintiffs' apartment, the wrong apartment, a fact which invalidated the warrant from the start, prior to execution.

140.    Officers' subsequent unauthorized entry and search violated plaintiffs' Fourth Amendment right to be free from unreasonable searches of their persons and homes.

141.    Moreover, officers failed to "knock-and-announce" in circumstances where it was required.

142.    As the sworn applicant for the warrant, officer Capello had a duty to discover and disclose to the issuing magistrate whether he had identified the correct apartment or place to be searched and not the residence of an innocent third party.

143.    Officer Capello and the officers named in this count reasonably knew or should have known that one or both intended target(s) of his warrant resided in the building's third floor apartment and that plaintiffs resided in the second floor apartment.

144.    Officer Capello and the other officers had a duty to reasonably investigate and verify information he received from his John Doe complainants who provided him with information about where the intended targets resided.

145.    Such an inquiry was easy to make.  Officer Capello and other officers had multiple sources of information available to them at the time, had they bothered to use them. They could have contacted the building's landlord.  They could have contacted a utility company supplying energy to the building.  They could have utilized CPD's own information sources, such as Accurint, which assists officers in identifying apartments and the persons residing in them.

146.    However, on information and belief, officer Capello and others did not conduct any investigation or verification or failed to conduct a reasonable one.

147.    Consequently, in their complaint for search warrant defendant officers identified the wrong apartment, plaintiffs' apartment, a place they never had probable cause to enter and search.  Because of officers' failed to independently investigate and verify the place to be searched, theirs was not a good faith error.

148.    Lieutenant Dari approved officer Capello's application for search warrant without ensuring that officer Capello and other officers had performed the due diligence required by CPD Special Order S04-19.

149.    Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

26

150. As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### *Defendant Officers' Conduct Was Willful and Wanton or Grossly Negligent*

151. Defendant officers' conduct under this count merits an award of punitive damages to plaintiffs. Defendant officers' shocking inaction in failing to perform required and basic reasonable due diligence to verify the correct location for a search warrant before raiding and searching citizens' residence constituted an abuse of power and authority. Defendant officers' actions – of relying solely on location information provided by a John Doe confidential informant who was a convicted felon with numerous prior arrests for handling and selling narcotics and not conducting their own investigation and surveillance to verify the correct address, then failing to immediately stop searching, remove handcuffs from Mr. Mendez and leave plaintiffs' apartment - were directed towards honest, hard-working citizens who were totally innocent of all criminal conduct.

152. Defendant officers' conduct toward plaintiffs was undertaken with willful and wanton disregard for the rights of others. Officers acted with actual intention or with a conscious disregard or indifference for the consequences when the known safety and health of plaintiffs was involved. Defendant officers acted with actual malice, with deliberate violence, willfully or with such gross negligence as to indicate a wanton disregard of the rights of others.

153. In light of the character of defendant officers' actions toward plaintiffs and the lasting or permanent psychological injury that defendants' conduct has caused plaintiffs, especially Peter and Jack Mendez, defendants' conduct merits an award of punitive damages.

### COUNT III – SUPERVISORY LIABILITY – UNLAWFUL SEARCH – INVALID WARRANT – 42 U. S. C. § 1983 (All Plaintiffs)

154.     Plaintiffs re-allege paragraphs 1 – 109, 138-153 above and incorporate them into this count.  All plaintiffs assert this claim against defendant officer Sgt. Egan.

155.     As alleged above, officer Cappello and other officers violated plaintiffs' Fourth Amendment rights by obtaining and exhibiting a search warrant for their apartment, the wrong apartment.

156.     When defendant Egan supervised defendant officer Capello's complaint for search warrant investigation before it went to the state's attorney and judge, he failed to ensure that officer Capello performed independent investigation and surveillance to verify that the address and apartment number provided by the John Doe confidential informant was accurate.  Such verification was essential to establishing probable cause for the targets' location, as well as to protecting cititzens who were not criminal suspects.

157.     Defendant Egan did not ensure that officer Cappello had verified, through investigation or surveillance, that the address the informant gave him was correct.

