## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| HESTER MENDEZ, et al. | ) | Case No. 18-cv-5560 |
| | ) | |
| Plaintiffs, | ) | Judge John Z. Lee |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| THE CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' JOINT RULE 56.1 STATEMENT OF UNDISPUTED FACTS

NOW COME Defendants OFFICERS JOSEPH T. CAPELLO IV (#10626); LIEUTENANT SAMUEL DARI (#603); MICHAEL W. DONNELLY (#13784); SERGEANT RUSSELL A. EGAN (#998); MICHAEL J. GUZMAN (#15911); JOSE M. HERNANDEZ (#15925); and ERIC M. SEHNER (#11641), ("Defendant Officers"), by and through their attorneys, Querrey & Harrow, Ltd., and Defendant City of Chicago, by and through its attorney, Celia Meza, Corporation Counsel for the City of Chicago, (collectively, "Defendants") and pursuant to Local Rule 56.1, provide the following statement of undisputed facts:

### I.      VENUE AND JURISDICTION

1.      Plaintiffs filed an action for money damages pursuant to 42 U.S.C. § 1983. (Plaintiffs' Fourth Amended Complaint, Dkt. 125, attached as Exhibit 1).

2.      Jurisdiction for Plaintiffs' claims is premised on 28 U.S.C. §§ 1331, 1343, and 1367, and venue is proper in this Court pursuant to 28 U.S.C. § 1391 as the alleged events giving rise to the claims asserted by Plaintiffs occurred within this district. (Ex. 1, Dkt. 125).

## II. PARTIES

3. Plaintiffs resided within the jurisdiction of this Court at all relevant times. (Ex. 1, Dkt. 125).

4. The City of Chicago is an Illinois municipal corporation, and Defendant Officers Cappello, Donnelly, Guzman, Hernandez, and Sehner are police officers employed by the City of Chicago, Defendant Sergeant Egan is a police sergeant for the City of Chicago, and Defendant Lt. Dari is a police lieutenant of the City of Chicago. (Ex. 1, Dkt. 125; Defendants' Answers and Affirmative Defenses to the Fourth Amended Complaint, attached as Exhibit 2).

## III. FACTS

**A. The Procurement and Issuance of the Search Warrant For Plaintiffs' Residence**

5. Sgt. Egan and Officer Sehner arrested the J. Doe on November 6, 2017, following a traffic stop and vehicle pursuit during which Officers recovered approximately 50-80 bags of heroin that were packaged for sale. (Deposition of Officer Cappello, at 130:4-18, attached as Ex. 3; Deposition of Officer Donnelly, attached as Exhibit 4, at 34:13-24 – 35:1-2, 43:3-8; Deposition of Officer Sehner, attached as Exhibit 5, at 153:24 - 154:1-8; Deposition of Sgt. Egan, attached as Exhibit 6, at 72:21-24, 73:8-16).

6. The J. Doe informed Officers he received his drugs from Curtis Roberts, who was known to be heavily involved in dealing narcotics in the 11th District and for whom he had been dealing drugs for over a year and provided Officers with information regarding Curtis Roberts, who he had known for ten years, and his girlfriend Patricka Cavazos, who he had known for two years, including the fact that Curtis Roberts was bald and had three stars tattooed on his head. (Complaint for Search Warrant and Search Warrant, attached as Exhibit 7, at 2; Ex. 3 - Cappello, at 131:8-24,

147:10-17, 261:14-20; Ex. 4 - Donnelly, 43:12-24, 76:5-13, 222:11-12 – 223:1-3; Ex. 6 - Egan, at 90:21-24).

7.      Since it was the first search warrant for which Officer Cappello was the affiant officer, Sgt. Egan supervised his investigation by walking him through the process of what was needed for the search warrant, advising him to verify the J. Doe's information, re-interviewing the J. Doe, assisting him with having the Cook County State's Attorney's Office felony review division and the Judge review and approve the search warrant. (Ex. 3 - Cappello, at 33:2-14, 133:3-21, 171:16-22; Ex. 6 - Egan, at 31:14-19, 40:11-24, 43:18-22 – 45:22).

8.      Officer Cappello and Officer Donnelly interviewed the J. Doe over a 45–60-minute period during which the J. Doe stated that he had been in the second floor apartment at 3557 S. Damen on November 4th at which time he went into Curtis Roberts and Patricka Cavazos's bedroom where Curtis Roberts grabbed an Adidas gym bag from next to the TV stand that contained four bags of suspect heroin and cocaine, and further stated he had been in the second floor apartment at 3557 S. Damen on five separate occasions during which he observed narcotics and a large amount of currency; Sgt. Egan reinterviewed him and received the same information. (Ex. 7 - Complaint for Search Warrant and Search Warrant; Ex. 3 - Cappello, at 138:10-13, 140:8-24 – 141:1-16, 145:8-19; Ex. 4 - Donnelly, at 42:9-21).

9.      Specifically, the J. Doe informed Officers that there was about a kilo of heroin, other narcotics, and possibly handguns in the 2nd Floor apartment located at 3557 S. Damen and that he knew Curtis Roberts to carry firearms. (Ex 4 - Donnelly, at 38:21-24 – 39:1-2, 39:12-18, 40:2-6; Ex. 6 - Egan, at 90:14-19).

10. The John Doe explained that to reach the target residence, the officers were to make entry into the common area/foyer, open another door, and then go up the flight of stairs and that the target residence would be the first door on the right-hand side. (Ex. 3 - Cappello, at 127:3-14).

11. After Officer Cappello advised Sgt. Egan of the information he received from the J. Doe, Sgt. Egan re-interviewed the J. Doe and received the same information. (Ex. 6 - Egan, at 74:18-24 – 75:1-3).

12. Officer Cappello used the resources he had available to him as a CPD patrol officer to verify the targets of the search warrant lived at that location. (Ex. 3 - Cappello, at 13:6-18, 176:9-24, 177:1-24, 178:1-21, 197:17 - 199:3, 251:6-8).

13. When the targets' names were run on a law enforcement database known as "LEADS," it was determined that they did not have any listed address at the building located at 3557 S. Damen. (Ex. 3 - Cappello, at 14:1-2; Ex. 4 -Donnelly, at 41:4-6; Ex. 6 -Egan, at 59:3-9).

14. In Officer Cappello's experience as a police officer, targets of search warrants sometimes do not have a listed address available to him in the databases and criminals are not always honest about where they are actually living. (Ex. 3 - Cappello, at 14:3-5, 179:16-24 – 180:1-8, 262:11-16).

