# EXHIBIT 3



Transcript of the Deposition of:
# Joseph Cappello

**Date:** September 18, 2019
**Volume:**

**Case:** Hester Mendez, et al. v. The City of Chicago, et al.

Printed On: October 9, 2019

VIDEO INSTANTER INCORPORATED
134 North LaSalle Street
Suite 1400
Chicago, IL 60602
Phone: 312-641-3605
Fax: 312-641-1147

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HESTER MENDEZ and GILBERT MENDEZ, )
for themselves and on behalf of )
their minor children, PETER MENDEZ )
and JACK MENDEZ, )
　　　　　　　　　　　　　　 )
　　　Plaintiffs, )
　　　　　　　　　　　　　　 )
　　vs. 　　　　　　 ) No. 1:18-cv-05560
　　　　　　　　　　　　　　 )
THE CITY OF CHICAGO; Chicago police)
officers JOSEPH T. CAPPELLO IV )
(star # 10626); LIEUTENANT SAMUEL )
DARI (#603); MICHAEL W. DONNELLY )
(#13784); SERGEANT RUSSELL A. EGAN )
(#998); MICHAEL J. GUZMAN (#15911);)
JOSE M. HERNANDEZ (#15925); and )
ERIC M. SEHNER (#11641), )
　　　　　　　　　　　　　　 )
　　　Defendants. )

VIDEOTAPED DEPOSITION
CONFIDENTIAL

　　　Deposition of JOSEPH CAPPELLO, taken by the Plaintiffs

herein, pursuant to notice and the provisions of the

Federal Rules of Civil Procedure pertaining to the taking

of depositions, before SAM KOHLHAAS a Notary Public within

and for the County of Cook and State of Illinois, on the

18th day of September, 2019, at the hour of 9:06 a.m., at

30 North LaSalle Street, Suite 3120, Chicago, Illinois.

1    A.   Initially, yes.

2    Q.   No, I'm asking -- I'm not asking you

3  about -- I understand you -- you initially thought

4  there may be a connection?

5    A.   Yes.

6    Q.   By the time you left, did you believe

7  there was any connection?

8    A.   I don't believe there was any

9  connection.

10    Q.   You -- you know now that the targets of

11  the search warrant lived in the third floor

12  apartment.  Correct?

13    A.   That's correct.

14    Q.   And the John Doe for the search warrant

15  gave you the wrong apartment number.  Correct?

16    A.   Yes.

17    Q.   And you didn't do anything to

18  independently investigate and verify yourself the

19  John Doe's representation, that the targets lived

20  in the second floor apartment, did you?

21    MR. KOWALCZYK:  Object to the form, but

22  go ahead, you can answer.

23    THE WITNESS:  We did several --

24  Typically, in a search warrant we're going to use

1    informant told you.

2        A.   Okay.

3        Q.   Okay?  So I'm asking -- And if the

4    answer's no, it's okay to say no.

5        A.   Yeah.

6        Q.   But if -- I'm asking you, did you do

7    anything in your investigation as a police officer

8    to independently, independent of what the John Doe

9    told you, to independently investigate and verify

10   that the apartment number that he gave you was in

11   fact the apartment where the targets lived or

12   could be found?

13       MR. KOWALCZYK:  Same objection, but go

14   ahead.

15       THE WITNESS:  I did all the -- the

16   resources that I had available through the Chicago

17   Police Department and being patrol, to verify that

18   they lived there.

19   BY MR. HOFELD:

20       Q.   In doing that research, and we'll talk

21   about it later, what it was, what it consisted of,

22   did you find -- did you verify for yourself that

23   that was the correct apartment number for the

24   targets?

Page 14

1    A.   No.  So Cavazos and Curtis, they did not

2    have an address that was to that building, but,

3    typically, in search warrants, sometimes the

4    target of that location's not going to have a

5    listed address available to me in our databases.

6    Q.   So you were unable -- Am -- am I correct

7    that you were unable to verify the apartment

8    number independently?

9    A.   Yes.

10    Q.   If you had -- if you had been able --

11    Strike that.

12        If you had successfully verified the

13    apartment number, that would have reduced the

14    chance that you would hit the apartment of an

15    in -- innocent family.  Correct?

16        MR. BERRINGTON:  Object to the form.

17        MR. KOWALCZYK:  Join.

18        MR. BERRINGTON:  Also calls for

19    speculation, but answer if you can.

20        THE WITNESS:  I don't really understand

21    that question.  Can you state it again?

22    BY MR. HOFELD:

23    Q.   If you had verified successfully the

24    correct apartment number for the targets, you

Page 33

1    A.   Prior to my first one?

2    Q.   Prior to November 7th of 2017, which is

3    the date of the search warrant in this case, 3557

4    South Damen, prior to that date, how -- how many

5    search warrant investigations had you done as the

6    affiant?

7    A.   Zero.

8    Q.   Okay.  So that was your very first?

9    A.   That's correct.

10   Q.   Okay.

11   A.   My very first search warrant.

12   Q.   Mendez search warrant was your very

13   first?

14   A.   That's correct.

15   Q.   Okay.  I'm sorry it had such

16   consequences.  I know it's -- it's part of the

17   job.  So you -- Let me see.  Let me get the next

18   exhibit.  I'm challenged for space.

19        MR. HOFELD:  Sam, can you please mark

20   this as 3?  Thank you.

21   BY MR. HOFELD:

22   Q.   Okay.  Officer, I'm handing you what's

23   been marked as Exhibit 3.  Let's see, let me --

24        MR. KOWALCZYK:  Thank you.

1    occupants a chance to open it before entering.

2    Correct?

3        A.  Well, that's correct.  There was a fast

4    breach.

5        Q.  Okay.  And when you say fast breach,

6    officers forced the door open and then entered.

7    Correct?

8        A.  That's correct.

9        Q.  Okay.  And this was not -- This was not

10   a no-knock warrant.  Correct?

11       A.  That's correct.

12       Q.  Okay.  You -- I believe you were the

13   second officer to enter the apartment.  Is that

14   correct?

15       A.  That's correct.

16       Q.  All right.  Who entered ahead of you?

17       A.  It'd be Officer Guzman.

18       Q.  And when you entered, you turned left

19   down the hallway.  Correct?

20       A.  That's correct.

21       Q.  All right.  And you had -- You had your

22   gun -- Well, you had two guns on you that day,

23   didn't you?

24       A.  That's correct.

Page 48

1     Q.  You had the rifle.  I forget the make

2   and model.

3     A.  The Spikes Tactical.

4     Q.  The Spikes Tactical.  Is that a -- is

5   that a automatic rifle?  What's the full name?

6   What's the full name of that weapon?

7     A.  It's a Spikes Tactical AR-15 rifle.

8     Q.  AR-15.  Okay.  You had the AR-15 in your

9   hands.  Right?

10    A.  That's correct.

11    Q.  And you also were carrying a pistol,

12  which was holstered.  Right?

13    A.  That's correct.

14    Q.  When you entered?

15    A.  That's correct.

16    Q.  Okay.  And then as you were -- After you

17  turned left down the hallway and proceeded down

18  the hallway towards the back of the apartment, you

19  saw -- or what did you see?

20    A.  We saw Mr. Mendez by the kitchen area

21  and by the -- there's a rear porch door area over

22  there.

23    Q.  He was -- As you were walking down the

24  hallway towards him, he was facing you.  Right?

Page 49

1    A.  That's correct.

2    Q.  And he was -- He was actually -- he was

3    actually in the kitchen at that point.  Right?

4    A.  That's correct.

5    Q.  Okay.  And he was in the kitchen near

6    the main hallway.  In other words, the main

7    hallway leads into the kitchen.  Right?

8    A.  Yes.

9    Q.  And he was in the kitchen close to the

10   main hallway?

11   A.  Yeah.  The kitchen was off the long

12   hallway.

13   Q.  And somebody shouted to Mr. Mendez,

14   get -- get down on the ground, get down on the

15   ground, get down on the effing ground.  It's your

16   testimony that that was not you shouting those

17   commands?

18   A.  I say get on the ground, I believe.  I

19   don't believe I say get on the effing ground.

20   Q.  Okay.  But you were giving him the

21   commands to get on the ground?

22   A.  That's correct.

23   Q.  Okay.  And you remember saying that?

24   A.  Yeah.

Page 50

1    Q.  Now, as you were saying that you were

2  pointing the rifle at him, your rifle at him.

3  Correct?

4    A.  That's incorrect.

5    Q.  That's not correct?

6    A.  That's not correct.

7    Q.  Okay.  What were you pointing your rifle

8  at?

9    A.  My rifle was at the low ready at all

10  times.

11    Q.  Okay.  Why don't we look at Exhibit

12  1-1, and then after that we'll look at some of the

13  stills.  So why don't we take a look here.

14      (WHEREUPON, the video was played.)

15      MR. HOFELD:  Maybe we should -- Sorry.

16  Can you stop it?  Maybe we should turn the lights

17  -- Can you guys see okay or should we -- You could

18  see better if we turn the lights down probably.

