**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HESTER MENDEZ, et al. | ) | Case No. 18-cv-5560 |
| | ) | |
| Plaintiffs, | ) | Judge John Z. Lee |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| THE CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant City of Chicago ("the City"), by and through its attorney, Celia Meza,

Corporation Counsel for the City of Chicago, and Defendants OFFICERS JOSEPH T. CAPELLO

IV (#10626); LIEUTENANT SAMUEL DARI (#603); MICHAEL W. DONNELLY (#13784);

SERGEANT RUSSELL A. EGAN (#998); MICHAEL J. GUZMAN (#15911); JOSE M.

HERNANDEZ (#15925); and ERIC M. SEHNER (#11641), ("Defendant Officers"), by and

through their attorneys, Querrey & Harrow, Ltd., (collectively, "Defendants") for their

Memorandum of Law In Support of their Motion for Summary Judgment, states as follows:

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STATEMENT OF UNDISPUTED FACTS...........................................................................2

    Procurement and Issuance of the Search Warrant ..............................................................2

    Execution of the Search Warrant .......................................................................................3

    Plaintiffs' *Monell* Claim ......................................................................................................4

    The City's Use of Force Policy ...........................................................................................5

    The City's Investigative and Disciplinary Policy ...............................................................5

    The City's Training of Officers...........................................................................................6

    The DOJ and PATF Reports................................................................................................7

    The City's Efforts to Improve Policing and Police Accountability....................................8

STANDARD OF REVIEW....................................................................................................8

ARGUMENT ..........................................................................................................................9

    I. The Court Should Grant Summary Judgment in Defendants' Favor as to Counts II, III and X Because the Procurement of the Search Warrant Was Constitutional ...................................9

        A. The Search Warrant Was Valid, Supported by Probable Cause...................................9

        B. The Existence of Exigent Circumstances Rendered Officers' Entry into Plaintiffs' Residence Lawful................................................................................................................15

        C. The Valid Search Warrant Defeats Plaintiffs' Supervisory Liability Claim against Sgt. Egan.16

        D. Alternatively, The Court Should Find That Qualified Immunity Protects the Defendant Officers Against Plaintiffs' Claims Set Forth in Counts II and III .................................18

    II. This Court Should Grant Summary Judgment as to the Unlawful Search-Warrantless "Entry"/Failure to Retreat Claim.........................................................................................20

    III. Defendants Are Entitled to Summary Judgment on Plaintiff's Federal False Arrest/False Imprisonment Claim ............................................................................................................23

    IV. Plaintiffs' *Monell* Claim Fails Because Plaintiffs Cannot Show Any Element of the Claim .......25

        A. Plaintiffs' *Monell* Claim Fails Because They Did Not Suffer a Constitutional Violation Related to Use of Excessive Force........................................................................................26

        B. Plaintiffs Fail to Demonstrate a Widespread Practice..................................................30

        C. Plaintiffs' *Monell* Claim Fails Because Plaintiffs Fail to Establish Deliberate Indifference .....38

        D. Plaintiffs' *Monell* Claim Fails Because Plaintiffs Fail to Establish "Moving Force"................43

    V. This Court Should Grant Summary Judgment as to Plaintiffs' State Law Claims......................44

        A. Assault......................................................................................................................44

        B. Battery ......................................................................................................................45

i

C. State False Arrest/False Imprisonment ...........................................................................46

D. Intentional And/Or Negligent Infliction of Emotional Distress...............................47

E. Trespass ..................................................................................................................................48

F. *Respondeat Superior*/Indemnification..............................................................................49

**CONCLUSION**.................................................................................................................................49

## TABLE OF AUTHORITIES

*Anderson v. United States*, 107 F.Supp.2d 191, 199 (E.D.N.Y. May 18, 2000)............................29

*Archie v. City of Chi.*, 2020 WL 5751185 (N.D.Ill. Sept. 25, 2020)................................24, 48

*Bakes v. St. Alexius Medical Center*, 2011 IL App (1st) 101646............................................45

*Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 869-70 (7th Cir. 2011)..................................16

*Bailey v. United States*, 568 U.S. 186, 194 (2013)..........................................................46

*Baird v. Renbarger*, 576 F.3d 340, 344-46 (7th Cir. 2009).................................................27

*Baskins v. Gilmore*, 2018 WL 4699847, at *12 (N.D. Ill. Sept. 30, 2018)................................49

*Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003)...............................13

*Bellotte v. Edwards*, 629 F. 3d 415, 426 (4th Cir. 2011)...................................................29

*Billups v. Kinsella*, 2010 WL 5110121 (N.D. Ill. Dec. 9, 2010).........................................24

*Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 400 (1997)........31, 38

*Brady v. Maryland*, 373 U.S. 83 (1963).....................................................................33

*Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016)............................................47

*Caldwell v. City of Chi.,*, 2010 WL 2722207 (N.D. Ill. July 8, 2010).....................................48

*Calhoun v. City of Chi.*, No. 09 C 2200, 2010 WL 4503218 (N.D. Ill. Oct. 28, 2010)................12, 19

*Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014)..............................................9

*Catlin v. City of Wheaton*, 574 F.3d 361, 365 (7th Cir. 2009).............................................18

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).........................................................9

*Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001).......................................16

*Chelios v. Heavener*, 520 F.3d 678, 692–93 (7th Cir.2008)...............................44

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 386-88 (1989)............................36, 37, 39

*City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)..............................................25, 26

*Connick v. Thompson*, 562 U.S. 51 (2011)..............................................................36, 43

*Cornfield by Lewis v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993)........38

*Draine v. Bauman*, 708 F. Supp. 2d 693, 707 (N.D. Ill. 2010)...........................................19

*Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1058 (7th Cir. 2018)..............10, 13, 14, 15, 18, 19, 21, 23

*Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80-81 (Ill. 2003)...................................................47

*First Midwest Bank v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021)................................25

*Franks v. Delaware*, 438 U.S. 154, 171 (1978)............................................................13

*Graham v. Connor*, 490 U.S. 386 (1989)...........................................................5, 6, 27, 46

*Guzman v. City of Chicago*, 565 F.3d 393, 397-8 (7th Cir. 2009)..........................................21

*Happel v. Wal-Mart Stores, Inc.*, 316 Ill. App. 3d 621, 630 (2nd Dist. 2000)................................45

*Harney v. Speedway SuperAmerica, LLC*, 526 F 3d 1099, 1104 (7th Cir. 2003)...........................9

*Hespe v. City of Chicago*, 307 F. Supp. 3d 874 (N.D. Ill. 2018)...........................................44

*Holder v. Ivaniack*, 93 F.Supp.2d 933, 940 (N.D. Ill. 2000)...............................................45

*Holland v. Harrington*, 268 F.3d 1179, 1192-93 (10th Cir. 2001)........................................30

*Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018)...................................................27

*Illinois v. Gates*, 462 U.S. 213, 234 (1983)..............................................................11, 13

*Illinois Mun. League Risk Management Ass'n v. Siebert*, 223 Ill. App. 3d 864, 877 (1992).................45

*Jacobs v. City of Chicago*, 215 F.3d 758, 771 (7th Cir. 2000)............................................21, 30

*Jane Doe–3 v. McLean County Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880, 887 (Ill.2012)...........44

*J.K.J v. Polk County*, 906 F.3d 367, 387 (7th Cir. 2020)..................................................35, 41

*Jones v. Wilhem*, 425 F.3d 455, 467 (7th Cir. 2005)......................................................15

*Jones v. City of Chi.*, 856 F.2d 985, 992-93 (7th Cir. 1988)................................................17

iii

*Junkert v. Massey*, 610 F.3d 364 (7th Cir. 2010)………………………………………………10, 19

*King v. Avila*, 760 F. Supp. 681, 685 (N.D. Ill. 1991)………………………………………………20

*Kirk v. Michael Reese Hosp. & Med. Ctr.*, 117 Ill. 2d 507, 533 (1987)……………………………..49

*Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)………………………………………………18, 22

*Los Angeles County v. Rettele*, 550 U.S. 609, 615-16 (2007)……………………………………..26

*Malley v. Briggs*, 475 U.S. 335, 345 (1986)………………………………………………………19

*McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 2002)…………………………………………29

*McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill, 1988)……………………………………………….47

*McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 511 (7th Cir. 1993)…………………………....38

*Meerbrey v. Marshall Field & Co.*, 189 Ill. App. 3d 1085, 1090 (1st Dist. 1989)………………….46

*Michigan v. Summers*, 452 U.S. 692, 705 (1981)……………………………………………23, 46, 47

*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978)……………..25

*Muehler v. Mena*, 544 U.S. 93, 98 (2005)………………………………………………23, 24, 46, 47

*Ortiz v. City of Chicago*, 686 F.Supp.2d 782, 795 (N.D.Ill. Feb. 18, 2010)……………………….49

*Outley v. City of Chicago*, 354 F. Supp. 3d 847, 872 (N.D. Ill. 2019)……………………………26

*Palmquist v. Selvik*, 111 F. 3d 1332 (1997)……………………………………………………….36

*Pavlik v. Kornhaber*, 761 N.E.2d 175, 186, 326 Ill. App. 731, 743-744 (1st Dist. 2001)…………..47

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009)………………………………………………….18

*Pembaur v. Cincinnati*, 475 U.S. 469, 4798-80 (1986)……………………………………………31

*People v. Edwards*, 144 Ill. 2d 108, 126 (1991)…………………………………………………..23

*People v. Goduto*, 21 Ill. 2d 605, 609 (1961)……………………………………………………48

*People v. McGurn*, 341 Ill. 632, 637 (1930)………………………………………………………47

*Price v. City of Chicago*, 2018 IL App (1st) 161599……………………………………………….45

*Ruiz-Cortez v. City of Chicago*, 931 F.3d 592 (7th Cir 2019)……………………………………..33

*Sallenger v. City of Springfield, Ill.*, 630 F. 3d 499, 503 (7th Cir. 2010)………………………….8

*Scott v. Harris*, 550 U.S. 372 127 S. Ct. 1769 (2007)……………………………………………28

*Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir. 1990)……………………………………………..31

*Simmons v. City of Chi.*, 2017 WL 497755 (N.D. Ill. Feb. 7, 2017)………………………………23

*Skierkewiecz v. Gonzales*, 711 F. Supp. 931, 935 (N.D. Ill. 1989)………………………………..49

*Smith v. Vill. of Norridge*, 2009 WL 210458, at *35-36 (N.D. Ill. Jan. 22, 2009)…………………17

*Suarez v. Town of Ogden Dunes*, 581 F.3d 591, 595 (7th Cir. 2009)……………………………….9

*Swanigan v. City of Chicago*, 775 F.3d 953, 963 (7th Cir. 2015)………………………………….26

*Tangwall v. Stuckey*, 135 F.3d 510, 514 (7th Cir. 1998)………………………………………....18

*Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2010)…………………..31

*Tennessee v. Garner*, 471 U.S. 1, 7 (1985)……………………………………………………….27

*Torres v. U.S.*, 200 F.3d 179, 185-86 (3d Cir. 1999)……………………………………………..46

*Tuscola v. Otto*, 33 Ill.App.3d 853, 856 (Ill.App. 1975)………………………………………....49

*United States v. Banks*, 628 F. Supp. 2d 811, 815 (N.D. Ill. 2009)……………………………….23

*United States v. Barrientos*, 758 F.2d 1152, 1159 (7th Cir. 1985)………………………………..15

*United States v. Burns*, 37 F.3d 276, 280 (7th Cir. 1994)……………………………………….23

*United States v. Garcia*, 528 F.3d 481, 483, 487 (7th Cir. 2008)………………………………....12

*United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014)………………………………………10

*United States v. Jennings*, 544 F.3d 815, 819 (7th Cir. 2008)…………………………………….23

*United States v. Johnson*, 125 F. Supp. 2d 308, 311 (N.D. Ill. 2000)…………………………12, 13

*United States v. Koerth*, 312 F.3d 862, 867 (7th Cir. 2002)……………………………………...10

*United States v. Leon*, 468 U.S. 897, 924 (1984)…………………………………………………19

*United States v. Lloyd*, 71 F.3d 1256, 1263 (7th Cir. 1995)……………………………………....13

iv

*United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003)……………………………………………10
*United States v. Searcy*, 664 F.3d 1119, 1122 (7th Cir. 2011)……………………………………………12
*United States v. Singer*, 943 F.2d 758, 751 (7th Cir. 1991)……………………………………………15
*Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011)……………………………………………39
*Wade v. Ramos*, 2019 WL 1318368 (N.D. Ill. Mar. 19, 2019)……………………………………14, 15, 19
*Walker v. Weatherspoon*, 2017 WL 3521417 (N.D. Ill. Aug. 15, 2017)……………………………………29
*Weeks v. City of Chicago*, 2014 WL 3865852 at *3 (N.D.Ill. Aug. 6, 2014)………………………...49
*Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993)……………………………………………39
*Woodward v. Corr. Med Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004)…………………………..43
*Wragg v. Village of Thornton*, 603 F.3d 464, 468 (7th Cir. 2010)………………………………………...31

Statutes

720 ILCS 5/12-3……………………………………………………………………………………45
745 ILCS 10/2-101……………………………………………………………………………………44
745 ILCS 10/2-109……………………………………………………………………………………44, 49
745 ILCS 10/2–202……………………………………………………………………………………44

Rules

Fed. R. Civ. P. 56(c)(2)……………………………………………………………………………8-9

## INTRODUCTION

In their Fourth Amended Complaint, Docket ("Dkt.") No. 125, Plaintiffs bring a dozen claims arising out of the procurement and execution of a November 7, 2017 search warrant at their home. Body worn camera ("BWC") footage depicts nearly the entire incident, which lasts, in total, less than fifteen minutes and ends with handshakes and a high five with the minor plaintiffs, and the minor plaintiffs saying, "bye police."