158.     On information and belief, defendant Egan knew and should have known that officer Cappello was about to present to the state's attorney and judge, and then to execute, a search warrant that lacked probable cause with respect to 3557 S. Damen, second floor. Alternatively, Defendant Egan was aware that officer Cappello has a practice of conducting poor investigations in similar situations.  Defendant Egan knew that Cappello's warrat was about to violate plaintiffs' Fourth Amendment rights.

159.     But Defendant Egan nevertheless approved, assisted, condoned or purposely ignored the hole in officer Cappello's search warrant investigation and the impending violation of plaintiffs' Fourth Amendment rights.

160.    Defendant Egan had or undertook the authority, duty, and ability to supervise officer Cappello and to ensure that he verified that the apartment provided by the informant was the correct location to be searched.

161.    Defendant Egan's actions and omissions were a proximate cause of the ensuing illegal search of plaintiffs' apartment and the resulting injuries that plaintiffs suffered. Had defendant Egan properly supervised officer Cappello, the warrant would not have been executed in plaintiffs' apartment, and plaintiffs would not have been injured.

## COUNT IV – UNLAWFUL SEARCH/WARRANTLESS "ENTRY"/
## FAILURE TO RETREAT – 42 U. S. C. § 1983 (All Plaintiffs)

162.    Plaintiffs re-allege paragraphs 1 – 109 and 151-153 above and incorporate them into this count.  All plaintiffs assert this claim against defendant officers Capello, Donnelly, Egan, Guzman, Hernandez, and Sehner.

163.    These officers' actions of continuing to remain within and search plaintiffs' apartment well after they were on notice that they had entered and were searching the wrong apartment (not the apartment where the intended targets of the warrant resided) constituted a violation of plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures.

164.    From the moment officers were on notice that they had entered and were searching the wrong apartment, they no longer were authorized to search plaintiffs' home, and they were obligated to cease immediately.  They knew they lacked probable cause, and no exigent circumstances existed that justified a warrantless entry or a continued search.

165.    In the alternative, based on information they gained from and about plaintiffs immediately after entry, officers knew or reasonably should have known that a mistake

29

had been made during the process of obtaining the warrant and that, as a result, officers were at the wrong residence and lacked probable cause.

166.    While executing the warrant, officers received detailed information that put them on notice that they had entered and were searching the wrong apartment (i.e., not the targets' apartment).  As indicted in bodycam video, several of them acknowledged among themselves that they were in the wrong apartment.

167.    Nevertheless, officers did not stop searching; well after they became aware the warrant was drawn for the wrong apartment, they remained in plaintiffs' apartment and continued searching.  Sergeant Egan ordered them to continued searching even after having notice they were in the wrong apartment.

168.    One or more officers had a reasonable opportunity to prevent or stop the violations of plaintiffs' constitutional rights but stood by and failed to take any action.

169.    Officers' actions in these respects were objectively unreasonable and were undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

170.    As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

### COUNT V – FALSE ARREST AND FALSE IMPRISONMENT – 42 U. S. C. § 1983 (Plaintiffs Mendez and Hester Mendez)

171.    Plaintiffs re-allege paragraphs 1 – 109 and 151-153 above and incorporate them into this count.  Mr. and Mrs. Mendez assert this claim against defendant officers Capello, Donnelly, Egan, Guzman, Hernandez, and Sehner.

172.    Officers arrested and imprisoned Mr. and Mrs. Mendez in their own home when, (a) without a warrant for his arrest and without probable cause to arrest him, they (a) handcuffed and/or confined them in their home and (b) kept them handcuffed and/or confined

long after they became aware that they were not the persons identified in the warrant and that the warrant was for the wrong apartment (and not the apartment where the intended targets of the warrant resided).

173.     Officers' actions constituted a violation of the Mendez's Fourth Amendment right to be free from unreasonable searches and seizures.

174.     When officers handcuffed and/or confined Mr. and Mrs. Mendez, they unlawfully deprived them of their liberty to move about, despite the fact that they had done nothing illegal and that officers had no probable cause for their arrest and imprisonment.  This violated plaintiffs' rights under the Fourth and Fourteenth Amendments to the U. S. Constitution.