15. Sgt. Egan and Officer Cappello did not have access to Accurint or LexisNexis in November of 2017, and they did not contact the property owner/manager or any utility company because they did not want to risk the targets being tipped off to their investigation. (Ex. 3 - Cappello, at 188:12-24 – 189:1-24; Ex. 6 - Egan, at 60:7-10, 61:6-17, 62:2-8, 78:2-24, 79:1-24, 80:1-12).

16. The J. Doe positively identified Curtis Roberts and Patricka Cavazos from their booking photos and positively identified the second-floor residence from the photos of the residence and from a video of the second floor apartment that was obtained from a real estate website. (Ex. 3 -

Cappello, at 147:2-6, 149:16-20, 150:2-9, 150:13-18, 184:1-8, 316:6-16; Ex. 4 - Donnelly, at 45:1-14, 46:13-23, 48:4-17).

17.     The John Doe told Officer Cappello that there were young children between the ages of 4-6 inside of the targets' apartment and that he was aware of several other children being over there from time to time. (Ex. 3 - Cappello, at 128:6-12, 128:22-24 – 129:1-4, 157:1-10; Ex. 4 - Donnelly, at 53:8-24; Deposition of Lt. Dari, attached as Ex. 8, at 42:14-20; Deposition of Officer Guzman, attached as Ex. 9, at 46:15-18).

18.     Per Sgt. Egan's instructions, Officer Cappello and Officer Donnelly then drove the John Doe past the target location two times during which he pointed out the second floor target residence several times as the place where he observed the narcotics. (Ex. 3 - Cappello, at 135:9-13, 138:14-23; Ex. 4 - Donnelly, at 11:22-24 – 12:1-2, 36:17-22, 150:23-24 – 151:1-13, Ex. 6 - Egan, at 46:18-20, 53:8-16).

19.     Sgt. Egan and Officer Cappello believed the information provided by the J. Doe was very credible especially since the J. Doe referred to Curtis Roberts as his cousin and because he provided very valuable information, some of which was already known to officers, regarding the target and narcotics sales in the District. (Ex. 3 - Cappello, at 146:14-22, 155:3-11, 250:1-3, 260:9-24, 274:7-15, 320:17-23, 321:1-16; Ex. 6 - Egan, at 84:20-24, 86:19-23, 87:1-13).

20.     Officer Cappello wrote the complaint for search warrant and search warrant with some input from Sgt. Egan and Felony Review, after which Sgt. Egan reviewed the documents and determined they accurately reflected what the J. Doe had told them. (Ex. 6 - Egan, at 47:2-16, 83:20-24, 84:10-15).

21.     The Complaint for Search Warrant and Search Warrant included numerous details including information about the targets and contraband being sought and, most importantly, a

description that the premises to be searched was "a brown brick multiunit family building located at 3557 S. Damen Avenue, 2nd Floor, Chicago, Cook County, Illinois." (Ex. 7 - Complaint for Search Warrant and Search Warrant).

22.     While Officer Cappello was meeting with felony review, Sgt. Egan conducted surveillance of the building located at 3557 S. Damen for about 15-20 minutes to see who was coming and going. (Ex. 6 - Egan, at 48:8-20, 49:1-3).

23.     ASA Glen Runk ultimately approved the search warrant after speaking to Officer Capello and Sgt. Egan, asking questions and having them make corrections. (Ex. 7 - Complaint for Search Warrant and Search Warrant; Ex. 6 - Egan, at 121:23-24 – 122:1-2, 17-24, 123:1-3; Deposition of ASA Glen Runk, at 16:7-20, 42:1-11, attached as Exhibit 10).

24.     On November 7, 2017, Officers Donnelly and Guzman transported the J. Doe to 26th and California and remained outside of the courtroom while Officer Cappello and Sgt. Egan presented the J. Doe to the Judge. (Ex. 4 - Donnelly, at 36:23-24, 37:1-24, 38:1-9; Ex. 9 - Guzman, at 13:6-8).

25.     Judge Burns approved the search warrant after hearing sworn testimony from the J. Doe, in the presence of Sgt. Egan, Officer Cappello, and Officer Hernandez, which consisted of testimony about, among other things, the J. Doe's arrest the night before, his criminal background, how many times he had sold drugs for the target, and if he had been incarcerated, and after going over the search warrant with Officer Cappello. (Ex. 7 - Complaint for Search Warrant and Search Warrant; Ex. 3 - Cappello, at 137:20-24 – 138:1-4, 221:1-24 – 225:12; Ex. 6 - Egan, at 124:3-24 – 125:1-12, 126:6-14, 127:13-14; Deposition of Officer Hernandez, attached as Exhibit 11, at 14:4-16).

26.     Lt. Dari, who reviewed and approved the complaint for search warrant and search warrant on November 7, 2017, after they were already approved by ASA Runk and Judge Burns, believed that there was sufficient probable cause to search the 2nd floor apartment at 3557 S. Damen

based on the information contained within the documents, the officers' judgment and paperwork, and the fact that the Assistant State's Attorney and the Judge had already signed off on it. (Ex. 8 -Dari, at 23:6-17, 25:21-22, 29:2-12, 30:10-15, 46:14-19, 54:8-19, 59:6-12, 103:2-23, 106:10-18; Ex. 6 - Egan, at 108:14-19).

27.     Officer Cappello interviewed the J. Doe again shortly before the search warrant was serviced to go over everything the J. Doe had told him, including the directions for reaching the target apartment. (Ex. 3 - Cappello, at 141:1-7-24).

28.     Officers Guzman, Sehner, and Hernandez had no involvement in the search warrant investigation and had no involvement in procuring the search warrant. (Ex. 9 - Guzman, at 13:6-8, 16:2-21, 113:11-24, 114:1-10, 115:21-24 – 116:1-6, 118:8-16; Ex. 5 - Sehner, at 19:4-24; 152:18-23, 156:6-19; Ex. 11 - Hernandez, at 11:11-23, 36:17-23).

29.     The Defendant Officers were unaware that they were given the wrong information and were unaware that the targets actually lived on the third floor of 3557 S. Damen Avenue while Plaintiffs lived on the second floor of the building. (Ex. 3 - Cappello, at 11:10-16; Ex. 12 - Hester Mendez at 10:3-7; Ex. 4 - Donnelly, at 122:4-24 – 123:1-10, 150:17-23, 160:9-24; Ex. 6 - Egan, at 197:9-19, 263:6-10; Ex. 9 - Guzman, at 72:7-19, 74:10-16, 75:1-7, 76:20-24 – 77:1-10, 81:10-24 – 82:1-24 – 83:1-2, 87:15-23; Ex. 5 - Sehner, at 105:17-24, 106:12-24 – 107:1-3, 141:21-24 – 142:1-11; Ex. 11 - Hernandez, at 106:10-24 – 107:1-3, 114:23-24 – 115:1-15, 126:18-24 – 127:1, 137:6-10).