19      MR. KOWALCZYK:  Do you want me to grab

20  them?

21      MR. HOFELD:  Yeah, sure.  Why not?  It's

22  probably -- Yeah.

23      MR. KOWALCZYK:  Yeah.

24      MR. HOFELD:  Can you -- can you start

1   was?

2       A.  I believe that was Eric Sehner.

3       Q.  Officer Sehner?

4       A.  Officer Sehner.

5       Q.  Okay.  The low ready position is at a 45

6   degree angle with the floor.  Right?

7       A.  Yeah.  It's like just right here around

8   where -- where your navel is, right out here, of

9   that nature.

10      Q.  And so the -- and so the trajectory

11  of -- of the gun is at a 45 degree angle with the

12  floor.

13      A.  Yeah.

14      Q.  Is that correct?

15      A.  And then as moving comes through -- When

16  you're moving through a location like that, there

17  was a lot of things everywhere, so technically

18  it's going to dip, and I might raise just to get

19  over objects and things --

20      Q.  Sure.

21      A.  -- of that nature in the apartment.

22      Q.  Sure.  Sure.  Understood.  When you

23  gave -- when you gave the order to Mr. Mendez to

24  get on the ground, did he comply with that order?

1    A.   Oh, he complied.  Yes.

2    Q.   Okay.  Did he comply immediately?

3    A.   Yes.

4    Q.   Okay.  And when he got on the ground, or

5    on the floor, which -- where was he?  Was he --

6    was he still in the kitchen?

7    A.   Oh, yeah.  He was in the kitchen off

8    towards by the cabinets, I believe, area over

9    there.

10   Q.   Okay.  Close to the hallway?

11   A.   Yes.

12   Q.   Okay.  And he complied -- You said he

13   complied immediately?

14   A.   Mm-hmm.

15   Q.   Did he comply -- As soon as -- as soon

16   as you gave the first order, as soon as you said

17   it the first time, did he start getting down?

18   A.   I believe he started making his way to

19   the ground, yes.

20   Q.   Okay.  Okay.  Can we look at the stills?

21   I have some still photographs of yourself in the

22   hallway from behind.  The -- the stills are made

23   from the video we just watched.  Can we make them

24   bigger?

1    did you?

2        A.   I -- It was unknown.  It was -- But

3    there was a large odor of burnt cannabis coming

4    from that area.

5        Q.   Well, we'll talk about that later, but

6    when you first entered the apartment, you didn't

7    know -- you didn't know -- you didn't know there

8    was any cannabis in the apartment.  Right?

9        A.   No, I had no idea.

10       Q.   Okay.

11       A.   You could smell it as we gained entry

12   into the hallway.

13       Q.   He didn't look angry.  Right?

14       A.   I don't know what -- I don't remember

15   what he appeared, how his face --

16       Q.   Okay.

17       A.   -- and his demeanor was that day.

18       Q.   And he -- he didn't -- he didn't look

19   hostile.  Right?  His face -- his -- his body

20   movements, he didn't look or act in a hostile

21   manner toward you, did he?

22       A.   No, he complied.

23       Q.   Yeah.  Let's see, So as I -- as I

24   understand it, as I think we already said, once

1    is that target, and your response was I don't

2    think so.  Correct?

3        A.  That's correct.

4        Q.  Okay.  And which officer asked you?

5    Do -- do you know who that was?

6        A.  I believe it was Officer Donnelly.

7        Q.  Yeah.  That's who I think it was too.

8    So here what you were -- As I understand it, what

9    you were telling Officer Donnelly is that you

10   didn't think Mr. Mendez was the target of the

11   search warrant.  Is that correct?

12       A.  No, it's not correct at all.

13       Q.  Okay.  What did you mean by that

14   statement?

15       A.  Ms. Cavazos, I believe -- I thought that

16   was -- Initially, on the approach, she stuck her

17   head out and I thought that was her -- on our

18   entryway, and when we made entry, I saw the

19   female, mother for the Mendez family --

20       Q.  Yes.

21       A.  -- and I believed that to be Ms. Cavazos

22   on our entryway into the apartment, and then I

23   finally saw her in the apartment.  So that's what

24   I believed Officer Donnelly was asking me.

Page 71

1          Q.  So you were saying -- so -- Okay.  So

2     you were saying that you don't think that Mrs.

3     Mendez is the target.

4          A.  Yeah.  I --

5          Q.  Correct?

6          A.  It looked like Mrs. Cavazos on our

7     way -- our entry point way.

8          Q.  Understood.

9          A.  Yeah.

10          Q.  So if the timestamp is correct, you guys

11     had been in the apartment for less than 2 minutes,

12     and you -- based on seeing Mrs. Mendez you didn't

13     think she was -- she was target.  Correct?

14          A.  That's correct.

15          Q.  Okay.  And by this point had -- Well,

16     you'd already seen -- Of course, you'd seen Mr.

17     Mendez when you first entered.

18          A.  Mm-hmm.

19          Q.  And you didn't think that he looked like

20     Roberts, did you?

21          A.  No.

22          Q.  Okay.  So -- so immediately you saw that

23     Mr. Mendez does not look like target.  Correct?

24          A.  That's correct.

Page 72

1    Q.   And then after -- After this exchange --

2    or subsequent to this exchange, you and other

3    officers searched the apartment.  Correct?

4    A.   That's correct.

5    Q.   Okay.  And, let's see, we have one clip

6    of you searching, and I wanted to ask you --

7    And -- But before I do, hold on one second.  Let

8    me just ask you -- we just asked you a little bit

9    about --

10        You said that when you were approaching

11   the building from the outside you saw someone

12   stick their head out of the -- of the second floor

13   apartment window?

14   A.   That's correct.

15   Q.   Okay.  So it wasn't -- Was the person

16   standing at the window on the inside and visible

17   to you or did the person actually open the window

18   and stick -- stick his or head out?

19   A.   That's correct.

20   Q.   The latter?

21   A.   Yes.  Mrs. Mendez opened the window and

22   physically stuck her whole head and front torso

23   out of the window.

24   Q.   Got it.  And you could see -- You could

1    see that the person was female?

2        A.   That's correct.

3        Q.   Okay.  And you could see that the

4    person -- to -- to you she looked like a Hispanic

5    female, if you know?

6        A.   She looked like Ms. Cavazos.  Yeah.

7        Q.   Okay.

8        A.   So that's why I began to knock and

9    announce.

10       Q.   Well, you didn't knock.  You -- you

11   announced but you didn't knock.  Right?

12       MR. KOWALCZYK:  Object to the form.

13   Where?  Go ahead.

14       THE WITNESS:  At which point the -- what

15   I believe one of the targets of the location stuck

16   her whole head and body out as I believed that at

17   that point they had already known that we were

18   there and we struggled to get into that front

19   door, so I began to yell and announce at the front

20   door because I believed the jig was up, and for

21   our safety and for safety of the individuals of

22   that apartment we began to knock and announce

23   there.

24   BY MR. HOFELD:

Page 74

1    Q.   So is it -- Okay.  Let's -- That's -- I

2    want to go back to the knocking part.

3         Is it your testimony that you -- that

4    you knocked on the --

5    A.   We begun to announce.

6    Q.   Okay.  So -- so you didn't knock on the

7    outside door to the building.  Right?

8    A.   The entryway into their unit, no.

9    Q.   Right.  So let's be clear, the three

10   doors.  You guys went through three doors to get

11   in the apartment.  Right?

12   A.   Yes.

13   Q.   So the first, the entry door to the

14   building, and then there's a vestibule, and then

15   there's an entry door.  After you get through the

16   second door, you're going up the stairs.  Right?

17   A.   Yes.

18   Q.   Okay.  So just -- so you -- you

19   didn't -- you didn't knock on any of those doors,

20   did you?

21   A.   But we made entry of a breach into the

22   front door so, I guess, technically, no.

23   Q.   Okay.  And you didn't ring any of the --

24   Were there doorbells?

1          A.   Yeah.  We're not going to ring doorbells

2     on a search warrant.

3          Q.   Fine.  I -- I know.  It sounds silly.

4          A.   Yeah.

5          Q.   I -- I got to ask you the question.

6          A.   Yeah.  I understand.

7          Q.   Okay.  All right.  So, yeah.  So you

8     didn't -- you didn't ring anybody's door bell?

9          A.   That's correct.

10          Q.   Okay.  But your testimony is that you --

11     Your testimony is that officers were announcing

12     themselves when they were on the front porch?

13          A.   Yes.  We began to announce as soon as we

14     got in -- out there, Chicago Police search

15     warrant, Chicago Police search warrant very vocal.

16

17          Q.   Sure.  And when -- when you -- and when

18     you were still outside you were announcing?

19          A.   As soon as the first door gets open, we

20     began to announce on our way up.

21          Q.   Oh, okay.  Yeah, that I was aware of.

22     Are -- I wanted to -- Are you saying that you guys

23     were announcing when you were still outside,

24     outside of the building?

Page 97

1    go ahead.  Sorry to interrupt.