In summary, a confidential informant arrested with a significant amount of drugs identified his suppliers as residents of the second floor apartment at 3557 S. Damen who he knew to be heavily armed. The officers investigated the informant's claims, had a Cook County Assistant State's Attorney review the warrant application, and then presented the informant to a Cook County judge, who asked him questions and approved the warrant. The officers executed the warrant the same day. BWC videos show some of the officers displayed guns on initial entry, handcuffed one of the occupants and then did not use further force. Unfortunately, the officers only then learned that the informant had provided incorrect information and the targets of the search warrant actually lived on the third floor. The officers apologized and left after about 14 minutes.

In Count I, the minor Plaintiffs bring a *Monell* claim in which they allege that the Individual Defendants, and particularly Defendants Officer Cappello and Sergeant Egan, used excessive force by pointing guns at them and/or handcuffing Gilbert Mendez during the warrant's execution, and that several alleged City policies caused the officers to do so. In Count II, Plaintiffs allege the Defendants procured and executed an invalid search warrant. In Count III, Plaintiffs allege that Defendant Egan should be liable for his supervision of the procurement of the warrant. In Count IV, Plaintiffs allege the officers failed to retreat after they were on notice that they were searching the wrong apartment. In Count V, Plaintiffs allege false arrest and false imprisonment based on the

1

detention during the warrant's execution. In Count VI, Plaintiffs allege assault. In Count VII, Plaintiffs allege battery based on Gilbert Mendez's handcuffing. In Count VIII, Plaintiffs allege false arrest and false imprisonment under state law. In Count IX, Plaintiffs allege intentional and/or negligent infliction of emotional distress under state law. In Count X, Plaintiffs make a claim for trespass. Counts XI and XII are for *respondeat superior* and indemnification. As discussed more fully below, Defendants are entitled to summary judgment on all counts.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The following summary is derived from Defendants' Statement of Undisputed Material Facts ("DSOF"), filed separately:

### *Procurement and Issuance of the Search Warrant*

On November 6, 2017, Sgt. Egan and Officer Sehner arrested a man during a traffic stop in which the officers recovered approximately 50-80 bags of heroin packaged for sale. DSOF ¶ 5. The man ("John Doe") became an informant, saying that he received the drugs from Curtis Roberts, for whom he had been selling drugs for a year, and providing the officers other information about Roberts and his girlfriend Patricka Cavazos. DSOF ¶ 6. Among other things, John Doe told Officers Cappello and Donnelly that he had been in the second-floor apartment at 3557 S. Damen on November 4, 2017 and had observed drugs in the bedroom there. DSOF ¶ 8. He also said that he had been in that apartment on five separate prior occasions during which he also saw drugs and money. *Id.* He said that Roberts was known to carry a gun and gave an explanation as to how to get to the Roberts/Cavazos apartment. DSOF ¶¶ 9-10. John Doe identified Roberts and Cavazos from booking photographs and identified the second-floor residence from photos and a video of the residence that were obtained from a real estate website. DSOF ¶ 16. John Doe also spoke to Sgt. Egan and gave him the same information. DSOF ¶ 11. Officers Capello and Donnelly drove John

2

Doe past 3557 S. Damen twice, and he pointed out the second-floor windows as the place where he saw the drugs. DSOF ¶ 18.

Based on the above, Officer Cappello wrote a complaint for search warrant and a search warrant with help from Sgt. Egan and the Cook County State's Attorney's Office's Felony-Review Unit. DSOF ¶ 20. After some discussion, ASA Glen Runk approved the search warrant. DSOF ¶ 23. Officers Donnelly and Guzman took John Doe before Judge Burns, who questioned him in the presence of Sgt. Egan and Officer Cappello about matters including his arrest, his criminal background, and his previous drug sales. DSOF ¶¶ 24-25. Judge Burns approved a search warrant authorizing the officers to search the second floor of 3557 S. Damen Avenue and to seize illegal drugs, paraphernalia, cash, records of illegal drugs transactions and residency documents. DSOF ¶ 26. Lt. Samuel Dari reviewed and approved the warrant after it had been approved by ASA Runk and Judge Burns. *Id.* Even after the warrant had been approved, Officer Cappello interviewed John Doe again to go over everything, including directions for reaching the target apartment. DSOF ¶ 27. Unbeknownst to the officers, however, their targets actually lived on the third floor of 3557 S. Damen Avenue and Plaintiffs lived on the second floor of the building. DSOF ¶ 29.

### Execution of the Search Warrant

On November 7, 2017, the officers were approaching the residence on the verge of executing the warrant when Hester Mendez looked outside her second-floor window, one of the same windows identified by the J. Doe, and made eye contact with an officer before moving away. DSOF ¶ 31. Thinking that Hester Mendez was Cavazos, the officers believed their cover had been blown, creating a risk to their safety and the possibility that evidence would be destroyed. DSOF ¶ 32. The officers sped up their entry, yelling, "Police, Search Warrant!" as they ran up the stairs to the second floor. DSOF ¶¶ 34-35. Six officers entered Plaintiffs' apartment to execute the search warrant—Sgt. Egan and Officers Cappello, Guzman, Donnelly, Sehner, and Hernandez, with all but

3

Sgt. Egan and Officer Cappello having BWC that captured what happened during the search. DSOF ¶ 33.

The BWC of Officers Guzman, Donnelly, Sehner and Hernandez shows that none of those officers had guns pointed directly at the plaintiffs at any point. DSOF ¶ 37. Capello, the only officer with a rifle, is seen on other officers' BWC with his rifle out but is never shown to have directed that gun at any of the plaintiffs and he kept his handgun holstered for the entire incident. DSOF ¶¶ 38, 42. Likewise, Sgt. Egan is not shown on other officers' BWC to have pointed his gun at any of the plaintiffs, or even to have his gun outside of his holster. DSOF ¶ 39. The footage shows Gilbert Mendez being handcuffed without incident in the kitchen, away from the minor Plaintiffs. DSOF ¶ 49. The officers smelled burnt cannabis, which was illegal at the time and which Gilbert Mendez admitted smoking, immediately upon entering the residence. DSOF ¶ 56. The officers concluded that the Plaintiffs were not Roberts or Cavazos, but thought it was possible that they were related to Cavazos in some way. DSOF ¶ 61. The officers only knew definitively that Plaintiffs were not connected to Roberts or Cavazos when Hester Mendez told them that Roberts and Cavazos lived upstairs and accurately described them. DSOF ¶ 64. At about 11 minutes into the search, Gilbert Mendez was uncuffed. DSOF ¶ 65. Afterward, the officers spent time talking with Plaintiffs, apologizing, shaking hands, and giving high fives to Peter and Jack Mendez. DSOF ¶¶ 66-67. After about 14 minutes, the officers left the apartment. DSOF ¶ 68.

## Plaintiffs' Monell Claim

Plaintiffs bring a *Monell* claim that alleges that the City has a widespread practice of using excessive force against or in the presence of minors, a widespread practice of failing to investigate and discipline the use of excessive force against or in the presence of minors, a failure to train officers to avoid the use of excessive force against or in the presence of minors and the code of

silence. DSOF ¶ 69. The parties have agreed that the relevant time period for this claim is from January 1, 2012 to December 31, 2017. DSOF ¶ 70.

### The City's Use of Force Policy

The City had two official policies on the use of force during the *Monell* time frame, which explicitly or implicitly quote the U.S. Supreme Court case, *Graham v. Connor*, 490 U.S. 386 (1989). DSOF ¶¶ 71-74 The policies do not expressly include words like "children" or "minors" because the City deems it unnecessary to specify "children" or "minors" as the policy applies to *everyone*, including children. DSOF ¶ 76. This policy aligns with the law. *Id.*

### The City's Disciplinary and Investigative Policy

Before the start of the *Monell* period, the City had created the Independent Police Review Authority ("IPRA") to investigate, among other areas, all allegations of the use of excessive force. DSOF ¶ 83. IPRA would investigate each complaint it received as to excessive force as long as the complaining witness signed an affidavit vouching for the validity of the allegations. DSOF ¶ 84. A state law at the time, the Uniform Peace Officers' Disciplinary Act, generally barred the investigation of misconduct complaints that lacked an affidavit. DSOF ¶ 85. The City enacted an "affidavit override" procedure that allowed investigations to proceed in cases where objective evidence could be observed that allowed for an IPRA official sufficient objective basis to believe a complaint had validity despite the lack of an affidavit. DSOF ¶¶ 86, 90. In 2016, City Council replaced IPRA with the Civilian Office of Police Accountability ("COPA"), giving this new agency more and broader power and resources. DSOF ¶¶ 119, 135, 137. Both IPRA and COPA executed their duties to the best of their abilities. DSOF ¶¶ 88, 91. Their sustained rates and other factors as it pertains to use of force incidents involving minors indicates that these investigations were taken seriously and investigated as such. DSOF ¶¶ 89, 92-94.

### The City's Training of Officers

The City trains officers on the use of force based on its official policy, which is based on the constitutional standard set out by *Graham v. Connor*. DSOF ¶ 95. This training instructs officers to evaluate the totality of the circumstances, which includes the age, size, and strength of the person the officer is interacting with. DSOF ¶ 98. More relevantly here, Chicago police officers are trained to be aware of children and to make it a priority to handle them tenderly and with extra care when executing search warrants. DSOF ¶¶ 96-97, 99. Officers are instructed orally throughout their search warrant training to be aware and sensitive to the presence of children and to try to always create a calm environment once the premises is cleared. DSOF ¶ 97.

During the *Monell* period, the City also trained officers to use a trauma-informed approach to policing children to avoid harming their health and development. DSOF ¶ 99. This training included a course called Crisis Intervention Team-Youth training ("CIT-Youth), a course called Procedural Justice, and a course in the Neurobiology of Post-Traumatic Stress Disorder ("PTSD"). DSOF ¶ 100-101. The City also trained officers on child development through the CIT – Youth course, the Neurobiology of PTSD course, its Crisis Intervention Team training, its Safe Start video and a video titled "Children Exposed to Violence". DSOF ¶ 101. These videos discussed the impact of violence on children. *Id.* The Neurobiology of PTSD was a required course for all recruits *Id.* Moreover, the Procedural Justice Course, which focuses on positive interactions and included a scenario involving an interaction with youth, was required for all officers. *Id.*. Over 2000 officers took the CIT course during the *Monell* Period and over 600 officers took the CIT-Youth course during the *Monell* Period. *Id.*. Lastly, since the early 2000s, many officers have received training employing trauma-informed principles through Children Exposed to Violence Training. DSOF ¶ 103.

In addition to these classes, all officers were required to take the City's revised use of force training in 2017 and 2018. DSOF ¶ 104. This Use of Force course trained officers on the factors to consider whether force was appropriate including the relative size and strength of the individual to the officer in the situation at issue. *Id.* Lastly, CPD was afforded accreditation from the Commission on Accreditation for Law Enforcement Agencies in 2017. DSOF ¶ 109.

***The DOJ Report and PATF Reports***

In 2016, then-Mayor Rahm Emanuel convened a Police Accountability Task Force to examine the City's police department and investigatory systems to make recommendations. DSOF ¶ 110. The PATF issued a report ("PATF Report") that stated in summary that widespread changes were needed in the City's policing and police accountability systems, including a complete overhaul of the Independent Police Review Authority ("IPRA"). DSOF ¶ 111. The PATF Report also found that police officers needed to improve relations with youth. *Id.* None of its recommendations pertained to the execution of search warrants. DSOF ¶ 112.