175.     One or more officers had a reasonable opportunity to prevent or stop the violations of plaintiffs' constitutional rights but stood by and failed to take any action.

176.     Through physical force and the invalid use of legal authority, officers acted to arrest, restrain and confine plaintiffs to a bounded area.

177.     Plaintiffs were acutely aware of and were harmed by officers' confinement, as detailed above.  *Inter alia*, Mr. Mendez was extremely concerned about his sons and was unable to hug and physically comfort them, as officers would not let him out of handcuffs and kept him segregated from his family and confined on a separate couch.

178.     Officers' actions in this respect were objectively unreasonable and undertaken intentionally, with malice and reckless indifference to plaintiffs' constitutional rights.

179.     As the direct and proximate result of officers' misconduct, plaintiffs suffered and continue to suffer injury and harm.

## <u>COUNT VI – ASSAULT – STATE LAW (All Plaintiffs)</u>

180.     Plaintiffs re-allege and incorporate paragraphs 1 – 109 above in this count. They assert this claim against defendant City of Chicago.

181.     The actions of officers set forth above, including pointing guns at close range at plaintiffs, created reasonable apprehensions in plaintiffs of immediate harmful contact to plaintiffs' persons and that of their parents.

182.     The officers intended to bring about apprehensions of immediate harmful contact in plaintiffs or knew that their actions would bring about such apprehensions.

183.     In the alternative, the conduct of defendant was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

184.     The conduct of defendant in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

185.     The Officers' actions were the direct and proximate cause of plaintiffs' apprehensions.

186.     Plaintiffs have been seriously harmed by officers' actions.

## COUNT VII – BATTERY – STATE LAW (Plaintiff Gilbert Mendez)

187.     Plaintiff Gilbert Mendez re-alleges and incorporates paragraphs 1 – 109 above into this count.  He asserts this claim against defendant City of Chicago.

188. The actions of officers set forth above, including handcuffing plaintiff, who was not a target of the search warrant, brought about harmful and offensive physical contact to plaintiff's person.

189. The officers intended to bring about harmful and offensive physical contact to plaintiff's person.

190. In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

191. The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries. Numerous prior injuries have occurred to civilians in this context. Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

192. The officers' actions were the direct and proximate cause of harmful and offensive physical contact to plaintiff's person.

193. Plaintiff was seriously harmed by officers' actions.

### COUNT VIII – FALSE ARREST AND FALSE IMPRISONMENT – <u>STATE LAW (Plaintiffs Hester and Gilbert Mendez)</u>

194. Mr. and Mrs. Mendez re-allege paragraphs 1 – 109 above and incorporates them into this count. Plaintiffs assert this claim against defendant City of Chicago.

195. Officers arrested and imprisoned Mr. and Mrs. Mendez in their own home when, (a) without a valid warrant and without probable to arrest, they handcuffed and/or confined them in their home and (b) they kept them handcuffed and/or confined even after they

33

were aware that they had entered and were searching the wrong apartment (and not the apartment where the intended targets of the warrant resided).

196.     Officers' actions restrained Mr. and Mrs. Mendez and confined them to bounded areas.

197.     Officers intended to restrain and confine plaintiffs to bounded areas within their home.

198.     In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

199.     The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

200.     Officers' actions caused the restraint and confinement of plaintiffs to bounded areas within their home.

201.      Plaintiffs were harmed by officers' actions in restraining and confining them, as detailed above.

## COUNT IX - INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – STATE LAW (Plaintiffs Peter and Jack Mendez)

202.     Plaintiffs Peter and Mendez and Jack Mendez re-allege and incorporate paragraphs 1 – 109 above in this count and assert this claim against defendant City of Chicago.

203.     The actions, omissions and conduct of officers set forth above were extreme and outrageous and exceeded all bounds of human decency.

34

204.    Officers' actions, omissions and conduct above were undertaken with the intent to inflict and cause severe emotional distress to plaintiffs, with the knowledge of the high probability that their conduct would cause such distress or in reckless disregard of the probability that their actions would cause such distress.