**B.     The November 7, 2017 Execution of the Search Warrant**

30.     There were two pre-execution meetings on November 7, 2017, during which Officers were shown photographs of Mr. Roberts and Ms. Cavazos and Google Street images of the building where the residence was located, and provided information pertaining to the search warrant, including everyone's role, the directions to the second floor residence, what contraband was expected to be

found in the residence, and the fact that children and a small dog were expected to be inside of the residence. (Ex. 3 - Cappello, at 122:7-24 – 123:1-2, 126:11-24, 127:2-14; Ex. 6 - Egan, at 135:17-24 – 136:1-7, 138:17-24 – 139:1-9; Ex. 4 - Donnelly, at 81:3-19; Ex. 9 - Guzman, at 150:8-24, 151:7-15).

31.     Mrs. Mendez was looking out the window of the second floor apartment as Officers approached the residence and made eye contact with an Officer. (Deposition of Hester Mendez, attached as Ex. 12, at 40:23-25 – 41:1-17; Ex. 4 - Donnelly, at 88:17-24; Ex. 9 - Guzman, at 29:15-17, 32:11-18, 33:1-7; Ex. 5 - Sehner, at 52:17-23; Ex. 11 - Hernandez, at 217:23-24 – 218:1-8).

32.     Due to seeing a Hispanic female observing them from the second floor and/or being told a Hispanic female was observing them from the second floor, the officers believed that Patricka Cavazos had spotted them, their cover had been blown, and that there was a risk both to their safety and to the preservation of evidence. (Ex. 3 - Capello, at 70:15-22, 71:6-8, 72:10-23, 73:3-6, 312:24 – 314:1; Ex. 4 - Donnelly, at 87:10-24, 88:1-24, 89:1-6, 218:21-24 – 219:1-15; Ex. 5 - Sehner, at 52:17-23, 53:8-18, 238:18-24 – 239:1-13; Ex. 11 - Hernandez, at 218:9-18).

33.     Four of the defendants, Officers Sehner, Donnelly, Hernandez and Guzman recorded the events of the November 7, 2017 search warrant at issue. (See Body Worn Camera Footage of Officer Sehner (QH 181), attached hereto as Exhibit 13; Officer Hernandez (QH 182), attached hereto as Exhibit 14; Officer Donnelly (QH 184), attached hereto as Exhibit 15; Officer Guzman (QH 185), attached hereto as Exhibit 16).[1]

---

[1] In order to assist with the Court's viewing of the BWC videos and the identification of the Officers seen on same, please note that Officer Cappello, who has a beard, can be seen wearing a black sweatshirt with a backwards baseball hat (Ex. 15-Donnelly BWC, at BWC clock 01:00:28-01:00:35); Officer Hernandez, a taller Hispanic man without a beard, can be seen wearing a black hoodie with white writing a the sleeve (Ex. 16-Guzman BWC, at BWC Clock: 00:53:28-00:53:43); Officer Sehner can be seen wearing a gray long sleeve jacket or hoodie with a baseball hat and glasses (Ex. 15-Donnelly BWC, at BWC clock 01:00:53-01:01:01); Officer Guzman can be seen wearing a black sweatshirt, gloves and a black hat (Ex. 13-Sehner BWC, at BWC clock 00:52:48); Officer Donnelly can be seen wearing a blue sweatshirt and baseball hat (Ex. 13-Sehner BWC, at

34.     Entry into the building and Plaintiffs' residence occurred faster in order to ensure officer safety and to prevent the destruction of evidence because Ms. Mendez (believed to be Ms. Cavazos) was watching the officers from the second floor window. (Ex. 9 - Guzman, at 29:15-20; Ex. 6 - Egan, at 259:11-24 – 260:1-12).

35.     Officers began announcing their office at the front door to the building and continued yelling "Police, Search Warrant" as they ran up the stairs to the second floor apartment for officer safety and the safety of the individuals in the target residence because Officers believed that the target of the search warrant was aware of their presence. (Ex. 13 - Officer Sehner's BWC (QH 181), at BWC Clock 00:48:58-00:49:28; Ex. 3 - Cappello, at 73:14-23, 74:1-5, 75:13-15; Ex. 5 - Sehner, at 57:5-10; Ex. 11 - Hernandez, at 89:5-8).

36.     Some of the officers had their guns out of the holster on initial entry, but they soon put them away. (Ex. 13 - Sehner BWC (QH 181) at BWC Clock 00:49:24-00:49:44; Ex. 14 - Hernandez BWC (QH 182), at BWC Clock 00:49:27-00:50:13; Ex. 15 - Donnelly BWC (QH 184), at BWC Clock 00:49:26-00:49:35).

37.     The BWC of Officers Guzman, Donnelly, Sehner, and Hernandez shows that none of these Officers aimed guns at any of the Plaintiffs, or even had guns pointed in the direction of any of the Plaintiffs as described in Plaintiffs' operative complaint. (Ex. 13-16).

38.     Capello is seen on other officers' BWCs with a rifle, but none of the officers' bodyworn footage shows Officer Cappello aiming the rifle at any of the plaintiffs. (Ex. 13-16; Compilation of BWC footage of Officer Cappello, attached as Ex.17).

---

BWC clock 00:52:56); and Sgt. Egan can be seen wearing a blue Chicago Police jacket (Ex. 15-Donnelly BWC, at BWC Clock 00:49:52-00:50:00, 00:51:32).

39. Likewise, Sgt. Egan is not shown on other Officers' BWC to have pointed his gun at any of the plaintiffs, or even to have his gun outside of his holster. (Ex. 14 - Hernandez BWC (QH 182), at BWC Clock 00:49:16-00:49:37; Ex. 15 - Donnelly BWC (QH 184), at BWC Clock 00:49:50-00:49:59; BWC footage excerpts of Sgt. Egan, attached as Ex. 18).

40. Officer Guzman used the ram to force entry and then stepped aside to let other officers enter before he entered the residence with his firearm in the low-ready position and not pointed at anyone. (Ex. 3 - Cappello, at 47:12-17; Ex. 9 - Guzman, at 19:7-11, 20:2-5, 51:15-17, 57:1-9, 59:3-14).