2         THE WITNESS:  Sorry.  Typically, in

3    search warrants, targets will not be onsite and

4    in location when we conduct our search warrant, so

5    that doesn't mean that we're just going to -- if

6    the target's not there, we're just going to give

7    up on our search to recover this very dangerous

8    drugs of heroin and crack cocaine.

9    BY MR. HOFELD:

10        Q.  So Mrs. Mendez -- Were you in the living

11   room?  I think you were.  Mrs. Mendez gave

12   officers information that people who fit the

13   description of Roberts and Cavazos lived upstairs.

14   Do you recall that?

15        A.  That was at the very end.  Yes.  Mrs.

16   Mendez related that she had problems with several

17   people throughout the building, so --

18        Q.  Well -- Yeah, that's not my question,

19   though.  I'm going to ask -- I have a very

20   specific question.  Do you recall her saying that

21   the people described in your search warrant lived

22   upstairs?

23        A.  Yes.  Right before we left.

24        Q.  Okay.  Did --

Page 98

1    A.   Towards the end of our search warrant.

2    Q.   Okay.  Well, did you search -- Did you

3    conduct any search after she said that?

4    A.   I believe -- No.  We -- we all had left.

5    Q.   The officers weren't still searching

6    after she said that?

7        MR. KOWALCZYK:  Object to the form of --

8    and foundation of other officers, but go ahead, to

9    the extent you know.

10       THE WITNESS:  To my knowledge, everybody

11   left after that.  I don't know what everybody else

12   was doing in other places.  I'm not other people.

13   BY MR. HOFELD:

14   Q.   Did you -- Do you -- Did you recall

15   continuing to search after she said that those

16   people live upstairs?

17   A.   No.  I made my way to the hallway.

18   Q.   You what?

19   A.   I made my way to the hallway, I believe,

20   outside of the location of the unit.

21   Q.   You were -- you were not wearing your

22   body camera during this raid.  Correct?

23   A.   That's correct.

24   Q.   Okay.  You had checked out a body camera

Page 122

1      A.   I heard him state it before we leave

2    that we're going to make a C-service request to

3    fix doors and --

4      Q.   And do you know if he actually ever did

5    that?

6      A.   I'm not too sure.

7      Q.   You -- There was a pre-execution meeting

8    held.  Right?

9      A.   Mm-hmm.

10      Q.   Where was that meeting held?

11      A.   Pre-execution meeting, there was a

12    little small one in the district, and then there

13    was another one done outside by a restaurant.

14    I -- I don't remember which restaurant it was, but

15    it was outside.  It was formal, just going over

16    our -- our task planned.  And pretty much every

17    search warrant you do a meeting with everybody,

18    who has what job, who's going to go where, who's

19    going to do what; is there children in the

20    apartment, is there animals in the apartment.

21    It's just pretty much a checklist of -- if an

22    officer gets hurt, what hospital are we going to

23    go to; what field car we going to use for a

24    CASEVAC, an overall -- show everybody photos of

Page 123

1    the targets, just an overall brief of what we're

2    about to do.

3       Q.  So at that meeting --

4       A.  Yes.

5       Q.  At the pre-meeting before the execution

6    of the warrant in the Mendez' apartment, you

7    showed -- you -- you showed photos of the targets

8    to the other officers?

9       A.  Yeah.  There was perimeter officers

10   there, and just in case if a subject did run out

11   of the location, that they would be able to

12   identify them and detain them on scene.

13      Q.  But the officers who actually entered

14   the apartment --

15      A.  Yes.

16      Q.  -- they were also present at this

17   meeting.  Correct?

18      A.  Yes.  That's correct.

19      Q.  Or at -- They were present at both pre-

20   meetings, the one at the station --

21      A.  Mm-hmm.

22      Q.  -- and the one outside the restaurant.

23   Correct?

24      A.  That's correct.

Electronically signed by Sam Kohlhaas (401-140-193-8254)

1      A.   Mm-hmm.

2          Q.   And then both meetings took place right

3      before you went to the building to execute the

4      search warrant?

5          A.   For the most part, yes.

6          Q.   Okay.  You -- you spoke at the meetings?

7          A.   Yes.

8          Q.   You -- In other words, you -- you

9      conducted the meetings?

10         A.   Myself and Sergeant Egan.

11         Q.   Okay.  And what information did you

12     provide about how to access the apartment?

13         A.   Was showed a Google Street still image,

14     of the target location.  We iterated that the John

15     Doe had pointed to the second floor on several

16     locations when we drove him past the target

17     location.  We went over what was supposed to be in

18     the apartment.  There was supposed to be multiple

19     large amounts of -- of both crack cocaine and

20     heroin, along with USC currency in a black Adidas

21     bag in a certain bedroom, in which the John Doe

22     described.  Further related that there was

23     supposed to be children in the location, a small

24     dog, and then the two targets, and then it was

1     unknown if there was going to be other occupants

2     inside of that location.  And then also the

3     path -- The John Doe was very specific on the

4     pathway leading up into the unit, and he was very

5     adamant on once you make entryway into the common

6     area, or foyer, however you want to describe

7     it --

8         Q.   Yes.

9         A.   -- and then you open another door and

10    you go up a large flight of stairs, and it's your

11    first door on the right.  So he was very adamant

12    on first door on your right as soon as you go up

13    the large flight of stairs, the door is right on

14    your right hand side.

15        Q.   Okay.  You -- you -- During the meeting,

16    you explained that there would be children?

17        A.   Yes.

18        Q.   Okay.  And where did you tell the

19    officers the children were expected to be?

20        A.   There wasn't really no expectation of

21    where they were going to be.  The expectation was

22    that there were going to be in the unit.

23        Q.   In which unit?

24        A.   The second floor unit where we conducted

1    the search warrant.

2        Q.   The expectation was they were going to

3    be in the target's unit.  Is that correct?

4        A.   Yes, where we believed the target unit's

5    would be the second floor.

6        Q.   Right.  And where did you obtain

7    information that children were going to be in the

8    target's apartment?

9        A.   The John Doe related to me.

10       Q.   The John Doe told you that there were

11   children in Cavazos and Roberts' apartment?

12       A.   That's correct.

13       Q.   Did he say there were -- Did he tell you

14   that there had been children in their apartment

15   when he visited them on previous occasions?

16       A.   Yes, there was children inside the

17   location.

18       Q.   Inside -- inside the apartment where

19   Cavazos and Roberts were.  Is that correct?

20       A.   Which he related was on the second

21   floor.  Yes.

22       Q.   Did he describe those children to you?

23       A.   He described them as young children,

24   approximately 4 to 6 years of age, but he said

1    he's known to know other several children, I

2    think, over there from time to time, so it's not

3    really not too sure.  I was expecting at least two

4    children there from what he described to me.

5        Q.   You showed -- And, again, he told you

6    that on previous occasions when he had visited the

7    targets in Cavazos' apartment that there had been

8    children there.  Is that right?

9        A.   That's correct.

10       Q.   Okay.  Two children?

11       A.   That's correct.

12       Q.   And during the pre-meetings, you and

13   Sergeant Egan showed photographs of the two

14   targets to the other officers?

15       A.   Yeah.  Every officer that was involved

16   on the pre-execution.

17       Q.   Okay.  Okay.  Okay.  Let me -- I'm going

18   to ask you in -- in -- in greater detail about

19   your investigation that led to the search warrant.

20       A.   Okay.

21       Q.   How did you -- how did you come to

22   initiate this particular investigation?  Did the

23   John Doe approach you and say I have information?

24   Did -- did another officer assign you to talk to

Page 130

1     this John Doe?  How did it come about?

2          MR. BERRINGTON:  Object to the form,

3     it's compound, but answer if you can.

4          THE WITNESS:  So the day prior to the

5     search warrant -- I believe it was the day prior.

6     I'm not a hundred percent on it, but I'm pretty

7     sure it was -- Sergeant Egan and Eric Sehner

8     conducted a traffic stop on the individual, and at

9     which point this individual disregarded police

10    lights and sirens in a marked Chicago Police

11    vehicle, a chase had ensued, a vehicle crash had

12    occurred, and a subject was placed in the custody

13    for act of eluding the police and there was a

14    substantial amount, a large, large amount of -- of

15    heroin, and the way it was bagged it was deemed

16    for sale.  It wasn't for a -- a personal use of

17    any sort or type of that, and that was recovered

18    on scene as well.  So he was charged with

19    multiple, multiple things that day, and the

20    subject, I believe, even was -- I'm not sure if

21    there was a resisting charge as well that day, as

22    well.

23          Q.   So you said that was Officers -- that

24    was Officer Sehner and Sergeant Egan?

Page 131

1       A.   Yes.

2       Q.   So Officer Egan brought this individual,

3   the John Doe, the person who became the John Doe

4   to your attention?