In 2017, the Department of Justice issued its own report about the Chicago Police Department and the City's disciplinary systems ("DOJ Report"). DSOF ¶ 114. The DOJ Report was critical of many aspects of how the CPD used force and stated that it had "reasonable cause to believe that there was a pattern and practice of CPD officers using unreasonable force." and that it believed the pattern and practice of CPD officers using unreasonable force included the use of less-lethal force against children. DSOF ¶¶ 114-115. The DOJ Report, however, contained no evidence of the use of excessive force akin to what Plaintiffs here are claiming: the pointing of guns during the execution of a search warrant, nor did it even contain numerous examples of excessive use of force on children. DSOF ¶¶ 116-118.

*The City's Efforts to Improve Policing and Police Accountability*

The City has been engaged in various efforts to improve policing and police accountability during the *Monell* period. DSOF ¶¶ 119-120. The City revised its use of force policy in 2017 in the wake of the DOJ Report. DSOF ¶¶ 127. In revising the policy, it sought information from community groups, other police departments, and think tanks. DSOF ¶ 129. The policy revision included a specific instruction to not use Tasers, pepper spray and canines on children or elderly people, as recommended by the DOJ Report. DSOF ¶¶ 122, 127.

The City also abolished IPRA and created COPA to address many of the practices raised in the PATF Report. DSOF ¶¶ 111, 135, 137. Among the City's objectives in creating COPA were to further improve accountability and independence. DSOF ¶¶ 135-137.

Additionally, the City created a specific full-time position within its Office of Inspector General to focus on both potential issues with the police department and its police accountability framework. DSOF ¶¶ 119, 135. The Deputy Inspector General for Public Safety is tasked not just with investigating individual cases but also looking for potential systemic problems. *Id.*

Moreover, the City expanded its use of BWC among its patrol officers from a pilot program to wide use in order to have a documented record of their activities. DSOF ¶¶ 113, 119, 125. Lastly, the City Council issued multiple resolutions or orders highlighting an intent to engage in the reform process sparked by the PATF and DOJ reports, and expressed commitment to proposed reforms and entering into a consent decree. DSOF ¶ 136.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Sallenger v. City of Springfield, Ill.*, 630 F. 3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ. P.

56(c)(2)). In determining whether summary judgment is appropriate, the court should construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Irrelevant or unnecessary facts do not deter summary judgment, *even when in dispute. Harney v. Speedway SuperAmerica, LLC*, 526 F 3d 1099, 1104 (7th Cir. 2003) (Emphasis added).

## ARGUMENT

I.     **The Court Should Grant Summary Judgment in Defendants' Favor as to Counts II, III, and X Because the Procurement of the Search Warrant Was Constitutional.**

Plaintiffs claim that the search warrant procured for their apartment was unconstitutional, that Sgt. Egan should be held liable for failing to supervise the procurement of the search warrant, and that the Defendant Officers trespassed in their home. (Dkt. 125, Counts II, III and X). These claims are defeated by the fact that the Defendant Officers were operating in good faith under a legally valid warrant.

### A.     **The Search Warrant Was Valid, Supported by Probable Cause.**

The undisputed facts in this case show that the Defendant Officers obtained the warrant in this case in good faith and that an independent magistrate approved the search warrant. Plaintiffs cannot show Officer Cappello, Sgt. Egan, or any other Officer had any reason to doubt the validity of the search warrant for Plaintiffs' residence or that any Officer withheld information from Judge Burns when he approved the search warrant.  Rather, the undisputed facts in this case show that Officer Cappello's affidavit in support of the Search Warrant sufficiently established the existence of probable cause. Probable cause exists when the totality of the circumstances is sufficient to warrant a man of reasonable prudence to believe that evidence of a crime will be found. *Suarez v. Town of Ogden*

9

*Dunes,* 581 F.3d 591, 595 (7th Cir. 2009). *See also Junkert v. Massey*, 610 F.3d 364, 367-68 (7th Cir. 2010) (explaining that affidavit for search warrant supports a finding of probable cause if "based on the totality of the circumstances," a reasonable person would believe that the search will uncover evidence of a crime); *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003) (same)).

The fact that the J. Doe does not appear to have a history of cooperating with the police does not render his information unreliable. As the *Edwards* Court reasoned, "statements from an informant of unknown reliability may serve to establish probable cause 'if, under the totality of the circumstances, a reasonable person might consider that the statements are worthy of credence.'" *See Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1058 (7th Cir. 2018) (quoting *United States v. Koerth*, 312 F.3d 862, 867 (7th Cir. 2002) (finding the fact that the J. Doe lacked a track record of being a reliable informant is "far from disqualifying" as "every informant necessarily provides information for the first time" when they begin working with police).

Since the totality of the circumstances test turns on the J. Doe's "reliability, veracity, and basis of knowledge," Courts analyze the following factors when considering search warrant affidavits premised on facts provided by an informant: "[1] the level of detail, [2] the extent of firsthand observation, [3] the degree of corroboration, [4] the time between the events reported and the warrant application, and [5] whether the informant appeared or testified before the magistrate." *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014); *Junkert*, 610 F.3d at 367. Because no one factor is determinative, "a deficiency in one factor may be compensated for by a strong showing in another or by some other indication of reliability." *Peck*, 317 at 756. As all five *Glover* factors are satisfied here for the following reasons, the information Officer Cappello obtained from the J. Doe was sufficiently reliable to support a finding that probable cause existed to obtain and execute the search warrant at the second floor apartment at 3557 S. Damen.

First, the Complaint for Search Warrant was sufficiently detailed and specific because it included: the targets' names, address, and the items to be seized, as well as a detailed account of the criminal activity observed by the J. Doe and the search warrant investigation. Specifically, it details that the J. Doe was inside of the targets' residence on November 6, 2017, when he observed a gym bag containing four large bags of suspect heroin and cocaine inside of the targets' bedroom. DSOF ¶ 21. It also details that the J. Doe knew Curtis Roberts for approximately 10 years and target, Patricka Cavazos for two years, that the J. Doe had been inside of the target's residence on five separate occasions during which he observed heroin and cocaine stored in the same manner. *Id.* Finally, it contained information regarding Officer Cappello's corroboration of the information provided to him, as well as the fact that J. Doe was brought before Judge Burns who questioned him and approved the search warrant. *Id.* The information provided by J. Doe and included in the Complaint for the Search Warrant is thus sufficiently detailed and reliable. *See Illinois v. Gates*, 462 U.S. 213, 234 (1983) (explaining detailed description with a statement that criminal activity was observed first-hand affords greater weight to J. Doe's information).

The undisputed facts show that the second *Glover* factor is also satisfied as the above information was entirely based on the J. Doe's own personal observations. DSOF ¶¶ 6, 8-10, 16-17. In short, the J. Doe related multiple first-hand observations based on having been inside the residence two days before his arrest and on five occasions prior to that, and based on the fact that he had been dealing drugs for Roberts for about a year. *Id.*

Next, Officers sufficiently corroborated the J. Doe's information. The officers' steps to corroborate the information included interviewing the J. Doe multiple times, running the targets' names through the LEADS database, showing the J. Doe photos of the targets and photos and a video of Plaintiffs' apartment obtained from a real estate website, driving the J. Doe by the apartment, and conducting 20 minutes of surveillance on the apartment. DSOF ¶¶ 8, 11-13, 18, 22.

11

None of the investigation refuted the J. Doe's statements. The undisputed facts clearly show that J. Doe's statements, as well as Officer Cappello and Sgt. Egan's corroboration, were sufficient to establish probable cause. *See Calhoun v. City of Chi.*, 2010 WL 4503218, at *3 (N.D. Ill. Oct. 28, 2010) (Der-Yeghiayan, J.)(finding informant's statements sufficient to show probable cause since they were based on his personal observations and corroborated by officer). *See also United States. v. Johnson*, 125 F. Supp. 2d 308, 311 (N.D. Ill. 2000) ("Although corroboration by an officer's independent investigation bolsters a finding of reliability, firsthand observations of a CI alone are enough.").

The fourth *Glover* factor is satisfied because J. Doe informed Officer Cappello on November 6, 2017, that he observed the narcotics in the targets' bedroom in the second-floor apartment at 3557 S. Damen two days earlier on November 4, 2019. DSOF ¶¶ 5, 6, 8. The search warrant was approved and executed on November 7, 2017, one day after Officer Cappello received the information from the J. Doe and only three days after the narcotics were observed in the residence. DSOF ¶¶ 24-25. *See United States v. Searcy*, 664 F.3d 1119, 1122 (7th Cir. 2011) ("This information was [] transmitted within a relatively short period of time—72 hours—before the application for the search warrant and certainly was not stale."); *United States v. Garcia*, 528 F.3d 481, 483, 487 (7th Cir. 2008) (reasoning that information contained in search warrant complaint was fresh because the drugs had been observed in the target residence three days before the warrant was approved and executed).

Finally, John Doe was brought before the magistrate and Judge Burns specifically asked him questions about his arrest the night before, his criminal background, how many times he had sold drugs for the target, and if he had ever been incarcerated DSOF ¶¶ 24-25. John Doe's criminal history and pending investigations were also made available to the Judge. *Id.* Judge Burns, who was fully aware of the scope of the information provided by John Doe and the corroboration of that information, clearly did not find the information or investigation lacking as he approved the search

12

warrant. Significantly, the John Doe is presumed to be reliable because he was cross-examined by Judge Burns. *Johnson*, 125 F. Supp. 2d at 311. *See also United States v. Lloyd*, 71 F.3d 1256, 1263 (7th Cir. 1995) ("Where an informant . . . is available to give testimony before the judge issuing the warrant, that informant's presence adds to the reliability of the information used to obtain the warrant, because it provides the judge with an opportunity to assess the informant's credibility and allay any concerns he might have had about the veracity of the informant's statements.") (internal quotations omitted).

A consideration of the *Glover* factors indisputably demonstrates that J. Doe was reliable and the search warrant was supported by probable cause. When deciding if probable cause existed, courts "'look only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight.'" *Edwards*, 907 F.3d at 1057 (quoting *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003)). Great deference is given to the probable cause finding made by the judge who evaluated the warrant application and it will be upheld if "there is a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Id.* (quoting *Gates*, 462 U.S. at 236). Defendants, therefore, acted reasonably in procuring the search warrant.

There is a presumption of validity with respect to the affidavit supporting the search warrant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). To defeat summary judgment, Plaintiffs must provide evidence that the Officers "knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officers' determinations that probable cause existed []." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 742 (7th Cir. 2003) (citing *Franks*, 438 U.S. at 155-56). Plaintiffs have not introduced any evidence in this case that officers made false statements to or withheld evidence from Judge Burns.

Plaintiffs are instead critical of the scope of the Officer Cappello's investigation and allege that he should have searched additional databases or contacted utility companies and/or Plaintiffs'

landlord. Officers, however, are not legally required to conduct the additional investigations contemplated by Plaintiffs. Such contentions are nothing more than an attempt to place a higher burden on Officers than what is constitutionally required and are completely negated by the undisputed fact that Judge Burns approved the search warrant after questioning the J. Doe and Officer Cappello regarding the information provided by the J. Doe and the search warrant investigation. DSOF ¶ 25. Moreover, such contentions are insufficient to defeat summary judgment.

Significantly, Seventh District and Northern District precedent strongly supports granting summary judgment in this case. The Seventh Circuit decision in *Edwards* also provides support for finding that the Search Warrant here was supported by probable cause. The *Edwards* Court determined that the search warrant was supported by probable cause because J. Doe gave specific information, based on his own firsthand observations, regarding his recent heroin purchase from the target, i.e., the quantity of drugs purchased, the quantity the target possessed, the target's offer to sell him more in the future, and the fact that he knew it was heroin because he had ingested it. *Edwards*, 907 F.3d at 1057. Further, the officer corroborated J. Doe's information by having him identify a photo of the house, by driving him past the location, and by having him identify a photo of the target. DSOF ¶¶ 16, 18; *See Id.* Finally, three days passed between J. Doe's heroin purchase and when the warrant was submitted and J. Doe appeared before the judge. DSOF ¶¶ 8, 24; *See Id.* The Court found that "[t]hese facts and circumstances combined to demonstrate a substantial likelihood that the search would uncover evidence of a crime, and the Fourth Amendment requires no more." *Id.* (internal quotations omitted).