205.    Officers, who occupied positions of special trust and authority, knew, had reason to know or believed that plaintiffs, who were young children, were especially vulnerable and fragile.

206.    As a direct and proximate result of officers' extreme and outrageous conduct, undertaken pursuant to the City's policies and practices as set forth above, plaintiffs suffered and continue to suffer long-term, severe emotional distress and trauma.

207.    In the alternative, officers owed plaintiffs a duty of care that they breached when they pointed guns at them, pointed guns at their mother and father, and kept their father handcuffed after they knew they were in the wrong place and that he did not pose a threat. Plaintiffs are direct victims of officers' negligent infliction of emotional distress.

208.    In the alternative again, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

209.    The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

210.    Officers' conduct was a proximate cause of plaintiffs' injuries and their extreme, severe, long-term emotional distress and trauma.

### COUNT X - TRESPASS – STATE LAW (All Plaintiffs)

211.    Plaintiffs re-allege paragraphs 1 – 109 above and incorporate them in this count.  Plaintiffs assert this claim against defendant City of Chicago.

212.    Officers physically invaded plaintiffs' right to and enjoyment of exclusive possession of their apartment.

213.    After officers were aware that the search warrant listed plaintiffs' apartment by mistake, such that any lawful right of entry expired at that time, by remaining and continuing to search officers intended to bring about a physical invasion of plaintiffs' apartment.

214.    In the alternative, the conduct of defendants was willful and wanton and constituted a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others and/or their property.

215.    The conduct of defendants in entering and executing a residential search warrant are generally associated with a risk of serious injuries.  Numerous prior injuries have occurred to civilians in this context.  Officers failed to take reasonable precautions after having knowledge of impending danger to plaintiffs.

216.    Officers' actions caused a physical invasion of plaintiffs' apartment.

217.    Plaintiffs were harmed by officers' physical invasion of their apartment.

### COUNT XI – *RESPONDEAT SUPERIOR* – STATE LAW  *(All Plaintiffs)*

218.    Plaintiffs re-allege paragraphs 180 – 217 above and incorporate them into this count.  Plaintiffs assert this claim against defendant City of Chicago.

219.    In committing the acts and omissions alleged above, officers were at all times members and agents of CPD and the City of Chicago and were acting within the scope of their employment.

220.    Defendant City of Chicago is, therefore, liable as principal for all common law torts committed by its agents within the scope of their employment.

## COUNT XII – INDEMNIFICATION – STATE LAW (All Plaintiffs)

221.    Plaintiffs re-allege and incorporate paragraphs 180-217 above.  Plaintiffs assert this count against defendant City of Chicago.

222.    Illinois law, 745 ILCS 10/9-102, directs public entities to pay any common law tort judgment for compensatory damages for which employees are held liable within the scope of their employment activities.

223.    Involved officers were and are employees of the City of Chicago who acted within the scope of their employment when committing the actions and omissions detailed above.

## PRAYER FOR RELIEF (ALL COUNTS)

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendants on each count for:

a.    Compensatory damages;

b.    Punitive damages under counts II-X;

c.    Reasonable attorney's fees and litigation costs and expenses; and

d.    Such other or further relief as the Court deems just.

Respectfully submitted,

s/Al Hofeld, Jr.
Al Hofeld, Jr.

s

Al Hofeld, Jr.
Law Offices of Al Hofeld, Jr., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com
www.alhofeldlaw.com

## JURY DEMAND

Plaintiffs demand trial by jury.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

## NOTICE OF LIEN

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.

s/Al Hofeld, Jr.
Al Hofeld, Jr.

## NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Al Hofeld, Jr., an attorney for plaintiffs, hereby certify that on September 26, 2019, filing and service of the foregoing *Fourth Amended Complaint* was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

<u>s/Al Hofeld, Jr.</u>
Al Hofeld, Jr.

Al Hofeld, Jr.
Law Offices of Al Hofeld, Jr., LLC
30 N. LaSalle Street, Suite #3120
Chicago, Illinois 60602
(773) 241-5844
Fax - 312-372-1766
al@alhofeldlaw.com
www.alhofeldlaw.com