41. When Officer Cappello entered the residence, he turned left down the hallway and went toward the kitchen (Ex. 3 - Cappello, at 47:18-20). Officer Cappello can be seen with his rifle going in to clear a dark room off the kitchen, which is the furthest area from the living room where the children and Mrs. Mendez are located, (Ex. 13 - Officer Sehner's BWC (QH 181), at BWC Clock 00:49:37-00:49:40), before he returns to the kitchen with his rifle slung downward, (Ex. 14 - Officer Hernandez's BWC (QH 182), at BWC Clock 00:49:49-00:49:50), and then proceeds to go into the hallway where he opens a door and walks by with his rifle slung downward, (Ex. 16 - Officer Guzman's BWC (QH 185), at BWC Clock 00:50:06-00:50:18), after which he is seen standing in the living room with his rifle slung downward, (Ex. 13 - Officer Sehner's BWC (QH 181), at BWC Clock 00:50:48), before leaving the apartment to put his rifle in the police car. (Ex. 14 - Officer Hernandez's BWC (QH 182), at BWC Clock 00:51:49; Ex. 17 – Compilation of BWC footage of Officer Cappello; Ex. 3 - Cappello, at 311:1-20).

42. Officer Cappello was equipped with a pistol that remained holstered, and a rifle that was never pointed at anyone inside of Plaintiffs' residence as it was kept at the low ready position while Officer Cappello was clearing the residence and then slung downward thereafter with the safety

on the entire time during which his finger was never on the trigger. (Ex. 3 - Cappello, at 48:1-15, 50:7-10, 308:10-24 – 309:1-16, 310:20-24 – 311:1-16).

43.     Mr. Mendez, who was in the kitchen when Officers entered the residence, complied with Officer Cappello's instructions to get on the ground and laid face down on the kitchen floor. (Ex. 3 - Cappello, at 48:16-22, 49:20-22, 54:23-24 – 55:1-9).

44.     When Officer Donnelly entered the residence, he turned left toward the kitchen and then entered and cleared the bathroom where he very quickly re-holstered his firearm after having seen Mr. Mendez already being detained and hearing children, and never pointed his firearm at anyone. (Ex. 4 - Donnelly, at 93:6-20, 206:12-24 – 207:1-9; 217:5-9).

45.     When entering the residence, Sgt. Egan turned right with no weapon in his hands towards the living room, where he encountered Mrs. Mendez and the two minor Plaintiffs and explained that they were executing a search warrant. (Ex. 6 - Egan, at 154:16-24, 158:5-15, 166:20-22; Ex. 14 - Hernandez BWC (QH 182), at BWC Clock 00:49:16-00:49:37).

46.     After leaving the bathroom, Officer Donnelly went into the living room where he observed two children crying, a woman sitting on the floor, and Sgt Egan standing with no weapon in either hand. (Ex. 4 - Donnelly, at 102:5-18, 104:4-7; Ex. 15 - Donnelly BWC (QH 184), at BWC Clock 00:49:50-00:49:59).

47.     When Officer Donnelly first saw Ms. Mendez sitting on the front room floor, he believed she matched the description of the female target but eventually realized that she was not the target. (Ex. 4 - Donnelly, at 105:12-17, 106:3-11, 119:7-16).

48.     Officer Sehner, who entered the residence behind Officer Donnelly, turned left and went to the kitchen where he handcuffed Mr. Mendez, who was laying on the floor, for security reasons and because Officer Sehner did not know what was going on elsewhere in the house, another

officer had instructed him to detain Mr. Mendez, and because it was his understanding that the law allowed him to detain Mr. Mendez in handcuffs incident to the search warrant. (Ex. 5 - Sehner, at 62:16-21, 63:3-6, 69:14-23, 75:7-24, 239:23-24 – 240:1-10; Ex. 6 - Egan, at 249:9-19).

49.     The Officers' BWC footage shows that Gilbert Mendez was handcuffed without incident in the kitchen, away from the minor Plaintiffs, and that no force was used against him beyond the display of guns on initial entry. (Ex. 13 - Sehner BWC (QH 181), at BWC Clock 00:49:37-00:50:43).

50.     Officer Sehner, who holstered his firearm before he handcuffed Mr. Mendez, did not point his firearm at anyone. (Ex. 5 - Sehner, at 239:23-24 – 240:1-10).

51.     Before walking Mr. Mendez to the living room, Officer Sehner performed a brief pat down of Mr. Mendez and recovered a knife from Mr. Mendez's person. (Ex. 5 - Sehner, at 70:20-24 – 71:1-12), and later told Mr. Mendez he was not under arrest but was just being detained (Ex. 5 – Sehner, at 126:15-19).

52.     Officer Hernandez, who was the last Officer to enter the residence, went left to the kitchen where he observed Officer Sehner placing Mr. Mendez in handcuffs. (Ex. 11 - Hernandez, at 93:9-13, 98:11-15).

53.     Officer Hernandez never pointed his firearm at anyone and holstered his weapon as soon as the apartment was cleared. (Ex. 11 - Hernandez, at 218:19-24 – 219:1-5; Ex. 14 – Hernandez BWC).

54.     Plaintiff Jack Mendez has stated multiple times that Officers never pointed a firearm at him. (See Deposition of Jack Mendez, attached as Exhibit 19, at 65:22-23; Video Clip of CBS's Interview of Jack Mendez, attached as Exhibit 20).

55.     When one of the kids asked if Mr. Mendez was going to jail after he was brought into the living room, Officer Donnelly reassured him that his dad was fine and that he was not going to jail. (Ex. 4 - Donnelly, at 115:1-13).

56.     Officers could smell burnt cannabis as they entered the residence which Mr. Mendez admitted to smoking and which, in the Officer Hernandez's experience, is often linked with other drugs. (Ex. 3 - Cappello, at 64:5-12; Ex. 9 - Guzman, at 44:11-12; Ex. 4 - Donnelly, at 127:6-7, 128:2-16; Ex. 5 - Sehner, at 99:7-10; Ex. 6 - Egan, at 261:8-14; Ex. 11 - Hernandez, at 125:13-17, 228:11-21, 229:1-5).

57.     Officers believed that they were present in the second-floor apartment at 3557 S. Damen pursuant to a valid search warrant that had been signed by a judge. (Ex. 3 - Cappello, at 316:1-5; Ex. 4 - Donnelly, at 213:15-19; Ex. 5 - Sehner, at 238:13-17; Ex. 6 - Egan, at 261:3-7).