5       A.   Yeah, he was an arrestee.  We brought

6   him into the 11th District, like we do for every

7   processing, at which point Officer Donnelly and

8   myself.  The John Doe related that he had some

9   information, and with the large amount of

10  narcotics recovered off of him, the information

11  and the targets that he gave deemed that it was

12  some very valuable information to the 11th

13  District in getting a possible offender off the

14  street in an area known where he runs a certain

15  drug trafficking ring, or however you want to

16  describe that.

17      Q.   Who's the he?  You're talking --

18      A.   The --

19      Q.   You're talking about who runs the drug

20  trafficking ring?

21      A.   Mr. Curtis Roberts.

22      Q.   Okay.

23      A.   He's involved in a lot of narcotics,

24  dealing in the 11th District.

Electronically signed by Sam Kohlhaas (401-140-193-8254)

1    Q.   Was anybody supervising your

2    investigation?

3    A.   Sergeant Egan helped me out along the

4    process and coached me up, in terms of proper

5    things that I had to get in place.

6    Q.   What did he -- what did he -- what did

7    he help you out with?

8    A.   Just what had to be in the complaints.

9    Q.   Had to what?

10   A.   What had to be in the complaint --

11   Q.   Okay.

12   A.   -- for a search warrant, surveillance

13   tips.  We had to take him past the location.  He

14   had to point it out several times, Cook County

15   Assessor's website, pulling up the location;

16   having defender pick out colored photos of both

17   targets that he observed in location.  Just an

18   overall checklist of what had to be done in order

19   to be successful in a search warrant, what all we

20   had to do to get it approved through the State's

21   Attorney's office.

22   Q.   Okay.  So Sergeant Egan went over with

23   you each one of those steps that you should do?

24   A.   Yes.

Page 135

1      Q.   What did he do?  Do you remember?

2      A.   I don't exactly remember --

3      Q.   Okay.

4      A.   -- now what Officer Hernandez did.

5      Q.   How about Officer Guzman?  Did -- did he

6   assist you in the search warrant investigation?

7      A.   Yes.

8      Q.   What did he do?

9      A.   So Officer Guzman and Officer Donnelly,

10  I believe we drove him in the Crown Vic, the gray

11  unmarked vehicle.  We drove him -- the John Doe

12  past the target location where he pointed it out

13  several times.

14     Q.   So the three of you -- the three

15  officers and the John Doe --

16     A.   Yes.

17     Q.   -- were in the car together when you --

18     A.   To the best of my knowledge, yes, I

19  believe us three were in that vehicle.

20     Q.   Okay.  And I need to finish my sentences

21  for the record.

22          The three of -- Yourself, Officers

23  Guzman and Donnelly and the John Doe were in the

24  car together when you drove to 3557 South Damen,

Page 137

1    myself went over the search warrant.

2        Q.   You're talking about in front of Judge

3    Burns?

4        A.   Yes.

5        Q.   Okay.  Okay.  So Hernandez went to court

6    with you to get the complaint approved by the

7    State's Attorney.  Right?

8        A.   Yes.

9        Q.   Okay.  And the day that -- and then when

10   you brought the John Doe before the judge, other

11   officers were with you?

12       A.   Here it says.  Correct.

13       Q.   And, I'm sorry, which ones were they

14   again?

15       A.   Officer Guzman and Officer Donnelly had

16   brought the John Doe.

17       Q.   Okay.  They brought the John Doe, I'm

18   sorry.

19       A.   Yes.  And then Sergeant Egan and me met

20   with Judge Burns and -- when they brought the John

21   Doe in.

22       Q.   Where did Guzman and Donnelly bring the

23   John Doe from, the police station?

24       A.   Yes.

Page 138

1    Q.   Okay.  So you -- Am I correct that you

2    did your search warrant investigation and wrote up

3    the complaint for search warrant on the same day

4    that the John Doe was arrested for the other

5    offense?

6    A.   That is correct.  The majority -- Yes,

7    I'm pretty sure.  Yes.

8    Q.   Who was present -- Well, hold on.

9    We'll -- we'll get to that.

10    Besides yourself, did any of the other

11    officers interview the John Doe?

12    A.   I believe it was just me and Officer

13    Donnelly for all of the interviewing purposes.

14    Q.   Other than driving -- When you -- when

15    you and the John Doe and Officers Guzman and

16    Donnelly drove to the building and he, the John

17    Doe -- I don't know if it's a he or she -- John

18    Doe pointed out the building and the second

19    apartment, second floor apartment, how long were

20    you -- how long were you there?  How long were

21    on -- on the scene?

22    A.   We -- I think -- I think it was two

23    passes, probably a total of 3 to 4 minutes.

24    Q.   Okay.

Page 140

1    A.  Are you asking for an overall time

2    period or how many times?

3    Q.  Well, I'm asking how many -- how many

4    different interviews.  So I can understand where

5    you can conduct one interview over an hour, but --

6    and you're in and out of the room, but I wouldn't

7    count each time you're in the room as a separate

8    interview.  So I need to know -- I need to know

9    how many times you interviewed -- you and Officer

10   Donnelly, I think you said --

11   A.  Mm-hmm.

12   Q.  -- interviewed the John Doe about the

13   tip he gave you for Roberts and 3557.

14   A.  Well, I was in and out a lot, so I was

15   coming and going a lot, showing pictures of the

16   target location.

17   Q.  3557, you mean?

18   A.  Yes.

19   Q.  Okay.

20   A.  Showing pictures of -- of both targets

21   that was supposed to be in the location, and then

22   sitting down for approximately -- probably 30

23   minutes.  So an overall period, if you're looking

24   for a -- a time I could give you, probably 45

Page 141

1    minutes to an hour.  I was in and out several

2    times.

3        Q.  Sure.  Sure.  Understood.  So 45 -- 45

4    to 60 minute interview, you were in and out.  This

5    is on one particular day.  Right?

6        A.  Yes.

7        Q.  Okay.  Was there another day when you

8    conducted an interview with the John Doe?

9        A.  Yes.  So, actually, before we left to

10   hit the target location, I had made my way to the

11   lockup by myself and I asked for the John Doe to

12   be put in a room, and I went over every aspect of

13   what he told me and everything that was factual,

14   and what I was about to see in there, what -- just

15   pretty much reit -- reit -- reiterate the original

16   interview, and just the overall path, how to get

17   in there, and he was just very adamant on up the

18   stairs, the big stairs, from the common area, door

19   on the right, so --

20       Q.  And when he said up the stairs, door on

21   the right, you understood that to be the second --

22   the -- the door to the second floor apartment?

23       A.  Yes.  The -- the apartment where the

24   John Doe pointed out.

Page 145

1    BY MR. HOFELD:

2        Q.   Okay.  Very good.  So, yeah.  So

3    you're -- so you're -- You're right.

4            Your first interview --

5        A.   The 6th.

6        Q.   -- with the John Doe is on the 6th --

7        A.   That's correct.

8        Q.   -- the day before you guys executed the

9    warrant.  Okay, thank you.  And he -- The John

10   Doe, during that first interview told you that he

11   had been in the apartment on November 4th,

12   right --

13       A.   That's correct.

14       Q.   -- been in Cavazos and Roberts'

15   apartment?  And he told you it was the second

16   floor and he told you he saw four bags of a

17   powdery substance that looked like cocaine or

18   heroin.  Correct?

19       A.   That's correct.

20       Q.   All right.  And he told you that he'd

21   been to the apartment on five separate occasions

22   when the targets were present and observed

23   narcotics and large amounts of currency?

24       A.   Yes.

1      Q.   Is that five -- Do you -- Is that five

2    times -- Did that -- Was the fifth time on the

3    4th, or was it five times before the 4th?  Did he

4    tell you?

5      A.   I'm -- I -- I don't --

6      Q.   Okay.

7      A.   -- really remember.

8      Q.   Did he tell you that he'd purchased

9    narcotics there?

10     A.   Yes.

11     Q.   Your complaint for search warrant

12   doesn't indicate that, does it?

13     A.   I don't believe it does.

14     Q.   Okay.  Did he tell you how many times

15   he'd purchased narcotics there?

16     A.   No.  He related to me that it was a

17   family member to him, so he did come and go.

18     Q.   Who was a family member to him?

19     A.   Curtis Roberts.

20     Q.   Roberts.  And he -- He described

21   Roberts -- Roberts and Cavazos to you --

22     A.   Mm-hmm.

23     Q.   -- and told you that he'd known Roberts

24   for 10 years and Cavazos for two years.  Correct?

Page 147

1       A.   Yes.

2       Q.   All right.  And then you showed him

3    photos of Roberts and Cavazos and he identified

4    those -- then he identified them as the people

5    that he'd visited in the apartment.  Correct?

6       A.   That's correct.

7       Q.   All right.  And how did you -- How did

8    you get the information that you needed to pull

9    the photos of those individuals?

10      A.   He immediately described the individual

11   that I knew from the 11th District, who was an

12   immediate affiliate in a gang.

13      Q.   Okay.

14      A.   And he described his unique tattoos on

15   his head, and at which point I looked in our

16   Caboodle data base and I-CLEAR database, and

17   that's when I pulled the picture.