In *Wade v. Ramos*, 2019 WL 1318368 (N.D. Ill. Mar. 19, 2019)(Pallmeyer, J.), the Court found that the totality of the circumstances supported finding that probable cause existed because "the facts in the criminal complaint that satisfy the *Glover* factors are, by definition, facts indicating that information relayed by Doe was reliable since those facts are designed to assess reliability, veracity,

14

and basis of knowledge." *Id.* at *12. Similar to the Complaint for Search Warrant submitted by Officer Cappello in this case as referenced throughout, the complaint in *Wade* identified the target by name, described a specific instance of unlawful conduct in which the target sold the informant [narcotics], provided the date the unlawful conduct occurred, identified the target apartment building by its address, stated the apartment was on the second floor, and had a brief description of the face of the building. *Id.* at *11-12. As set forth above, the Complaint for Search Warrant here contained this same information relating to the target, the narcotics transaction, and the residence to be searched. The Complaint for Search Warrant and Search Warrant here are substantially similar to those in *Wade* and *Edwards*. This Court should thus find that J. Doe was reliable and the Search Warrant was supported by probable cause.

It should be noted that Plaintiffs' Unlawful Search-Invalid Warrant claim is also brought against Lt. Dari. However, the undisputed facts in this case show that he was not involved in procuring the search warrant. Rather, he reviewed and approved the complaint for search warrant and search warrant, for which he believed probable cause existed, after they had already been approved by ASA Runk and Judge Burns. DSOF ¶ 26. Accordingly, the Court should also grant summary judgment as to Lt. Dari on Count II of the Fourth Amended Complaint.

### B. The Existence of Exigent Circumstances Rendered Officers' Entry into Plaintiffs' Residence Lawful.

Pursuant to the Fourth Amendment, Officers are required to knock and announce their office prior to entering a residence to execute a search warrant. However, the existence of exigent circumstances can excuse an officer's failure to knock. *United States v. Singer*, 943 F.2d 758, 751 (7th Cir. 1991). Exigent circumstances include "a particularized risk to the officers executing a warrant" and the risk that the occupants of the residence will destroy evidence before the officers are able to enter. *Jones v. Wilhem*, 425 F.3d 455, 467 (7th Cir. 2005) (citing *Singer*, 943 F.2d at 762; *United States v. Barrientos*, 758 F.2d 1152, 1159 (7th Cir. 1985)).

As Defendant Officers were approaching the building, Mrs. Mendez, who resembled Patricka Cavazos from the Officers' viewpoint, was admittedly looking out the window of the second floor apartment and made eye contact with an Officer. DSOF ¶¶ 31-32. At that point, both of the above-mentioned exigent circumstances were present as Officers believed that their cover had been blown which posed a security and safety risk. DSOF ¶ 32. This was especially true since the J. Doe had informed Officers that handguns were possibly present in the 2nd Floor apartment and that he knew Curtis Roberts to carry firearms, and because the Officers already had some prior knowledge of Curtis Roberts's criminal history. DSOF ¶¶ 6, 9, 19. Moreover, Defendant Officers were also concerned that a risk that approximately kilo of heroin and other narcotics would be destroyed. DSOF ¶¶ 32, 34. Due to the particularized risk to the Defendant Officers and the risk that the contraband would be destroyed, Officers quickly entered into the building and residence in order to ensure officer safety and to prevent the destruction of evidence. *Id.* Officers began announcing their office at the front door to the building and continued yelling "Police, Search Warrant" loudly as they ran up the stairs to the second floor apartment where Officer Guzman used the ram to force entry. DSOF ¶ 35. The undisputed facts in this case, therefore, show that the Officers' entry into Plaintiffs' residence without knocking was justified by the existence of exigent circumstances. Defendants are therefore entitled to summary judgment on Count II.

### C. The Valid Search Warrant Defeats Plaintiffs' Supervisory Liability Claim against Sgt. Egan.

The undisputed facts show that summary judgment is proper as to the supervisory liability claim against Sgt. Egan. Pursuant to § 1983, a supervisor "may be personally liable for the acts of his subordinates if he 'approves of the conduct and the basis for it.'" *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 869-70 (7th Cir. 2011) (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001))). To be found liable under supervisory liability, supervisors must act either knowingly or with deliberate, reckless indifference in that they "must know about the conduct and facilitate it, approve

16

it, condone it, or turn a blind eye for fear of what they might see." *Id.* (quoting *Jones v. City of Chi.*, 856 F.2d 985, 992-93 (7th Cir. 1988)) (internal quotations omitted). Supervisors who are merely negligent, or even grossly negligent, are not liable under § 1983. *Jones*, 856 F.2d at 992. *Id.* Nor can there be any supervisory liability without an underlying constitutional deprivation. *Smith v. Vill. of Norridge*, No. 06 CV 4250, 2009 WL 210458, at *11 (N.D. Ill. Jan. 22, 2009).

In the instant matter, the undisputed facts establish that the search warrant for Plaintiffs' residence was supported by probable cause and, therefore, did not violate Plaintiffs' constitutional rights. As there is no underlying constitutional violation with respect to the procurement of the search warrant for the reasons set forth above, Sgt. Egan cannot be held liable under a supervisory liability theory for the procurement of the search warrant. *Id.*

But even assuming for argument's sake that there was something amiss with the procurement of the warrant, the facts of this case show that Sgt. Egan acted reasonably at all times while supervising Officer Cappello's investigation. Sgt. Egan assisted and supervised the investigation by walking Officer Cappello through the process of what was needed for the search warrant, advising him to verify the J. Doe's information, re-interviewing the J. Doe, conducting surveillance, and assisting Officer Cappello with having the Cook County State's Attorney's Office felony review division and the Judge review and approve the search warrant. DSOF ¶¶ 7, 18. He was also present when Judge Burns questioned the J. Doe and Officer Cappello and approved the search warrant. DSOF ¶ 26. Notably, Sgt. Egan believed the J. Doe was credible based on information he was providing them regarding narcotics activities in the District and regarding the target. DSOF ¶ 19. Sgt. Egan further believed that the search warrant was valid. DSOF ¶¶ 29, 57 . The undisputed facts in this case, therefore, clearly establish that Sgt. Egan did not act either knowingly or with deliberate, reckless indifference when he was assisting and supervising Officer Cappello's search warrant investigation.

17

Summary judgment is also proper to the extent the supervisor liability claim relates to the execution of the search warrant. As set forth above, the quicker entry into Plaintiffs' residence was justified by the existence of exigent circumstances in that Mrs. Mendez was looking out the window as Officers were approaching, thereby creating safety risk to the officers and a risk that any contraband would be destroyed. Furthermore, as set forth below in Sections II and III, the Officers reasonably executed the search warrant in that Plaintiffs were lawfully detained and the Officers left the residence as soon as they determined that the targets lived on the third floor. Accordingly, Sgt. Egan did not act either knowingly or with deliberate, reckless indifference when he was assisting and supervising the execution of the search warrant. Defendant Sgt. Egan is therefore entitled to summary judgment as to Count III of the Fourth Amended Complaint.

**D.      Alternatively, The Court Should Find That Qualified Immunity Protects the Defendant Officers Against Plaintiffs' Claims Set Forth in Counts II and III.**

The doctrine of qualified immunity shields officers from liability under § 1983 when they perform their duties reasonably. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). *See also Tangwall v. Stuckey*, 135 F.3d 510, 514 (7th Cir. 1998) (explaining qualified immunity protects officers from interferences with their duties and threats of liability). Qualified Immunity "protects all but the plainly incompetent or those who knowingly violate the law," and even applies where officers make "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). To overcome qualified immunity, Plaintiffs must establish that: (1) their allegations amount to a constitutional violation, and (2) if their allegations do amount to a constitutional violation, that the right at issue was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. *See also Catlin v. City of Wheaton*, 574 F.3d 361, 365 (7th Cir. 2009). Clearly established law cannot be defined "at a high level of generality." *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1060 (7th Cir. 2018).

With respect to search warrants, qualified immunity rests on whether "a reasonably well-trained officer would have known that the search was illegal despite the judge's authorization." *Draine v. Bauman*, 708 F. Supp. 2d 693, 707 (N.D. Ill. 2010). *See also Malley v. Briggs,* 475 U.S. 335, 345 (1986); *United States v. Leon,* 468 U.S. 897, 924 (1984) (explaining inquiry is what reasonably well-trained officers would have known). Defendant Officers may be personally liable only if: (1) a court has previously held that a materially similar affidavit in a case with facts indistinguishable from the matter before the court failed to establish probable cause; or (2) "the affidavit is so plainly deficient that any reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley*, 475 U.S. at 345; *Junkert*, 610 F.3d at 369. Based on this test, qualified immunity is proper here.

Courts have "time and again . . . upheld warrants based on an informant's recent and firsthand account of criminal activity." *See Edwards*, 907 F.3d at 1060 (collecting cases in which courts have upheld a warrant based on an informant's tip). *See also Wade v. Ramos*, No. 16 CV 9022, 2019 WL 1318368, at *12-14 (N.D. Ill. Mar. 19, 2019) (Pallmeyer, J.); *Calhoun v. City of Chi.*, No. 09 C 2200, 2010 WL 4503218, at *3 (N.D. Ill. Oct. 28, 2010) (Der-Yeghiayan, J.) (finding complaints and search warrants were supported by probable cause when based on an informant's first-hand knowledge of recent criminal activity). Here, as analyzed above, the Complaint for Search Warrant was based on the J. Doe's detailed recent and firsthand account criminal activity in the second floor apartment of 3557 S. Damen, and the steps taken to corroborate that information. DSOF ¶¶ 6-13; 16, 18, 22, 25. Courts have not held that materially similar affidavits failed to establish probable cause and the complaint for search warrant was clearly not so lacking that a reasonably well-trained officer would have known it failed to establish probable cause as evidenced by the fact that Judge Burns approved the search warrant after interviewing the J. Doe and Officer Cappello and because the Officers all believed they were executing a valid search warrant. DSOF ¶¶ 25, 57. *Edwards*, 907

19

F.3d at 1061. *See also King v. Avila*, 760 F. Supp. 681, 685 (N.D. Ill. 1989) ("[P]olice acting under color of a facially valid warrant are immune from damages for violation of civil rights."). Defendant Officers are thus entitled to qualified immunity as to Plaintiffs' Unlawful Search-Invalid Warrant claim. For these same reasons, Sgt. Egan is also entitled to qualified immunity on Plaintiffs' Supervisory claim.

This Court should also find that the Officers are entitled to qualified immunity on any claim that they failed to knock and announce their office while executing the search warrant. First, the BWC videos show that Officers repeatedly announced their office from the time they entered the building through their entry into Plaintiffs' residence. Furthermore, Defendant Officers reasonably believed that exigent circumstances existed due to the undisputed fact that Mrs. Mendez was looking out of the window of the target residence and was aware of the Officers' presence and for the other reasons discussed above in Section I.B.

## II. This Court Should Grant Summary Judgment as to the Unlawful Search-Warrantless "Entry"/Failure to Retreat Claim.

Summary judgment is proper as to Count IV of the Fourth Amended Complaint because the undisputed facts establish that Defendant Officers executed the search warrant at the correct residence as it was the exact same residence identified as the place to be searched in the search warrant. Moreover, Defendant Officers left Plaintiffs' residence once it became clear to them that the targets did not reside there. Defendants must reiterate at the outset that the entire execution of the warrant is completed in under fifteen minutes and the officers were expecting to find armed individuals harboring large amounts of serious drugs.

Defendant Officers did not initially believe that the J. Doe had provided incorrect information regarding the second-floor apartment simply because the targets were not present, and they did not immediately find drugs. Although the Officers eventually realized that Mr. and Mrs. Mendez were not the targets, Officers initially believed that they could have been Patricka Cavazos's

parents or family members. DSOF ¶ 61. Defendant Officers were also expecting children to be present in the residence. DSOF ¶ 17. Mrs. Mendez's statement that an African American couple lived upstairs and her denial that a Hispanic woman lived upstairs added to the Officers' confusion because the targets were an African American man and a Hispanic woman. DSOF ¶¶ 62-63.

It should first be noted that most cases concerning whether officers should call off searches involve search warrants that did not plainly describe the residence to be searched and the officers thus executed the warrant at the wrong address. *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1059 (7th Cir. 2018) (citing *Guzman v. City of Chicago*, 565 F.3d 393, 397-8 (7th Cir. 2009); *Jacobs v. City of Chicago*, 215 F.3d 758, 771 (7th Cir. 2000)). Like *Edwards*, this case is distinguishable from those other cases as Defendant Officers executed the search warrant at the same residence described in the search warrant.