58.     Since it is not unusual for the target of a search warrant to not be present when a search warrant is serviced, police officers do not just leave and not search a residence when the target is not present. (Ex. 3 - Cappello, at 97:2-8).

59.     Officers conducted a visual once over or a surface level type search of the residence. (Ex. 4 - Donnelly, at 217:14-24 – 218:1; Ex. 9 - Guzman, at 89:9-23, 94:17-19, 96:12-14; Ex. 11 - Hernandez, at 110:13-23, 114:1-5, 116:18-21, 130:7-22, 226:14-24 – 227:1-15).

60.     After briefly looking around a few areas of the apartment, Officer Guzman exited the residence because he felt like his search was complete and he did not participate in any further search of the residence. (Ex. 9 – Guzman, at 90:4-15, 92:11-24 – 93:1-11, 108:8-14).

61.     Officers believed it was possible that Mr. and Mrs. Mendez were Patricka Cavazos's parents or that they were related to her in some way. (Ex. 4 - Donnelly, at 130:1-24 – 131:1-2; Ex. 5 - Sehner, at 132:5-18; Ex. 6 - Egan, at 262:24 – 263:1-5).

62. When asked who lived upstairs, Mrs. Mendez stated that an African American couple lived upstairs and responded "no" when Officer Cappello asked if a Hispanic girl lived upstairs thus adding to the Officers' confusion. (Ex. 4 - Donnelly, at 161:14-20, 214:11-24 – 215:1; Ex. 5 - Sehner, at 115:8-13, 243:1-16; Ex. 6 - Egan, at 262:1-7).

63. Ms. Mendez's statement that an African American couple lived upstairs did not cause Officers to think that the targets may live upstairs because the targets were an African American man and a Hispanic woman. (Ex. 5 - Sehner, at 117:10-24 – 118:1-3; Ex. 6 - Egan, at 262:9-18).

64. Although Officers may have begun suspecting that the targets may not have been connected to the second-floor residence at 3557 S. Damen, they did not definitively know that the targets were not connected with that residence until Mrs. Mendez read the search warrant and told Officers that Curtis Roberts lived upstairs on the third floor and then accurately described the targets to the Officers, including a reference to the tattoos on Robert Curtis's head. (Ex. 13 - Sehner BWC (QH 181), at BWC Clock 00:58:58-01:00:10; Ex. 15 - Donnelly BWC (QH 184), at BWC Clock 00:59:00-01:00:04; Ex. 4 - Donnelly, at 122:4-24 – 123:1-10, 150:17-23, 160:9-24; Ex. 6 - Egan, at 197:9-19, 263:6-10; Ex. 9 - Guzman, at 72:7-19, 74:10-16, 75:1-7, 76:20-24 – 77:1-10, 81:10-24 – 82:1-24 – 83:1-2, 87:15-23; Ex. 5 - Sehner, at 105:17-24, 106:12-24 – 107:1-3, 141:21-24 – 142:1-11; Ex. 11 - Hernandez, at 106:10-24 – 107:1-3, 114:23-24 – 115:1-15, 126:18-24 – 127:1, 137:6-10).

65. Gilbert Mendez had been handcuffed for a little under 11 minutes when Officer Sehner removed the handcuffs shortly after Mrs. Mendez informed Officers that the target resided upstairs, and never complained that the handcuffs hurt or were otherwise too tight. (Ex. 13 - Sehner BWC (QH 181), generally and at BWC Clock 01:00:07-01:00:26; Ex 5 - Sehner, at 140:17-24-141:15-20; Ex. 14 - Hernandez; Ex. 15 - Donnelly; Ex. 16 – Guzman).

14

66.     After Mrs. Mendez told officers that Curtis Roberts and Patricka Cavazos lived upstairs, the Officers spent a few minutes speaking with Plaintiffs about the targets of the search warrant and then left the apartment a little over 3 ½ minutes later. (Ex. 3 - Cappello, at 97:10-23, 98:1-20; Ex. 13 - Sehner BWC (QH 181), at BWC Clock 00:58:58-01:02:39).

67.     Prior to leaving the apartment, Officers apologized, shook Mr. and Mrs. Mendez's hands, and Officer Donnelly gave high fives to the minor Plaintiffs, who said "Bye Police". (Ex. 4 - Donnelly, at 215:7-21; Ex. 6 - Egan, at 263:14-21; Ex. 13 - Sehner BWC (QH 181), at BWC Clock 01:00:33-01:02:35; Ex. 15 - Donnelly BWC (QH 184), at BWC Clock 01:00:36-01:02:26).

68.     The Officers were inside Plaintiffs' residence for less than 14 minutes. (Ex. 15 - Donnelly BWC (QH 184), at BWC Clock 00:49:24-01:02:26).

## C.     Plaintiffs' *Monell* Claim

69.     Plaintiffs bring a *Monell* claim that alleges that the City has a widespread practice of using excessive force against or in the presence of minors, a widespread practice of failing to investigate and discipline the use of excessive force against or in the presence of minors, a failure to train officers to avoid the use of excessive force against or in the presence of minors and the code of silence. Ex. 1, Dkt. 125 at pp. 19-25.

70.  The parties have agreed that the relevant time period for this claim is from January 1, 2012 to December 31, 2017. Plaintiffs' Third Amended Notice of F.R.C.P. 30(b)(6) Deposition of City of Chicago, attached as Exhibit 21, at Q.

## D.     The City's Official Use of Force Policies and Facts Related Thereto

71.     The City's official policy on the use of force from 2012 to October 2017 is contained in Chicago Police Department General Order G03-02, "Use of Force Guidelines." ("Use of Force Guidelines, FCRL 00030-32, attached as Exhibit 22).

72.     "Use of Force Guidelines" explicitly cites to the U.S. Supreme Court case, *Graham v. Connor*, 490 U.S. 386 (1989) and states that "the central inquiry in every use of force is whether the

amount of force used by the officer was objectively reasonable in light of the particular circumstances faced by the officer," that "Reasonableness is not capable of precise definition or mechanical definition," and that "The reasonableness of a particular use of force will be judged under the totality of the circumstances viewed from the perspective of a reasonable officer on the scene." (Ex. 22 - Use of Force Guidelines).

73.     The City's official policy on the use of force in effect at the time of the incident is contained in Chicago Police Department General Order G03-02, "Use of Force." FCRL 99-103, attached as Exhibit 23.