18      Q.   Caboodle?

19      A.   Yes.

20      Q.   Okay.  What's the Caboodle database?

21      A.   Caboodle Mobile.  It's a gang database,

22   which is -- it's quadrant off, I guess, in layers

23   throughout certain parts of the city in gang

24   layers.

1     Q.   Very good.  Did the John Doe tell you

2   that Cavazos had children with him, with Roberts?

3     A.   He said that he had chil -- children,

4   but I don't know whose children or who or of that

5   nature.  He said baby mama, but I wasn't sure if

6   it was like his kids, he's just watching those

7   kids, he's the stepfather, of that sort.

8     Q.   You said earlier that he told you that

9   there were kids in the apartment where Cavazos and

10   Roberts were when he visited.  Correct?

11     A.   Yes.

12     Q.   Okay.  You didn't -- you didn't indicate

13   that in your search warrant, in your complaint for

14   search warrant.  Correct?

15     A.   That's correct.

16     Q.   All right.  And when you showed him the

17   photos of Roberts and Cavazos, he identified them

18   both as the people that he was -- the people that

19   he was talking about.  Correct?

20     A.   That's correct.

21     Q.   The people who he had visited in that

22   apartment?

23     A.   Yes.

24     Q.   How did you show him the photos, on your

Page 150

1    phone or on a computer?

2        A.  I printed out I-CLEAR photos from

3    Chicago Police Department computer and they were

4    just still images with no names, and he pointed

5    them out.

6        Q.  Okay.  And you showed him photo --

7    photos of the exterior of the building.  Is that

8    correct?

9        A.  That's correct.

10        Q.  All right.  And your complaint for

11   search warrant doesn't indicate that, does it?

12        A.  I don't believe so.  No.

13        Q.  Okay.  And you -- Did you show him

14   photos of the interior common area of the

15   building?

16        A.  Yeah.  We had some -- There's several

17   realty -- realtor websites that we had were

18   public.

19        Q.  That's fine.  And your complaint for

20   search warrant doesn't indicate that either, does

21   it?

22        A.  No, it does not.

23        Q.  Okay.  And then, as you said, you went

24   with the informant to the address on November 6th.

Page 155

1    apartment of 3557 South Damen. Correct?

2        A.  That's correct.

3        Q.  So how many -- To the best of your

4    recollection, how many different times did he tell

5    you that it's the second floor apartment?

6        A.  Like seven to eight times. He was very

7    adamant on that that was the location where the

8    narcotics were.

9        Q.  And did you think the fact that he said

10   it multiple times made it more reliable?

11       A.  Absolutely.

12       Q.  Did the John Doe give you any

13   information about Mr. or Mrs. Mendez?

14       A.  No.

15       Q.  What about their children?

16       A.  The only thing he talked about children

17   was that there were children in the location where

18   he described.

19       Q.  Children in the targets' apartment?

20       A.  Yes, where he related the targets'

21   apartment was the second floor.

22       Q.  Okay. Did he give you any information

23   about the Mendez' family?

24       A.  No. He just related that there was the

Page 157

1    information to you that there were children in the

2    targets' apartment?

3        A.  I asked him, so he replied.

4        Q.  What did you ask?  What was your

5    question?

6        A.  I asked him if there were any children

7    inside the location.

8        Q.  You asked -- you asked who lived there?

9        A.  I asked who lived there and if there was

10   any children or animals.

11       Q.  Okay.  And -- and who -- Did you ask him

12   who was the actual tenant or who had the lease to

13   the apartment?

14       A.  I don't think so.  I don't think so.

15       Q.  Okay.  Did he tell you that Cavazos was

16   the one who actually resided there and Roberts was

17   just to be --

18       A.  That's what's -- that's the way he kind

19   of described it.  Yeah.

20       Q.  And Roberts could be found there?

21       A.  Roberts does live there with her.

22       Q.  Your complaint -- your complaint for

23   search warrant doesn't indicate that you asked the

24   informant whether there were children in the

1 A. Yeah.

2 Q. -- in the deposition.

3 A. Okay.

4 Q. So you're adding -- so you now remember

5 that you -- you went through the -- you drove

6 through the alley?

7 A. Just -- just one -- one pass.

8 Q. One pass?

9 A. It was just --

10 Q. Okay.

11 A. -- an immediate circle, circle, and then

12 a quick check of the immediate alley.

13 Q. Okay. So Sergeant Egan did suggest to

14 you to do surveillance. Is that correct?

15 A. Yes.

16 Q. Okay. And when did you have your

17 conversation with him about the steps that you

18 should take in the search warrant investigation?

19 A. It was immediately after, once we

20 acquired the information from the John Doe.

21 Q. So it was on November 6th?

22 A. Yes.

23 Q. Okay. And it -- So it was before you

24 submitted the complaint for search warrant to

Page 176

1    me and Officer Donnelly.

2        Q.   Okay.  And did Officer Donnelly, did you

3    see him make any notes?

4        A.   No.

5        Q.   And after you met with the confidential

6    informant, you didn't make any notes then either,

7    did you?

8        A.   No.

9        Q.   Now, after talking with the John Doe and

10   having him tell you that the targets resided in

11   the second floor apartment, did you do anything

12   specific on your own to verify that Cavazos and

13   Roberts actually lived in that apartment,

14   apartment 2?

15       MR. KOWALCZYK:  Just object insofar as

16   it's been asked and answered previously in certain

17   respects, but go ahead and answer.

18       THE WITNESS:  Yes.  So --

19   BY MR. HOFELD:

20       Q.   What specifically did you do?

21       A.   I ran both of the names after they were

22   ID'd by the John Doe.

23       Q.   You ran which names?

24       A.   Curtis Robinson, and I -- I can't

1    pronounce -- Cava -- Cavazos, Patricia Cavazos,

2    Cavazos. Just --

3        Q.  You -- you ran which names?  You ran --

4        A.  Both names.

5        Q.  Okay.  You meant Roberts.  Right?

6        A.  Yeah.

7        Q.  You ran Roberts and you ran --

8        A.  Curtis Roberts.  Yeah.

9        Q.  Cavazos?

10       A.  Yes.

11       Q.  You ran them through what?

12       A.  Our LEADS database, at which point --

13   and I run someone through a LEADS database, it

14   asks for basic identifiers, date of birth, name

15   spelling, all of that, male, female, what

16   ethnicity they are, and once I send it through the

17   computer, it gives me a readout and the basic

18   readout states -- will give me an address.  It'll

19   give me usually  maybe a driver's license number,

20   a status of their driver's license, valid,

21   suspended, revoked, things of that nature,

22   warrants, stuff like that.  It gives a basic

23   readout of that person's history. That's available

24   to me in the LEAD system.

Page 178

1     Q.   Okay.

2     A.   And then I also --

3     Q.   Yes.  Go ahead.

4     A.   -- did a -- We have I-CLEAR system with

5     the Chicago Police Department where I could run

6     name checks on individuals --

7     Q.   Yes.

8     A.   -- and I did both -- name checks on both

9     individuals, and running them in I-CLEAR, coming

10    back with their criminal history, and just seeing

11    past arrests, what address they use for their

12    residence when they are arrested --

13    Q.   Yes.

14    A.   -- and etc. and etc.

15    Q.   Okay.  Is there anything else specific

16    that you did to attempt to verify that the targets

17    actually live in the second level apartment that

18    the John Doe identified?

19    A.   Those are the only two platforms that me

20    being in bureau patrol that I have access to and

21    can use.

22    Q.   Is there -- And to be clear, neither

23    database that you checked, neither the LEADS

24    database or the I-CLEAR system database turned up

1    the address, 3557 South Damen, second floor

2    apartment.  Correct?

3        A.  That's correct.

4        Q.  So neither database that you checked

5    confirmed that the apartment identified by the

6    John Doe was -- was -- was actually the apartment

7    where the targets could be found.  Correct?

8        A.  That's correct.

9        Q.  Okay.  When you got those results, when

10   your checks of those two databases were

11   inconclusive for corroborating the address given

12   to you by the John Doe, did it occur to you that

13   you should do something else to try to verify that

14   the address the John Doe gave you was correct for

15   these targets?

16       A.  So basically when you're doing search

17   warrants and things of that nature, a lot of the

18   times criminals are not going to use an address.

19   They're going to list someone else's name as an

20   address, and sometimes they're not going to list

21   anyone's name on that address, and sometimes when

22   you run these LEADS printouts and these I-CLEAR

23   printouts, criminals are not always honest with

24   where they are actually living, along with getting

1     updated addresses for, say, your driver's license

2     when it expires.  They may provide a old piece of

3     mail from where, say, their mother lives or a

4     grandmother lives, or some family member where

5     they receive the majority of their mail.  So

6     they're not going to actually use the Damen

7     address listed on the complaint of the search

8     warrant.

9         Q.   Understood.  So I think what you're

10    saying -- Correct me if I'm wrong.  What you're

11    saying is the fact that the Damen address didn't

12    turn up in the two databases you check --

13        A.   Yes.

14        Q.   -- checked does not necessarily mean

15    that they didn't live there?