In *Edwards*, the plaintiffs argued that the officers should have abandoned the search because the home did not fit the stereotype of a stash house, there were minor discrepancies between their home and the description of it in the search warrant, and the officers did not immediately find any drugs. *Id.* at 1059-60. In rejecting the plaintiffs' arguments, the Seventh Circuit determined that the Officers were not required to call off the search simply because the house did not fit the stereotype of a stash house or because there were small inconsistencies. *Id.* at 1059. Nor were the officers required to call off the search simply because drugs were not immediately seen or found. *See id.* (affirming summary judgment and finding it was not unreasonable for officers to use a canine and to search the residence for two hours).

Similar to the Officers in *Edwards*, the Officers in this case were executing a valid search warrant at the residence identified and described in the warrant. There was nothing that immediately made them think the target residence was not connected to Curtis Roberts and Patricka Cavazos. Indeed, they instantly smelled illegal cannabis which, in their experience, was often linked with other

21

drugs. DSOF ¶ 56. Although Officers may have begun suspecting that the targets were not connected to the second-floor residence at 3557 S. Damen, they did not definitively know that the targets were not connected with that residence until Mrs. Mendez assertively told Officers that Curtis Roberts lived upstairs on the third floor and then accurately described the targets to the Officers. DSOF ¶ 64. Given the stakes of the targets of the warrant, the Defendant Officers were entitled to – and, indeed would be expected to – do some sort of investigation to ensure that they were not walking away from a major drug stash house.

After Mrs. Mendez told Officers that Curtis Roberts and Patricka Cavazos lived upstairs, the Officers spent a few minutes speaking with Plaintiffs about the targets of the search warrant and then left the apartment a little over 3 ½ minutes later after apologizing to Plaintiffs, shaking hands with Mr. and Mrs. Mendez, and high-fiving the minor Plaintiffs. Before that point, confusion remained, including based on descriptions given by the plaintiffs of who lived in the other apartment units. Significantly, Officers did not conduct any systematic search of the residence. Rather, they merely conducted a surface level search during and immediately following the clearing of the residence until Mrs. Mendez informed them the targets lived on the third floor. Summary judgment is thus appropriate as to Count IV because the undisputed facts show that Officers immediately stopped searching and left Plaintiffs' residence when they learned that the targets of the search warrant lived in the third-floor apartment.

Alternatively, the Court should afford the Defendant Officers qualified immunity because they acted in good faith based on the information relayed by the J. Doe and they reasonably believed Curtis Roberts and Patricka Cavazos lived in the second-floor apartment until Mrs. Mendez definitively told officers the targets lived in the third-floor apartment. At most, Officers were reasonably mistaken in believing the targets were connected to the second-floor apartment after they began executing the search warrant. They are, therefore, entitled to qualified immunity. *See Kisela*,

22

138 S. Ct. at 1152 (explaining that qualified immunity applies where officers make "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact").

## III.    Defendants Are Entitled to Summary Judgment on Plaintiff's Federal False Arrest/False Imprisonment Claim.

Summary judgment is proper as to Plaintiffs' False Arrest/False Imprisonment claim (Count V) because Plaintiffs were lawfully and reasonably detained incident to the execution of a valid search warrant. The Fourth Amendment authorizes police officers who are executing a search warrant "to 'take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search.'" *United States v. Banks*, 628 F. Supp. 2d 811, 815 (N.D. Ill. 2009) (quoting *United States v. Jennings,* 544 F.3d 815, 819 (7th Cir. 2008)). Officers, therefore, have the authority "to detain the occupants of the premises while a proper search is conducted." *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Michigan v. Summers,* 452 U.S. 692, 705 (1981)). *See also United States v. Burns*, 37 F.3d 276, 280 (7th Cir. 1994) (finding detention during the execution of the search warrant reasonable under the Fourth Amendment); *People v. Edwards*, 144 Ill. 2d 108, 126 (1991) (explaining that "a warrant to search for contraband, founded on probable cause, implicitly carries with it the authority to detain occupants of the premises while the search is being conducted").

Police officers' authority to detain the occupants of a residence incident to a search is categorical. *Muehler*, 544 U.S. at 98. Officers may "detain occupants of the premises without probable cause or particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers." *Simmons v. City of Chi.*, No. 14 CV 9087, 2017 WL 497755, at *4 (N.D. Ill. Feb. 7, 2017) (citing *Summers*, 452 U.S. at 702-705; *Muehler*, 544 U.S. at 98). Additionally, Officers' authority to use reasonable force to effectuate a detention is inherent in their authority to detain incident to a search. *Id.*

The Fourth Amendment is not violated when occupants are handcuffed during the execution of a search warrant for two reasons. *Id.* First, the detention is much less intrusive than the

search. *Id.* Second, three law enforcement interests justify such a detention: "[1] preventing flight in the event that incriminating evidence is found; [2] minimizing the risk of harm to the officers; and [3] facilitating the orderly completion of the search, as detainees' self-interest may induce them to open locked doors or locked containers to avoid the use of force." *Muehler*, 544 U.S. at 98

Here, Plaintiffs Hester Mendez and Gilbert Mendez's claim for False Arrest and False Imprisonment stem from their detention incident to the valid search warrant. From the BWC, it is apparent Mrs. Mendez and the children were never handcuffed. Mr. Mendez was handcuffed for less than 11 minutes and never complained that they were too tight or causing him pain. DSOF ¶ 65. The above precedent unequivocally establishes that Defendant Officers could lawfully detain Mr. and Mrs. Mendez and handcuff Mr. Mendez incident to the execution of the search warrant. Moreover, the length of Plaintiffs' detention—less than 15 minutes—does not render their detention incident to the search warrant unlawful. *See Muehler*, 544 U.S. at 102 (emphasis added) (finding that defendant officers acted reasonably when they handcuffed the plaintiff in a garage for *two to three hours* during the execution of the search warrant)(emphasis added); *Billups v. Kinsella*, 2010 WL 5110121, at *4-5 (N.D. Ill. Dec. 9, 2010) (finding detention and handcuffing of plaintiff for three hours, the duration of the search, was reasonable). The Court should thus grant summary judgment in favor of Defendant Officers because the undisputed facts unequivocally show that Plaintiffs' detention comported with the Fourth Amendment and was lawful.

Alternatively, Defendant Officers are entitled to qualified immunity for Plaintiffs' § 1983 False Arrest/False Imprisonment claim because the clearly established case law analyzed above confirms that Officers reasonably believed that Plaintiffs' detention incident to the search warrant was reasonable and lawful. *See Archie v. City of Chi.*, 2020 WL 5751185, at *17-18 (N.D. Ill. Sept. 25, 2020) (Gettleman, J.) (affording officers qualified immunity on plaintiff's false arrest claim that arose

from her hour long detention incident to the execution of a search warrant during which she was handcuffed).

## IV. Plaintiffs' *Monell* Claim Fails Because Plaintiffs Cannot Show Any Element of the Claim.

In Count I, Plaintiffs allege that the Individual Defendants, and particularly Defendants Officer Cappello and Defendant Sergeant Egan, used excessive force by pointing guns at them and/or by handcuffing Gilbert Mendez in the presence of his children. Plaintiffs seek to hold the City of Chicago ("the City") liable for this alleged use of excessive force under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). A constitutional injury is required for a *Monell* claim. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Once such an injury is established, a plaintiff may seek to hold a municipality liable in three ways: because of an express policy that causes a constitutional injury when enforced, a widespread practice so permanent and well-settled that it constitutes a custom or practice; or the direct acts of a final policymaker. *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). In the case of an allegation of a widespread practice, as Plaintiffs allege here, plaintiffs must meet three elements. First, they must show the existence of the widespread practice; then they must show deliberate indifference to the alleged practice, and finally show that the practice was the moving force behind the plaintiffs' constitutional injury. *Id.*

However, Plaintiffs' complaint fails to meet every element required by *Monell*. First and foremost, the undisputed facts show that there was no underlying use of excessive force. Second, the record fails to show sufficient evidence on any of the four alleged widespread practices to show to fairly attribute them to the City. Third, Plaintiffs fail to show that the City is deliberately indifferent to any of the alleged policies. Fourth, Plaintiffs fail at showing that any of the alleged practices was the "moving force" behind the alleged constitutional violation they suffered. Even assuming for argument's sake that they suffered a constitutional violation in the first place, and that

the City had any of the policies as alleged, Plaintiffs have not satisfied the rigorous standards to show that any of the alleged polices caused the officers to violate Plaintiffs' rights.

### A. Plaintiffs Did Not Suffer A Constitutional Violation Related to Use of Excessive Force.

The Supreme Court has held that there is no municipal liability under *Monell* based on the actions of a municipal police officer who "inflicted no constitutional injury." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). If the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations. *Swanigan v. City of Chicago*, 775 F.3d 953, 963 (7th Cir. 2015); *Outley v. City of Chicago*, 354 F. Supp. 3d 847, 872 (N.D. Ill. 2019) (finding that the municipality "cannot be liable under *Monell* since [the plaintiff] has not presented evidence from which a reasonable jury could conclude that he suffered a constitutional injury"). Plaintiffs' *Monell* claim is premised on the allegation that Defendant Officers' conduct constituted excessive force—specifically, that supposedly pointing guns at them and/or handcuffing Gilbert Mendez in front of them was a use of excessive force on them. But that notion is fatally flawed because the BWC establishes that the officers used only reasonable force.

The Supreme Court has firmly established police officers may reasonably display weapons and handcuff people during the execution of a search warrants:

> Valid warrants will issue to search the innocent, and people…unfortunately bear the cost. Officers executing search warrants on occasion enter a house when residents are engaged in private activity; and the resulting frustration, embarrassment, and humiliation may be real, as was true here. When officers execute a valid warrant and act in a reasonable manner to protect themselves from harm, however, the Fourth Amendment is not violated. *Los Angeles County v. Rettele*, 550 U.S. 609, 615-16 (2007).

No one is contesting that the entry into the Mendez home was initially disturbing and frightening for both the young plaintiffs and the adults. The BWC clearly shows that initially

Peter and Jack Mendez were crying and upset. But the BWC also establishes that there was no use of excessive force.

Because Plaintiffs' *Monell* claim is premised on excessive force, this Court must analyze the excessive force claim under the reasonableness standard set by *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). What is a reasonable use of force depends on the "totality of the circumstances." *Id.* at 9. Particularly, this requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). To determine whether an officer used excessive force, courts must use the information the officer had at the time and decide whether "the officer's use of force was objectively excessive from the perspective of a reasonable officer at the scene." *See Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018). This involves evaluating the information the officer had at the time of the incident and refusing to "view the events through hindsight's distorting lens." *Id.* at 950.

Police are entitled to point their guns at citizens "when there is a reason to fear danger," as in execution of a warrant based on "crimes that contain the use of force as an element, crimes involving possession of illegal weapons, and *drug crimes*, all of which are associated with violence." *Baird v. Renbarger*, 576 F.3d 340, 344-46 (7th Cir. 2009) (emphasis added).

This is exactly the situation the six officers who were executing the warrant found themselves in. They were operating under the belief that they were entering the home of a drug dealer who was known to use guns and whose girlfriend had spotted them coming. DSOF ¶¶ 25, 29, 57. Under the circumstances, they are entitled to use reasonable force to protect them and to search the premises. And that is exactly what the BWC confirms they did. The four officers who had BWC -- Sehner, Hernandez, Donnelly or Guzman – clearly never pointed a weapon at any of

27

the Plaintiffs or even had their weapons out beyond the initial entry in the home. One can tell from seeing Sgt. Egan in the BWC of Officer Hernandez that Sgt. Egan did not have a gun in either hand as he made initial entry into the building or the apartment, and he is never depicted in any BWC as having a gun in his hand. DSOF ¶ 39. Officer Cappello, is shown with a rifle slung over his shoulder that is never pointed at anyone. DSOF ¶ 38. After a while, he is shown leaving the apartment with the rifle and returning without it. *Id.*

There is no point at which Sgt. Egan or Officer Cappello can be heard making threats of violence to any plaintiff. DSOF ¶ 33. There is no point at which the BWC shows either Sgt. Egan or Officer Cappello aiming a gun at Plaintiffs, giving commands to Plaintiffs, or Plaintiffs reacting as though a gun has been just pointed at them after the initial entry. *Id.* Plaintiffs may argue that the BWC did not capture all the actions of Sgt. Egan and Officer Cappello visually, and that their testimony that one or both of those officers pointed guns should be enough to defeat this aspect of Defendants' summary judgment motion. It is not. Courts do not have to credit a version of events that is clearly contradicted by audio/video evidence. *See Scott v. Harris*, 550 U.S. 372 127 S. Ct. 1769 (2007) (When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Many of Plaintiffs' assertions in their testimony about the purported use of force are so contradicted.