74.     "Use of Force" states, among other things, that Chicago police officers "are often forced to make split-second decisions – in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation. These decisions must therefore be judged based on the totality of the circumstances known by the member at the time from the perspective of a reasonable Department member on the scene, in the same set of circumstances, and not with the benefit of 20/20 hindsight," that Chicago police officers may "only use force that is objectively reasonable, necessary, and proportional," that "Reasonableness is not capable of precise definition or mechanical application." Ex. 23 - "Use of Force," at FCRL 99-100.

75.     "Use of Force" further requires officers to comply with it and to ensure other officers comply, including reporting truthfully about uses of force that allegedly violate the policy. Ex. 23 - "Use of Force," at FCRL 102.

76.     Neither "Use of Force Guidelines" nor "Use of Force" expressly include words like "children" or "minors" because the City deems it unnecessary to specify "children" or "minors" as the policies are meant to apply to everyone; policies are general because it would be difficult to make

16

such a policy tailored to every situation or class of person. Deposition of Karen Conway Pt. 1, attached as Exhibit 24, 62:4-9; 97:18-23

77.     The Chicago Police Department strives to maintain constitutional policing and attempts to make its directives consistent with constitutional law, including its directives on use of force and search warrants, by having them reviewed by the Chicago Police Department's Office of Legal Affairs and the City's Department of Law. Ex. 24 - Conway Pt. 1, 89:24-90:10; 90:21-91:1.

78.     Under CPD's written use of force policy, it would be a violation to point a gun deliberately targeting a child who was complying with orders and doing nothing wrong. Ex. 24 - Conway Pt. 1 164:12-165:7

79.     Between 2012-2018, Chicago Police Officers arrested over 775,000 people. List of Number of Arrests per Year, 2012-2018, attached hereto as Exhibit 40.

80.     Between 2012 and 2018, Chicago Police officers arrested 101,123 juveniles. List of Juvenile Arrests, Juvenile Use of Force Incidents, and Search Warrants 2012-2018, attached hereto as Exhibit 41.

81.     Between 2012 and 2018, there were 3,194 use of force incidents with children. Ex. 41.

82.     CPD executes approximately 1,500-2500 search warrants in a given year. Ex. 41.

**E.      The City's Police Accountability System**

83.     During the beginning of the *Monell* period, the City relied upon the Independent Police Review Authority ("IPRA") to investigate, among other areas, all allegations of the use of excessive force. *See* IPRA Ordinance, attached hereto as Exhibit 46.

84.     IPRA would investigate each complaint it received as to excessive force as long as the complaining witness signed an affidavit vouching for the validity of the allegations. Deposition of Shannon Hayes[2], attached as Exhibit 25, 144: 23-145:17.

85.     A state law at the time, the Uniform Peace Officers' Disciplinary Act, generally barred the investigation of misconduct complaints that lacked an affidavit. Ex. 25 – Hayes, 138:2-139:11; 50 ILCS 725/1 et seq.

86.     The City enacted an "affidavit override" procedure that allowed investigations to proceed in cases where objective evidence could be observed that allowed for an IPRA official sufficient objective basis to believe a complaint had validity despite the lack of an affidavit and would actively seek avenues to get complaining witnesses to cooperate or to pursue an override if necessary. Ex. 25 – Hayes, 139:3-141:24.

87.     As to statistical analysis of Complaint Registers pertaining to the investigation or discipline of excessive force against children, the record does not support a showing that the number or type of CRs indicate that there is a widespread practice of using excessive force against children in the context of search warrant execution, or more broadly. Expert Report of Jeffrey Noble, paragraphs 54-62, attached hereto as Exhibit 45.

88.     Both IPRA and COPA fully investigated as objectively and thoroughly as possible. Ex. 25 - Hayes, 145:13-17.

89.     IPRA and COPA sustained allegations of use of force against a minor.  Ex. 45 - Expert Report of Jeffrey Noble, paragraph 60.

---

[2] Although the deposition of Shannon Hayes was taken in *Tate v. City of Chicago et al.*, 18 C 7439, the parties have agreed that 30(b)(6) depositions taken in that case may be used in the case at bar.

90.     IPRA and COPA engaged in the affidavit override process for complaints involving alleged use of excessive force against minors. Ex. 25 - Hayes, 111:13-112:16, 113:20-114:6.

91.     IPRA and COPA undertook reasonable investigative steps, such as canvassing, interviewing witnesses, collecting medical records, and obtaining other documentary evidence in order to ensure thorough investigations. Ex. 25 - Hayes, 140:12-141:21; Ex. 45 - Expert Report of Jeffrey Noble, paragraph 35.

92.     28 employees were disciplined for violations of Rules 14, 21, and 22 from 2012-2017. List of Sustained Rule 14, 21, and 22 Violations, attached hereto as Exhibit 43; Ex. 45, Expert Report of Jeffrey Noble at paragraph 51.

93.     194 employees resigned under investigation from 2012-2017. List of Employees who Resigned under Investigation, attached hereto as Exhibit 42; Ex. 45 - Expert Report of Jeffrey Noble, paragraph 50.

94.     These numbers demonstrate that officers were in fact disciplined and implies that officers resigned because they knew they could be disciplined. Ex. 45 - Expert Report of Jeffrey Noble, paragraphs 50, 51.

**F.      The City's Training of Officers**

95.     The City trains officers on the use of force based on its official policy, which is based on the constitutional standard set out by *Graham v. Connor*. Deposition of Trak Silapaduriyang, attached hereto as Exhibit 38, 123:4-24; Ex. 36 - Benigno I, 98:3-15.

96.     Sgt. Egan testified that in being trained in search warrants he was taught that officers were trained to be aware of children and to make it a priority to handle them tenderly and with extra care. Ex. 6 - Egan at 38:21-39:6.

97. Officers are instructed orally throughout their search warrant training to be aware and sensitive to the presence of children and to try to always create a calm environment once the premises is cleared. Deposition of Matthew Cline, attached as Exhibit 26, 120:8-16, 124:12-125:1.

98. Officers are trained to consider the totality of circumstances in the use of force, which includes the age, size, and strength of the individual. Ex. 36 - Benigno I, 110:2-9, 112:13-16, 118:9-119:17, 187:23-188:4, 218:19-220:3.

99. During the *Monell* period, the City also trained officers to use a trauma-informed approach to policing children to avoid harming their health and development. Deposition of John Benigno vol II, attached as Exhibit 27, 280:8-13.