16        A.   Yes.

17        Q.   Okay.  I understand that, but the other

18    possibility is that you have -- The other

19    possibility was that you had a John Doe who wasn't

20    giving you the correct information.  Right?

21        A.   That's correct.

22        Q.   Okay.  So did you do anything else --

23    and I think you answered this, but I want to give

24    you another chance just in case.  Did you do

Page 184

1    A.  That's incorrect.  We used several

2    websites in order to obtain pictures of the inside

3    of the location, such as, I believe, Redfin, and

4    all the realty websites, and I never at one point

5    saw any landlord's information at -- on any of

6    the -- I guess you say the -- like the Trulias,

7    the renting sites of -- that are all public to

8    anybody when they access the Internet.

9    Q.  Okay.  Were you looking for -- Were you

10   on those websites because you were looking for the

11   name of the landlord or the name of the property

12   manager or the building owner?

13   A.  I was obtaining any information that was

14   available to me --

15   Q.  Okay.

16   A.  -- on these websites, and at no point

17   did I see any lease owner information, any renters

18   because if I would have saw a name, I would have

19   called.  So, for example, if there was a -- a name

20   listed for the unit 2 -- of the Mendez' family, it

21   would have raised some red flags to me, and we

22   would have talked about it, but there was no

23   public information listed on there, a leaseholder,

24   who -- property manager.  It was pretty much

Page 188

1    find out the names of persons who live at a given

2    address, isn't that correct?

3        MR. KOWALCZYK:  Object to form, but go

4    ahead.

5        THE WITNESS:  At the time, not that I

6    was aware of.

7    BY MR. HOFELD:

8        Q.   Well, are you aware today?

9        A.   Later on today, yes, I'm aware of a

10   couple of new forms.

11       Q.   What are you aware of today?

12       A.   I believe there is something called

13   Accurint.

14       Q.   Okay.

15       A.   And I'm not sure of the other one, but I

16   do not have any access, still as a police officer,

17   to either one of those platforms.

18       Q.   Did you -- And so -- Now, you -- You --

19   Who has access to Accurint?

20       A.   To my basic understanding, the more

21   advanced units in the Chicago Police Department,

22   such as your fugitive apprehension is --

23   they're -- they're Chicago Police Officers, but

24   they're like assigned to the -- the task force for

1    the U.S. Marshals.  They have special -- You have

2    to have special clearances in order to use those

3    platforms, narcotic's division.  Some of the units

4    that just are high up there in prestige in the

5    Chicago Police Department, that me being a basic

6    patrolman, I'm not going to have a login or any

7    way of even getting onto any of those platforms.

8        Q.  Does Sergeant Egan have access to

9    Accurint?

10        A.  I have no idea.

11        Q.  Did the Chicago Police Department

12    lieutenants have access to Accurint?

13        A.  I have no idea.

14        Q.  Did you -- You -- Did you request that

15    you be given access to Accurint for the purpose of

16    running this particular address or the names of

17    the targets?

18        A.  At the time, I didn't even have any

19    knowledge that these two databases existed.

20        Q.  Okay.  And what's the second one?

21        A.   Accurint, and I'm not -- I don't know

22    the other name.

23        Q.  LexisNexis?

24        A.  Yeah.  There you go.

1    warrant complaint, taking notes, and etc.  And

2    once he -- he provided me with Mr. Roberts' name,

3    I was able to produce an I-CLEAR photo from the

4    I-CLEAR system.

5        Q.   Yes.

6        A.   And then along with that, I did a IR

7    relation search --

8        Q.   Yes.

9        A.   -- which corroborates several

10   co-subjects of a certain individual.  If they are

11   arrested --

12       Q.   Sure.

13       A.   -- case reports are generated.  It's an

14   overall database that kind of links everybody

15   together in some way, shape, or form.

16       Q.   Got it.

17       A.   And then I would be able to find the

18   female's picture.  So me using the CLEAR syst --

19   the CLEAR system, I was able to find I-CLEAR

20   photos to show to the John Doe, and then once he

21   confirmed that these were both of the targets

22   living in that individual unit, I then ran them in

23   the LEADS database, trying to see if the address

24   that the John Doe gave me did come back, but it

Page 198

1    did not come back to either/or subject.

2        Q.   Right.  Got it.  But did you -- You said

3    something about matching -- Maybe you misspoke or

4    maybe I misheard you.  You said something about

5    matching the address that John Doe gave you to the

6    address in the complaint for search warrant.

7        A.   Yeah, matching the address listed in the

8    complaint form, that -- to see if it would match

9    either subjects that were the target of the search

10   warrant.

11       Q.   Right.  And you couldn't come up with a

12   match?

13       A.   I could not come up with a match.

14   That's correct.

15       Q.   Okay.  Is there anything else -- I

16   understand your work with the databases you

17   confirmed a number of things through the

18   databases.  You confirmed that these were the

19   individuals.  You guys were talking about the same

20   individuals.

21       A.   Yes.

22       Q.   What other specific pieces of

23   information that the John Doe gave you did you

24   independently verify through other sources?

1      A.   Those were the only sources that were

2    available to me, and those were the only sources

3    that I used.

4      Q.   Are tho -- are those the only pieces of

5    information that you -- that you were able --

6    Strike that.

7         Are those the only pieces of information

8    that you verified through other sources, namely,

9    the identity -- the identify of the targets?

10     A.   That's correct.

11     Q.   Nothing else?

12     A.   Like I said before, we've -- we've --

13    Just the Chicago Police databases?  Is that what

14    you're asking?

15     Q.   No.  I'm saying -- I'm -- I'm asking you

16    what statements the John Doe made to you that you

17    actually verified through other sources were true?

18    And you've told me that the -- You've -- The

19    identities of the targets, I got that down.  If

20    you -- You guys are -- Let me help you.  You guys

21    were talking about the same building.

22     A.   The same building.  Yeah.

23     Q.   Okay.  Beyond those two pieces of

24    information that he gave you, were there any

1    with us when Officer Donnelly and Guzman brought

2    in the John Doe where we had the conversation

3    about the search warrant.

4       Q.  So then present in the room with the

5    judge was yourself and Sergeant Egan and the John

6    Doe.

7       A.  Yes.

8       Q.  Is that correct?

9       A.  That's correct.

10      Q.  I just -- I just want to be clear.  And

11   the other two officers did not remain in the room

12   or were not in the room?

13      A.  I don't believe so.

14      Q.  Okay.  Did you bring with you -- did you

15   bring the John Doe's criminal background history

16   with you when you went in to see the judge?

17      A.  Yes.  It's a part of the packet and it's

18   always included for the judge to see.

19      Q.  Very good.  And did you give it to Judge

20   Burns?

21      A.  Yes.

22      Q.  Did he review it?

23      A.  Yes.

24      Q.  Okay.  Did he ask you questions about

Page 222

1    it?

2        A.  He did not.

3        Q.  Did you tell him about the arrests from

4    the day before?

5        A.  Yes.

6        Q.  Did Judge Burns question the John Doe?

7        A.  Yes, he did.

8        Q.  What did he ask him?

9        A.  He asked him -- he asked him if this was

10   the residence where he was at stated in the

11   complaint, the -- I believe it was the 6th -- or

12   the 4th.  I don't remember the exact date.

13       Q.  I believe he said his last visit was on

14   the 4th.  Right?

15       A.  Yes, the 4th.  Yeah.  He asked him about

16   the last time he had been there and what he

17   observed, what the building looked like, and the

18   location of the building, which would be the

19   address and unit number.

20       Q.  How long did Judge Burns examine the

21   John Doe for?

22       A.  Probably 5 minutes.

23       Q.  Okay.  Did Judge Burns ask you any

24   questions about your complaint for search warrant

Page 223

1    or any of the information in your complaint?

2        A.   No.

3        Q.   Did he ask you -- Was the informant

4    present -- Strike that.

5            Did Judge Burns ask you if you had

6    verified the address through a source other than

7    the confidential informant?

8        A.   No, he did not.

9        Q.   You said that you and Sergeant Egan had

10   talked to Judge Burns about your complaint for

11   search warrant.  Right?

12       A.   Yes.

13       Q.   Okay.  Was that before the informant

14   arrived?

15       A.   It was just giving the judge a courtesy

16   of, sir, you know, we have a search warrant here

17   that needs to be signed, we're going to have a

18   John Doe walk in here, we're going pla -- go in

19   front of you for review.

20       Q.   Okay.  So did you present -- Did you

21   yourself present information or details from your

22   complaint to Judge Burns?

23       A.   Yes, I always give the judge the whole

24   packet, because he likes to see everything.

Page 224

1    Q.   What I need to -- I wasn't clear on that

2    orally.  Did -- did you summarize -- did you tell

3    the judge verbally about the contents of your

4    complaint for search warrant?

5    A.   I did not.

6    Q.   Okay.  So he just read it?

7    A.   He just read it.  Yes.

8    Q.   Okay.  And did Sergeant Egan try to

9    summarize the content of your complaint for search

10   warrant to Judge Egan -- to Judge Burns?