No reasonable jury could find that what is depicted in the BWC constitutes excessive force. Nearly the entire interaction is caught on video, and nowhere does the viewer see guns being pointed at the children. There are only *fifteen seconds* where this would even be possible as to Sgt. Egan, who can be seen before and after with empty hands, and only *twenty-five seconds* where this would be possible as to Officer Capello who is clearing a room furthest from the living room and is seen both before and after with rifle slung downward. DSOF ¶ 33-39. The trier of fact

28

would have to find that in those seconds Sgt. Egan or Officer Capello unholstered their weapons solely to train them on the children on the floor. That is not a reasonable inference.

Defendants have not found any cases in which a court has held that behavior like that depicted in the BWC could be construed as excessive force of any sort. The pointing guns at minors, without any other accompanying facts to show increase severity, has been held to be insufficient to amount to excessive force. *See Anderson v. United States*, 107 F.Supp.2d 191, 199 (E.D.N.Y. May 18, 2000)(holding that as a matter of law the momentary drawing of weapons on several children was objectively reasonable and did not constitute an excessive use of force because FBI agents were performing a protective sweep of a residence the agents reasonably believed to be of a person with affiliations to organized crime.); *Bellotte v. Edwards*, 629 F. 3d 415, 426 (4th Cir. 2011)(affirming summary judgment in favor of the defendants where "there is no evidence that the officers who entered [the minor's] room kept their weapons drawn after they realized who she was," and after "they realized that she did not pose an immediate threat to the safety of the officers or others, the officers used no force or weapons at all on [the minor.])(Internal citations omitted.) Here, some officers had their guns unholstered and at the low-ready during the initial sweep of the apartment, none of them specifically trained on the minor plaintiffs. Under the aforementioned case law, no reasonable jury could hold that the officers' actions were tantamount to excessive force.

When courts have found gun pointing to be excessive, it has only been for far more egregious behavior than is depicted on the BWC to be excessive force, such as aiming the gun directly at someone who poses no threat after an initial sweep, prolonged targeting of a person, or additionally displaying weapons and making verbal threats to use them. See, *e.g.*, *Walker v. Weatherspoon*, No. 12-CV-08571, 2017 WL 3521417, at *6 (N.D. Ill. Aug. 15, 2017), aff'd, 900 F.3d 354 (7th Cir. 2018), cert. denied, 139 S. Ct. 832, 202 L. Ed. 2d 580 (2019); *McDonald v. Haskins*,

966 F.2d 292, 295 (7th Cir. 2002)(holding gun to head of 9-year-old plaintiff and threatening to pull the trigger is excessive force); *Jacobs v. City of Chicago*, 215 F.3d 758, 764, 774 (7th Cir. 2000) (pointing gun at 60-year-old man who posed no threat for 10 minutes during execution of a search warrant was excessive force); *Holland v. Harrington*, 268 F.3d 1179, 1192-93 (10th Cir. 2001) (finding excessive force where officers who were verbally abusive and who "continu[ed] to hold the children directly at gunpoint after the officers had gained complete control of the situation").

At various times in this litigation, Plaintiffs have alleged that the handcuffing of Gilbert Mendez in the presence of his children Peter and Jack somehow constituted excessive force. This theory is completely without merit. Defendants have not found any cases suggesting that Peter and Jack Mendez could claim excessive force against them for witnessing ordinary handcuffing of their father in their presence. To the extent that Plaintiffs intend to pursue a claim that Plaintiffs Peter or Jack Mendez have a constitutional claim based on witnessing force being used on either parent, Defendants are entitled to summary judgment on such a claim.

The foundation of a *Monell* claim is a viable constitutional violation. But here, that foundation is has no base. Because the undisputed facts show that the officers' conduct was not excessive force as a matter of law, the minor plaintiffs' *Monell* claim fails at the first prong and summary judgment on Count I of Plaintiffs' Fourth Amended Complaint should be entered in favor of Defendants.

### B.  Plaintiffs Fail to Demonstrate A Widespread Practice.

Even assuming *arguendo* that a reasonable jury could find that at least one of the Defendant Officers used excessive force, Plaintiffs fail at the next step of a viable *Monell* claim: demonstrating the existence of one or more widespread practices that causes constitutional violations. According to Plaintiffs, the City has four widespread pattern and practices that supposedly caused their injury: a widespread practice and pattern of using excessive force against children ages 0-14; a failure to

30

investigate and discipline officers; a failure to train officers and a code of silence. Plaintiffs allege that the City is deliberately indifferent to this alleged practice in four ways: (1) an absence of child-specific use of force policy; (2) an absence of child-specific use of force training; and (3) a failure to investigate and discipline child excessive force complaints and (4) the code of silence. Plaintiffs have not established the existence of any of these.

A policy is "widespread" when it is so well-settled as to be considered an official practice of the municipality. *Pembaur v. Cincinnati*, 475 U.S. 469, 4798-80 (1986); *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 400 (1997). "Isolated" acts committed by non-policymaking officials generally do not amount to a "custom" which "implies a habitual practice of a course of action that characteristically is repeated under like circumstances." *Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir. 1990). To prevail on a "custom or practice" theory, a plaintiff must show that a pattern of similar deprivation is so "permanent, well-settled, and widespread as to constitute custom or usage." *Wragg v. Village of Thornton*, 603 F.3d 464, 468 (7th Cir. 2010). There are no bright-line rules defining how frequently conduct must occur to impose *Monell* liability, except it must be more than one instance or even three. *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2010). A plaintiff must "demonstrate that there is a policy at work rather than a random event." *Id.*

i. *Plaintiffs have not established a widespread practice of a use of excessive force against minors.*

To the extent Plaintiffs attempt to claim any of the above practices exist as to the use of force against relatives of minors in the minors' presence, such a claim fails. As stated above, there is no constitutional right for one person to be free from witnessing a use of force against another.

The next problem that Plaintiffs face is that they do not offer proof of a sufficient number of similar incidents to show that it is potentially a policy at work. Based on their answers to the City's contention interrogatories, Plaintiffs appear to seek to point to the testimony of an

unspecified number of children, their parents and/or grandparents as to similar allegations of excessive force; alleged gaps CPD policy and training; statistical analysis of data extracted from CRs and findings from the DOJ and PATF Reports to demonstrate any of these widespread practices. The problem for Plaintiffs is that each of these has a shaky foundation.

To start with the testimony of other witnesses, these appear to be plaintiffs in a handful of other civil rights cases filed in the Northern District. Plaintiffs have not provided evidence that any of these cases have resulted in findings of liability against any of the officers or the City. But even taking it as a given that each of the approximately 10-15 incidents Plaintiffs could cite could be used as evidence in this case, the City contends it is too few for a reasonable jury to find that there is a widespread pattern of officers using excessive force against to children generally, and especially during the execution of search warrants. As to statistical analysis of Complaint Registers pertaining to the investigation or discipline of excessive force against children, the record does not support a showing that the number or type of CRs indicate that there is a widespread practice of using excessive force against children in the context of search warrant execution, or more broadly. DSOF ¶ 87.

As to the DOJ and PATF Reports, Plaintiffs once again face multiple problems. The Reports do not articulate any similar incidents to what Plaintiffs here are alleging. Indeed, the words "search warrant" appear nowhere in the DOJ Report. DSOF ¶ 117. The section that is entitled "CPD's pattern or practice of unreasonable force includes the use of excessive less-lethal force against children" contains a handful of anecdotes describing uses of force against minors. DSOF ¶ 118. This hardly represents a pattern that is so widespread as to constitute official policy. Even taking it as a given that these incidents were sufficient to represent a pattern of excessive less-lethal force against children, these incidents are very different from what is alleged here. Similarly, in its discussions about youth, the PATF Report includes no examples pertaining to the

32

use of excessive force during the execution of a search warrant. DSOF ¶ 112. Rather, it discusses alleged disrespect towards youth and the purported overuse of stop-and-frisk. DSOF ¶ 111. Thus, neither report is a basis a reasonable jury could use to find that the City had a widespread practice of excessive force akin to what Plaintiffs here are alleging. The Seventh Circuit affirmed the grant of summary judgment to the City on *Monell* in a similar case: *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592 (7th Cir 2019). In that case, the plaintiff sought to hold the City liable under *Monell* in a case where a police officer violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). The plaintiff complained that the practice of using paid active informants and the failure to supervise informants' officer-handlers led to the constitutional injuries. *Ruiz-Cortez*, 931 F.3d at 598. Plaintiff sought to use a 1997 Report of the Commission for Police Integrity ("Webb Report") to show that the City knew about the dangers of police corruption and failed to act. *Id.* at 596. The Seventh Circuit affirmed the grant of summary judgment. It reasoned that the Webb Report did not conclude that the use of informants posed a constitutional danger, only speaking to the general problem of police corruption and narcotics crimes. *Id.* at 599-600. The same principle should apply here. Since neither the DOJ Report nor the PATF Report speaks to the alleged use of excessive force against children in during the execution of a warrant, neither should serve as a basis for Plaintiffs to claim that there is such a widespread practice. Simply put, Plaintiffs cannot rely solely on the DOJ and PATF Reports to establish this alleged widespread practice, and no other evidence tends to support it.

Even assuming *arguendo* the broad allegations contained in the PATF and DOJ Reports could be likened to the sort of misconduct Plaintiffs allege happened here or that their allegations about the widespread use of force could be applied, they still should not form a basis for liability against the City because these allegations are based on flawed foundations. Some of them rely on hearsay upon hearsay. In other words, someone (whether a plaintiff's attorney, a parent, or

another person) told the members of the respective committees something, and they incorporated those statements into the report. This is classic hearsay-upon-hearsay and would not be admissible at trial. Moreover, in both cases, the methodology of the reports is opaque. And indeed, the DOJ simply admits it does not know how far the alleged patterns extend. It asserts that neither a specific number of incidents nor statistical evidence are necessary for its analysis. DSOF ¶ 116.

The DOJ is also in several points simply wrong about the law. For instance, the DOJ appears ignorant that a state law required affidavits before police misconduct cases could proceed. DSOF ¶ 85. It also asserts that it is "unconstitutional on its face" to use a Taser on a suspect who is fleeing after a minor property crime. DSOF ¶ 121. The undersigned has found no case with that holding. The DOJ and PATF Reports give little to no details about how precisely they reached the conclusions they did. If an expert were to offer the opinions given in the DOJ or PATF Reports, they would almost certainly be limited or completely barred by *Daubert*.

The undisputed evidence demonstrates that between 2012 and 2018, Chicago Police officers arrested 101,123 juveniles, and there were 3,194 use of force incidents with children. DSOF ¶ 80. Moreover, there are approximately 1,500-2000 search warrants executed in Chicago a year. DSOF ¶ 82. The notion that there were a small number of complaints of gun pointing or other excessive force against minors during a five-year period is not a sufficient basis for a reasonable jury to conclude that those examples constitute evidence of a custom of the City without stacking inference upon inference upon inference.

ii. *Plaintiffs have not established a widespread practice of failure to investigate.*

The record likewise indicates that there was no failure to investigate such claims, either in the context of search warrant execution or more broadly. Indeed, the facts show that IPRA and COPA investigated all allegations of the use of excessive force as long as the complaining witness signed an affidavit vouching for the validity of the allegations. DSOF ¶ 84. Even though state law

34

required an affidavit to proceed, the City enacted an "affidavit override" procedure that allowed investigations to proceed in cases where objective evidence gave a basis to believe a complaint had validity despite the lack of an affidavit. DSOF ¶ 86. Both IPRA and COPA engaged in reasonable investigations, undertaking the necessary steps to ensure all allegations were investigated as thoroughly and objectively as possible. DSOF ¶¶ 88, 91. Their sustained rates and other factors as it pertains to use of force incidents involving minors indicates that these investigations were taken seriously and investigated as such. DSOF ¶ 89. Moreover, there is no evidence that any of the CRs that were not found as "sustained" should have been found to be sustained or any other failure on the part of the investigating agencies. Simply put, there is no evidence in the record that IPRA or COPA failed to investigate the alleged use of excessive force against minors.

   *iii.*   *Plaintiffs have not demonstrated a failure to train.*

  As to training, the evidence does not support the notion that there is a widespread failure to train officers as to the proper use of force in situations like the one at bar. The alleged gaps that Plaintiffs have suggested include the failure of the official written policy to specify that excessive force not be used against children, the failure to use a "trauma-informed" approach to its policies and its training, the failure to follow every detail of model policies by the International Association of Chiefs of Police or other agencies' policies; and the failure to address the issue in the Consent Decree. But the City is under no obligation to adopt what Plaintiffs might prefer to be its policies or training, as long as its own policies are constitutional. *See, e.g., J.K.J v. Polk County*, 906 F.3d 367, 387 (7th Cir. 2020)(Easterbrook, J., dissenting).The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 386-88 (1989). "[I]n resolving the issue of a city' liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* at 391. It

will not suffice to prove that "better or more training" would have avoided the particular injury. *Id.* "Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Id.* The Supreme Court held that any lesser standard of fault would "engage the federal courts in an endless exercise of second-guessing municipal employee-training programs[,]"which "federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism." *Id.* at 392.