100. This training included a course called Crisis Intervention Team-Youth training ("CIT-Youth), a course called Procedural Justice, and a course in the Neurobiology of Post-Traumatic Stress Disorder ("PTSD"). Ex. 27 - Benigno vol II, 280:14-23.

101. The City also trained officers on, among other subjects, child development through the CIT – Youth course, the Neurobiology of PTSD course, its Crisis Intervention Team training, its Safe Start video and a video titled "Children Exposed to Violence." These videos discussed the impact of violence on children. The Neurobiology of PTSD was a required course for all recruits. Over 2000 officers took the CIT course during the *Monell* Period and over 600 officers took the CIT-Youth course during the *Monell* Period.  Ex. 27 - Benigno vol. II 282:12-23; 302:7-15; 283:8-17; 310:15-17; Ex. 2.

102. Moreover, the Procedural Justice Course, which focuses on positive interactions and included a scenario involving an interaction with youth, was required for all officers. Ex. 36 - Benigno I, 173:13-23, 221:8-20; Ex. 27 - Benigno II, 310:9-17.

103.     Since the early 2000s, many officers have received training employing trauma-informed principles through Children Exposed to Violence Training, and these principles applied to all aspects of their jobs. Deposition of Aileen Robinson, attached hereto as Exhibit 37, 226:1-228:19

104.     In addition to these classes, all officers were required to take the City's revised use of force training in 2017 and 2018. This Use of Force course trained officers on the factors to consider whether force was appropriate including the relative size and strength of the individual to the officer in the situation at issue. Ex. 27 - Benigno vol II 310:9-12; 314:19-315:4.

105.     CPD's superintendent possessed ultimate authority to order officer training, subject to being mandated to train on subjects based on state statute and the Illinois Law Enforcement Training and Standards Board. Deposition of Daniel Godsel, attached as Exhibit 28, 19:5-22

106.     Throughout the *Monell* period, CPD's training was approved by the Illinois Law Enforcement Training and Standards Board, the governing board, and in compliance with its standards. Ex. 28 - Godsel, 91:22-92:23.

107.     CPD requires more training courses for recruits than were required by law. Ex. 28 - Godsel, 91:22-96:5.

108.     CPD looks to sources ranging from other police agencies, the Federal Law Enforcement Training Center, the International Association of Chiefs of Police, the Police Executive Research forum, community groups and subject matter experts to shape its training. Ex. 28 - Godsel, 96:13-97:7

109.     In 2017, CPD was afforded accreditation from the Commission on Accreditation for law Enforcement Agencies. Ex. 24 - Conway I, 14:18-15-22; Ex. 45 - Expert Report of Jeffrey Noble, paragraphs 66, 67.

**G.     The PATF And DOJ Reports**

110.    In 2016, then-Mayor Rahm Emanuel created a Police Accountability Task Force to review the City's system of accountability, oversight and training for police officers and to make recommendations for improvements. *See* press release, available at https://chicagopatf.org/wp-content/uploads/2015/12/12.1.15PoliceAccountability.pdf(last accessed 10/26/21); Deposition of Michelle Harris, attached hereto as Exhibit 34, 60:1-7, 135:8-14.

111.    In April 2016, the PATF issued a report ("PATF Report") that stated in summary that widespread changes were needed in the City's policing and police accountability systems, including a complete overhaul of the Independent Police Review Authority ("IPRA") and that CPD officers should receive better training to interact with youth. PATF Report, attached as Exhibit 29, at p. 14.

112.    Nowhere does the PATF Report mention search warrants or allegations of excessive force akin those made in the case at bar. (Ex. 27 – PATF Report[3]; Plaintiff Hester Mendez's Amended Answers On Behalf of Peter Mendez to Defendant City's First Set of Interrogatories ("Contention Interrogatory Answers"), attached as Exhibit 30, at 3).

113.    Noting that "[b]ody cameras are a promising technological tool to protect both the public from police misconduct and police officers from false allegations of misconduct. They promote accountability and transparency. The presence of body cameras can also de-escalate encounters, resulting in improved behavior among both police officers and the public" and that the City was embracing the use of such cameras and expanding their use, the PATF Report recommended that the City continue rolling the use of such cameras.  Ex. 29 – PATF Report, p. 141.

114.    In January 2017, the Department of Justice issued its own report about the Chicago Police Department and the City's disciplinary systems ("DOJ Report") that stated, among other things,

---

[3] An searchable electronic version of the PATF Report is available at https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_4_13_16-1.pdf (last checked 10/26/21). Searching for "search" or "search warrant" using the Control-F function there does not come with any relevant results.

that it had "reasonable cause to believe that there was a pattern and practice of CPD officers using unreasonable force," that it believed the pattern and practice of CPD officers using unreasonable force included the use of less-lethal force against children, that the City's police accountability systems and training of officers needed to be improved. DOJ Report, attached as Exhibit 31, at p. 5-11.

115.    The DOJ states, "we found reasonable cause to believe that CPD has engaged in a pattern or practice of unreasonable force in violation of the Fourth Amendment and that the deficiencies in CPD's training, supervision, accountability, and other systems have contributed to that pattern or practice." Ex. 31 - DOJ Report, p. 23.

116.    In reaching its conclusion, the DOJ states that it does not need to provide either statistics nor a certain number of incidents to show how frequently Chicago police officers use excessive force in general or against youths. Ex. 31 – DOJ Report, p. 24; Deposition of Jeffrey Noble, attached as Exhibit 32, 266:8-267:17.

117.    The DOJ Report contained no evidence of the use of excessive force akin to what Plaintiffs here are claiming in the underlying case: the pointing of guns at youths during the execution of a search warrant. Ex. 31 – DOJ Report[4]; Ex. 30 – Contention Interrogatory Answers at 3.

118.    In finding that "CPD's pattern or practice of excessive force also includes subjecting children to force for non-criminal conduct and minor violations," the DOJ Report contains several anecdotes on the subject: officers hitting a 16-year-old girl with a baton and Tasering her after was asked to leave school for violating school rules on having a cell phone; drive-stunning students to break up fights; an officer pointed a gun at several children, used profanity and threatened them. The officer had a finding of sustained; a case in which an officer allegedly pushed a girl and cursed her was

---

[4]    A searchable electronic version of the DOJ Report is available at https://www.justice.gov/opa/file/925846/download (last checked 10/26/21). Searching by using the Control-F function for "search" or "search warrant" yields no relevant results.

found not sustained; another case in which an officer handcuffed a 12-year-old boy riding a bike in response to a report of two male Hispanics running from an area. Ex. 31 - DOJ Report, pp. 34-35.