11   A.   No, he did not.

12   Q.   Okay.  So the judge just -- just read

13   the complaint and asked the John Doe a few

14   questions?

15   A.   Questions regarding things in the

16   complaint.  Yes.

17   Q.   And that was it?

18   A.   Yes.

19   Q.   How long were you in front of the judge?

20   A.   Probably 7 to 10 minutes, somewhere in

21   that window.

22   Q.   And the judge did his reading while he

23   was sitting there with you?

24   A.   Yes.

1       Q.   Did the judge ask anyone if children

2   lived in the building or in the second floor

3   apartment?

4       A.   I don't recall that.

5       Q.   You don't recall that he did?

6       A.   I don't recall that -- if he asked that

7   question or not.

8       Q.   Did you present any information to the

9   judge that is not contained in your complaint for

10  search warrant?

11      A.   Everything that's in my complaint was --

12  was presented to the judge.

13      Q.   How about the John Doe; did he present

14  any information to the judge that is not -- was

15  not contained in your complaint?

16      A.   No.

17      Q.   Was the -- was the John Doe on probation

18  or parole when he was arrested on October 6th?

19      A.   I don't recall that.

20      Q.   You don't recall that he was or you

21  don't recall one way or the other?

22      A.   I don't recall if he was on probation or

23  parole at the time.

24      Q.   Was the agreement, the oral agreement

Page 250

1        A.   To -- to our knowledge, at the time,

2    before we executed the search warrant, they were

3    reliable and credible to my understanding.  Yes.

4        Q.   Well, they were reliable only based on

5    what the informant told you.  Right?

6        A.   That's correct.

7        Q.   So the sole basis for reliability for

8    apartment 2 was what the informant told you.

9    Correct?

10       A.   That's correct.

11       Q.   And -- and as it turned out, that

12   representation wasn't reliable.  Right?

13       A.   That's correct.

14       Q.   Okay.  And on page -- and, finally,

15   VI(B) -- sorry, VI(B)(2)©, the investigation

16   leading up to the need for a search warrant has

17   been thoroughly conducted.  Is there -- In terms

18   of being thorough, in terms of thoroughness, is

19   there anything else that you -- that you think you

20   could have done to verify the apartment number

21   through a source other than the confidential

22   informant?

23       MR. KOWALCZYK:  Object to the form.

24   Asked and answered to some degree, but go ahead.

Page 251

1            THE WITNESS:  I believe we did the best

2      job we possibly could, and I'm sticking by my work

3      and --

4      BY MR. HOFELD:

5          Q.   So you --

6          A.   I used every platform that I was --

7      available to use being in patrol, and that's what

8      I used.

9          Q.   So -- so you don't think there's

10     anything else you could have done?  You can't

11     think of anything else you could have done?

12         A.   Not that I was aware of at the time.

13     No.

14         Q.   Okay.  And you did mention surveillance.

15     You would have liked to do more surveillance?

16         A.   That's correct.

17         Q.   Okay.  Okay.

18            MR. HOFELD:  Could we mark this, please,

19     as 7?  Thank you.

20     BY MR. HOFELD:

21         Q.   Officer, I'm handing you that.

22            MR. KOWALCZYK:  Thank you.

23     BY MR. HOFELD:

24         Q.   And let's see here.  Officer, can you

Page 260

1    which the agent knew or should have known was

2    false or intentionally misleading.  My question to

3    you is shouldn't you have known through conducting

4    your own investigation that the -- that the

5    targets -- that the informant's representation,

6    that the targets lived in the second floor

7    apartment was untrue?

8          MR. KOWALCZYK:  Object to the form.

9          THE WITNESS:  I believed everything was

10   truthful that the John Doe had said to me.  All

11   the information that he had given me while I was

12   in the 11th District matched up with a large

13   amount of narcotic -- narcotics recovered from

14   that day to the source that he gave, Curtis

15   Roberts, who did sell a large amount of narcotics

16   on a certain block in the 11th District.  And,

17   typically, drug dealers are not going to have a

18   home of record in the place where they're selling

19   and running a block of -- where they're selling

20   narcotics.  They're going to have it outside of

21   the district area.  So I believed that all the

22   information that the John Doe had given me was in

23   line and in order and reliable, based on my

24   experience as a Chicago Police Officer.

1    BY MR. HOFELD:

2        Q.   Well, this was your first search

3    warrant.  Right?

4        A.   Yeah.

5            MR. KOWALCZYK:  Object to the form.

6    BY MR. HOFELD:

7        Q.   So --

8            MR. KOWALCZYK:  First as an affiant.

9            MR. HOFELD:  As an affiant, thank you.

10   BY MR. HOFELD:

11       Q.   And so you didn't have much experience

12   with search warrant investigations before this

13   one, did you?

14       A.   No, I didn't, but I have a lot of

15   experience with narcotics that led up to this

16   point in understanding street terminology and the

17   rankings and systems that I had already prior

18   known of Curtis Roberts' involvement in the 11th

19   District with the huge heroin epidemic in the City

20   of Chicago.

21       Q.   Understood.  And I don't fault you for

22   any of that.  I think you -- My opinion's

23   irrelevant, but I think you did a good job on the

24   rest of the investigation.  I don't have any --

Page 262

1    I'm not arguing with you about that.

2         Slide 2944.  Let's see, the last bullet

3    point says ensure that the place to be searched is

4    accurately described and all investigative

5    resources were used to link the target of the

6    warrant to the place to be searched.  You did not

7    use all investigative resources available to you

8    to link the target to the place to be searched,

9    did you?

10        MR. KOWALCZYK:  Object to the form.

11        THE WITNESS:  I used the sources that

12   were available to me, and even though those

13   sources did not come back with a positive match

14   for the address doesn't mean that the target was

15   not going to be at that location and live at that

16   location.

17   BY MR. HOFELD:

18       Q.   Right, but it also -- The problem for --

19   for you was it also didn't mean that -- it also

20   didn't confirm that he was going to be at that

21   location, did it?

22       A.   Sometimes when con -- conducting search

23   warrants the target is not going to be at the

24   location.

Page 274

1    A.   That's correct.

2    Q.   Okay.  So I just want to ask you, did

3    you have any reason to think that this particular

4    informant that you worked with for 3557 was --

5    was -- was honest or more honest than -- than

6    other informants?

7    A.   I believed he was honest from the get-go

8    because the information that he provided was

9    valuable in our district and we had already had a

10   knowledge of it from the target he gave up and to

11   what he said he was doing in that area, selling

12   narcotics, and he was providing narcotics for that

13   area, and still is to this very day.  I believe

14   that all the information that the John Doe gave me

15   was credible and accurate and believable.

16   Q.   So you trusted the information that he

17   gave you.  Is that right?

18   A.   I did.

19   Q.   You felt it -- you felt it was

20   trustworthy?

21   A.   We weren't dealing with the average

22   street level of narcotics.  We arrested the John

23   Doe with the large amount of heroin that was on

24   his person.

Page 308

1    A.   Several courses within the -- my

2    military experience was like a little over three

3    years, expert marksman every year that I was in

4    the military.  I learned every platform from basic

5    carbine, what I carry on the street, or AR-15

6    platform to heavy machine gun, light machine gun,

7    50 cal bolt action rifle, pistol, every firearm

8    that was available in the United States Army,

9    pretty much.

10    Q.   And in terms of rifle safety, were you

11    specifically trained on how to hold an AR-15 in

12    order to stay safe?

13    A.   Yes.

14    Q.   And with respect to fingers on the

15    trigger, for example, are you ever supposed to

16    have your finger on a trigger of any weapon?

17    A.   Not unless you intend to engage that

18    weapon at another subject or some sort of that

19    nature.

20    Q.   In the apartment, November 7th of 2017,

21    was your finger ever on the trigger of the AR-15?

22    A.   It was never on the trigger.

23    Q.   Does that rifle also contain a safety?

24    A.   It does.

Page 309

1    Q.  Was the safety always engaged on that

2    rifle?

3    A.  The safety was enga – on the whole time.

4        MR. HOFELD:  In the apartment?

5    BY MR. KOWALCZYK:

6    Q.  In the apartment.

7    A.  Yes.

8    Q.  Okay.

9    A.  And my finger was never on the trigger,

10   along with the safety intact at all times.  It was

11   never flipped to the fire position.

12   Q.  Okay.  And you have already told us that

13   you've never -- you'd never pointed that AR-15 at

14   any individual with the intention of using it

15   while you were in the apartment?

16   A.  Yes.

17   Q.  Okay.  And you never pointed it at any

18   kids?

19   A.  Yes.

20   Q.  All right.  With respect to the members

21   of your team, are you trained regarding gun

22   safety?

23   A.  Yes.

24   Q.  All right.  In terms of search warrants,

Page 310

1    in particular, you may have a person in front of

2    you, for example.

3        A.  That's correct.

4        Q.  And making sure that your muzzle is at

5    the low ready or your gun is held at the low ready

6    is imperative in addition to people you may

7    encounter to not injuring a fellow officer?