These common-sense principles were re-affirmed by *Connick v. Thompson*, 562 U.S. 51 (2011). There, the plaintiff alleged that prosecutors received no formal training on *Brady* violations. *Id.* The Supreme Court analyzed the training received by the attorneys, which included training by senior prosecutors, character and fitness standards, and ethical rules. *Id.* at 65-66. The Court rejected the argument that "the absence of any *formal* training sessions about *Brady* is equivalent to the complete absence of legal training," because "failure-to-train liability is concerned with the substance of the training, not the particular instructional format." *Id.* at 68.

The leading police-related failure to train case in the Seventh Circuit is *Palmquist v. Selvik*, 111 F. 3d 1332 (1997). There, an estate argued that the Village of Bensenville provided inadequate training in handling abnormally behaving persons. *Id.* at 1336. Bensenville provided relevant recruit training, but did not require any additional training. *Id.* at 1344-45. The Seventh Circuit held that "[t]he estate's argument boils down to 'no special training = deficient training.' We cannot accept this equation." *Id* at 1345. The court also held that "[i]t is against these 'better or more' training scenarios that the Court warned against in *City of Canton*[,]" and that "[t]o conclude otherwise would be to subject all municipalities which employ police officers who attended either of the only two Illinois police training institutes to liability for 'inadequate' training[.]" *Id.* at 1345.

36

Here, the undisputed testimony of various witnesses establishes that the Chicago Police Department meets state-mandated standards for training. DSOF ¶ 105. The undisputed testimony also states that officers are trained to consider the totality of circumstances in the use of force, which includes the age, size, and strength of the individual. DSOF ¶¶ 95-98, 104. As it concerns the use of force in the execution of search warrants, the undisputed evidence shows that the Chicago Police Department trains officers to be conscious of the possibility of children being present and to adjust the use of force accordingly. DSOF ¶ 96-98. And even more than that, the record indicates that CPD does and did offer training that included trauma-informed principles, offers courses that are not required, and requires more training hours than legally mandated. DSOF ¶¶ 99-103. Simply put, the record indicates that the City actually goes above and beyond what is required by law.

To the extent that Plaintiffs may attempt to cite to the DOJ Report or the PATF Report, there are two problems. First, neither of those reports discuss training as to use of force in contexts analogous to the case at bar. The Reports do not discuss training about the execution of a search warrant at all. The Reports generally talk about the actual use of force, rather than the threatened use of force. Second, the evidence is that the training on the use of force is the constitutional standard of reasonableness under the totality of the circumstances that the officer faces. Indeed, the evidence is that in the specific context of conducting search warrants, officers are trained to be mindful of children. DSOF ¶¶ 96-97. Simply put, Plaintiffs have failed to fit the exacting standard set for failure to train claims.

> iv.    Plaintiffs have not established the existence of a widespread "code of silence."

As to the code of silence, the record fails to establish evidence sufficient to show that it is a widespread practice of the City. The record demonstrates that during the *Monell* period, 28 CPD employees were disciplined for violating the rules pertaining to truthfulness and failing to report,

37

and 194 employees resigned while under investigation. DSOF at ¶¶ 92, 93. This demonstrates that the rules and potential consequences for breaking them were taken seriously. Given the lack of evidence in the record to establish the code of silence as a widespread practice of the City, the City is entitled to summary judgment on any claim based on that alleged practice.

### C. Plaintiffs' *Monell* Claim Fails Because Plaintiffs Fail to Establish Deliberate Indifference.

Even assuming for argument's sake that Plaintiffs had established they had suffered excessive force in some fashion and that the City had one or more of the alleged widespread practices, they would merely be onto the next hurdle. Not only must plaintiff show a policy is "widespread," but Plaintiff must also establish the requisite degree of culpability on the municipality's part – namely, that the alleged municipal practices were carried out with "deliberate indifference" to their known or obvious consequences. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Bryan County*, 520 U.S. at 404. This requires evidence that the final policymaking authority both knew of and acquiesced to this practice. *Cornfield by Lewis v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993). Custom can be established through widespread, enduring practices that violate constitutional rights in a systemic manner. *Id.*; *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 511 (7th Cir. 1993). Although evidence of a persistent and deeply-rooted practice permits the inference that policymakers must have known of its existence, the plaintiff must still prove that the policymaking authority acquiesced to it. *McNabola*, 10 F.3d at 511; *Cornfield*, 991 F.2d at 1316. They must show that it was the final policymaker, rather than individual actors, who was responsible by acting or failing to act. Simply put, a plaintiff must show that the municipality acted with "deliberate indifference to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Canton*, 489 U.S. at 388.

Plaintiffs fail at this prong as well. The evidence in the record shows in various situations, either no evidence that the final policymaker was aware of the alleged widespread pattern Plaintiffs

claim of, or no evidence that it failed to act to address the purported pattern. In many cases, the evidence is clear that the City actively tried to combat these issues, as even confirmed by Plaintiffs' chief evidence of the patterns, the DOJ Report. At worst, Plaintiffs can only argue that the City has not eliminated the patterns of misconduct they complain of. But the Seventh Circuit teaches us, "[f]ailure to eliminate a practice is not the same as endorsing a practice." *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993).

A municipality's final policymaker is the "apex of authority" for a given policy. *See, e.g., Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011) For most policies, that would be the City Council. For some, including police training, it would be the Superintendent of Police. For each of the policies Plaintiffs are alleging, the deliberate indifference argument fails.

As to the alleged widespread policy of excessive force against juveniles, there is no evidence in the record from which one can show that either the City Council or the CPD superintendent knew or should have known that there was a widespread pattern of excessive force was being used against children during search warrants. Nor was there evidence from which can show either potential final policymaker knew or should have known that there was a widespread pattern of excessive force being used against children more generally. Indeed, the evidence is that the City Council was not aware of any pattern of excessive force against children. DSOF ¶ 133. For the reasons discussed above, the DOJ Report and the PATF Report did not discuss the issue that of search-warrant related excessive force against youth, and it did not provide enough detail or methodology to show that there was a broader widespread pattern of excessive force against youth. It cannot therefore be reasonably said that either report put the final policymaker on notice that there was such a widespread practice of either search-warrant-related excessive force against children or more broadly excessive force against children. Indeed, given that Plaintiffs failed to demonstrate that such a pattern existed despite having both Reports as a guide and despite nearly three years of

discovery, the silence on this point is telling. Moreover, the fact that the written policy parallels the constitutional standard on use of force further supports the notion that the final policymaker would have thought such a policy met the constitutional standard. Plaintiffs offer no evidence on which a reasonable jury could conclude that the final policymaker should have believed the official policy on use of force was being flouted left and right to the point that the City's true policy was to use unreasonable force against children.

As to the disciplinary systems, the record includes no evidence that the final policymaker knew or should have known as to any potential problems with the investigation or discipline of allegations of excessive force against children in search warrant cases or more broadly. The record shows that the City held budget hearings requiring IPRA and COPA to be accountable. DSOF ¶ 132. The record shows that IPRA sustained at least some of the investigations into excessive force against children. DSOF ¶ 88. As discussed above, there has not been evidence presented that there was such a widespread practice of either in the first place that it could be considered the City's way of doing business. There is no evidence beyond pure speculation to suggest that any IPRA or COPA investigation cleared an officer who should have been found guilty of using excessive force against children. On top of that, there is no evidence from which a reasonable jury could determine that either the City's final policymaker knew that the investigation and discipline system was fundamentally flawed as to these specific points or, at a maximum, should have known prior to the PATF and DOJ Reports. And as we discuss below, it is undisputed that the City took action when flaws were pointed out about its accountability systems through those reports.

Next, there is no evidence to suggest that the final policymaker was or should have been aware of a deficiency as to training as to the use of force against children, either in the search-warrant context or more broadly. Against the backdrop that the City employed a training standard that met or exceeded state requirements and the fact that the written policy on the use of force

40

paralleled the constitutional standard, no reasonable jury could find that the City's final policymaker knew or should have known that its training was problematic. Despite Plaintiffs' wish list of different training they might prefer, there is no constitutional obligation for the City to agree to provide best-practices training. *See, e.g., J.K.J.*, 906 F.3d at 387(Easterbrook, J., dissenting).Plaintiffs cannot show that the final policymakers knew of a problem with the training, or that other training was necessary to teach police not to point guns at children deliberately when there was no need to.

As to the code of silence, the record similarly does not show that the City's final policymaker condoned it or acquiesced to it. Plaintiffs likely will cite former Mayor Emanuel's acknowledgement of the code of silence in his December 2015 speech. But that was the exact opposite of acquiescing to it. It was Mayor Emanuel drawing a line that the code of silence would no longer be tolerated.

Moreover, the record is chockfull of actions that the City took to address issues during the *Monell* time frame such as the perception of a pattern of excessive force, insufficient mechanisms for police accountability, additional needed training and the code of silence.

Most notably, City Council engaged in significant activities to reform the police department and its disciplinary system. DSOF ¶ 135. The City created COPA to address some of IPRA's flaws. Among the improvements COPA had over IPRA were a more resources, better training for its investigators, and more staff. DSOF ¶ 135, 137. Second, the City created the position of Deputy Inspector General for Public Safety, which was tasked with making sure both the Police Department and COPA were performing well. DSOF ¶ 135. The City Council also issued multiple resolutions or orders highlighting an intent to engage in the reform process sparked by the PATF and DOJ reports, and expressed commitment to proposed reforms and entering into a consent decree. DSOF ¶ 136.

Additionally, CPD revised its use of force policy in 2017, soliciting information from various parties to formulate the policy, and expanded its use of BWC among officers during the *Monell*

41

period. DSOF ¶¶ 104, 113. The existence and use of BWC is lethal to a code of silence, because any allegation of misconduct is likely to have an objective record of what happened, or require an explanation as to why there is not one. Would-be rogue officers simply cannot cover up misconduct or lie about it effectively when there is an expectation that they and their fellow officers will record all relevant police activity

Moreover, the very creation of the PATF itself was the City's taking action to examine issues around the how its police department could function better. The PATF was an effort by the City to assess weaknesses in its policing and police-accountability systems and to address them. The report the PATF generated, along with the steps that the City has taken following it, destroy the notion that the City was deliberately indifferent to the practices Plaintiffs complain of.

Even the DOJ Report, the main basis Plaintiffs have for alleging widespread practices, concedes that the City took action to address the various widespread practices at work. The DOJ Report credits the City with having attempted reforms over the years, with creating COPA and the Deputy Inspector General for Public Safety, with reviewing its official use of force policies and training methods, and with expanding the use of BWC. DSOF ¶¶ 119-120 And it must be noted that during the *Monell* period, the City began engaging in the process to enter into a federal consent decree. DSOF ¶ 136.

At worst, the record shows that the final policymaker did not eliminate the various practices. But as *Wilson* teaches us, that is not the same as endorsing them. The evidence is clear that the City did reject the alleged widespread practices and took responsible steps to curb them. Given the many steps the City indisputably took during the *Monell* time frame, there cannot be a showing of deliberate indifference by the final policymaker. The City is therefore entitled to summary judgment on Plaintiffs' *Monell* claim.

42

### D. Plaintiffs' *Monell* Claim Fails Because They Fail to Show Any Policy Was The "Moving Force" Behind A Constitutional Injury.

The final *Monell* element is the most stringent. A plaintiff "must satisfy a 'rigorous' standard of causation." *Connick*, 563 U.S. at 75. This means Plaintiffs must "demonstrate[ing] a direct causal link between the municipal action and the deprivation of federal rights." *Id.* Put simply, Plaintiffs must show the policies at issue were the "direct cause" or "moving force" behind the underlying. constitutional violation (here, the alleged pointing of guns at the minor plaintiffs). *Woodward v. Corr. Med Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (policy must directly inflict an injury and not merely be a contributing factor). Plaintiffs fail to meet this exacting standard.

There is absolutely no evidence in the record that demonstrates that any of the "widespread policies" alleged by Plaintiffs were the moving force behind the constitutional violation at issue here. Indeed, the Defendant Officers had their guns at that low ready upon entry and sweep for safety purposes, not because they were emboldened to do so or because the City's training was lacking. As discussed above, there is no reliable evidence to support that these widespread policies even exist. Thus, they certainly could not have been the "moving force" behind this conduct.