119.    The DOJ Report credits the City with multiple reform efforts, including creating the Police Accountability Task Force for assessing and making recommendations for change in areas including oversight and accountability, creating the Civilian Office of Police Accountability, and establishing a Deputy Inspector General for Public Safety, expanding its use of bodyworn camera with the goal of having all patrol officers equipped by the end of 2017, and reviewing and revising its use of force policies. Ex. 31 - DOJ Report, p. 3, 7.

120.    The DOJ Report states, among other things, "The City has acknowledged and begun to correct a number of deficiencies related to how officers use and are held accountable for force," "The City recognizes the need for comprehensive reform of its training program," "We also recognize that the City has taken some steps that – if properly implemented – could represent meaningful improvements to the way that officers use force." and "We appreciate that CPD has recognized the need to address some of the problems described in this Report. The steps the City has taken are meaningful and important," and "Throughout the time our investigation has been underway, the City has undertaken positive steps to improve its accountability structure and repair its relationship with the community, and it should be commended for this." Ex. 31 - DOJ Report p. 7, 10, 23, 46, 48.

121.    The DOJ Report contends that using a Taser on someone who is fleeing after committing a minor property crime is "unconstitutional on its face." Ex. 31 - DOJ Report, p. 32.

122.    The DOJ Report states that CPD's Taser policy should address the use of Tasers on children because their smaller size makes children especially vulnerable to greater injury from them. Ex. 31 - DOJ Report, p. 34.

123.     CPD asked DOJ for data supporting its conclusions and were not provided with any. Deposition of Karen Conway Pt. 2, attached hereto as Exhibit 33, 18:22-19:24

## H.     The City's Reform Efforts

124.     The Chicago Police Department's Research and Development Division started in early 2015 looking at force mitigation and de-escalation policies and in the wake of DOJ Report formed a group to revamp use of force policies. Ex. 24 - Conway pt. 1, 26:2-9

125.     CPD began expanding use of bodyworn cameras in 2016 and by April 2018 had all patrol officers required to use them. Bodyworn Camera Directives, attached hereto as Exhibit 44; Ex. 24 – Conway pt. 1, 74:2-77:10.

126.     The research and development division creates or revises directives based on lots of possible reasons, including changes in laws, observation of trends and patterns seen nationwide or working groups formed to address specific requests, including from the superintendent or deputy superintendent. Ex. 24 - Conway pt. 1, p. 106:17-107:16

127.     The Chicago Police Department took the DOJ report into consideration and incorporated some suggestions into its use of force policy, including by instituting prohibitions on using Taser, OC spray and batons on children. Ex. 24 - Conway pt. 1, 123:9-17, 124:7-19.

128.     The PATF report is part of the consideration for policies being crafted by CPD in terms of interaction with youth, including better training for school resource officers; CPD started the process of addressing PATF recommendations in 2016 and all of its recommendations are being explored by a working group. Ex. 24 - Conway pt. 1, 125:22-126:24; 128:6-11; 131:7-9; Ex. 33 - Conway Pt. 2: 44:8-45:10

129.     In devising the revision to use of force policy, CPD contacted 50-75 other police agencies and looked at the work of industry groups like the International Association of Chiefs of

Police, the Police Executive Research Forum and others. Ex. 24 - Conway pt. 1, 150:22-151:13; 152:19-153:8

130.    If state law or the Constitution imposed new requirements, the police department would revise its policies to comply with the law, and if there were a constitutional standard that prevented minors from being handcuffed or that required officers executing search warrants to not point guns on entry, CPD would create policies to comply with those standards. Ex. 24 - Conway Pt. 1, 155:20-24, 152:8-23.

131.    During the *Monell* timeframe, the City Council held multiple hearings about excessive force and investigation of police misconduct. Deposition of Alderman Michelle Harris[5], attached as Exhibit 34, 20:14-21:10, 29:22-30:4, 43:17-44:12.

132.    The Chicago Police Department and IPRA also had to answer annually to the City Council as part of the budget process, which requires those departments to provide reports and be accountable. Ex. 34 – Harris, 23:20-24:13, 93:10-94:11, 135:23-137:18.

133.    The City Council did not find a specific pattern of excessive force against children, and was not made aware of such a pattern through either a media or public outcry. Ex. 34 – Harris, 44:16-46:11, 48:9-13; 49:3-13.

134.    The City Council did not have an indication that IPRA was not fulfilling the needs of citizens prior to the hearings. Ex. 34 – Harris, 138:14-17.

135.    Among other actions, the City Council passed ordinances and resolutions to create the Civilian Office of Police Accountability, create a deputy inspector general position for public safety, which was tasked with ensuring that COPA and CPD were performing well. Ex. 34 – Harris, 131:7-

---

[5] Although the deposition of Ald. Harris was taken in *Tate v. City of Chicago et al.*, 18 C 7439, the parties have agreed that 30(b)(6) depositions taken in that case may be used in the case at bar.

23; Municipal Code of Chicago 2-78 (COPA Ordinance), attached as Exhibit 35; Municipal Code of

Chicago 2-56-200 et. seq., attached as Exhibit 36.

136.    The City Council also issued multiple resolutions or orders highlighting an intent to

engage in the reform process sparked by the PATF and DOJ reports, and expressed commitment to

proposed reforms and entering into a consent decree. Ex. 34 - Harris, 129:17-131:23.

137.    Among the improvements COPA had over IPRA were more resources, more staff,

and better training for its investigators. Ex. 25 – Hayes, 26: 15-23, 72:23-73:1, 135:10-15.

Dated:  October 26, 2021                    Respectfully Submitted,

                                            */s/ Raoul Vertick Mowatt*
                                            Assistant Corporation Counsel

Marion C. Moore, Chief Assistant Corporation Counsel
Raoul Vertick Mowatt, Assistant Corporation Counsel
Kyle Rockershousen, Assistant Corporation Counsel
City of Chicago Department of Law, Federal Civil Rights Litigation Division
2 N. LaSalle Street, Suite 420
Chicago, IL 60602
(312) 744-3283
Atty. No. 6302587
**Attorneys for Defendant City**

                                            */s/Larry S. Kowalczyk*

Larry S. Kowalczyk, Special Assistant Corporation Counsel
Megan K. Monaghan, Special Assistant Corporation Counsel
QUERREY & HARROW, LTD.
120 N. LaSalle St., Suite 2600
Chicago, IL 60602
(312) 540-7000
**Attorneys for Defendant Officers**