8        A.  That's correct.

9        Q.  All right.  And is that something you

10   expected of your teammates as well when you --

11       A.  Yes.  We expect it of each other.

12       Q.  Okay.  So in a search warrant, as

13   Counsel pointed out, you do not know who or what

14   will be on the other side of the door?

15       A.  That's correct.

16       Q.  Upon entering a residence, the key

17   objective is to safely clear the residence as

18   quickly as possible?

19       A.  That's correct.

20       Q.  All right.  And as soon as the residence

21   is cleared, are weapon's put away?

22       A.  Yeah.  If the -- if the scene is deemed

23   safe and -- which I felt it was, put my rifle in

24   the truck that night.

Page 311

1    Q.  Okay.  And after you had cleared the

2  back room, I think you said you briefly went to

3  the living room, you then went downstairs to put

4  the -- the rifle in the truck?

5    A.  Yeah.  I cleared, made my way to the

6  kitchen, encountered Mr. Mendez, where he was

7  ordered to the ground, and then cleared the back

8  room, made my way back to the front to the living

9  room area, at which point Eric Sehner is taking

10  pictures in the hallway, I believe, and I kind of

11  dipped into a bathroom real quick so he could get

12  a clear picture without us in the hallway, at

13  which point I met with the perimeter officer,

14  Solis, and Officer Calhoun, and at which point

15  they opened the rear hatch to their patrol vehicle

16  and I placed my AR-15 rifle in the back.

17    Q.  Okay.  So as soon as a residence is

18  cleared, in the context of serving a search

19  warrant, you immediately de-escalate?

20    A.  Absolutely.

21    Q.  Okay.  And with respect to the use of

22  force policy that was referenced, de-escalation is

23  the concept throughout that -- that policy?

24    A.  Absolutely.

Page 312

1    Q.   Okay.  As you also had indicated, the

2    use of force policy applies to all people?

3        A.   That's correct.

4        Q.   So the de-escalation would apply to all

5    human life, including children?

6        A.   That's correct.

7        Q.   Okay.  And did you observe anyone doing

8    anything other than de-escalating after the

9    residence was cleared?

10       A.   Yes.  Everyone on the team was more than

11   polite to the whole family.  Officer Donnelly and

12   Offic -- Sergeant Egan did a great job of hanging

13   out with the family and getting them calmed down

14   after the initial breach into the apartment.

15       Q.   Okay.  And on the body-worn camera

16   footage, it appears that Sergeant Egan is the

17   first in the living room -- or -- or in the living

18   room with the family for the majority of the

19   period of time?

20       A.   That's correct.

21       Q.   Did you ever see Sergeant Egan's gun

22   even removed from his holster?

23       A.   No.

24       Q.   Okay.  At the entrance to the building,

Page 313

1    you indicated that a woman stuck her head out of

2    the window.  And my question there was you

3    reasonably believed her to be the target woman

4    whose who was -- seen you?

5        A.  Yes.

6        Q.  So at that point, was it your belief

7    that your cover had been blown in terms of serving

8    the search warrant?

9        A.  Yes.  I believed that at that point we'd

10   been made and began to announce.

11       Q.  Okay.  And when you say began to

12   announce, is that the -- the loud Chicago Police

13   search warrant that we hear on the body-worn

14   camera?

15       A.  That's correct.

16       Q.  All right.  And was the concern to you

17   that having been seen from the second floor

18   apartment by who you believed to be the target was

19   a big safety risk?

20       A.  Yeah, a safety risk for not just me but

21   everyone on the team.

22       Q.  Okay.  And was there also a risk of

23   potential contraband being disposed of before you

24   even got there?

Page 314

1     A.   Yes.

2     Q.   Okay.  The complaint for search warrant

3   that you drafted, I think you told us that

4   Sergeant Egan assisted you in that regard?

5     A.   That's correct.

6     Q.   Okay.  And did you rely on his

7   experience, to some extent, in terms of what you

8   needed to do in order to prepare your search

9   warrant?

10    A.   Absolutely.

11    Q.   Okay.  This being a John Doe, you did

12  indicate that the John Doe was in fact taken

13  before the judge in presenting the complaint for

14  search warrant?

15    A.   Yes.

16    Q.   Okay.  And Counsel had shown you certain

17  training documents of which, for example, Exhibit

18  7, page 2762, indicates types of search warrants,

19  and it states John Doe.  It says the prior

20  reliability of the person providing the

21  information for the search warrant complaint is

22  not necessary because the judge signing the

23  warrant will determine their credibility.  Do you

24  recall seeing that in the training document?

1     Q.   All right.  And did you believe that you

2   were operating under a valid search warrant for

3   the second floor apartment at the building at 3557

4   South Damen?

5     A.   Yes.

6     Q.   All right.  And the interior -- I'm

7   sorry, the -- the website that you mentioned,

8   whichever the website showed interior photos of

9   this building, did the John Doe in fact take you

10   through interior photos of the stairwell to show

11   you the route that you were to go to access where

12   the targets would live?

13     A.   Yes.

14     Q.   Okay.  And that was the first flight of

15   stairs and the door to the right, as he explained?

16     A.   That's correct.

17     Q.   All right.  And I believe we hear that

18   on the body-worn camera at one point as well,

19   someone mentioning that as information that was

20   shared.  Okay.  The use of body-worn cameras, was

21   it newer in the 11th District as of the time that

22   this search warrant was served in November of

23   2017?

24     A.   Yes, it was.

1     Q.  Okay.  So, for example, in 2787, it does

2    list the items for consideration within those

3    training documents?

4     A.  Yes.

5     Q.  Which would include the word children?

6     A.  That's correct.

7     Q.  Okay.  When you were hired -- In order

8    to be hired by the Chicago Police Department, you

9    had to pass a number of tests?

10     A.  That's correct.

11     Q.  And, ultimately, you did pass the state

12    certification in order to be a lawful officer?

13     A.  Yes, I did.

14     Q.  And you also passed any physical and any

15    psychological exams required?

16     A.  That's correct.

17     Q.  Okay.  And I think you indicated with

18    regards to the John Doe, that this particular

19    individual was providing information to you that

20    matched up with information you already had about

21    the drug trade in that particular area with that

22    particular person, Curtis Roberts?

23     A.  That's correct.

24     Q.  So he was giving you information that

Page 321

1 you already had other corresponding and

2 corroborating information about what the

3 activities of that person involved?

4  A. Yes.

5  Q. And so the fact he was found with this

6 huge amount of heroin, was giving information

7 about what this person was allegedly doing,

8 combined with the information that you pulled from

9 the CLEAR database, including the photos that he

10 identified of Curtis Roberts and then his baby

11 mama added to the credibility of this John Doe in

12 your belief?

13  A. Yes.

14  Q. All right. And you believe it was a

15 reasonable belief?

16  A. Yes, it was.

17  Q. Okay. The complaint for search warrant,

18 Counsel asked you, it doesn't contain certain

19 facts or certain details. The complaint for

20 search warrant must be sufficient -- must lay out

21 sufficiently facts to support probable cause in

22 order for you to obtain a search warrant?

23  A. Yes.

24  Q. No more, no less?

Page 339

1    STATE OF ILLINOIS   )

2                 )  SS:

3    COUNTY OF C O O K   )

4              I, SAM KOHLHAAS, a Notary Public

5    within and for the County of Cook and State of

6    Illinois, do hereby certify that JOSEPH CAPPELLO,

7    the deponent, was by me first duly sworn to

8    testify the truth, the whole truth and nothing

9    but the truth in the cause aforesaid; that the

10   deposition of the said JOSEPH CAPPELLO was taken

11   before me at 30 North LaSalle Street, Suite 3120,

12   Chicago, Illinois, commencing at the hour of 9:06

13   a.m. on the 18th day of September, A.D. 2019, and

14   was concluded at the hour of 4:38 p.m. on that

15   date.

16              I further certify that the

17   testimony given at said deposition by said

18   witness was recorded by an audio/visual recording

19   device, by me in the presence of said witness and

20   thereafter transcribed into typewriting under my

21   direction and control.

22              I further certify that the

23   foregoing transcript of said deposition is a

24   true, complete and correct report of the entire

4ff4baa4-97d8-4484-9354-de2ced93e500

Page 340

1   testimony so given by said witness, together with

2   such other matters and things as counsel for the

3   parties present at the taking of said deposition

4   desire to have appear of record.

5           I further certify that I am not

6   counsel for, nor attorney for any of the parties

7   to the aforesaid cause, nor am I related to any

8   of the parties to the aforesaid cause, nor am I

9   interested in any manner in the said cause or in

10  its outcome.

11          I further certify that the

12  deponent has reserved the right to review and

13  certify this transcript.

14          IN WITNESS WHEREOF, I have

15  hereunto set my hand and affix my seal of office,

16  at Chicago, Illinois this 9th day of October,

17  A.D. 2019.

18

19

20                          _Samuel Wohlhaas_

21

22          NOTARY PUBLIC

23  My commission expires:

24  May 13, 2023.