Plaintiffs cannot reasonably support with facts in the record that the Defendant Officers here took the actions they did because they knew of and were motivated by a supposed widespread practice of using excessive force on minors. Nor can they point to facts in the record that the Defendant Officers were motivated by their belief that they could commit misconduct and get away with it for failure. Nor can they show where the training they received was at fault. Finally, the very fact that the search warrant execution was being recorded by four of the officers makes a claim that the officers were motivated by the code of silence simply untenable. Simply put, no reasonable jury could believe that officers would believe that they could maintain a code of silence knowing of the

43

existence of video recorded proof of their misconduct. Therefore, Defendants are entitled to summary judgment on Plaintiffs' *Monell* claim.

## V. Defendants Are Entitled To Summary Judgment on Plaintiffs' State Law Claims.

Plaintiffs bring several claims under state law for which summary judgment should be granted because the City is entitled to summary judgment under the Illinois Local Government and Governmental Employees Tort Immunity Act, 745 ILCS 10/2-101 et seq. ("Tort Immunity Act"). A public entity cannot be liable for an act or omission by one of its employees where the employee is not liable. 745 ILCS 10/2-109. In order to pierce the tort immunity that applies to government employees as to claims for damages, the plaintiff must establish that the officers acted "willfully and wantonly." *See* 745 ILCS 10/2–202; *Chelios v. Heavener*, 520 F.3d 678, 692–93 (7th Cir.2008). Willful and wanton conduct is a heightened state of mind requirement; the plaintiff must prove all of the elements of the tort and "either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Jane Doe–3 v. McLean County Unit Dist. No. 5 Bd. of Directors*, 362 Ill.Dec. 484, 973 N.E.2d 880, 887 (Ill.2012). Here, no reasonable jury could conclude that any acts of Defendant Officers were willful and wanton in their actions, given the facts as established by the BWC. Therefore, the City is entitled to summary judgment on Plaintiffs' state law claims.

### A. Plaintiffs' Assault Claim Fails.

Plaintiffs bring an assault claim against the City, based on their fear of receiving a battery when the officers executed the search warrant armed with guns. Under Illinois law, an assault is an intentional, unlawful offer of corporal injury by force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented. *Hespe v. City of Chicago*, 307 F. Supp. 3d 874 (N.D. Ill. 2018). As Defendants have argued earlier, the Defendant Officers had the right to display guns to secure the premises as they executed the search warrant. Because the officers were

44

legally entitled to display weapons, and because the BWC shows no additional force was used, an assault claim cannot lie. The City is therefore entitled to summary judgment.

### B. Plaintiffs' Battery Claim Fails.

Plaintiffs make a claim for battery in that Plaintiff Gilbert Mendez was handcuffed during the execution of the search warrant in Count VII. But Defendants were executing a valid search warrant and thus had the right to place him or other occupants in handcuffs.

A person commits a battery if "he or she knowingly *without legal justification* by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (emphasis added). Illinois law permits unconsented, physical contact if it is legally justified. *Holder v. Ivaniack*, 93 F.Supp.2d 933, 940 (N.D. Ill. 2000) (applying Illinois law) (where a jury found that an officer used reasonable force during a lawful arrest, the officer's contact with plaintiff was legally justified and thus plaintiff was estopped from claiming battery); 720 ILCS 5/12-3. Battery is an *intentional* tort. *Bakes v. St. Alexius Medical Center*, 2011 IL App (1ˢᵗ) 101646, ¶ 21 (emphasis added). "Battery requires more than an intent to contact, in that a defendant must intend to cause a harmful or offensive contact." *Bakes*, 2011 IL App (1ˢᵗ) 101646, ¶ 22 (citing *Happel v. Wal-Mart Stores, Inc.*, 316 Ill. App. 3d 621, 630 (2ⁿᵈ Dist. 2000)).

Similar to *Holder*, the Defendant Officers had both lawful authority and legal justification to use reasonable force to detain Plaintiff Gilbert Mendez in handcuffs. *Holder*, 93 F.Supp.2d at 940. Moreover, Illinois courts have looked to the Fourth Amendment's reasonableness standard for purposes of assessing whether an officer's use of force is legally appropriate. *See also Illinois Mun. League Risk Management Ass'n v. Siebert*, 223 Ill. App. 3d 864, 877 (1992); *Price v. City of Chicago*, 2018 IL App (1ˢᵗ) 161599, ¶ 1, ¶ 51 (assessing use of force under reasonableness standard). As established above, at the beginning of the incident, Defendant Officers were executing a valid search warrant. With respect to the execution of search warrants, "the execution of a warrant to

search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence," and "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. *Bailey v. United States*, 568 U.S. 186, 194 (2013)(quoting *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981)). The Supreme Court has held that "officers executing a search warrant for contraband have the authority "to detain the occupants of the premises while a proper search is conducted." *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Summers*, 452 U.S. at 705. "Inherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Id.* The use of handcuffs to detain the occupants of the target of a search warrant is reasonable when the "governmental interests outweigh the marginal intrusion," use of handcuffs must be "reasonable," as assessed under the *Graham* balancing test. *Muehler,* 544 U.S. at 98-100. See also., *Torres v. U.S.*, 200 F.3d 179, 185-86 (3d Cir. 1999) (finding detention lawful where officers executing a narcotics search warrant left handcuffed occupant on the floor, then helped him to a couch, where he remained in handcuffs for 1.5 to 3 hours).

The BWC makes clear that the handcuffing of Gilbert Mendez was uneventful and painless. No reasonable jury could find that the handcuffing of Gilbert Mendez was an unlawful touching. Therefore, Defendants are entitled to summary judgment on this count.

## C. Plaintiffs' Claim For State False Arrest/False Imprisonment Fails.

Plaintiffs allege false arrest and false imprisonment based on the detention during the warrant's execution. False imprisonment is an unreasonable restraint of a plaintiff's liberty against his will caused or procured by the defendant and false arrest is the unlawful restraint of an individual's personal liberty. *Meerbrey v. Marshall Field & Co.*, 189 Ill. App. 3d 1085, 1090 (1st Dist. 1989). "When officers assume the power to imprison without authority of law, or without any of

the forms or processes usual and necessary to be employed, they become liable for false imprisonment. *People v. McGurn*, 341 Ill. 632, 637 (1930). However, The United States Supreme Court has held that "officers executing a search warrant for contraband have the authority "to detain the occupants of the premises while a proper search is conducted." *Muehler,* 544 U.S. at 98 (2005) (quoting *Summers*, 452 U.S. at 705. Here, the legally valid search warrant authorized Defendants to detain Plaintiffs using methods of detainment prescribed by the United States Supreme Court in *Muehler*. Plaintiffs do not need to be under arrest to be detained while Defendant Officers secure the scene and conclude the execution of the search warrant. Defendants anticipated that the target of their search warrant would be armed and possess contraband. Therefore, the brief detainment of Plaintiffs was authorized, and the City is entitled to summary judgment on this count.

### D. The City is Entitled to Summary Judgment on Plaintiffs' Claim For Intentional and/or Negligent Infliction of Emotional Distress.

A claim for intentional infliction of emotional distress requires plaintiffs "show (1) that the conduct was truly extreme and outrageous, (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and (3) the conduct must in fact have caused severe emotional distress." *Pavlik v. Kornhaber*, 761 N.E.2d 175, 186, 326 Ill. App. 731, 743-744 (1st Dist. 2001). Case law holds that "mere insults, indignities, threats, annoyances, petty oppressions or other trivialities" do not constitute extreme and outrageous conduct. *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill, 1988). The nature of "the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community," *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80-81 (Ill. 2003).

Here, Plaintiffs fail to demonstrate evidence of the first and second elements of the tort. For the reasons stated above, the Defendant Officers obtained a valid search warrant, albeit one

based on incorrect information. Some of them had guns out at the beginning of the search warrant execution, but none deliberately targeted any plaintiff with guns. DSOF ¶¶ 33-39. The officers eventually realized they had made a mistake and apologized to Plaintiffs for it. DSOF ¶ 67. Under these undisputed facts as documented by the BWC, there is no evidence on which a reasonable jury could decide that the Defendant Officers' conduct in this case met the definition of "extreme and outrageous." Nor is there evidence that any of the Defendant Officers intended to cause the Plaintiffs severe emotional distress or knew that there was a high probability that their serving a valid search warrant would cause severe emotional distress. Indeed, the notion that any defendant intended to cause any plaintiff emotional distress is undercut by the many apologies the officers rendered, and their gentle, friendly attitude after the premises were secured.

As to a negligent infliction of emotional distress, such a claim is doomed. Plaintiffs would first have to show that the officers owed them a duty that was breached. There is no evidence that Defendants breached any legal duty to Plaintiffs. Plaintiffs' counsel in this case agreed in a similar case to voluntarily dismiss a negligent infliction of emotional distress claim because he understood that it failed as a matter of law. *See Archie*, 2020 WL 5751185 at * 7. Plaintiffs' negligent infliction of emotional distress claim is a non-starter and the City is entitled to summary judgment.

### E.     Execution of A Valid Search Warrant Defeats Plaintiffs' Trespass Claim.

In order to set forth a valid trespass claim under Illinois law, Plaintiffs must show the Defendant Officers' entry onto their property was unauthorized or that they unlawfully remained on their property. *Caldwell v. City of Chi.*, 2010 WL 2722207, at *5 (N.D. Ill. July 8, 2010) (citing *People v. Goduto*, 21 Ill. 2d 605, 609 (1961)). Police officers cannot be held liable for trespass when they have a valid search warrant. *Id.* Case law makes it clear that officers executing a valid search warrant cannot be held liable for trespass under Illinois law. "It cannot be contended that going upon the land pursuant to an express order of the court would constitute a trespass." *Archie*, 2020

48

WL 5751185 at *8 (granting motion to dismiss trespass claim in search warrant case and citing to City of *Tuscola v. Otto*, 33 Ill.App.3d 853, 856 (Ill.App. 1975)). *See also Weeks v. City of Chicago*, 2014 WL 3865852 at *3, 12 CV 10056 (N.D.Ill. Aug. 6, 2014); *Ortiz v. City of Chicago*, 686 F.Supp.2d 782, 795 (N.D.Ill. Feb. 18, 2010) (referencing *Skierkewiecz v. Gonzales*, 711 F. Supp. 931, 935 (N.D. Ill. 1989)) (finding that officers are not liable for trespass when they are obeying a court order). Because Defendants entered Plaintiffs' residence while they were executing a valid search warrant signed by Judge Burns, obtained the search warrant in good faith and left as soon as they confirmed the information they received was incorrect, Plaintiffs cannot maintain a trespass action under state law. Summary judgment should be granted.

## VI.    Plaintiffs' *Respondeat Superior* and Indemnification Claims Fail.

Because Plaintiffs have failed to state an underlying claim for liability, the Court should dismiss their *respondeat* superior and indemnification claims against Defendant City. *See Baskins v. Gilmore*, 2018 WL 4699847, at *12 (N.D. Ill. Sept. 30, 2018) ("[a]n indemnification claim necessarily will be tied to an underlying claim for liability"); *See also Kirk v. Michael Reese Hosp. & Med. Ctr.*, 117 Ill. 2d 507, 533 (1987)("Where the agent is not guilty, it necessarily follows that the party for whom he acted, the master, cannot be guilty"); 745 ILCS 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable").

**CONCLUSION**

For the above stated reasons, Defendants are entitled to summary judgment on all of Plaintiffs' claims. Defendants therefore respectfully ask this Honorable Court to grant them summary judgment, and any other relief that the Court deems appropriate.

Dated:  October 26, 2021                          Respectfully Submitted,

                                                  By:      /s/ Marion C. Moore
                                                           Chief Assistant Corporation Counsel

Marion C. Moore, Chief Assistant Corporation Counsel
Raoul Vertick Mowatt, Assistant Corporation Counsel
Kyle Rockershousen, Assistant Corporation Counsel
City of Chicago Department of Law, Federal Civil Rights Litigation Division
2 N. LaSalle Street, Suite 420
Chicago, IL 60602
(312) 744-5170
Atty. No. 6302566
**Attorneys for Defendant City**


                                                  /s/Larry S. Kowalczyk

Larry S. Kowalczyk, Special Assistant Corporation Counsel
Megan K. Monaghan, Special Assistant Corporation Counsel
QUERREY & HARROW, LTD.
120 N. LaSalle St., Suite 2600
Chicago, IL 60602
(312) 540-7000
**Attorneys for Defendant Officers**

50