## TABLE OF CONTENTS

Table of Authorities ................................................................................................................... ix

I.   INTRODUCTION ................................................................................................. 1

II.  SUMMARY OF UNDISPUTED AND DISPUTED FACTS ................................... 1

III. STANDARDS OF LAW ........................................................................................ 2

IV. ARGUMENT ......................................................................................................... 2

   A.  The Material Facts for Plaintiffs' *Monell* Claim are Partly Disputed and Partly Undisputed in Plaintiffs' Favor ....................................................................... 2

     1.  The Facts Regarding Whether Officers Pointed Guns at Peter and Jack Are Disputed, and No Definitive Evidence Exists to Resolve the Issue ................................................. 2

       a.  "Video May Not Tell the Whole Story" – *Felton v. City of Chi.,* 827 F. 3d 632, 637 (7th Cir. 2016) ................................................................................. 5

       b.  Defendants Are Not Entitled to Qualified Immunity for Pointing Guns At Young Children Who Posed "No Hint of Danger" ........................................................... 7

     2.  The Facts on Whether the City Had A Custom 2012-2017 of Excessive Force Against Children 0-14 are Mostly Undisputed: in 30(b)(6) Testimony the City *Admits* Officers Used Excessive Force Against Children, including "Commonly" Pointing Guns at Them While Serving Search Warrants ........................................................................ 9

       a.  *Multiple* Sources of Evidence Show CPD's Widespread Practice 2012-2017 of Excessive Force Against Children 0-14 When They Were Fully Compliant and Posed "No Hint of Danger" .................................................................. 9

         i.  255 Reported Complaints 2012-2017 of Excessive Force Against Children, 0-14, in Situations Where They Posed No Danger Are Evidence of a Widespread Practice ................................................................... 10

         ii.  An Additional 24 Children Not Within the City's Complaint Files Have Testified or Will Testify that Officers used Excessive Force Against Them During 2015-2020 When They Posed "No Hint of Danger" ..................... 12

         iii.  In 30(b)(6) Testimony, the City *Admits* CPD Used Excessive Force Against Children and "Commonly" Pointed Firearms at Them When Serving Search Warrants .......................................................................... 14

      iv.   It is Undisputed that DOJ and PATF Reports Contain Official Government Investigative Findings that During 2010-2016 CPD Engaged in Excessive Force against, Mistreated and Traumatized Children and Youth ............... 14

           a.   DOJ's Findings are Sufficiently Similar to Plaintiffs' Allegations and Evidence ............................................................................................. 15

           b.   The City's PATF's Findings Are Also Sufficiently Similar to Plaintiffs' Allegations and Evidence .................................................................... 18

     b.   During 2012-2017 CPD Had No Affirmative Policy or Training Prohibiting or Discouraging Officers from Using Unnecessary Force Against, Including Pointing Guns at, Children 0-14 ................................................................... 20

     c.   There is Copious Evidence that the City's Police Accountability System Failed to Investigate, Discipline, and Correct Officer Excessive Force Against Children ................................................................................................................ 23

     d.   There is Undisputed Evidence that a "Code of Silence" Pervaded CPD and Chicago's Police Accountability Agencies 2012-2017 ...................................... 24

   3.   The Undisputed and Profuse Evidence Shows Final Policy Makers Had Notice of CPD's Custom of Excessive Force Against Children .................................................... 25

   4.   Undisputed and Overwhelming Evidence Shows the City Was Deliberately Indifferent to CPD's Custom of Excessive Force Against Children .......................... 26

   5.   There is Evidence that the City's Custom, Policy and Training Gaps, Failures to Investigate and Discipline, and Code of Silence Were the Moving Force Behind Defendant Officers' Excessive Force Against Peter and Jack Mendez ...................... 31

B.   The Material Facts for Plaintiffs' Count II Invalid Warrant Claim are Undisputed in Plaintiffs' Favor ............................................................................................................ 33

   1.   Defendants Are Not Entitled to Qualified Immunity For Recklessly Disregarding the Truth ....................................................................................................................... 40

C.   The Material Facts for Plaintiffs' Count III Supervisory Liability Claim Are Undisputed for Plaintiffs ..................................................................................................................... 43

D.   The Material Facts for Plaintiffs' Count IV Warrantless Entry/Failure to Retreat Claim Are Undisputed for Plaintiffs ............................................................................................. 45

E.   The Material Facts for Count VI, Assault, Are Disputed ................................................. 49

F.   Most of the Material Facts for Plaintiffs' Count IX, Intentional Infliction of Emotional Distress, are Undisputed for Plaintiffs ............................................................................. 53

G.  The Material Facts for Mr. Mendez's Count VII, Battery, Are Undisputed for Plaintiffs 57

   1.  The Use of Handcuffs was Unreasonable ...................................................................58

H.  The Material Facts for Plaintiffs' Counts V and VIII, § 1983 and Illinois False Arrest/False Imprisonment, Are Undisputed for Plaintiffs .................................................60

I.  The Material Facts for Plaintiffs' Count X Trespass Claim Are Undisputed ...................63

J.  Summary Judgment Must Be Denied as to Counts X and XI............................................64

V.  CONCLUSION.......................................................................................................................64

## EXHIBIT LIST

Appendix 1: 9/17/18 Email from Gregory Beck

Exhibit A: 12/22/2020 Transcript of Superintendent Brown

Exhibit B: Jack Ryan Expert Report

Exhibit C: Officer Cappello Deposition Transcript

Exhibit D: Sgt. Egan Deposition Transcript

Exhibit E: Officer Donnelly Transcript

Exhibit F: Officer Guzman Deposition Transcript

Exhibit G: Officer Hernandez Deposition Transcript

Exhibit H: Officer Sehner Deposition Transcript

Exhibit I: Defendant City's Second Supplemental Responses to Plaintiffs' First Set of Interrogatories

Exhibit J: Lt. Cascone Deposition Transcript (PLAINTIFF 7852-7975)

Exhibit K: Lt. Benigno Part 1 Deposition Transcript

Exhibit L: Commander Cline Deposition Transcript

Exhibit M: Officer Runk Deposition Transcript

Group Exhibit N: Capello Personnel File and Test Results (FCRL 1864-1867, 1870-1872, Plaintiff 5639-5372, 7776-7780)

Exhibit O: Signed Search Warrant and Complaint for Search Warrant (QH 0001-0003)

Exhibit P: Lt. Dari Deposition Transcript

Exhibit Q: Officer Guzman BWC (FCRL 7)

Exhibit R: Hester Mendez Deposition Transcript

Exhibit S: Officer Sehner BWC (FCRL 1)

Exhibit T: Officer Hernandez BWC (FCRL 2)

Exhibit U: Officer Donnelly BWC (FCRL 5)

Exhibit V: Gilbert Mendez Deposition Transcript

Exhibit W: Jack Mendez Deposition Transcript

Exhibit X: Peter Mendez Deposition Transcript

Exhibit Y: Peter Mendez Deposition Video

Exhibit Z: Jack Mendez Deposition Video

Exhibit AA: Peter Mendez Deposition Clip

Exhibit BB: Jack Mendez Deposition Clip

Exhibit CC: Steve Berkowitz Expert Report of Jack Mendez

Exhibit DD: Steve Berkowitz Expert Report of Peter Mendez

Exhibit EE: Steve Berkowitz Rebuttal Report

Exhibit FF: COPA Log #2019-0004600 Summary Report

Exhibit GG: 2015 Search Warrant Special Order (FCRL 205-218)

Group Exhibit HH: Pre-2015 Search Warrant Training (FCRL 2940-2982),

2015 Search Warrant Manual and Training (FCRL 2745-2939), 2017 Search Warrant Training

(Tate FCRL 20814-20942), 2021 Search Warrant Special Order SO4-19

Exhibit II: 2013 Use of Force Bulletin (FCRL 3424-3426)

Exhibit JJ: Max Schanzenbach Expert Report

Exhibit KK: Max Schanzenbach Rebuttal Report

Exhibit LL: Alderman Harris Deposition Transcript (PLAINTIFF 10561-10620)

Exhibit MM: Karen Conway Part 1 Deposition Transcript

Exhibit NN: Davianna Simmons Deposition Transcript

Exhibit OO: Davianna Simmons Deposition Video

Exhibit PP: Emily Simmons Deposition Transcript

Group Exhibit QQ: Plaintiffs' Second and Fifth Amended MIDP

Exhibit RR: Hester Mendez's Amended Answers on Behalf of Peter Mendez to the City's First

Set of Interrogatories

Exhibit SS: *Blassingame* Second Amended Complaint

Exhibit TT: *Smith* Amended Complaint

Exhibit UU: Alberta Wilson Signed Affidavit

Exhibit VV: *Archie* CBS Clip

Exhibit WW: *Archie* Third Amended Complaint

Exhibit XX: LaNiya Booth Deposition Transcript

Exhibit YY: LaNiya Booth Deposition Video

Exhibit ZZ: Legend Booth Deposition Transcript

Exhibit AAA: Legend Booth Deposition Video

Exhibit BBB: Emonie Booth Deposition Transcript

Exhibit CCC: Emonie Booth Deposition Video

Exhibit DDD: Kiqiana Jackson Deposition Transcript

Exhibit EEE: Arkeya Blanchard Deposition Transcript

Group Exhibit FFF: *James* CBS Clips

Exhibit GGG: *James* Complaint

Exhibit HHH: *Harbin* Second Amended Complaint

Exhibit III: *Evans* Amended Complaint

Exhibit JJJ: *Vale* Amended Complaint

Exhibit KKK: *Lyons* Amended Complaint

Exhibit LLL: Lisa Thurau Expert Report

Exhibit MMM: Lt. Benigno Part 2 Deposition Transcript

Group Exhibit NNN: 2007 Search Warrant Special Order (FCRL 177-190), 2015 Search Warrant Special Order (FCRL 205-218), 2020 Search Warrant Special Order

Exhibit OOO: Jack Ryan Rebuttal Report

Exhibit PPP: DOJ Report (PLAINTIFF 530-693)

Exhibit QQQ: PATF (PLAINTIFF 1135-1324)

Exhibit RRR: Defendant City's Response to Plaintiffs' First Set of Requests for Admission

Exhibit SSS: Karen Conway Part 2 Deposition Transcript

Exhibit TTT: 2017 Use of Force Policy (FCRL 99-146)

Exhibit UUU: 2017 Use of Force Training (FCRL 2994-3066, 3651-3851, 3857-3876, 4010-4034)

Exhibit VVV: Trak Deposition Transcript

Exhibit WWW: Commander Godsel Deposition Transcript

Exhibit XXX: Sgt. Egan CR files (QH 323-405)

Exhibit YYY: Lt. Dari CR files (FCRL 11039-11056)

Exhibit ZZZ: Shannon Hayes Deposition Transcript (PLAINTIFF 8384-8444)

Exhibit AAAA: 2016 Force Mitigation Training (FCRL 3106-3175, 3177-3178, 3240-3317)

Exhibit BBBB: 2020 Search Warrant Training (Bures FCRL 6558-6651)

Exhibit CCCC: Jack Ryan Deposition Transcript

Exhibit DDDD: Max Schanzenbach Deposition Transcript

Exhibit EEEE: Steven Berkowitz Deposition Transcript

Exhibit FFFF: Royal Wilson Video

Exhibit GGGG: Lisa Thurau Deposition Transcript

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Allen v. Dist. Attorney's Office,* 644 F. Supp. 2d 600, (E.D. Pa. 2009) ........................................................ 43

*Amos v. State,* 55 Ill. Ct. Cl. 368, 379 (Ill. Ct. Cl. May 8, 2003) ................................................................. 57

*Archie v. City of Chicago,* 2020 U. S. Dist. LEXIS 176221, *7-9, 16, 22-23 (N. D. Ill. Sept. 25, 2020)... 8, 12, 17, 55, 58, 59, 62, 63

*Arias v. Allegretti,* No. 05 C 5940, 2008 U.S. Dist. LEXIS 4352, *11-13 (N.D. Ill. Jan. 22, 2008).......................... 30

*Aristotle P. v. Johnson,* 721 F. Supp. 1002 (N.D. Ill. 1989) ................................................................... 4, 54

*Arrington v. City of Chicago,* 2018 U. S. Dist. LEXIS 14168, *9-11 (N. D. Ill. Jan. 30, 2018)................................ 15

*Awalt v. Marketti,* 74 F. Supp. 3d 909, 937-38 (N.D. Ill. 2014) ................................................................ 21

*Baird v. Renbarger,* 576 F. 3d 340, 345-46 (7th Cir. 2009) ........................................................... 3, 7, 8, 51

*Bakes v. St. Alexius Med. Ctr.,* 2011 IL App (1st) 101646, ¶ 21, ¶ 23 ......................................................... 57

*Balthazar v. City of Chi.,* 735 F.3d 634, 638 (7th Cir. 2013) .................................................................. 48

*Baskins v. Gilmore,* 2018 U. S. Dist. LEXIS 168579, *16 (N. D. Ill. Sept. 30, 2018) .................................... 18

*Bd. of the Cnty. Comm'rs v. Brown,* 520 U. S. 397, 407, 411 (1997) ..................................................... 26, 30

*Beauchamp v. City of Noblesville,* 320 F. 3d 733, 742-43 (7TH Cir. 2003) ........................................... 34, 42

*Betker v. Gomez,* 692 F.3d 854, 861-62 (7th Cir. 2012) ........................................................................ 42

*B.H. v. Johnson,* 715 F. Supp. 1387 (N.D. Ill. 1989) ........................................................................ 4, 54

*Black v. Wrigley,* 2017 U. S. Dist. LEXIS 202260, *39 (N. D. Ill. Dec. 8, 2017) ...................................... 54

*Bogie v. Rosenberg,* 705 F. 3d 603, 609 (7th Cir. 2013)........................................................................ 7

*Bond v. Utreras,* 2006 U. S. Dist. LEXIS 10501, *16-17 (N. D. Ill. 2006) ............................................... 11

*Boone v. City of Chicago,* No. 16-CV-11510, 2018 U.S. Dist. LEXIS 28408, *6-7 (N.D. Ill. Feb. 22, 2018)...... 49, 61

*Boyd v. City of Chicago,* 378 Ill. App. 57, 69 (1st Dist. 2007) ................................................................ 57

*Breneisen v. Motorola, Inc.,* 512 F.3d 983 (7th Cir. 2008)...................................................................... 53

*Butts v. City of Bowling Green,* 374 F. Supp. 2d 532, 544 (W.D. Ky. 2005) ........................................... 41

*Cain v. Rinehart,* 2021 U. S. Dist. LEXIS 192470, *13 (E. D. Mich. May 11, 2021).......................... 52, 62

*Calhoun v. Ramsey,* 408 F.3d 375, 380 (7th Cir. 2005)................................................................... 10, 20

*Callahan v. Aldridge,* No. 10 C 0864, 2011 U.S. Dist. LEXIS 12756, *11-13, 16-18 (N.D. Ill. Feb. 9, 2011)..... 51, 63

*Carmona v. City of Chi.,* No. 15 C 462, 2019 U.S. Dist. LEXIS 149318, *33-49 (N.D. Ill. Sep. 3, 2019)................ 54

*Carthans v. City of Harvey,* 2017 U. S. Dist. LEXIS 78117, at *18 (N. D. Ill. May 23, 2017).................................... 14

*Cazares v. Frugoli,* No. 13 C 5626, 2017 U.S. Dist. LEXIS 49938, *55, 59-64 (N.D. Ill. Mar. 31, 2017).......... 14, 32

*Chavez v. Illinois State Police,* 251 F. 3d 612, 651 (7th Cir. 2001) ............................................................................ 43

*Cline v. City of Mansfield,* 745 F. Supp. 2d 773 (N.D. Ohio 2010) ............................................................................ 41

*Cohen v. Smith,* 269 Ill. App. 3d 1087, 1090 (1995)................................................................................................... 57

*Coleman v. City of Chi.,* No. 09 C 6700, 2011 U.S. Dist. LEXIS 43675, *16-17 (N.D. Ill. Apr. 22, 2011)............... 57

*Coleman-Johnson v. City of Chicago,* 1996 U. S. Dist. LEXIS 10250, *6-7, 10-11, 15-19 (N. D. Ill. July 18, 1996)
.................................................................................................................................................................. 34, 38, 42

*Collier v. City of Chi.,* No. 14 C 2157, 2015 U.S. Dist. LEXIS 113336, (N.D. Ill. Aug. 26, 2015) .......................... 61

*Connick v. Thompson,* 563 U.S. 51, 61-62 (2011) ...................................................................................................... 26

*Curtis v. Jaskey,* 326 Ill. App. 3d 90, 93 (2001)......................................................................................................... 57

*Cusack v. City of Des Plaines,* No. 06 C 2507, 2007 U.S. Dist. LEXIS 63717, *14-18 (N.D. Ill. Aug. 29, 2007)..... 61

*Day v. Wooten,* 947 F. 3d 453, 461-63 (7th Cir. 2020)................................................................................................ 58

*Daniel v. Cook County,* 833 F. 3d 728, 740-42 (7th Cir. 2016)................................................................................... 15

*Davis v. Thillman,* No. 93 C 3335, 1994 U.S. Dist. Lexis 368, *15-17 (N.D. Ill. Jan. 18, 1994).............................. 61

*De La Torre v. City of Renton,* 164 F. Supp. 3d 1275, 1285 (W.D. Wash. 2016)........................................................ 64

*Doe v. Calumet City,* 161 Ill. 2d 374, 392-93 (1994) .................................................................................................. 53

*Doe v. City of Chi.,* No 95 C 2117, 1995 U.S. Dist. LEXIS 14517, *18-19 (N.D. Ill. Oct. 2, 1995) ........................ 49

*Doe v. Vill. of Arlington Heights,* 782 F.3d 911, 917 (7th Cir. 2015)..................................................................... 4, 54

*Draine v. Bauman,* 708 F. Supp. 2d 693, 698, 700, 707-708 (N. D. Ill. April 16, 2010) ..................................... 39, 42

*Edwards v. Jolliff-Blake,* 907 F. 3d 1052 (7th Cir. 2018) ........................................................................................... 39

*EEOC v. O & G Spring and Wire Forms Specialty Co.,* 38 F. 3d 872 (7th Cir. 1994)................................................. 11

*Estate of Loury v. City of Chicago,* No. 16-cv-4452, 2019 U.S. Dist. LEXIS 38029, 4, 16, 21-23 (N.D. Ill. Mar. 11, 2019)..................................................................................................................................................................... 15, 16

*Feltmeier v. Feltmeier,* 207 Ill. 2d 263, 269-71, 273 (2003) ...................................................................................... 53

*Felton v. City of Chi.,* 827 F.3d 632, 637 (7th Cir. 2016)............................................................................................. 6

*Fiala v. Bickford Senior Living Grp, LLC,* 2015 IL App (2d) 150067, ¶ 20 .............................................................. 57

*Fields v. Zolkowski,* No. 17-C-1506, 2018 U.S. Dist. LEXIS 130328, *9 (E.D. Wis. Aug. 2, 2018) .......................... 7

*Finsel v. Hartshorn,* 200 F. Supp. 2d 960, 971 (C.D. Ill. 2002) ................................................................. 63

*First Midwest Bank v. City of Chi.,* 337 F. Supp. 3d 749, 777-79 (N.D. Ill. Aug. 29, 2018) ........................... 15, 17, 18

*Foley v. City of Lowell, Mass.,* 948 F. 2d 10 (1ˢᵗ Cir. 1991) ................................................................. 13

*Fort v. Smith,* 85 Ill. App. 3d 479, 481 (1980) ................................................................................ 60

*Franks v. Delaware,* 438 U. S. 154, 155-56 (1978) ............................................................................. 42

*Garcia v. City of Chi.,* No. 01 C 8945, 2003 U.S. Dist. LEXIS 4577, *18-23 (N.D. Ill. Mar. 19, 2003) ................... 32

*Gaskin v. Goldwasser,* 166 Ill. App. 3d 996, 1011-1012 (1988) ............................................................... 57

*Gill v. United States,* No. 19-12441-NMG, 2021 U.S. Dist. LEXIS 18117, *25 (D. Mass. Jan. 29, 2021) ............... 64

*Glisson v. Ind. Dep't of Corr.,* 849 F.3d, 372, 380 (7th Cir. 2020) ........................................................... 20

*Godinez ex rel. Godinez v. City of Chicago,* No. 16-cv-07344, 2019 U.S. Dist. LEXIS 187994, *10-11 (N.D. Ill. Oct.
  30, 2019)........................................................................................................................ 15, 16, 17

*Gordon v. FedEx Freight, Inc.,* 674 F.3d 769, 772-73 (7th Cir. 2012) ........................................................ 2

*Green v. Butler,* 420 F.3d 689, 695-96 (7th Cir. 2009) ........................................................................ 50

*Grochocinski v. Mayer Brown Roe & Maw, LLP,* 719 F.3d 785, 794 (7th Cir. 2013) .................................... 2

*Grossmeyer v. McDonald,* 128 F.3d 481, 486 (7th Cir. 1997) ................................................................. 49

*Guzman v. City of Chicago,* 565 F.3d 393, 398 (7th Cir. 2009) ............................................................... 48

*Hartsfield v. Lemacks,* 50 F.3d 950, 955 (11th Cir. 1995) .................................................................... 43

*Hale v. Fish,* 899 F.2d 390 (5th Cir. 1990) .................................................................................... 41

*Hanno v. Sheahan,* No. 01 C 4677, 2004 U.S. Dist. LEXIS 23688, *39-40 (N.D. Ill. Nov. 23, 2004) ...................... 14

*Hendricks v. Bryant,* No. 20-cv-00249, 2021 U.S. Dist. LEXIS 188817, *3, *10-14 (N.D. Ill. Sep. 30, 2021) ... 20, 30

*Henry v. County of Shasta,* 132 F. 3d 512 (9ᵗʰ Cir. 1997), opinion amended, 137 F. 3d 1372 (9ᵗʰ Cir. 1998) ............ 13

*Herion v. Vill. of Bensenville,* No. 00 C 1026, 2000 U.S. Dist. LEXIS 16745, *12-14 (N.D. Ill. Oct. 31, 2000) ....... 49

*Hicks v. Marsalik,* No 97 C 6097, 1999 U.S. Dist. LEXIS 3562 ............................................................... 39

*Hill v. Shell Oil Co.,* 2000 U. S. Dist. LEXIS 19398, *5 (N. D. Ill.) .......................................................... 11

*Holt v. Lewsader,* 2020 U.S. Dist. LEXIS 2582456, *77 ........................................................................ 63

*Hooks v. Brewer,* 818 Fed. App'x. 923, 928-30 (11th Cir. 2020) ............................................................. 41

*Hope v. Pelzer,* 240 F. 3d 975 (11ᵗʰ Cir. 2001), *rev'd,* 122 S. Ct. 2508, 2516 (2002)..................................... 8

*Horan v. City of Chi.,* No. 09 C 0505, 2010 U.S. Dist. LEXIS 72633, *16-18 (N.D. Ill. July 16, 2010) ............. 52, 57

*Hudson v. City of Chicago,* No.14-CV-06267, 2017 U.S. Dist. LEXIS 106450, *12-13 (N.D. Ill. July 10, 2017) 38, 42

*Illinois v. Gates,* 462 U.S. 213, 241-42 (1983) ................................................................................................ 39

*Ingram v. City of Columbus,* 185 F. 3d 579, 592 (6th Cir. 1999) ....................................................................... 58

*International Brotherhood of Teamsters v. U. S.,* 431 U. S. 324, 339 (1977) .................................................. 11

*Irish v. Maine,* 849 F. 3d 521, 527-28 (1st Cir. 2017) .......................................................................................... 8

*Jacobs v. City of Chicago,* 215 F.3d 758, 768-69, 772-74 (7th Cir. 2000) ..................... 4, 8, 34, 39, 45, 52, 60, 62, 63

*J.K.J. v. Polk Cty.,* 960 F.3d 367, 378-380, 383 (7th Cir. 2020) ............................................................... 20, 30, 32

*J.K.J. v. Polk Cnty.,* No.15-cv-428-wmc, 2018 U.S. Dist. LEXIS 154, *28 (W.D. Wis. Jan. 3, 2017) ...................... 25

*Johnson v. City of Chi.,* No. 05 C 6545, 2009 U.S. Dist. LEXIS 49526, 15-16, *27-29 (N.D. Ill. June 9, 2009) ....... 30

*Jones v. Webb,* No. 92 C 20198, 1999 U.S. Dist. LEXIS 15828, n. 8 (N.D. Ill. Oct. 28, 1993) ................................. 59

*Jones v. Wilhelm,* 425 F. 3d 455, 463-64 (7th Cir. 2005) ..................................................................................... 45

*Karkoszka v. Dart,* No. 13 C 1635, 2016 U.S. Dist. LEXIS 4454, *5-6, *16-18 (N.D. Ill. Jan. 14, 2016) ............... 57

*Karney v. City of Naperville,* 2016 U. S. Dist. LEXIS 143655, *37-39 (N. D. Ill. Oct. 18, 2016) ............................ 13

*Kernats v. O'Sullivan,* 35 F. 3d 1171, 1182 (7th Cir. 1994) ................................................................................ 43

*King v. Kramer,* 680 F.3d 1013, 1021 (7th Cir. 2012) .......................................................................................... 20

*Kitzman-Kelley ex rel. Kitzman-Kelley v. Warner,* 203 F.3d 454, 459 (7th Cir. 2000) ......................................... 27

*Kohler v. Englade,* No. 03-857-JJB, 2009 U.S. Dist. LEXIS 47105, *15-17 (M.D. La. June 3, 2009) ..................... 41

*Kraman v. Hoskinson,* No. 16 C 4960, 2018 U.S. Dist. LEXIS 39457, *9-13 (N.D. Ill. Mar. 12, 2018) .................. 61

*L. A. County v. Rettele,* 550 U. S. 609, 611, 614-15 (2007) ........................................................................ 9, 58, 59

*LaPorta v. City of Chicago,* 277 F. Supp. 3d 969, 981, 987-89 (N. D. Ill. 2017) .......................................... 10, 15, 18

*Lark v. City of Evanston,* No. 16 C 4630, 2017 U.S. Dist. LEXIS 12653, *15-19 (N.D. Ill. Jan. 31, 2017) ......... 54, 61

*Lindell v. Pollard,* No 19-C-255, 2021 U.S. Dist. LEXIS 167574, *30 (E.D. Wis. Sep. 3, 2021) ............................... 6

*Liston v. County of Riverside,* 120 F.3d 965 (9th Cir. 1997) ................................................................................ 42

*Lombardi v. Range,* 2003 U. S. Dist. LEXIS 12812, *15 (N. D. Ill. July 22, 2003) ................................................ 51

*Lynch v. Young,* 2005 U. S. Dist. LEXIS 7603, *12 (N. D. Ill. March 9, 2005) ....................................................... 53

*Lyons v. City of Chicago,* 2021 U.S. Dist. LEXIS 190453, *6, 12-13 (N. D. Ill. Sept. 30, 2021) ......................... 7, 63

*Maglaya v. Kumiga,* No. 14-cv-3619, 2015 U.S. Dist. LEXIS 101217, *2-6, 20-21 (N.D. Ill. Aug. 3, 2015) ........ 4, 54

*Malley v. Briggs,* 475 U. S. 335, 344-45 (1986) ........................................................................ 40, 64

*Mark v. Furay,* 769 F. 2d 1266, 1269 (7th Cir. 1985)................................................................... 61

*Markel Int'l Ins. Co. v. Montgomery,* 2020 IL App (1st) 191175, ¶ 46....................................... 49

*Martinez v. Dart,* No. 19 C 4359, 2021 U.S. Dist. LEXIS 145832, *7-11 (N.D. Ill. Aug. 4, 2021)....................... 6, 58

*Maryland v. Garrison,* 480 U.S. 79, 87 (1987) ........................................................................... 45

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-587 (1986)...................... 2

*McCadd v. Murphy,* 763 F. Supp. 2d 1018, 1026 (N.D. Ill. 2010)........................................... 39, 41

*McCann v. Iroquois Mem. Hosp.,* 622 F.3d 745, 752 (7th Cir. 2010) .......................................... 2

*McCauley v. Sinnot,* No 13 CV 522, 2014 U.S. Dist. LEXIS 152429, *3-4, *8-9 (N.D. Ill. Oct. 23, 2014).............. 57

*McDonald v. Haskins,* 966 F.2d 292, 294-95 (7th Cir. 1992) ................................................ 4, 8

*McGregory v. Ozelie,* No. 18-CV-25, 2019 U.S. Dist. LEXIS 130328, *9 (E.D. Wis. Aug. 2, 2018)........................ 7

*Meerbrey v. Marshall Field & Co.,* 139 Ill. 2d 455, 474 (1990)............................................... 61

*Mena v. City of Simi Valley,* 226 F. 3d 1031, 1039-1041 (9th Cir. 2000) ................................. 58

*Messerschmidt v. Millender,* 565 U.S. 535, 547 n. 1 (2012) .................................................... 42

*Michigan v. Summers,* 452 U. S. 692, 705 (1981) ................................................................ 58, 60

*Milan v. Bolin,* 795 F. 3d 726, 728-30 (7th Cir. 2015) ............................................................. 42

*Moore v. City of Chicago,* 2014 U. S. Dist. LEXIS 58402 (N. D. Ill. Apr. 28, 2014)...................... 8

*Muehler v. Mena,* 544 U.S. 93, 99, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005) ...................... 50, 58

*Mueller v. Tinkham,* 162 F.3d 999 (8th Cir. 1998) .................................................................. 41

*Obrycka v. City of Chi.,* 2012 U. S. Dist. LEXIS 22818 *20-24 (N. D. Ill. Feb. 23, 2012) .......................... 13, 31, 32

*Ortiz v. City of Chicago,* 686 F. Supp. 2d 782, 789.................................................................. 64

*Owusu v. Grzyb,* 749 F. Supp. 1389, 1390 (N.D. Ill. 1989) ................................................. 52, 57

*Pearce v. Thiry,* No. 08 C 4483, 2009 U.S. Dist. LEXIS 92204, *21-23 (N.D. Ill. Oct. 1, 2009)........................ 39, 61

*Pearson v. Callahan,* 555 U. S. 223, 232 (2009) ....................................................................... 7

*Pechan v. DynaPro, Inc.,* 251 Ill. App. 3d 1072, 1084 (2d Dist. 1993) ...................................... 57

*People v. Johnson,* 408 Ill. App. 3d 107, 113 (1st Dist. 2010)................................................... 59

*People v. McGurn,* 341 Ill. 632, 637 (1930) ........................................................................... 61

*Phillips v. City of Chi.,* No. 18-cv-0316, 2021 U.S. Dist. LEXIS 79414, *15, 18 (N.D. Ill. Apr. 26, 2021) ......... 39, 41

*Pindak v. Dart,* 125 F. Supp. 3d 720, 756-77 (N.D. Ill. 2015) ................................................. 10

*Powell v. City of Berwyn,* 68 F. Supp 3d 929 (N. D. Ill. Sep. 19, 2014) ................................... 8

*Public Finance Corp. v. Davis,* 66 Ill. 2d 85, 90 (1976) .......................................................... 53

*Rascon v. Hardiman,* 803 F. 2d 269, 273-274 (7th Cir. 1986) ............................................... 43

*R.D. v. Concord Cmty. Schs.,* No. 3:19-CV-823-PPS, 2021 U.S. Dist. LEXIS 131963, *26-27 (N.D. Ind. July 15, 2015) ............................................................................................................................... 20

*Reardon v. Schossow,* 416 F. Supp. 3d, 793, 806 (E. D. Wis. 2019) ...................................... 39

*Richards v. U.S. Steel,* 869 F.3d 557, 566 (7th Cir. 2017) ...................................................... 53

*Richards v. Wisconsin,* 520 U.S. 385, 394-95 (1997) ............................................................. 50

*Robinson v. Wexford Health Sources, Inc.,* 2019 U.S. Dist. LEXIS 22208, *6 (N.D. Ill. Dec. 30, 2019) ................. 10

*Rogers v. Cook,* No. 08 C 2270, 2008 U.S. Dist. LEXIS 103702, *5-6 (N.D. Ill. Dec. 23, 2008) .............................. 52

*Rosenberg v. Packerland Packing Co.,* 55 Ill. App. 3d 959, 964 (1st Dist. 1977) ........................................... 49

*Ruby v. Horner,* 39 Fed. App'x 284, 287 (6th Cir. 2002) ....................................................... 41

*Sanders v. City of Chicago Heights,* 2016 U.S. Dist. LEXIS 64418, *37-38 (N.D. Ill. May 17, 2016) ..................... 20

*Sanseverino v. Chrostowski,* 536 Fed. App'x 62 (2nd Cir. 2013) ............................................ 41

*Schroeder v. Lufthansa German Airlines,* 875 F. 2d 613, 621 (7th Cir. 1989) ........................ 60

*Schweihs v. Chase Home Fin., LLC,* 2016 IL 120041, ¶ 37, ¶ 50, ¶ 52 ...................... 53, 54, 63

*Scott v. Harris,* U.S. 372, 380 (2007) ...................................................................................... 6

*Simmons v. City of Chicago,* No. 14 C 9042, 2017 U.S. Dist. LEXIS 137395, *24-25 (N.D. Ill. Aug. 29, 2017) 15, 17

*Skierkewiecz v. Gonzalez,* 711 F. Supp. 931, 935-936 (N. D. Ill. 1989) ................................. 64

*Smith v. City of Milwaukee,* No. 18-CV-1797, 2020 U.S. Dist. LEXIS 21224, *13-16 (E.D. Wis. Feb. 7, 2020) ........ 6

*Southern v. City of Harvey,* 2006 U. S. Dist. LEXIS 99816, *13-14 (N. D. Ill. Nov. 13, 2006) ................................ 53

*Spalding v. City of Chi.,* 186 F. Supp. 3d 884, 915-917 (N.D. Ill. May 11, 2016) ......................................... 32

*Spearman v. Elizondo,* 230 F. Supp. 3d 888, 893 (N. D. Ill.) .................................................... 9

*Spina v. Forest Preserve District of Cook County,* 2002 U. S. Dist. LEXIS 14016, *6 (N. D. Ill. Ill.) ..................... 11

*Stainback v. Dixon,* 569 F. 3d 767, 772 (7th Cir. 2009) ......................................................... 58

*Stamps v. Hernandez,* No. 08 C 2196, 2010 U.S. Dist. LEXIS 95539 (N.D. Ill. Sep. 14, 2010) ............................. 41

*Stamps v. Town of Framingham,* 813 F. 3d 27, 31 (1st Cir. 2016) ...................................... 4, 52

*Tate v. City of Chicago,* 2020 U. S. Dist. LEXIS 213712, *7, 10-12, 20, 25 (N. D. Ill. Nov. 16, 2020) ...... 3, 7, 56, 63

*Turner v. Marion County Sheriff Dep't,* 94 F. Supp. 2d 966, 972-73 ................................................ 43

*Turner v. Paul,* 953 F.3d 1011, 1017 (7th Cir. 2020) ..................................................................... 27

*Thomas v. Cook County Sheriff's Dep't,* 604 F.3d 293, 303 (7th Cir. 2009) ........................................ 10, 13

*Thomas v. Sheahan,* 499 F. Supp. 2d 1062, 1095-96 (N.D. Ill. 2007) .......................................... 25

*Toothman v. Hardee's Food Sys.,* 304 Ill. App. 3d 521, 534 (1999)................................................ 49

*United States v. Bell,* 585 F.3d 1045, 1048 (7th Cir. 2009) ......................................................... 38

*United States v. Betro,* No. 04-CR-064-S, 2004 U.S. Dist. LEXIS 13919, *19-20 (E.D. Wis. Mar. 28, 2005).......... 38

*United States v. Brown,* 333 F.3d 850, 852 (7th Cir. 2003) ......................................................... 50

*United States v. Gillaum,* 372 F.3d 848, 854 (7th Cir. 2004) ....................................................... 50

*United States v. Glover,* 775 F. 3d 811, 816, 818-20 (7th Cir. 2014)................................................ 37, 39

*United States v. Harju,* 384 F. Supp. 2d 1278, 1287-89 (E.D. Wis. 2005) *rev'd on other grounds*, 466 F.3d 602 (7th

    Cir. 2006) .............................................................................................................. 39

*United States v. Harris,* 464 F.3d 733 (7th Cir. 2006)................................................................ 42

*United States v. Hawthorne,* No. 13 CR 772-19, 2014 U.S. Dist. LEXIS 150260, *7-8 (N.D. Ill. Oct. 2, 2014) ....... 38

*United States v. Jones,* 208 F.3d 603, 610 (7th Cir. 2000) .......................................................... 50

*United States v. Koerth,* 312 F.3d 862, 866-68 (7th Cir. 2002)...................................................... 38, 39

*United States v. Leon,* 468 U.S. 897, 914, 923 (1984) ............................................................... 42, 43

*United States v. McNeal,* 82 F. Supp. 2d 945, 956, 961 (S.D. Ind. 2000) .......................................... 41

*United States v. Peck,* 317 F.3d 754, 756-57 (7th Cir. 2003) ....................................................... 38, 42

*United States v. Pollard,* 07-CR-09, 2007 U.S. Dist. LEXIS 32481, *5-8 (E.D. Wis. May 2, 2007)...................... 38

*United States v. Simmons,* 771 F. Supp. 2d 908, 924-25 (N.D. Ill. 2011) ......................................... 39

*United States v. Vigeant,* 176 F.3d 565 (1st Dist. 1999) ............................................................ 41

*U. S. v. Lanier,* 520 U.S. 259, 271 (1997) ........................................................................... 7

*Vincent v. Williams,* 279 Ill. App. 3d 1, 5-6 (1996) ................................................................ 60

*Volk v. Coler,* 845 F. 2d 1422, 1425, 1439 (7th Cir. 1988) .......................................................... 11

*Wade v Ramos,* 2019 U. S. Dist. LEXIS 44591, 4, 26 (N. D. Ill. Mar. 19, 2019)...................................... 40

*Walden v. City of Chicago,* 755 F. Supp. 2d 942, 969-972 (N.D. Ill. 2010)........................................... 31

*Walker v. Witherspoon,* 2017 U. S. Dist. LEXIS 129182, *20 (N. D. Ill. Aug. 15, 2017) ........................................... 51

*Weeks v. City of Chicago,* 2014 U. S. Dist. LEXIS 107660, *8-9 (N. D. Ill. Aug. 6, 2014) .................................. 34, 61

*White v. Olig,* 56 F.3d 817, 818-821 (7th Cir. 1995) ........................................................................................... 49

*White v. Rochford,* 592 F.2d 381, 383-86 (7th Cir. 1979) ........................................................... 4, 29, 52, 54

*Whiteley v. Warden,* 401 U.S. 560, 566-68 (1971) ............................................................................................ 39

*Williams v. City of Chi.,* No. 16 C 2303, 2018 U.S. Dist. LEXIS 145107, *32 (N.D. Ill. Aug. 27, 2018) ................. 61

*Wilson v. Ark.,* 514 U.S. 927, 929, 936 ............................................................................................................. 50

*Wordlow v. Chicago Board of Education,* No. 18-cv-8040, 2018 U.S. Dist. LEXIS 199701, *20 (N.D. Ill. Nov. 26, 2018) ................................................................................................................................................................ 59

*Wragg v. Vill. of Thornton,* 604 F.3d 464, 469 (7th Cir. 2010) ....................................................................... 25

## STATUTES

745 ILCS 10/2-202 ........................................................................................................................... 52, 57

## RULES

Fed. R. Civ. Pro. 30(b)(6) .................................................................................................................... 14

Fed. R. Civ. P. 56(a) .............................................................................................................................. 2

Fed. R. Evid. 801(d)(2)(D) .................................................................................................................... 15

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| HESTER MENDEZ and GILBERT MENDEZ, for themselves and on behalf of their minor children, PETER MENDEZ and JACK MENDEZ, | ) ) ) ) | |
| | ) | No.  1:18-cv-05560 |
| Plaintiffs, | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| | ) | Magistrate Judge Young B. Kim |
| THE CITY OF CHICAGO; Chicago police officers JOSEPH T. CAPELLO IV (#10626); LIEUTENANT SAMUEL DARI (#603); MICHAEL W. DONNELLY (#13784); SERGEANT RUSSELL A. EGAN (#998); MICHAEL J. GUZMAN (#15911); JOSE M. HERNANDEZ (#15925); and ERIC M. SEHNER (#11641), | ) ) ) ) ) ) ) ) ) ) | |
| | ) | Jury Demanded |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

*Plaintiffs' counsel*
Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, IL 60602
Office:  (773) 241-5844
Fax:  (312) 372-1766
Email:  al@alhofeldlaw.com

December 30, 2021

Plaintiffs respectfully submit this memorandum in opposition to defendants' joint motion for summary judgment and in support of their cross-motion for partial summary judgment:

## I.    INTRODUCTION

Defendants request summary judgment on *all twelve (12)* counts of plaintiffs' complaint, arguing plaintiffs have no evidence to support any of their claims.  (Defendants' Memo. at 2, 9-24, 25, 39-41).  Defendants' sensational argument ignores the vast majority of the evidentiary record.  The material facts in this case are sprinkled across 37 liability depositions, 50,000 pages of documents, and 11 expert reports.  Plaintiffs, in order to meet the burden thrust on them by defendants' tactic, have compressed and pigeonholed the additional, undisputed material facts - hidden or ignored by defendants - into the number, scope and form of paragraphing required by Local Rule.[1]  Based on a review of the actual evidence, the Court should deny defendants' motion in its entirety.

## II.    SUMMARY OF UNDISPUTED AND DISPUTED FACTS

Moreover and contrary to defendants' argument, the material facts are not only undisputed in plaintiffs' favor, but the evidence is overwhelming on key elements of count I, the *Monell* claim, including the City's widespread practice, gaps in official policy and training, actual notice, and the City's deliberate indifference.  The material facts for count I are disputed as to:  the predicate violation for the *Monell* claim, as no objective evidence resolves the issue of whether guns were pointed at Peter and Jack Mendez; whether the City failed to investigate and discipline officer excessive force against children; and causation.  In addition, the material facts are undisputed in plaintiffs' favor on:  count II, invalid warrant; count III, supervisory liability; count IV, failure to

---

[1] To the extent that defendants in reply choose attack plaintiffs' paragraphs of fact as too long or including more than one unrelated fact, then (but otherwise) plaintiffs ask the Court to strike many of defendants' statements of fact, including but not limited to ¶¶ 6, 8, 25, 29, 32, 41, 64, 74, 77, 86, 87, 101, 113, 114, 118-120, 126, 129-131, and 135-136 on the grounds that each contains multiple facts.

1

retreat; counts V and VIII, false arrest; count VII, battery; nearly all of count IX, intentional infliction of emotional distress; and count X, trespass. The material facts for count VI, assault, and a small part of count IX, intentional infliction, are disputed – again, as to whether officers pointed guns at Peter and Jack. Plaintiffs cross-move and request judgment on the claims and parts of claims where the facts are undisputed for them.

## III. STANDARDS OF LAW

The Court may only grant summary judgment if there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a). When examining a motion for summary judgment, the Court must draw all reasonable inferences and view all facts in favor of the nonmoving party. *Grochocinski v. Mayer Brown Roe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But the Court may not "weigh the evidence or decide which testimony is more credible." *McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). If a reasonable jury could return a verdict in the nonmovant's favor, the Court must deny the motion for summary judgment. *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772-73 (7th Cir. 2012).

## IV. ARGUMENT

### A. The Material Facts for Plaintiffs' *Monell* Claim are Partly Disputed and Partly Undisputed in *Plaintiffs'* Favor

#### 1. The Facts Regarding Whether Officers Pointed Guns at Peter and Jack Are Disputed, and No Definitive Evidence Exists to Resolve the Issue

Defendants officer Cappello and Sgt. Egan engaged in excessive force against 5-year-old Jack and 9-year-old Peter Mendez when each pointed his firearm directly at their heads and chests at close range when the children and their mother were fully compliant and posed zero threat to officer safety. (Plaintiffs' Statement of Additional Material Facts ("PSAMF"), ¶¶ 44-48). Sgt. Egan's handgun, which he continued to aim at them with two hands *after* they had immediately complied with his order to "GET THE FUCK DOWN ON THE FLOOR!", was loaded and had

2

no safety feature. (PSAMF ¶¶ 45-46). Moments later, officer Cappello also aimed his M4 assault rifle at each one of them as they were lying flat on the living room floor, screaming. (PSAMF ¶¶ 43, 47). Officers' did not merely "display" their weapons, and their pointing was more than momentary, more than a brief "scan" or "protective sweep" across the room; Sgt. Egan did not just run past the boys and their mother but was "standing there pointing" for "a few seconds" or "about a minute"; Egan himself testified he was in the room for 25-30 seconds to "secure" it before moving on to clear and secure the next room. (Memo. at 26; PSAMF ¶¶ 44-46). Cappello aimed his assault rifle at the boys for several seconds. (PSAMF ¶ 47).

Crucially, Egan and Cappello had not received *any* information from the John Doe that the targets were armed, dangerous or had guns in the apartment, and both officers *knew* in advance they would encounter young children in the apartment. (PSAMF, ¶¶ 13, 28). Further, when they actually saw Peter, Jack, and their mother, Egan and Cappello immediately perceived that they posed no threat to officers. (PSAMF, ¶ 44). The children presented no hint of danger. (Id.). When officer Cappello pointed at the children, it was unreasonable for the additional reason that Sgt. Egan had already "cleared and secured" the living room and pointed at them once. (PSAMF, ¶¶ 43, 44, 47).

In the Seventh Circuit, pointing guns at vulnerable individuals, especially children, when they are fully compliant and pose no threat to officer safety, constitutes excessive force. *Tate v. City of Chicago*, 2020 U. S. Dist. LEXIS 213712, *10 (N. D. Ill. Nov. 16, 2020)("defendants [i.e., same counsel in this case] concede that a police officer pointing a gun at a person who poses no threat can constitute excessive force"), *citing Baird v. Renbarger*, 576 F. 3d 340, 345 (7th Cir. 2009)(collecting cases from multiple circuits)("pointing guns at persons who are compliant and

3

present no danger is a constitutional violation").[2]  There is good reason for this rule of law:  an

officer's gun drawn and pointed at someone can easily lead to accidental discharge if the officer is

startled, distracted or loses his balance.  *Stamps v. Town of Framingham*, 813 F. 3d 27, 31 (1st Cir.

2016)(officer lost his balance and accidentally shot and killed a fully compliant, elderly civilian).  For

this reason, it is generally accepted in law enforcement firearm training that "you should never point

a firearm at something or someone you do not intend to shoot unless you anticipate an immediate

threat of serious bodily harm or death."  (PSAMF Exhibit B, ¶¶ 464, 482, 486, at 104, 110, 112).

In addition, officers have a well-established duty to not place child detainees in

danger; if children are present, officers may not create a situation that harms their physical safety or

emotional well-being.  *White v. Rochford*, 592 F.2d 381, 383-86 (7th Cir. 1979).[3]  Here, unnecessarily

pointing guns at Peter and Jack put them in mortal, physical danger and severely and caused them

severe, long-term, emotional, including PTSD and anxiety.  (PSAMF ¶ 48).

Whether officer Sgt. Egan and officer Cappello pointed their guns at the children is a

genuine issue of material fact.  Hester, Peter and Jack Mendez each testified that each officer

pointed his firearm at each of them individually.  (PSAMF, ¶¶ 44-48).  Peter's and Hester's

testimony is clear and unambiguous, including on the point that Sgt. Egan and officer Cappello

---

[2] See also, *Jacobs v. City of Chicago*, 215 F.3d 758, 773-74 (7th Cir. 2000)(officers used excessive force when they were executing a search warrant and pointed loaded weapons at an unarmed man who had done nothing to evade arrest); *McDonald v. Haskins*, 966 F.2d 292, 294-95 (7th Cir. 1992) (pointing a gun at a nine-year old child during a search and threatening to shoot was "objectively unreasonable").

[3] *See also Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 917 (7th Cir. 2015); *Maglaya v. Kumiga*, No. 14-cv-3619, 2015 U.S. Dist. LEXIS 101217, *2-6, 20-21 (N.D. Ill. Aug. 3, 2015)(officer created a situation where he exhibited a reckless disregard for a five-year-old's safety by shooting the child's dog to death while the child was mere feet away); *B.H. v. Johnson,* 715 F. Supp. 1387 (N.D. Ill. 1989)(director of Department of Child and Family Services violated children's 14th Amendment rights by failing to ensure foster homes were safe); and *Aristotle P. v. Johnson*, 721 F. Supp. 1002 (N.D. Ill. 1989)(child plaintiffs stated Due Process and First Amendment claims where director of DCFS allowed children to be placed in foster homes separate from their siblings).

pointed at Jack. (Id.). During his video deposition, Jack himself testified and physically demonstrated that Sgt. Egan pointed the gun *at his mother's chest while she was in a seated position on the floor at the same time as she was holding him in front of her body with both arms.* (Id. ¶ 46). From this, a reasonable juror could easily conclude that Sgt. Egan pointed his gun *at Jack.*

### a. "Video May Not Tell the Whole Story" – *Felton v. City of Chi.*, 827 F. 3d 632, 637 (7th Cir. 2016)

Defendants first misleadingly argue it is undisputed that Egan and Cappello did not point at Peter and Jack because their pointing was not captured on body worn camera ("BWC") videos, then *admit* that temporal gaps in the BWC videos do not show Egan's and Cappello's actions during crucial moments in first two minutes after entry. (Memo. at 4, 27-29). Those gaps exist because 1) Egan and Cappello never turned on their BWCs during the raid (and Guzman turned his on late, long after entry), in violation of CPD policy, and 2) Egan and Cappello and their actions were simply not captured/are not visible on any other officers' BWCs for substantial periods, 17 and 11 seconds, respectively (or 15 and 25 seconds according to defendants), which is long enough for both of them to have pointed their guns at the children in the living room for the amount of time that plaintiffs testified they did. (PSAMF, ¶¶ 29, 40, 41, 43, 45-46; Memo. at 28).[4]

What is more, the extant BWC videos contain evidence that Egan and Cappello *did* point their guns at Peter and Jack. First, they show that 4 of the 6 officers had their guns drawn as they entered plaintiffs' apartment. (PSAMF, ¶¶ 33, 36). Second, forensic review of the BWC videos shows that officers were pointing their guns in front of them as they entered, not carrying them at the low-ready. (Id.). Third, forensic review of the BWC videos also unmistakably shows officer

---

[4] Since the beginning of the case (i.e., before the City produced any BWC videos to plaintiffs), plaintiffs alleged it was in the living room in the first minutes after officers forcibly entered the apartment that they pointed firearms at Peter and Jack. (Docket #1, ¶¶ 30, 35-39, at 6-7; 09/17/18 email from Corp. Counsel Gregory Beck to Al Hofeld, Jr., re: delivery of BWC videos, attached hereto as Appendix 1).

Cappello pointing his assault rifle at Gilbert Mendez when he was prone on the floor in the kitchen; it also shows Peter, peering from behind the crashed front door, witnessed this (BWC shows him standing there watching from behind the door). (PSAMF, ¶¶ 36, 38). Fourth, while BWC videos do not show Egan with his pistol drawn when he first enters the apartment front door, Peter testified he saw him draw it from his jacket as he entered the living room, and BWC shows that Sgt. Egan was the first officer to turn right after entering the apartment door, which made him the first officer to clear and secure the living room, which meant he was concerned enough about his own safety to have drawn his gun. (PSAMF, ¶¶ 37, 42, 45).

Because the BWC videos do not show the crucial moments when plaintiffs testified that Egan and Cappello pointed guns at them, they *do not* contradict plaintiffs' testimony or resolve the issue of fact on gun-pointing. Indeed, "there is no objective evidence disputing Mrs. Mendez and the boys' claims that Egan pointed his gun at them." (PSAMF, ¶ 41).

The Seventh Circuit recognizes that summary judgment is inappropriate where the "video may not tell the whole story…." *Felton v. City of Chi.*, 827 F.3d 632, 637 (7th Cir. 2016) (citing *Scott v. Harris*, U.S. 372, 380 (2007) (Stevens, J., dissenting)). District courts in the Seventh Circuit deny summary judgment where police body camera footage contains a gap like the ones identified above. *Martinez v. Dart*, No. 19 C 4359, 2021 U.S. Dist. LEXIS 145832, at *7-10 (N.D. Ill. Aug. 4, 2021)(denying defendant officer's motion for summary judgment where, in the "crucial moment" during which the alleged excessive force occurred, the camera was pointed away from plaintiff).[5] Similarly, where body camera footage is unclear, it will not support a grant of summary judgment.

---

[5] *See also Lindell v. Pollard*, No 19-C-255, 2021 U.S. Dist. LEXIS 167574, at *30 (E.D. Wis. Sep. 3, 2021)(denying defendant officers' motion for summary judgment where plaintiff alleged that the officers unconstitutionally strip searched him after turning off their body cameras); *Smith v. City of Milwaukee*, No. 18-CV-1797, 2020 U.S. Dist. LEXIS 21224, at *13-16 (E.D. Wis. Feb. 7, 2020)(denying summary judgment where officers failed to turn on their body cameras during the allegedly unconstitutional conduct).

*McGregory v. Ozelie*, No. 18-CV-25, 2019 U.S. Dist. LEXIS 130328, at *9 (E.D. Wis. Aug. 2, 2018);

*Fields v. Zolkowski*, No. 17-C-1506, 2018 U.S. Dist. LEXIS 130328, at *9 (E.D. Wis. Aug. 2, 2018).[6]

Defendants' argument that "it did not happen because it is not on video" misrepresents the

evidence. Given the gaps, which testimony fills in, the BWC videos do not compel summary

judgment for defendants on whether defendants Egan and Cappello used excessive force against

Peter and Jack.

> **b. Defendants Are Not Entitled to Qualified Immunity for Pointing Guns At Young Children Who Posed "No Hint of Danger"**

Defendant officers Egan and Cappello are not entitled to qualified immunity for

pointing their firearms at 5- and 9-year-old Jack and Peter when the boys not only immediately and

fully complied with commands but obviously posed "no hint of danger." *Baird*, 576 F. 3d at 346.

Qualified immunity is denied when the constitutional right at issue was clearly established on the

incident date, such that an objectively reasonable official, in similar circumstances, would have

known that violating that right was unlawful. *Pearson v. Callahan*, 555 U. S. 223, 232 (2009). Prior

case decisions establishing a clear violation of rights in identical factual circumstances are not

necessarily required: "a general constitutional rule already identified in the decisional law may apply

with obvious clarity to the specific conduct in question." *U. S. v. Lanier*, 520 U.S. 259, 271 (1997); *see*

---

[6] Moreover, even where the BWC videos contain clues as to whether or not guns were pointed, the parties' testimony is still crucial to resolving this dispute of fact. Fundamentally, because "any photograph or film shows only one perspective on a scene, so that additional perspectives, *such as eyewitness testimony* or photographs or films *from* different angles or *different times*, might reveal additional facts that would change the legal analysis," a plaintiff's claims are not properly disposed of unless videos "incontrovertibly contradict" their allegations, *not* when obvious limitations in the videos leave room for the "logical possibility" that Egan and Cappello pointed their firearms at the children. *Bogie v. Rosenberg*, 705 F. 3d 603, 609 (7th Cir. 2013)(emphasis added); *Lyons v. City of Chicago*, 2021 U.S. Dist. LEXIS 190453, at *6 (N. D. Ill. Sept. 30, 2021)("the fact that video does not capture all of defendant officers' actions compels the Court to find the BWC footage insufficient to refute Plaintiffs' claims…."); *Tate v. City of Chicago*, 2020 U. S. Dist. LEXIS 213712, at *7, 10-11, 12 (N. D. Ill. Nov. 16, 2020)(officers' cameras were not trained on the baby during the moment when guns were allegedly pointed at her, and videos did show that officers had their guns drawn).

*also Hope v. Pelzer*, 240 F. 3d 975 (11th Cir. 2001), *rev'd,* 122 S. Ct. 2508, at 2516 (2002). Additionally, police department policies or training can be *central* to the question of whether the illegality of an officer's conduct was clearly established at the time. *Irish v. Maine*, 849 F. 3d 521, 527-28 (1st Cir. 2017).

On November 7, 2017, there was clear, Seventh Circuit precedent that pointing firearms at vulnerable individuals, especially children, when they are fully compliant and pose no danger to officer safety, is excessive force. The *McDonald*, *Jacobs*, and *Baird* decisions cited above all announced or reiterated this rule, applied it to facts highly similar to the facts here, and in *McDonald* and *Jacobs* concluded that the officer gun-pointing violated the Fourth Amendment. Though these cases are sufficiently similar to this one, a precisely factually identical case is not required. *Powell v. City of Berwyn*, 68 F. Supp 3d 929 (N. D. Ill. Sep. 19, 2014); *Moore v. City of Chicago*, 2014 U. S. Dist. LEXIS 58402 (N. D. Ill. Apr. 28, 2014). Not only had the Seventh Circuit rule on officer gun-pointing been crystal clear for decades, but, in addition, *CPD's own, annual use of force training included a summary of the holding in Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000), which stated that it is unreasonable to point a loaded gun at someone who had not indicated he was dangerous, was unarmed, had not resisted and had not committed a crime. (PSAMF ¶ 65). This precisely describes the situation Egan and Cappello faced when they pointed at Jack and Peter. Moreover, given that children "are much less likely to present the police with a credible threat," "the unreasonableness of the gun-pointing is more apparent" here. *Baird*, 576 F. 3d at 346.[7]

---

[7] Defendants argue that Peter and Jack did not suffer a constitutional violation (and perhaps that the officers are entitled to qualified immunity) by 1) *ignoring* the Seventh Circuit's clear gun-pointing rule and precedent; 2) citing *out-of-circuit* decisions (like *Anderson* and *Bellotte*, Memo at 29) that follow a different rule of law on gun-pointing (namely, that gun-pointing at non-threatening individuals when securing a space is permissible) and 3) mischaracterizing Egan's and Cappello's gun-pointing at Jack and Peter as "not egregious" enough to come within the rule of *McDonald, Jacob* and *Baird*. (Memo. 27, 29-30). But if a pointing a loaded gun with no safety feature directly at the front of the heads and chests of 5- and 9-year-old children from "a couple feet away" for several seconds or a minute when there was no hint of danger from the start is not egregious conduct, then nothing is. (PSAMF ¶¶ 45-47); *Archie v. City of Chicago*, 2020 U. S. Dist. LEXIS 176221, *22 (N. D. Ill.

2.      **The Facts on Whether the City Had A Custom 2012-2017 of Excessive Force Against Children 0-14 are Mostly Undisputed:  in 30(b)(6) Testimony the City *Admits* Officers Used Excessive Force Against Children, including "Commonly" Pointing Guns at Them While Serving Search Warrants**

When Chicago police officers pointed guns at Peter and Jack, causing them severe post-traumatic distress, it was far from an isolated incident and harm.  There is abundant, undisputed evidence that during at least January 1, 2012 – December 31, 2017:  Chicago police officers had a widespread practice of using excessive force against children, ages 0-14; CPD had gaps in official policy and training regarding the use of force and children; the City's police accountability agencies (i.e., IPRA/COPA, CPD, and Police Board) systematically failed to investigate and discipline officer excessive force against children; the City maintained a code of silence regarding police misconduct; and one or more of these failures, in combination, resulted in the violation of Peter and Jack's rights on November 7, 2017.  Plaintiffs' evidence is that this "set of interrelated, mutually-reinforcing customs or practices" "all… contribute[d] to" defendants' use of excessive force against 9- and 5-year-old Peter and Jack.  (Docket #125 ¶¶ 113-137); *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 893 (N. D. Ill. 2016).  There is abundant evidence that the City's final city policy makers all had notice of the pattern of excessive force against children yet failed to take any remedial action.

a.      ***Multiple* Sources of Evidence Show CPD's Widespread Practice 2012-2017 of Excessive Force Against Children 0-14 When They Were Fully Compliant and Posed "No Hint of Danger"**

Multiple sources and types of evidence show that in the five years preceding November 7, 2017, Chicago police officers had a widespread practice or *de facto* custom of excessive force against children, 0-14.  Below, plaintiffs present evidence of a widespread practice that

---

Sept. 25, 2020).  Defendants also cite *L. A. County v. Rettele*, 550 U. S. 609, 611 (2007), which did not involve pointing guns at young children who obviously posed no danger. (Memo. at 26).

amounted to *de facto* policy. *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 981 (N. D. Ill. 2017)(equating widespread practice with *de facto* custom or usage); *Robinson v. Wexford Health Sources, Inc.*, 2019 U.S. Dist. LEXIS 22208, *6 (N.D. Ill. Dec. 30, 2019) ("A *de facto* policy claim falls under the 'widespread practice' theory of liability"). To correct defendants' mischaracterization, plaintiffs' widespread practice allegation is *not* that officers use excessive force against children "in the context of search warrant execution"; that limitation is a defense invention. (Memo. at 32, 33, 39). Rather, plaintiffs have always alleged, and the evidence below shows, that CPD used excessive force against children in *all types of police actions*. (Docket #125, ¶¶ 114-116, 118-120; PSAMF ¶¶ 66, 67, 77, 78).[8]

i. **255 Reported Complaints 2012-2017 of Excessive Force Against Children, 0-14, in Situations Where They Posed No Danger Are Evidence of a Widespread Practice**

There is evidence that Chicago police used excessive force against children in hundreds of incidents 2012-2017, many documented by the City of Chicago itself. If a similar constitutional problem has arisen many times, then it is possible to infer there is a policy at work. *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). The Seventh Circuit has held that the conduct at issue must have occurred more than three times. *Thomas v. Cook County Sheriff's Dep't,* 604 F.3d 293, 303 (7th Cir. 2009). It must have occurred enough times to create the inference that the final policymakers must have noticed and failed to correct the problem. *Pindak v. Dart*, 125 F. Supp. 3d 720, 756-77 (N.D. Ill. 2015).

Evidence of the City's widespread practice includes, first, data from the City's own IPRA/COPA misconduct complaint files showing that, during 2012-2017, there were 255 instances in which Chicago police officers used some type of excessive force against a child, 0-14, when they

---

[8] The City's mischaracterization is an attempt to lower the number of instances in which officers used excessive force against children to make it appear there is less of a pattern of excessive force and to exclude the DOJ's finding that the City has a practice of engaging in excessive force against children. (PSAMF ¶92; PSAMF Exhibit OO, ¶ 5; see *infra*).

posed no danger, including but not limited to pointing firearms at them. (PSAMF ¶¶ 66-67, 92). The City also has an additional 70 complaint files for incidents that occurred 2012-2017 in which children 0-14 witnessed officers use excessive force against their parent(s), grandparent(s), or other close relative(s). (Id. ¶ 66). These official counts do not capture incidents where the victim and his/her family did not bother making a police misconduct complaint because of a fear of retaliation or a lack of faith that the City would hold the officers accountable. (PSAMF, ¶¶ 70-78).

The City's complaint data is generally accepted as reliable. (PSAMF ¶ 67). The complaint allegations alone are evidence that the underlying excessive force occurred.[9] Indeed, many of the complaint files contained corroborating evidence that made the allegations credible, but IPRA/COPA simply did not investigate them. (PSAMF ¶¶ 127, 130-135). Moreover, sustained complaints are not necessary to prove a widespread practice where, as here, there is evidence that the City systematically failed to investigate and discipline complaints of officer excessive force, including excessive force against children, in large part because IPRA/COPA treated them as "nonmajor cases" and a low priority for its severely limited resources. (PSAMF ¶¶ 67, 92, 96, 127-128, 130-135).

Based upon on a close, in-depth review of 70 (or 27percent) of the 255 misconduct complaint files with an allegation of excessive force against children, plaintiffs' defense-oriented, police practices expert Jack Ryan concluded that CPD has "has a widespread custom and practice

---

[9] For example, it is well-established in civil rights cases that evidence of a pattern and practice of similar acts, including "individuals who testified about their personal experiences with the company," is admissible to prove a civil rights violation. *International Brotherhood of Teamsters v. U. S.*, 431 U. S. 324, 339 (1977); *Volk v. Coler*, 845 F. 2d 1422, 1425, 1439 (7th Cir. 1988); *EEOC v. O & G Spring and Wire Forms Specialty Co.*, 38 F. 3d 872 (7th Cir. 1994)(accord); *Spina v. Forest Preserve District of Cook County*, 2002 U. S. Dist. LEXIS 14016, *6 (N. D. Ill. Ill.); *Hill v. Shell Oil Co.*, 2000 U. S. Dist. LEXIS 19398, *5 (N. D. Ill.); *Bond v. Utreras*, 2006 U. S. Dist. LEXIS 10501, *16-17 (N. D. Ill. 2006)(police officer disciplinary records were relevant to plaintiff's claim that officers abused her and her family as part of a pattern and practice of similar abuse).

with respect to improper use of force on children and a complete failure to direct officers on the need to consider the vulnerabilities of children in planning and executing law enforcement operations." (PSAMF ¶¶ 67, 92). Moreover, of the 70 actual *files* that Mr. Ryan carefully reviewed, 32 – or nearly half of the sample - include allegations that Chicago police officers pointed firearms at children, 0-14. (Id. ¶ 67). About 35 include allegations that officers pushed, kicked, pulled, grabbed or threw children 0-14, and about 10 contain allegations that officers handcuffed them unnecessarily. (Id.). In approximately 26 of the 70 the files reviewed, officers used excessive force against children when executing a search warrant, an arrest warrant or a warrantless home entry of some kind.[10] (Id.).

### ii. An Additional 24 Children Not Within the City's Complaint Files Have Testified or Will Testify that Officers used Excessive Force Against Them During 2015-2020 When They Posed "No Hint of Danger"

Second, not included within the 255 IPRA/COPA misconduct complaints or the additional 70 referenced above are an additional 24 young children, age 3-14, who have bravely testified or will testify in currently pending lawsuits that Chicago police officers used excessive force against them during 2015-2020. (PSAMF ¶¶ 70-78).[11] These 24 instances of gun-pointing and

---

[10] They are: complaints 4, 8, 9-12, 16, 18, 21, 29, 32, 33, 38-40, 42, 46, 48, 51, 53, 54, 58, 60-62, and 66 in Mr. Ryan's initial expert report. (PSAMF ¶ 67).

[11] 3-year-old Davianna (in her video deposition), 4-year-old Justin, 6-year-old Jeremy, 11-year-old Jaden, 11-year-old Nasir, 6-year-old Royalty (in his mother's affidavit), 8-year-old Royal (in his mother's affidavit), 9-year-old Roy (in his mother's affidavit), 7-year-old Jhaimarion (BWC video), 11-year-old Talia (BWC video), 14-year-old Savannah (BWC video), 8-year-old Legend (in his video deposition), 11-year-old La'niya (in her video deposition), 13-year-old E'monie (in his video deposition), 3-year-old Terrance, Jr. (in deposition of his aunt and family friend), 7-year-old Samari (in deposition of her aunt and family friend), 13-year-old Lazerick (BWC video), 11-week-old Cali, 4-year-old Reshyla, 9-year-old Savayla, 4-year-old Leyalina, and 4-year-old Lillie have testified (or their parent/close relative has testified on their behalf) or alleged and will testify that Chicago police officers pointed assault rifles or handguns directly at their heads, faces, and chests at close range in circumstances where they were immediately and fully compliant and posed no hint of danger to officers. (Id.). Some of these pointing incidents are visible in dramatic fashion on the BWC videos from the officers who pointed their firearms at the children or their colleagues standing nearby. For example, publicly available video from the officers' BWCs in the *Archie* and *James* incidents incontrovertibly show officers

excessive force against children occurred in 12 separate incidents before as well as shortly after

November 7, 2017.  (Id. ¶¶ 70-78).  It is well-established that similar incidents occurring after the

underlying incident can be indicative or probative of the existence of a *Monell* practice on the

underlying incident date.  *Karney v. City of Naperville*, 2016 U. S. Dist. LEXIS 143655, at *37-39 (N. D.

Ill. Oct. 18, 2016).[12]  In all 12 incidents, officers pointed their guns at the children; in 10 of the 12,

they were executing a search warrant while, in two, they made warrantless entries.  (PSAMF ¶¶ 70-

78).[13]  For children who have not yet testified, plaintiffs request that the Court pursuant to Fed. R.

Civ. Pro. 201 take judicial notice of their allegations.  (Id.).

> Without any authority and directly contrary to Seventh Circuit precedent, the City

asserts that expert witness testimony about the findings from their reviews of the City's 240

misconduct complaint files and 70 sample of the actual investigative files, along with the testimony

from up to 24 child or close relative pattern witnesses, is insufficient to show a disputed issue

regarding a widespread practice.  (Memo. at 32, 34); *Thomas,* 604 F.3d at 303.  But in the face of

pattern and practice evidence, courts deny summary judgment to the City.  *Obrycka v. City of Chicago,*

---

pointing an assault rifle, a handgun, and a taser at 7-year-old Jhaimarion, 11-year-old Talia, 14-year-old
Savannah, and 13-year-old Lazerick *after* they are prone on the floor or otherwise fully compliant.  (PSAMF
¶¶ 74, 77).  In addition, officers' BWC videos from the Wilson incident show that officers handcuffed 8-year-
old Royal behind his back for 40 minutes, and BWC videos from the James incident (in addition to showing
officers pointing a handgun at 13-year-old Lazerick) shows officers shoving Lazerick into a wall after he was
fully compliant then handcuffing his right wrist and dragging him by the other end of the handcuff through
his apartment while he was on his knees.  (Id. ¶¶ 73, 77).

[12] See also *Henry v. County of Shasta*, 132 F. 3d 512 (9th Cir. 1997), opinion amended, 137 F. 3d 1372 (9th Cir.
1998); *Foley v. City of Lowell, Mass*., 948 F. 2d 10 (1st Cir. 1991).

[13] Plaintiffs repeatedly and timely disclosed all of these pattern witnesses and their statements in news stories
in multiple, amended MIDP disclosures and answers to the City's contention interrogatories.  (PSAMF ¶¶ 70-
78).  Defense counsel in this case took depositions of Legend, La'niya, E'monie, Kiqiana Jackson, and Arkeya
Blanchard but chose not to depose the other pattern witnesses.

2012 U. S. Dist. LEXIS 22818 *20-24 (N. D. Ill. Feb. 23, 2012).[14]  Also without authority, the City

errantly asserts that a judgment is necessary in each witness' lawsuit before he/she can testify; that is

a jury argument about the weight of their testimony, not about admissibility.  (Memo. at 32).  Finally,

even if the City were correct that plaintiffs' evidence of a pattern of excessive force or gun-pointing

against children is exclusively from search warrant actions, there is a sufficient number of these

incidents alone to prove that officer excessive force against children, 0-14, during search warrants

was a widespread practice in Chicago, 2012-2017.  (PSAMF ¶¶ 66-67; 70-78).  The City's arrest and

force incident data is mainly minors older than age 14.  (Memo. at 34).

### iii.  In 30(b)(6) Testimony, the City *Admits* CPD Used Excessive Force Against Children and "Commonly" Pointed Firearms at Them When Serving Search Warrants

Third, in sworn testimony in this case, including Fed. R. Civ. Pro. 30(b)(6) testimony,

City of Chicago policy officials openly state that 1) it was "common" for officers to point guns at

children when executing residential search warrants and 2) CPD had a practice of using excessive

force against children during 2012-2017.  (PSAMF ¶¶ 68-69).  Summary judgment is denied to the

City where officers themselves testify that it was routine practice for them to engage in the conduct

at issue. *Hanno v. Sheahan*, No. 01 C 4677, 2004 U.S. Dist. LEXIS 23688, *39-40 (N.D. Ill. Nov. 23,

2004) (jury could find widespread practice where officers testified that they had routine practice of

searching homes where evictions were occurring without a warrant).  During 2012-2017, CPD

executed 1,500-2,000 search warrants annually, the vast majority of them residential.  (PSAMF ¶ 69).

During those home entries, it was common for officers to encounter children.  (Id.).

### iv.  It is Undisputed that DOJ and PATF Reports Contain Official Government Investigative Findings that During

---

[14] *See also Carazes v. Frugoli*, 2017 U. S. Dist. LEXIS 49938, at *55 (N. D. Ill. Mar. 31, 2017); *Carthans v. City of Harvey*, 2017 U. S. Dist. LEXIS 78117, at *18 (N. D. Ill. May 23, 2017).

### 2010-2016 CPD Engaged in Excessive Force against, Mistreated and Traumatized Children and Youth

Fourth, key findings in the U. S. Department of Justice (DOJ) and Police Accountability Task Force (PATF) reports regarding CPD's practices with children are sufficiently similar to plaintiffs' widespread practice allegations to constitute relevant and admissible evidence. Plaintiffs are not relying solely on the DOJ and/or PATF reports to prove a widespread practice of excessive force against children, but it is black-letter law that: on summary judgment, plaintiffs may rely on the findings of investigations, including official government investigations, of many similar incidents in order to prove a widespread practice of constitutional violations. *Estate of Loury v. City of Chicago*, No. 16-cv-4452, 2019 U.S. Dist. LEXIS 38029, *21-23 (N.D. Ill. Mar. 11, 2019) (PATF and DOJ reports were enough to preclude summary judgment on *de facto* policy of failure to investigate and discipline officers); *LaPorta v. City of Chi.*, 277 F. Supp. 3d 969, 987-989 (N.D. Ill. 2017) (DOJ & PATF reports precluded summary judgment on code of silence). The DOJ and PATF reports are admissible. *Daniel v. Cook County*, 833 F. 3d 728, 740-42 (7th Cir. 2016).[15] In all of these cases, both the DOJ and PATF reports were held to be admissible under Federal Rule of Evidence 803(8)(A)(iii), the hearsay exception for "factual findings from a legally authorized investigation." (Id.). Additionally, the PATF report is also admissible against the City of Chicago as a statement of a party opponent. Fed. R. Evid. 801(d)(2)(D); *LaPorta v. City of Chi.*, 277 F. Supp. 3d at 989.

### a. DOJ's Findings are Sufficiently Similar to Plaintiffs' Allegations and Evidence

---

[15] *Arrington v. City of Chicago*, 2018 U. S. Dist. LEXIS 14168, *9-11 (N. D. Ill. Jan. 30, 2018); *Godinez ex rel. Godinez v. City of Chicago*, No. 16-cv-07344, 2019 U.S. Dist. LEXIS 187994, *10-11 (N.D. Ill. Oct. 30, 2019) (denying summary judgment to City); *Estate of Loury v. City of Chicago*, at *16 ("the DOJ Report and the PATF Report are clearly admissible."); *First Midwest Bank v. City of Chi.*, 337 F. Supp. 3d 749, 777-79 (N.D. Ill. Aug. 29, 2018); *Simmons v. City of Chicago*, No. 14 C 9042, 2017 U.S. Dist. LEXIS 137395, *24-25 (N.D. Ill. Aug. 29, 2017).

The similarities between plaintiffs' widespread practice claim and DOJ's findings are obvious and legion. (Dkt. #125, ¶¶ 21-27, 113-137; PSAMF ¶¶ 93-94). First, DOJ's systemic investigation focusing on CPD's use of force spanned the same period encompassed by plaintiffs' *Monell* claim; the DOJ report is relevant here because it documents CPD practices during the same period when the constitutional torts against plaintiffs occurred. *Godinez*, 2019 U.S. Dist. LEXIS 187994 at *10; *Estate of Loury*, 2019 U.S. Dist. LEXIS 38029 at *4. The DOJ report was released in 2017, the same year Chicago police executed the search warrant in plaintiffs' residence. The time period covered by the report, i.e., January, 2011 – April, 2016, is more than "overlapping" with the *Monell* period in this case, i.e., January 1, 2012 – November 7, 2017; it is nearly identical with plaintiffs' period. (PSAMF ¶ 93; DOJ, at 22-25, attached as PSAMF <u>Exhibit PPP</u>). Further, as elaborated below, specific findings contained in the DOJ report– not only DOJ's finding regarding CPD excessive force and children – are sufficiently similar to policies alleged in plaintiffs' *Monell* claim to be evidence of those policies.

Tracking plaintiffs' *Monell* claim, the DOJ found that CPD has a broad pattern and practice of using lethal and non-lethal excessive force of all types against citizens of color disproportionately, including: citizens who do not present a threat, innocent bystanders, *and children*. (PSAMF, ¶¶ 93-94). Moreover, as part of this overarching finding, in a stand-alone section the DOJ expressly concluded that CPD has a pattern and practice of using excessive force against children. (PSAMF, ¶¶ 93-94). In two different examples cited in the report, Chicago police officers *pointed guns at close range at children of color,* precisely as plaintiffs and their pattern witnesses allege that the defendant officers did to them, and in other examples cited in the report, officers used excessive force against *an 8-year-old girl* and *12-year-old boys*. (Id.). All of the children in the DOJ's examples, exactly like Peter and Jack Mendez and plaintiffs' pattern witnesses, are Black or Latino. (Id. ¶¶ 70-78, 93-94).

The City argues that DOJ's finding regarding CPD and children is not relevant because the report does not include incidents similar to plaintiffs' incident. (Memo. at 32). This is inaccurate for the reasons explained above: the DOJ report illustrates its pattern and practice finding with several incidents of officer excessive force against children, including incidents in which officers pointed their firearms at children the same age as Peter Mendez. This conduct is sufficiently similar to what plaintiffs testified Sgt. Egan and officer Cappello did to them. (PSAMF ¶¶ 44-48); *Archie v. City of Chicago*, 2020 U. S. Dist. LEXIS 176221, at *7 (N. D. Ill. Sept. 25, 2020)(DOJ findings "mirror what the defendant officers here allegedly did to [the minor plaintiffs]," which was to point guns at 7, 11 and 14-year-old children when they posed no threat and after they were already down on the floor).[16] The also City argues that the DOJ's finding that CPD uses excessive force against children does not extend to situations in which officers are executing search warrants. (Memo. at 32-33). But courts have rejected the City's argument. *Archie v. City of Chicago*, 2020 U. S. Dist. LEXIS 176221, *8-9 ("[i]t is reasonable to infer from the DOJ report's findings – and from plaintiffs' allegations – that Chicago police officers have a widespread practice of using excessive force against children in *all sorts of contexts, including when officers execute residential search warrants*")(emphasis added).[17] The City's remaining arguments for why the DOJ report's findings are inadmissible improperly attack the report's *credibility*. (Memo. at 33-34).

---

[16] The City cites *Simmons v. City of Chicago*, U.S. Dist. LEXIS 137395, at *24-25, for its argument that DOJ's finding is insufficiently similar to plaintiffs' evidence. That aspect of *Simmons* is, respectfully, wrongly decided; Judge Kennelly mistakenly believed that the DOJ's finding applied to teenagers when the report includes examples of excessive force against an 8-year-old girl and 12-year-old boys. (See *supra*). *Archie*, which examined the DOJ report more closely, is correctly decided. (Id.).

[17] Even if the City were correct that DOJ's finding does not encompass search warrant executions, such a close, granular connection is simply not required. In *Godinez v. City of Chicago*, 2019 U. S. Dist. LEXIS 187994 (N. D. Ill. Oct. 30, 2019), for example, the City objected that the DOJ report did not discuss the specific restraint techniques that were the subject of the plaintiff's *Monell* claim. Id at 10. The Court rejected the City's argument and held that "The DOJ report does not discuss the specific restraint techniques in this case but that does not bar plaintiff from relying on the report as evidence of a genuine issue of material fact related to her *Monell* claim." Id. at *11. Similarly in *First Midwest Bank v. City of Chicago*, 337 F. Supp. 3d 749,

> **b.** **The City's PATF's Findings Are Also Sufficiently Similar to Plaintiffs' Allegations and Evidence**

Similarly, the findings of the City's own PATF report, which covers almost the same time period as the DOJ report and plaintiffs' *Monell* claim, are sufficiently similar to plaintiffs' widespread practice allegations - particularly in the common focus on the trauma officers' excessive force causes children - to be admissible evidence of a pattern of excessive force against children. ((Dkt. #125, ¶¶ 21-27, 113-137; PSAMF ¶¶ 95-96); *First Midwest Bank v. City of Chicago*, 337 F. Supp. 3d at 777-779 (PATF report was "a close enough fit"). Moreover, the PATF contains the City's own statements. Id. at 778-79 (PATF speaks for the City because "The City created PATF for the express purpose of reviewing the system for accountability, oversight and training in place for Chicago's police officers"); *Laporta v. City of Chicago*, 277 F. Supp. 3d at 989. Released in April 2016, the PATF report covers 2010-2016 (and, in some cases, 2007-2016), making it almost entirely coterminous with plaintiffs' 2012-2017 *Monell* period. (PATF, 7-17, attached as PSAMF <u>Exhibit QQQ</u>). Moreover, multiple findings contained in the City's PATF report are sufficiently similar to the practices plaintiffs allege in their *Monell* claim. The PATF report's findings are also in accord with DOJ's findings.

Like DOJ, PATF also found that Chicago police officers mistreat children. In a separate, stand-alone section discussing police interactions with youth of color, PATF found that rather than "protect[ing] the most vulnerable (children)," *Chicago police officers "mistreated" "youth of color," "humiliating them or worse."* (PATF at 14, 54-55). In addition, paralleling plaintiffs' failure to train allegations, PATF also found that Chicago officers *"were not adequately trained or equipped to interact*

---

777-779 (N. D. Ill. Aug., 29, 2018), the Court rejected City's argument here that the DOJ and PATF reports lacked "a close fit" to the facts of plaintiff's case and held that both reports were "a close enough fit." Id. *See also Baskins v. Gilmore*, 2018 U. S. Dist. LEXIS 168579, *16 (N. D. Ill. Sept. 30, 2018)(rejecting City's argument that DOJ report examples were not similar enough to plaintiff's alleged facts). The DOJ finding and examples need only be "similar enough." (Id.).

*with youth" and, therefore, interacted with them in ways that traumatized them.* (Id., 14, 55). In the section on police-youth interactions, PATF made a specific recommendation to the City for training, namely, that *CPD should "evaluate and improve the training officers receive with respect to youth so that they are prepared to engage in ways that are… trauma-informed…."* (Id. 17, 55, 154). These PATF report findings are based on evidence. (PATF at 54)("[W]e heard story after story of officers treating youth with disrespect, humiliating them, or worse"). Exactly as PATF describes, Peter and Jack are "youth of color" who were "mistreated" "and worse" by Sgt. Egan and officer Cappello, with the same result identified by PATF, namely, they were severely "traumatized" when the two officers pointed guns at them. (PSAMF ¶ 31). As a result, both were diagnosed with long-term PTSD and anxiety. (PSAMF ¶ 48).[18]

As with the DOJ report, the City argues that PATF's findings regarding officers' interactions with youth are not relevant because the report does not include examples of excessive force against youth during search warrants. (Memo. at 32-33). First, the report need not contain any examples of excessive force against youth (from any context) in order for the City's *statements* about officers' conduct towards youth of color to be relevant party admissions. Second, even if it is true that the report contained no allusions to excessive force during illegal searches, its findings are still relevant because plaintiffs' evidence of a widespread practice is not limited to search warrant

---

[18] In mischaracterization, the City says its PATF report only discusses officers treating youth with "alleged disrespect." (Memo at 33). But the City's statements in the report obviously go much farther than that, admitting in damning terms that Chicago police officers *"mistreated" "youth of color," "humiliating them and worse*," and as a department were "*not adequately trained or equipped*" to engage with youth without traumatizing them. (PSAMF ¶ 95). These extraordinarily candid and damning statements, (e.g., "humiliating them *and worse*") coming as they do out of the City's own mouth in an official investigative report for the public, can only mean that officers also subjected youth to inappropriate force. (Id.). There is no other possible way to construe the City's stark admissions about itself.

executions.[19]  The City's remaining attacks on its own report all improperly address PATF's *credibility*. (Memo. at 33-34).

> **b.** **During 2012-2017 CPD Had No Affirmative Policy or Training Prohibiting or Discouraging Officers from Using Unnecessary Force Against, Including Pointing Guns at, Children 0-14**

The evidence shows CPD had no official policy or training that affirmatively prohibited, discouraged or otherwise prevented officers from using excessive force against children, 0-14, during 2012-2017.  (PSAMF ¶¶ 79-91)("CPD did not consider children").  These gaps included a failure to have *any* policy or training on when officers may draw and point firearms at people, including children.  (Id. ¶¶ 80-82).  Consequently, CPD policy and training were completely inadequate to protect children from officer excessive force.  (Id. ¶¶ 79).  Gaps in official policy create *Monell* liability when: 1) an official policy fails to address an obvious risk that the Constitution will be violated;[20] 2) there is a recommendation from a higher authority to adopt a policy, and the municipal entity does not do so, *Glisson v. Ind. Dep't of Corr.*, 849 F.3d, 372, 380 (7th Cir. 2020); 3) there are enough incidents showing that the same problem has arisen many times and the municipality has acquiesced to the outcome (i.e., by not prescribing policy or training), *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005); or 4) there is evidence that there was no relevant training.[21]

---

[19] Third, the City ignores the extent to which PATF actually does focus on the use of excessive force against people of color during disproportionately frequent illegal stops and searches of persons, their vehicles, and during search warrants and non-consensual searches in homes. (Id. 24, 33, 39, 54-55, 97).  It was *PATF's* focus on unlawful searches and seizures that spurred the City create a special Inspector General for Public Safety.  (Id. 82, 76, 161).

[20] *Hendricks v. Bryant*, No. 20-cv-00249, 2021 U.S. Dist. LEXIS 188817, *10 (N.D. Ill. Sep. 30, 2021)(City's failure to have any policy or training regarding gun-pointing a policy choice that led to plaintiffs' injury), *J.K.J. v. Polk Cty.*, 960 F.3d 367 (7th Cir. 2020) and *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012).

[21] *R.D. v. Concord Cmty. Schs.*, No. 3:19-CV-823-PPS, 2021 U.S. Dist. LEXIS 131963, *26-27 (N.D. Ind. July 15, 2015); *Sanders v. City of Chicago Heights*, 2016 U.S. Dist. LEXIS 64418, *37-38 (N.D. Ill. May 17, 2016) (summary judgment denied where expert testified that City's failure to train was departure from accepted

In this case, plaintiffs present evidence of *all four* types of policy and training gaps above. First, CPD's official policy, including its use of force and search warrant directives 2012-2017, failed to address an obvious risk that the Constitution would be violated:

- At no point during 2012-2017 did CPD have *any* policy that clearly or expressly prohibited or even discouraged officers from using force, including unnecessary force, against children. (PSAMF ¶ 80). For example, no policy prohibited or discouraged officers from pointing guns at or handcuffing children. (Id. ¶ 80).

- At no point during 2012-2017 did CPD have *any* policy that addressed when it is reasonable for officers to draw or point firearms at people, including children; no CPD policy even defined pointing as a "use" of the firearm or considered pointing a seizure, a reportable use of force or even a threat of force. (PSAMF ¶¶ 80-82). CPD had no gun-pointing policy until 2019. (Id.).

- No CPD search warrant policy during 2012-2017 required officers to: 1) plan their entry and force tactics so as not to harm or traumatize children; 2) maintain firearms at the low-ready and not point them at or handcuff children; or 3) "if children are present… maintain a sensitive approach and use due care to safeguard the emotional and physical well-being to minimize trauma following a search warrant." (PSAMF ¶¶ 83-84). The latter mandate was not added to CPD's search warrant policy until Jan. 3, 2020. (Id. ¶¶ 83, 85).

- No CPD policy during 2012-2017 defined "trauma-informed" or required or encouraged officers to use a trauma-informed approach to policing children. (PSAMF ¶ 88).

In sum, no policy 2012-2017 even mentioned children. (PSAMF ¶¶ 79-82, 83, 87-88). Yet it was always obvious that, when CPD officers executed residential search warrants, they would enter residences with guns drawn (to protect themselves) *and* that they would encounter families with children; more generally, it was obvious that officers would need to draw and point their firearms during enforcement actions of all types and that there would sometimes be children present or nearby. During 2012-2017, CPD executed 1,500-2,000 search warrants per year, the vast majority of them residential, and it was "common' for CPD officers to encounter children. (PSAMF, ¶ 69). It was always obvious that CPD faced "the need to consider the vulnerabilities of children in planning

---

standards); *Awalt v. Marketti*, 74 F. Supp. 3d 909, 937-38 (N.D. Ill. 2014) (summary judgment on failure to train claim was denied where plaintiff presented evidence that correctional officers did not receive training).

and executing law enforcement operations." (PSAMF, ¶ 79 and PSAMF Exhibit B, ¶ 539). In other words, it was generally accepted policy and practice during 2012-2017 to consider the safety of children who may be present during the execution of a search warrant. (PSAMF, ¶ 79 and PSAMF Exhibit B, ¶ 505, 533; PSAMF Exhibit OO, ¶ 5)("I do not know that I have not seen an agency that does not provide either policy or training for vulnerable populations, including children, as part of the use of force training program"). Yet "despite being aware of the vulnerabilities of children during enforcement actions, [CPD] failed to train officers or put policies in place to direct officers on the proper treatment of children during enforcement actions." (PSAMF, ¶ 79 and Exhibit B, ¶ 533). Similarly, there is evidence that during 2012-2017 CPD had no or almost no relevant training whatsoever:

- During 20112-2017 no CPD training included the lessons that officers should not point firearms at or handcuff children or that they should make an effort to avoid or minimize these or other uses of force against children. (PSAMF ¶¶ 83, 85-87, 117-120). No training addressed the topic of force and children. (Id.).

- No part of CPD's search warrant training curriculum 2012-2017 required or encouraged officers to: 1) plan their entry and force so as not to harm or traumatize children and de-escalate if/when officers encounter children; 2) maintain firearms at the low-ready and not point them at or handcuff children; or 3) "if children are present… maintain a sensitive approach and use due care to safeguard the emotional and physical well-being to minimize trauma following a search warrant." (PSAMF ¶¶ 85-87).

- During 2012-2017 CPD ignored all generally accepted law enforcement standards and the numerous officer training programs for policing children without the use of unnecessary force. (PSAMF ¶¶ 89, 91, 111). There was no training about the effect on children and child development of exposing them to *officers'* use of force and how they could avoid inflicting those traumas.

- CPD's Safe Start training taught officers in only 2 out of 22 police districts about the impact on children of exposure to community violence, did not train officers about the impact of *their own* uses of force or to not use force against or in front of children, and the City stopped funding Safe Start in 2016. (PSAMF ¶ 90).

Third, as already shown there were hundreds of incidents throughout 2012-2017, as well as sweeping findings by the PATF and the DOJ in 2016 and 2017, that showed that the problem of officers

using excessive force against children, including pointing guns at them, had arisen repeatedly and yet the City still did not prescribe any policy or training to address the issue. (PSAMF ¶¶ 66-67, 70, 92-95). Fourth, there were recommendations to the City of Chicago from higher authorities to adopt training, and the City nevertheless did not do so:

- In April, 2016, PATF made specific recommendations to CPD for it to "evaluate and improve the training offices receive with respect to youth[] to ensure that all officers are prepared to engage with youth in ways that are age-appropriate" and "trauma-informed." (PSAMF ¶ 95; PATF, 55).

- In January 2017, the DOJ report stated that CPD's pattern of excessive force against people included children and pointing guns at them. (PSAMF ¶¶ 93-94).

Despite these recommendations, the City did not adopt PATF's recommendation before officers injured Peter and Jack on November 7, 2017 (or subsequently), and the City made only "minor" changes to the taser, OC spray, and canine addenda to its revised use of force policy (effective October, 2017) while doing nothing material to address the overarching problem of officers pointing guns at, handcuffing, and pushing/punching/kicking/grabbing/throwing children. (PSAMF ¶¶ 102-103, 105, 106, 107, 108-122, especially 110; Exhibit B, ¶ 510). For example, it did not prohibit or discourage officers from pointing their guns at or otherwise using guns against children. (Id. ¶¶ 103-105). It did not even consider the issue. (Id. ¶ 108).

The City argues that oral instruction in search warrant training taught officers to be mindful of children, but no search warrant training curriculum used by CPD 2012-2017 contains *any* mention of children – until 2020. (Memo. at 6, 37; PSAMF ¶¶ 85-91, 112-122).

### c. There is Copious Evidence that the City's Police Accountability System Failed to Investigate, Discipline, and Correct Officer Excessive Force Against Children

There are multiple sources of evidence that the City of Chicago systematically failed to investigate, discipline and otherwise correct officers who used excessive force against children 0-14 during 2012-2017. First, IPRA/COPA ultimately sustained a mere 1.6 percent of all allegations

of officer excessive force against children during this period, significantly below the national average of sustain rates for excessive force complaints in large departments. (PSAMF ¶ 128). For allegations of excessive force in which a child was a witness, the rates were even lower. (Id.). Similarly, discipline was ultimately imposed in only .9 percent of all allegations of officer excessive force against or in the presence of children, and it took 3.5 years on average to get these discipline results. (Id.). Second, IPRA/COPA rarely even investigated allegations of excessive force against children, closing up to 50 percent of investigations for lack of an affidavit, refusing to use the override provision, failing to interview officers even when credible allegations were corroborated, failing to conduct pattern analysis of allegations or the officers committing them, and never recommending changes in policy or training to address observed patterns of complaints of excessive force against children. (PSAMF ¶¶ 127, 129, 130). A close review of 70 of the actual complaint investigative files reveals these and other, specific investigative deficiencies. (PSAMF ¶¶ 127; Exhibit B, ¶¶ 507-509, 512, 516-523). IPRA/COPA simply did not devote investigative resources to firearm pointing cases, which it considered "minor." (PSAMF ¶¶ 131-132). COPA was under-resourced, just like IPRA. (PSAMF ¶¶ 133-135). Finally, tracking plaintiffs' allegations evidence, both the DOJ and the PATF found that the City systematically failed to investigate and discipline excessive force by Chicago police officers. (PSAMF ¶ 96).

### d. There is Undisputed Evidence that a "Code of Silence" Pervaded CPD and Chicago's Police Accountability Agencies 2012-2017

Once again there are multiple sources of evidence - including admissions by two Mayors, a Superintendent, and an FOP-Lodge 7 President – that, during 2012-2017, a "code of silence" existed among CPD officers and Chicago's police accountability agencies. (PSAMF ¶¶ 123-126; PSAMF Exhibit B, ¶¶ 524, 529). That code is a tendency to ignore, deny, and cover up misconduct committed by officers. (Id.). IPRA/COPA did not even interview officers when faced

with credible and corroborated allegations of officer excessive force against children. (PSAMF ¶¶ 127; Exhibit B, ¶¶ 516-523). The DOJ and PATF reports also found there is a code of silence. (PSAMF ¶ 96). The supervising defendant officers in this case, Egan and Dari, have sustained CRs for lying to a police misconduct investigator and failing to report officer misconduct, including excessive force. (PSAMF ¶¶ 124, 126). Additionally, Sgt. Egan never reported himself, Cappello or Guzman for not properly operating their BWCs on November 7, 2017. (PSAMF ¶ 125). All defendants deny ever witnessing, reporting or intervening to stop officer misconduct, including the pointing of guns at Peter and Jack on November 7, 2017. (PSAMF ¶¶ 124-125).

### 3. The Undisputed and Profuse Evidence Shows Final Policy Makers Had Notice of CPD's Custom of Excessive Force Against Children

There is overwhelming, undisputed evidence that the City of Chicago's final policy makers had both clear, actual notice and constructive notice of CPD's pattern of excessive force against children well before November 7, 2017. Either is sufficient. Deliberate indifference requires a policymaker's actual awareness of the risk or pattern of constitutional violations, *Wragg v. Vill. of Thornton,* 604 F.3d 464, 469 (7th Cir. 2010), or the policymaker is presumed to have actual knowledge where it has been directly presented with evidence of the risk or because there are so many instances that a pattern is obvious.[22]

First, during the five years before November 7, 2017, IPRA/COPA, which reports to the Chicago City Council, had constructive notice of a pattern of hundreds of complaints of excessive force against children that included pointing guns at them. (PSAMF, ¶ 92). This alone "would have put any city and its professional law enforcement organization and their policy makers on notice that improper customs and practices existed and that immediate change was necessary."

---

[22] *J.K.J. v. Polk Cnty.*, No.15-cv-428-wmc, 2018 U.S. Dist. LEXIS 154, at *28 (W.D. Wis. Jan. 3, 2017); *Thomas v. Sheahan*, 499 F. Supp. 2d 1062, 1095-96 (N.D. Ill. 2007).

(Id.).  Second, in April, 2016, final policy makers received clear, actual notice that CPD officers "mistreat" children of color, "humiliating them and worse," when the City's own PATF told them so.  (PSAMF, ¶ 95).  Third, again in January, 2017, the City's final policy makers received clear, actual notice of CPD's practice of excessive force against children when the DOJ told them with absolute, written clarity, plus detailed discussion: "CPD's pattern or practice of unreasonable force includes the use of excessive less-lethal force against children."  (PSAMF, ¶ 93-94; DOJ, 34-35).  *All* of the City's final policy makers received a personal copy of the DOJ report, and CPD reviewed it in its entirety.  (PSAMF, ¶ 97).  Fourth, as noted CPD was well-aware of the obvious, recurring risk of violating children's constitutional rights when officers executed 1,500-2,000 residential search warrants annually, commonly encountered children, and had no official policy or training to guide their conduct in this fraught situation.  (PSAMF, ¶¶ 69, 79-82, 83, 87-88; PSAMF Exhibit B, ¶¶ 505, 533, 539).  Fifth, the Chicago Department of Public Health and CPD were well-aware before 2012 of the scientific knowledge that exposing children to violence causes long-term harm to their intellectual, social, and emotional development and their mental and physical health.  (PSAMF, ¶ 101).

### 4. Undisputed and Overwhelming Evidence Shows the City Was Deliberately Indifferent to CPD's Custom of Excessive Force Against Children

There is overwhelming evidence that, despite multiple sources of notice to all City final policy makers during 2012-2017, the City of Chicago was deliberately indifferent to CPD's ongoing, widespread practice of excessive force against children, 0-14.  A policymaker is deliberately indifferent if: (1) there was a pattern of similar violations or (2) the risk of constitutional violations was sufficiently obvious. *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011); *Bd. of the Cnty. Comm'rs v. Brown*, 520 U. S. 397, 411 (1997)(or if it "disregarded a known risk or obvious consequence of his

action").[23]  With respect to training, a policy maker is deliberately indifferent if he knows (1) employees will confront a given situation; (3) the situation presents employees with a hard choice that training would make easier; and (3) a wrong choice by employees will cause a constitutional violation.  *Kitzman-Kelley ex rel. Kitzman-Kelley v. Warner*, 203 F.3d 454, 459 (7th Cir. 2000).  The City was deliberately indifferent in all four ways.

First, despite their awareness of 1) hundreds of misconduct complaints of excessive force against children, 0-14, 2) the results of two government investigations, both finding that CPD uses excessive force against children, 3) the obvious and repeated risk posed to children when officers forcibly enter their homes to execute warrants, and 4) the trauma children experience when exposed to violence, final City policy makers did not undertake *any* reforms to CPD policy or training during 2012-2017 to stop officers' ongoing violations of children's constitutional rights. (PSAMF ¶¶ 106-107).  In particular, the City council did not enact or consider any legislation to change CPD policy or training, did not hold any hearings addressing excessive force against children, and did not request or review IPRA/COPA data regarding excessive force against children.  (Id. ¶¶ 98, 108).  The Mayor did not propose any reforms to CPD policy or training addressing excessive force against children.  (Id. ¶ 99).  Moreover, neither the CPD superintendent, nor CPD's head policy developer, nor those with penultimate responsibility for CPD's training curriculum, ever made or requested any changes to CPD policy or training regarding the treatment of children, including the lessons that officers not point their firearms at or handcuff children.  (Id. ¶¶ 100, 109-122).  CPD *did not even bother* to conduct any internal inquiry to determine the accuracy, extent, and specifics of any pattern, including what types of excessive force officers were using against children, even though "it should have been clear to anyone reading the DOJ report that the data came from

---

[23] See also *Turner v. Paul*, 953 F.3d 1011, 1017 (7th Cir. 2020) (same).

CPD's own databases and included complaints reviewed by COPA and IPRA that were closed with little or no investigation." (Id. ¶ 108). CPD also simply never utilized the City's own expert knowledge of childhood trauma by training officers about the harm that *their own uses of force* can cause to children or to exercise restraint when contemplating force against children and/or their families. (Id. ¶ 101).

In the wake of the DOJ report in 2017, when the City faced its golden opportunity to change its use of force policy and training for the department, it made no changes to protect children. In October, 2017, when the City implemented its revised use of force policy and use of force training curriculum, it made "minor" changes to the taser, OC spray, and canine addenda to the new policy; the changes basically prohibit officers from using those devices against children, given children's increased vulnerability to serious injury and death. (PSAMF ¶¶ 102-103). These minor changes were the only revisions in the new policy and training that contained any reference to children. (Id. ¶¶ 102-104). But the use of tasers, OC spray, and canines on children was *never even a problem*; gun-pointing, handcuffing and physical abuse of children comprised the largest components of the pattern of non-lethal, unreasonable force against children. (Id. ¶¶ 67, 69, 70-78). Yet CPD made *no changes* to its use of force policy or training to address the practices of officers pointing guns at, handcuffing, and pushing/punching/kicking/grabbing/throwing children. (Id. ¶¶ 102-103, 106, 107, 108-122, especially 110; Exhibit B, ¶ 510). In particular, CPD did not revise the "Firearms Discharge Incidents" addendum to the 2017 use of force policy to include the same blanket prohibition that it was then adding to the taser, OC spray, and canine addenda, even though "any professional organization would have recognized that this same principle [behind banning taser use on children] applies to pointing a gun at a child." (PSAMF ¶¶ 102-105). Nor did CPD add policy or training on when it is appropriate for officers to draw and point their firearms at people. (Id. ¶¶ 80, 103). In fact, CPD did not even consider the phenomenon of officers pointing at civilians during its

2017 revision to policy and training. (Id. ¶ 108).[24] While the facilitator's guide to the revised 2017 use of force training does mention relative physical size and strength as a consideration in the use of force, it was not even mandatory for instructors to train on this point. (Id. ¶ 105; Memo. at 7).

There is also evidence the City was deliberately indifferent long before 2017. For instance, despite the PATF's April 2016 recommendation that CPD evaluate and improve officer training for interacting with youth of color, CPD did nothing on that but have meetings for six years: it did not add any training or draft/revise any policy. (PSAMF ¶ 110). As another example, in 2020, when CPD implemented a revised search warrant policy and a revised search warrant training curriculum, for the first time it added a sentence reminding officers of their federal common law duty: "if children are present, department members shall maintain a sensitive approach and use due care to safeguard the emotional and physical well-being to minimize trauma following a search warrant." (PSAMF ¶¶ 83, 85); *White v. Rochford*, 592 F.2d 381, 383-86 (7th Cir. 1979). However, CPD had never included this language in any prior policy or training in the history of the department. (Id.). The change, driven only by media attention to this and similar cases, came far too late for Peter and Jack.

Finally, the risk of officers violating children's constitutional rights when they forcibly enter homes to execute search warrants was obvious throughout 2012-2017 but got no attention from the City. CPD was well-aware that it executed 7,500 – 10,000 residential search warrants during 2012-2017, i.e., *4-6 per day*, that it was "common" for children to be present, and that it was "common" for officers point guns at occupants, including children, upon entry. (PSAMF

---

[24] The total context shows that, when CPD revised its taser, OC spray and canine device policies to prohibit use against children, it was just "checking a box." The change to taser policy was the one, specific, unreasonable-force-against-children recommendation that DOJ made to CPD. Changing the OC spray and canine policies as well at the same time was just grabbing low-hanging fruit: their use against children was not a documented problem anyway.

¶¶ 68-69). In this perilous situation that officers confronted regularly – perilous for both officers and civilians - the risk of a host of constitutional violations was blatantly obvious to any professional law enforcement organization. Yet CPD took no action during 2012-2017 to make officers' jobs easier and prevent predictable harm to Peter, Jack or other children.

The City argues it was not deliberately indifferent because it made some reforms *after* November 7, 2017 – including the consent decree and the IG for Public Safety (inducted in 2018) - when it was *too late* for Peter and Jack.[25] (Memo. at 41-42). None of these were addressed to the documented pattern of excessive force against children or the numerous gaps in policy and training that enabled the obvious risk and the violations to continue. (Id.). Rather, "passing resolutions," "highlight an intent to engage," "expressing commitment" and writing a report was not reform: this kind of "reform" was mere lip-service, cosmetic to the specific trouble at hand, and was not designed to address officer excessive force against children. (Memo. at 8, 41-42; *Hendrick v. Bryant,* No. 20-cv-00249, 2021 U.S. Dist. LEXIS 188817, at *3, 11-12, 13-14 (N.D. Ill. Sep. 30, 2021)(after many incidents of inappropriate officer gun-pointing, the City agreed in a consent decree to adopt a gun-pointing policy, then failed to do it).[26] Moreover, even if some reforms were genuine, the City can still be deliberately indifferent where, as here, it is aware there is a problem, and its approach is *ineffective. J.K.J. v Polk Cty.,* 960 F.3d 367, 383 (7th Cir. 2020); *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997). If the City had made any real reforms to end excessive force against children, then there would be evidence recently of fewer incidents/complaints of excessive force against kids, but the evidence shows the opposite. (PSAMF ¶¶ 70-78). Moreover,

---

[25] For example, it is a matter of public record and the Court can take judicial notice that the City did not enter the consent decree until January, 2019, and there was no agreed, draft consent decree until late 2018.

[26] See also *Johnson v. City of Chi.,* No. 05 C 6545, 2009 U.S. Dist. LEXIS 49526, at *27-29 (N.D. Ill. June 9, 2009). *Arias v. Allegretti,* No. 05 C 5940, 2008 U.S. Dist. LEXIS 4352, at *11-13 (N.D. Ill. Jan. 22, 2008).

the City's data shows no reduction in the numbers of misconduct complaints of excessive force against children and no increase in the abysmally low rates at which they were almost never investigated, sustained, or disciplined.  (Id. ¶¶ 66-67, 128).  COPA continued to be just as under-resourced as IPRA and to continue to treat pointing guns at children as a low investigative priority. (Id. ¶¶ 129-135).

<div style="margin-left:2em">

**5.     There is Evidence that the City's Custom, Policy and Training Gaps, Failures to Investigate and Discipline, and Code of Silence Were the Moving Force Behind Defendant Officers' Excessive Force Against Peter and Jack Mendez**

</div>

There is sufficient evidence that the City's *de facto* policies and policy and training gaps were the moving force that proximately caused defendant officers to point their firearms at Peter and Jack when they posed no hint of danger.  On summary judgment, plaintiffs are entitled to all reasonable inferences of causation.  Consistent with their allegations that several, interrelated, mutually reinforcing customs contributed to defendants' use of excessive force against Peter and Jack, plaintiffs need not delineate a single custom or policy that caused their harm.  *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 603, 604.

First, Peter and Jack, children of color, suffered abuse very similar to the pattern of gun-pointing identified in hundreds of IPRA/COPA misconduct complaints 2012-2017 and documented by investigators in the DOJ and PATF reports.  *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 969-972 (N.D. Ill. 2010) (causation existed where the plaintiff suffered abuse similar to the custom or policy documented in expert and government reports).

Second, because complaints of excessive force against children were almost never investigated and even more rarely disciplined by IPRA/COPA leading up to November 7, 2017, it is reasonable inference that CPD officers, including defendants on that date, felt confident they could engage in that type of misconduct without ever having to worry about any official consequence from

IPRA/COPA or CPD.[27]  Third, it is a reasonable inference that the City's code of silence regarding officer misconduct and the investigation of same led defendants to believe they were above the law and to engage in tortious conduct (or to refuse to intervene and/or report it) without fear of consequences.[28]  In fact, on November 7, 2017, no defendant officer had ever been disciplined for misconduct.  (PSAMF, ¶ 137).  These failures in the City's accountability process "would lead officers, including the officers involved in the raid on the Mendez family home, to believe that they could act with impunity…."  (PSAMF, ¶ 137).

Fourth, CPD's failure to take *any* steps to remedy an obvious problem merits three final inferences of causation.  Where a municipality does not take any steps to remedy an incredibly obvious problem, a jury may reasonably draw an inference of causation.  *J.K.J. v. Polk County*, 960 F.3d at 378-380 (Although obvious that female guards would be vulnerable to sexual abuse in prison, the County took no steps to decrease the likelihood of such abuse).  Here, hundreds of misconduct complaints, the PATF, and the DOJ all told CPD that its widespread practice of excessive force against children was an obvious problem.  Moreover, the gaps in CPD's affirmative policy and training that failed to regulate officer conduct towards children when executing residential search warrants posed an obvious risk that "were a [tragic] moving force behind officer misconduct in this case."  (PSAMF, ¶ 136).  That is because most officers comply with policy and follow training; had CPD policy and training prohibited defendants from pointing their firearms at children,

---

[27] *Spalding v. City of Chi.*, 186 F. Supp. 3d 884, 915-917 (N.D. Ill. May 11, 2016) (summary judgment denied in First Amendment retaliation claim where expert testified that "the City maintains a code of silence … advanced by the City's conscious decision to… fail to discipline officers who engage in misconduct"); *Garcia v. City of Chi.*, No. 01 C 8945, 2003 U.S. Dist. LEXIS 4577, *18-23 (N.D. Ill. Mar. 19, 2003) (summary judgment denied on *Monell* excessive force claim where plaintiff presented evidence that CPD rarely disciplined officers).

[28] *Cazares v. Frugoli*, No. 13 C 5626, 2017 U.S. Dist. LEXIS 49938, *59-64 (N.D. Ill. Mar. 31, 2017)(denying summary judgment on *Monell* claim); *Obrycka v. City of Chi.*, 2012 U.S. Dist. LEXIS 22818 (denying summary judgment on *Monell* claim).

defendants would have complied. (PSAMF, ¶¶ 138-140). Empirically, when departments adopt policy and training mandating trauma-informed policing with children, the result is lower rates of use of force (and, hence, of excessive force) against children. (PSAMF ¶ 140). Finally, the harm that flowed from failing to train officers to not use unnecessary force against so vulnerable a population was incredibly obvious to CPD and other city agencies, given the City's expert knowledge of childhood trauma. These were all obvious risks that became the City's moving forces behind officers' misconduct towards Peter and Jack Mendez.

### B. The Material Facts for Plaintiffs' Count II Invalid Warrant Claim are Undisputed in Plaintiffs' Favor

Defendants obtained a search warrant for the wrong address and permanently traumatized two young children and their law-abiding parents. (PSAMF ¶¶ 2-3). Their mistake was not objectively reasonable: the bad information was from a Doe who officers knew was unreliable in every way yet they did absolutely nothing to corroborate his tip, then concealed key facts undermining probable cause from the judge. (Id. ¶¶ 4-12, 14, 18-20, 22-27). The supervisors failed because, as the CPD Superintendent admitted, the entire CPD culture was "too reliant on informants without third party or evidentiary corroboration." (Id. ¶ 1). In this case, defendants not only admit they wholly trusted the unreliable John Doe's word, but they all admit they did not even understand they had a duty to independently corroborate and did not even understand what corroboration is. (Id. ¶¶ 4, 26).

The evidence shows that officers Cappello, Egan and Dari exhibited a reckless disregard for the truth when each 1) had obvious reason to doubt the accuracy of a completely untested John Doe's statements, including his statement that the targets, Curtis Roberts and Patricka Cavazos, were in the second-floor apartment at 3557 S. Damen Avenue; 2) failed to investigate and corroborate any of those statements; and 3) failed to inform the judge of key facts that they knew negated probable cause. (PSAMF ¶¶ 1-27). In other words, the officers should have known, in light

of the information they had, that the affidavit and testimony they provided in support of the warrant failed to establish probable cause such that they should not have applied for the warrant. *Beauchamp v. City of Noblesville*, 320 F. 3d 733, 743 (7TH Cir. 2003). Officers are liable if they knowingly, intentionally or with a reckless disregard for the truth made false statements to the judge, and those statements were necessary to the judge's determination that probable cause existed. *Beauchamp*, 320 F. 3d at 743. A reckless disregard for the truth exists when the affiant(s) entertained serious doubts as to the truth of his statements in the affidavit, had obvious reason to doubt the accuracy of the informant's information, and/or failed to inform the judge of facts he knew would negate probable cause. Id. Such an officer violates the Fourth Amendment rights of anyone injured by the illegal search.[29] Moreover, if defendants' search warrant was invalid, then their entire search and seizure – all of their actions towards plaintiffs – were unlawful. *Jacobs v. City of Chicago*, 215 F. 3d at 772-774.

In this case, when Cappello and Egan composed their complaint for search warrant and appeared before Judge Burns on November 7, 2017, both men knew:

- They personally had just arrested and booked the John Doe on November 6, after he had fled from police in a dangerous, high-speed vehicle chase that had resulted in a crash;

- They arrested the Doe with 80 bags of heroin pre-packaged for sale, and the Doe was already a convicted felon with "a laundry list" of charges from selling large quantities of narcotics and a pending criminal case;

- On the same day they arrested him and while he was in lockup, the Doe gave Cappello and Egan his tip;

- The Doe had never served as an informant before; defendants had no experience with him;

- In exchange for the tip, Cappello "orally agreed" with the Doe that, if his information panned out, he would "go to bat for him" with the State's Attorney to get lenient charges and/or sentencing;

---

[29] *Weeks v. City of Chicago*, 2014 U. S. Dist. LEXIS 107660, *8-9 (N. D. Ill. Aug. 6, 2014); *s v. City of Chicago*, 1996 U. S. Dist. LEXIS 10250, *15-16 (N. D. Ill. July 18, 1996).

- Neither Cappello nor Egan had investigated and corroborated any of the informant's statements, including his statement that the targets were in the second-floor apartment; and

- Even the bit of "investigation" Cappello did do (in LEADS and I-CLEAR) had *failed* to corroborate the address the Doe had given him.

(PSAMF ¶¶ 4-9, 12-20, 23-27). Despite the risk presented by the prospect of applying for a search warrant based solely on a completely untested informant of unknown reliability who had obvious motives to lie and contrary to CPD official policy, training and generally accepted law enforcement standards, Cappello and Egan failed to conduct any independent investigation to corroborate the John Doe's tip, even though they had time. (PSAMF ¶¶ 1, 4, 8-12, 13, 14, 18-20). Rather, Cappello's entire affiant's "investigation" consisted merely of checking CPD's LEADS and I-CLEAR databases for photos of the targets to show the Doe, showing the Doe "useless" photos of the building from the internet, and briefly driving the Doe past the building to have him point out the apartment. (PSAMF ¶ 8). *Even from this superficial check of two databases, Cappello discovered that LEADS and I-CLEAR did not confirm the address provided by the Doe,* a fact which cut against the reliability of the tip but which neither Cappello nor Egan did anything to investigate further. (PSAMF ¶¶ 9-12, 14, 18-20, 27; PSAMF Exhibit B ¶ 439). Defendants' statement that "None of the investigation refuted the J. Doe's statements" is false. (Memo. at 12; Id.). Instead, the officers simply ignored this contradictory fact and jointly prepared a complaint for search warrant based solely and entirely on the untested, self-interested Doe's uncorroborated statements. (PSAMF ¶¶ 4-6, 8-12, 14, 15-16, 18-20, 22-23). "I believed everything that the John Doe had said to me" "was credible and accurate and believable." (PSAMF ¶ 4). Cappello and Egan could have taken any of a multitude of standard investigative steps to corroborate the informant's statements and had time to do so. (PSAMF ¶¶ 9-12, 14, 18-20, 27; PSAMF Exhibit B, ¶¶ 428-445). They failed to take even the most basic ones. (PSAMF ¶¶ 4, 9, 10-12, 14, 18-20; PSAMF Exhibit B, ¶¶ 428-445).

Although he did not sign the complaint for search warrant that he co-wrote with Cappello, Egan recklessly disregarded the truth just as much, if not more. (PSAMF ¶¶ 15-16, 24). As the supervisor guiding a first-time affiant, Egan not only supervised but was directly involved in "all aspects of" Cappello's "investigation" and was aware of all of the same facts. (PSAMF ¶¶ 4, 5, 14-22, 24). He interviewed the John Doe, told Cappello what investigative steps to take, knew Cappello had not corroborated any of the Doe's statements, ghost-wrote and revised the complaint, and appeared before Judge Burns with Cappello and the Doe. (PSAMF ¶¶ 5, 6, 16, 18, 22-24). Despite knowing that that I-CLEAR and LEADS had not verified the address provided by the informant and that Cappello had not taken any steps to corroborate, Egan never directed Cappello to investigate and corroborate and never did so himself. (PSAMF ¶¶ 4, 14, 18-20). In fact, neither he, nor Cappello, nor Dari even understood that what corroboration meant or that they were supposed to do it. (PSAMF ¶¶ 4, 26).

When officer Cappello and Sgt. Egan went before Judge Burns for a brief, 5-minute hearing, neither officer disclosed any of the following facts of which both were aware and on which probable cause depended:

- They had just arrested the Doe the previous day, after he had fled from the police in a violent vehicle chase, was caught with 80 bags of heroin, and was in lockup at the time he provided his tip;

- Cappello had entered into "an oral agreement" with the Doe, promising that "I would go to bat for him, speak with the State's Attorney to see… if we could work something out" for a lesser charge or a lenient sentence for the crimes defendants charged him with;

- Cappello's LEADS and I-CLEAR checks had failed to confirm the address that the Doe had provided;

- Cappello had not conducted any investigation and had taken no steps to corroborate any part of the Doe's tip, including the Doe's statement that the targets were in the second-floor apartment;

36

(PSAMF ¶¶ 21-23). Nor had Cappello and Egan included any of these facts in the sworn complaint, which the Judge reviewed, and at the hearing neither Cappello, nor Egan, nor the Doe orally provided the Judge with any additional information beyond that contained in the complaint. (Id.). Lt. Dari was personally involved in procuring the search warrant because Egan testified he kept him updated throughout process, yet Dari, in violation of CPD policy, completely abdicated his supervisory role of ensuring that Cappello had conducted an independent investigation by knowingly agreeing not to sign the complaint until after it had been signed by the judge and, when Dari did sign, he "rubber-stamped," doing literally nothing to ensure any corroboration had occurred. (PSAMF ¶¶ 24-26, 62-63).

In light of all of the facts and circumstances of which Cappello and Egan were aware, the complaint for search warrant failed to establish probable cause, and no objectively reasonable officer would have applied for it. The complaint fails under *United States v. Glover*, 775 F. 3d 811, 816 (7th Cir. 2014). Plaintiffs agree with defendants that whether officers acted reasonably "turns on" the informant's reliability and veracity (Memo. at 10); here, the springboard for analysis is that this Doe had *neither*. (PSAMF ¶¶ 5, 6, 23). Officers used a fleeing felon as a first-time informant with no track record, unknown reliability, dubious veracity (given his dramatic evasion of officers and the dire, penal circumstances in which they held him), and an added reason to lie (they had promised they would "go to bat for him"). (Id.). Instead investigating any of his statements, officers relied solely and completely on the untested Doe's word: they performed *zero* "degree of corroboration." *United States v. Glover*, 775 F. 3d at 816; (PSAMF, ¶¶ 4, 8-12, 14, 18-20). While other *Glover* factors are important,[30] here the failure to corroborate a John Doe who had not one, single

---

[30] For example, the Doe's observation of drugs in the apartment was already stale - from Nov. 4 and 5 other occasions for which dates are not provided) - and the "the level of detail" provided by the informant was very sparse. (Id.). Cappello's complaint for search warrant is "bare bones"; it is unusually short, merely relating that "I had a conversation with J. Doe" and omits key details. The text also contains grammatical errors, such as "J. Doe…swore to the contents of the complainant [sic]" and curious quotation marks around formulaic

compensating factor for reliability is determinative. Where the informant's tip is totally

uncorroborated, the reasonableness of an officer's conduct turns on the informant's reliability.

*Coleman-Johnson v. City of Chicago*, 1996 U. S. Dist. LEXIS 1534 at *6-7, 10-11.

Uncorroborated informant tips are insufficient for probable cause, especially where,

as here, the informant is of unknown reliability, untested, obviously self-interested, and/or the

informant's tip or affidavit are lacking in detail. *United States v. Bell*, 585 F.3d 1045, 1048 (7th Cir.

2009) ("Because affidavit failed to establish the reliability of the informants, and law enforcement

officers did not sufficiently corroborate the informant's' reports, the warrant was not supported by

probable cause"); *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003). The mere fact that an

informant is untested weighs against a finding of probable cause, especially where there is little or no

corroboration. *Bell*, 585 F.3d 1045, 1048.[31]

Because Cappello's Doe was a fleeing felon whose reliability was completely

unknown and who had obvious and urgent motives to lie, corroboration in this circumstance was

essential. *Hudson v. City of Chicago*, No.14-CV-06267, 2017 U.S. Dist. LEXIS 106450, at *12-13 (N.D.

Ill. July 10, 2017)(summary judgment denied because "information from a self-interested and

untested informant was not sufficiently trustworthy to provide probable cause on its own").[32] It is

well-known that John Doe informants (i.e., with no track record of providing information) are

inherently unreliable. *United States v. Hawthorne*, No. 13 CR 772-19, 2014 U.S. Dist. LEXIS 150260,

---

sentences, suggesting Cappello simply used a template with little attention to detail. (PSAMF ¶ 22; PSAMF
<u>Exhibit O</u>).

[31] *See also United States v. Koerth*, 312 F.3d 862, 866-68 (7th Cir. 2002); *United States v. Betro*, No. 04-CR-064-S,
2004 U.S. Dist. LEXIS 13919, at *19-20 (E.D. Wis. Mar. 28, 2005).

[32] *See also United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003)(warrant based on uncorroborated tip and
insufficient detail lacked probable cause even though informant appeared before judge); and *United States v.
Pollard*, 07-CR-09, 2007 U.S. Dist. LEXIS 32481, at *5-8 (E.D. Wis. May 2, 2007)(uncorroborated tip of an
arrestee shortly after arrest was insufficient for probable cause).

at *7-8 (N.D. Ill. Oct. 2, 2014).[33]  Therefore, an officer has a fundamental duty to corroborate a John

Doe informant's tip.  *Illinois v. Gates*, 462 U.S. 213, 241-42 (1983); *Jacobs v. City of Chi.*, 215 F.3d at

768, n. 4.  Moreover, only corroboration of *non-innocent* facts can turn a tip into probable cause.

*Whiteley v. Warden*, 401 U.S. 560, 566-68 (1971).[34]  Here, Cappello and Egan openly admit they

completely abdicated their duty to corroborate their Doe's statements.  (PSAMF ¶¶ 4, 8-12, 14, 18-

20, 22-27).

Search warrant investigations like defendants' have been found insufficient for

probable cause in this Circuit, based on a lack of corroboration of an unreliable Doe coupled with

the same types of omissions that defendants made in their sworn complaint.  *United States v. Glover*,

755 F.3d 811, 819-20 (7th Cir. 2014)(officer omitted facts about the informant's credibility).[35]

Defendants cite *Edwards v. Jolliff-Blake,* 907 F. 3d 1052 (7th Cir. 2018), arguing that lack of a track

record alone is not disqualifying, but in *Edwards* other factors gave the informant's statements

---

[33] *McCadd v. Murphy*, 763 F. Supp. 2d 1018, 1026 (N.D. Ill. 2010)(*accord*); *Draine v. Bauman*, 708 F. Supp. 2d 693, 698, 700 (N.D. Ill. 2010)(tip from John Doe in police custody was unreliable); *United States v. Koerth*, 312 F. 3d 862, 867-868 (7th Cir. 2002)(warrant lacked probable cause when officers failed to corroborate untested informant's tip in a "bare bones" affidavit)("[t]o uphold the state judge's ruling in this case would be to ratify the search of a home based on the use of essentially conclusory statements without corroboration"); *Philips v. City of Chi.*, No. 18-cv-0316, 2021 U.S. Dist. LEXIS 79414, at *18 (N.D. Ill. Apr. 26, 2021)(relying solely "on uncorroborated information from an informant whose reliability was not established or even mentioned" can violate clearly established right to be free of unreasonable searches).

[34] See also *Reardon v. Schossow*, 416 F. Supp. 3d 793, 806 (E. D. Wis. 2019); *United States v. Glover*, 755 F.3d 811, 818 (7th Cir. 2014) (corroboration of tip by showing informant suspect's picture and verifying suspect's address and criminal history were insufficient); *United States v. Harju*, 384 F. Supp. 2d 1278, 1287-89 (E.D. Wis. 2005) *rev'd on other grounds*, 466 F.3d 602 (7th Cir. 2006).

[35] *See also United States v. Simmons*, 771 F. Supp. 2d 908, 924-25 (N.D. Ill. 2011)(attempts to corroborate involved the informant alone and officers omitted that informant was recently arrested and had a history of lying to police); *Phillips v. City of Chi.*, No. 18-cv-0316, 2021 U.S. Dist. LEXIS 79414, at *15 (N.D. Ill. Apr. 26, 2021)(officer failed to corroborate informant of unknown reliability); *Reardon v. Schossow*, 416 F. Supp. 3d 793, 806 (E. D. Wis. 2019)(summary judgment denied on search claim based on uncorroborated informant tip); *Hicks v. Marsalik*, No 97 C 6097, 1999 U.S. Dist. LEXIS 3562 (N. D. Ill. Mar. 23, 1999)(summary judgment denied where uncorroborated tip from an anonymous informant did not even provide reasonable suspicion); *Pearce v. Thiry*, No. 08 C 4483, 2009 U.S. Dist. LEXIS 92204, at *21-23 (N.D. Ill. Oct. 1, 2009)(same).

reliability overall, including that his information was from the same day, *and, critically, that he gave information against his penal interest and the affiant had not withheld any credibility-damning statements from the judge.* Id. at 1055-56, 1057, 1062.[36]

Cappello and Egan exhibited a reckless disregard for the truth when they were aware of numerous facts that gave them obvious reason to doubt the accuracy of the totally untested informant's tip, and they failed to inform the judge of these facts, including the key facts: Cappello's investigation had failed to corroborate the target's address, that neither officer had conducted any corroboration, and that Cappello had promised the Doe leniency. (PSAMF ¶ 23). Because they concealed these facts from the judge when they were necessary to his probable cause analysis, it is they, not judge Burns, who are responsible. In *Malley v. Briggs*, 475 U. S. 335, 345 (1986), the Court rejected defendants' cart-before-the horse argument that probable cause existed merely because a judge signed the search warrant. (Memo. at 9, 12-13, 14, 19). The defendant officers have *always* blamed judge Burns for *their* mistake. (PSAMF ¶ 58)("*He* signed off on it"). The issue is whether a reasonable officer in Cappello's position would have known that his affidavit failed to establish probable cause, regardless of whether a judge approved it. Id. A reasonable officer would have known that the facts Cappello withheld undercut probable cause.

### 1. Defendants Are Not Entitled to Qualified Immunity For Recklessly Disregarding the Truth

Defendants are not entitled to qualified immunity. First, an officer seeking a warrant is entitled to qualified immunity only if the warrant application has sufficient indicia of probable cause to make official belief in it reasonable. *Malley v. Briggs*, 475 U.S. at 344-45. As shown above, no

---

[36] Defendants also cite *Wade v Ramos*, 2019 U. S. Dist. LEXIS 44591 (N. D. Ill. Mar. 19, 2019), but the *Wade* informant was a registered confidential informant, had provided tips 250-300 times with a 90 percent accuracy rate, and there was no evidence the affiant had omitted material information from the warrant application. Id. at 4, 26.

reasonable officer would have applied for a warrant based solely and entirely on the statements of a

fleeing felon turned untested John Doe when there had been no investigation to corroborate

anything he said. On summary judgment, affiants are denied good faith and qualified immunity

when they fail in their duty to corroborate information from an informant of unknown reliability

and then rely solely on that informant's uncorroborated tip.[37][38] In addition to case law, the duty to

corroborate a John Doe's statements was clearly established 2012-2015 in CPD's search warrant

policy and training. (PSAMF ¶¶ 63-63). Defendants were trained that John Does are unreliable, and

---

[37] *Phillips v. City of Chi.*, No. 18-cv-0316, 2021 U.S. Dist. LEXIS 79414, at *18 (N.D. Ill. Apr. 26, 2021) (officer not entitled to qualified immunity where he relied solely on uncorroborated information from an informant whose reliability was not established); *Stamps v. Hernandez*, No. 08 C 2196, 2010 U.S. Dist. LEXIS 95539 (N.D. Ill. Sep. 14, 2010) (denying qualified when officers relied on a warrant based on John Doe informant's testimony without adequately verifying the John Doe's allegations that there was only one apartment on 3rd floor was invalid); *cf. McCadd v. Murphy*, 763 F. Supp. 2d 1018 (N.D. Ill. 2010)(officers not entitled to summary judgment on invalid search warrant claim because police only corroborated innocent details); *Draine v. Bauman*, 708 F. Supp. 2d 693, 708 (N.D. Ill. 2010) (qualified immunity denied where officer relied on tip from informant who did not know the name of the suspect, could not pick the suspect out of a photo spread, and could not specify from what house he bought narcotics in affidavit); *United States v. McNeal*, 82 F. Supp. 2d 945, 956, 961 (S.D. Ind. 2000) (good-faith exception did not apply where affidavit contained "unattributable information" about drug transactions from "a source about whom nothing is known").

[38] *See also, Cline v. City of Mansfield*, 745 F. Supp. 2d 773 (N.D. Ohio 2010) (officers relied on uncorroborated informant tip for search warrant of plaintiffs' residence); *Mueller v. Tinkham*, 162 F.3d 999 (8th Cir. 1998) (officers were not entitled to qualified immunity where they relied on tip from informant that was mostly undermined by their attempts at corroboration); *United States v. Vigeant*, 176 F.3d 565 (1st Dist. 1999) (Warrant based on stale tip from informant of unknown reliability and with a known criminal history was not sufficient for probable cause, and affiant omitted facts that undermined the informant's credibility); *Hale v. Fish*, 899 F.2d 390 (5th Cir. 1990) (upholding district court's denial of qualified immunity where warrant affidavit lacked probable cause where it was based off information from an informant who had reason to lie because he was being prosecuted and where two charges against informant were dropped as a result); *Hooks v. Brewer*, 818 Fed. App'x. 923, 928-30 (11th Cir. 2020) (officer who failed to corroborate recently arrested informant's tip and made reckless omissions about informant's credibility was not entitled to qualified immunity); *Ruby v. Horner*, 39 Fed. App'x 284, 287 (6th Cir. 2002) (affirming denial of qualified immunity to officers who failed to verify tips about the location of the target of search warrant); *Butts v. City of Bowling Green*, 374 F. Supp. 2d 532, 544 (W.D. Ky. 2005) (denying qualified immunity to officer who failed to include any information regarding informant's reliability in warrant application); S*anseverino v. Chrostowski*, 536 Fed. App'x 62 (2nd Cir. 2013) (officer who obtained warrant based on conclusory informant tip without corroborating anything more than the target's address and prior criminal history was not entitled to qualified immunity); *Kohler v. Englade*, No. 03-857-JJB, 2009 U.S. Dist. LEXIS 47105, at *15-17 (M.D. La. June 3, 2009) (officer not entitled to qualified immunity where he omitted relevant information from warrant application which included only two anonymous and uncorroborated tips).

policy mandated that 1) the affiant "verify and corroborate" "by an independent investigation" a John Doe's "specific information" and 2) a Lt. ensure that the affiant had done this before approving the affiant's complaint to send to a state's attorney and judge.  (Id.).

Second, when defendants applied for the warrant, it was clearly established that procuring a search warrant in reckless disregard of the truth violates the Fourth Amendment. *Beauchamp v. City of Noblesville*, 320 F.3d at 742-743; *Franks v. Delaware*, 438 U. S. 154, 155-56 (1978); *Draine v. Bauman*, 708 F. Supp. 2d 693, 707-708 (N. D. Ill. April 16, 2010); *Coleman-Johnson v. City of Chicago*, 1996 U. S. Dist. LEXIS 10250, *15-16.  Where an officer misleads a judge into issuing a warrant based upon statements that he knows are false or would know are false if not for his reckless disregard of the truth, he is not entitled to qualified immunity.  *United States v. Leon*, 468 U.S. 897, 923 (1984); *Messerschmidt v. Millender*, 565 U.S. 535, 547 n. 1 (2012); *Liston v. County of Riverside*, 120 F.3d 965 (9th Cir. 1997).  A presumption of good faith is rebutted by showing facts indicating that the magistrate rubber-stamped the warrant application, the officers were dishonest or reckless when preparing the affidavit, or that no reasonable officer would have thought the warrant was supported by probable cause. *Id. United States v. Peck*, 317 F.3d at 757.  On summary judgment, courts deny qualified immunity where a reasonable jury could find that the affiant made false statements either knowingly or with a reckless disregard for the truth.[39]  Here, as shown, defendants are not entitled to qualified immunity because during Judge Burns' 5-minute hearing they concealed facts that undercut his probable cause analysis.  (PSAMF ¶¶ 22-23).

---

[39] *Betker v. Gomez*, 692 F.3d 854, 861-62 (7th Cir. 2012); *Coleman-Johnson v. Chicago*, No 95 C 3455, 1996 U.S. Dist. LEXIS 10250, at *17-19 (N.D. Ill. Jul. 18, 1996); *United States v. Harris*, 464 F.3d 733 (7th Cir. 2006) (good faith exception did not apply where defendant made preliminary showing that warrant was obtained with reckless disregard for truth); *Hudson v. City of Chi.*, No. 14-CV-06267, 2017 U.S. Dist. LEXIS 106450 (N.D. Ill. July 10, 2017) (denying qualified immunity to officers who arrested plaintiff without probable cause based on uncorroborated tip); *Milan v. Bolin*, 795 F. 3d 726, 728-30 (7th Cir. 2015)(qualified immunity denied where officers executed a search warrant after a perfunctory investigation and did not wait before they broke open the front door at a residence occupied by an elderly woman and her two daughters).

Finally, *no* defendant officer is entitled to qualified immunity for obtaining the invalid search warrant. Qualified immunity should be denied to defendants Cappello and Egan, the officer in charge, who were responsible for ensuring that the correct residence was searched.[40] Qualified immunity should also be denied to officers Donnelly, Hernandez, Guzman, Sehner, and Dari because each directly participated in or approved the search warrant investigation, were well-aware of the facts and circumstances and did no corroboration, and because no objectively reasonable officer in their position would have believed the warrant was valid. (PSAMF ¶¶ 5-7, 12, 70); *Leon*, 468 U.S. at 923.

### C. The Material Facts for Plaintiffs' Count III Supervisory Liability Claim Are Undisputed for Plaintiffs

The undisputed evidence shows that Sgt. Egan failed to properly supervise officer Cappello's search warrant investigation and that his failure resulted in the illegal search of plaintiffs' apartment. (PSAMF ¶¶ 2-4, 9, 14-20, 22-27). To prevail on count III, supervisory liability, plaintiffs must prove that: 1) an officer violated their constitutional rights; 2) the officer's supervisor knew the officer was about to do so or that the officer had a practice of doing so in similar situations; 3) the supervisor approved, assisted, condoned or purposely ignored the officer's violation; and 4) plaintiffs were injured as a result. *Chavez v. Illinois State Police*, 251 F. 3d 612, 651 (7th Cir. 2001).[41] First, as shown, the undisputed facts show that any reasonable officer would have known that Cappello's completely uncorroborated John Doe complaint for search warrant lacked probable. (*See*

---

[40] *Hartsfield v. Lemacks*, 50 F.3d 950, 955 (11th Cir. 1995)(denying qualified immunity to officer who "did nothing to make sure that he was leading other officers to the correct residence"); *Turner v. Marion County Sheriff Dep't*, 94 F. Supp. 2d 966, 972-73 (S. D. Ind. 20000)(denying qualified immunity to officers who deferred to detective-in-training's identification of the residence without confirming that it was correct); *Allen v. Dist. Attorney's Office*, 644 F. Supp. 2d 600 (E.D. Pa. 2009).

[41] See also *Kernats v. O'Sullivan*, 35 F. 3d 1171, 1182 (7th Cir. 1994); *Rascon v. Hardiman*, 803 F. 2d 269, 273-274 (7th Cir. 1986).

*supra*).  Second, it is undisputed that Egan was not only Cappello's direct, daily supervisor, but he both directed and was intimately involved in "all aspects" and stages of Cappello's "investigation," and knew that Cappello's complaint was based solely on the statements of a fleeing felon turned untested John Doe that no officer had bothered to investigate in order to corroborate.  (PSAMF ¶¶ 4-7, 9, 14-16, 18-20, 22-23).  Moreover, not only did Egan know Cappello was a new officer who had never conducted a search warrant investigation, but Capello's CPD personnel file, which Sgt. Egan had viewed, indicated that Cappello had failed the "Fundamentals of Investigation" section of the Illinois Law Enforcement Training and Standards Board in 2015, *including* specific exam questions about "corroboration."  (PSAMF ¶¶ 15, 17).  Egan knew Cappello was about to get a search warrant without probable cause.

Third, it is undisputed Sgt. Egan directly and actively assisted in officer Cappello's investigation and was well-aware there had been and would be no corroboration of any of the information from the untested, self-interested John Doe.  (PSAMF ¶¶ 6, 9, 14, 16, 18-20, 22-23).  In spite of being aware of these facts, Egan ignored them:  he did not ask Cappello to take steps to corroborate and took none himself but nevertheless shepherded Cappello through the process of getting the complaint for search warrant approved by the state's attorney and the judge.  (PSAMF ¶¶ 15-16, 18-20, 22-23).  Fourth, it is undisputed that, as a result of Egan's assistance, supervision, and approval of Cappello's complaint, Cappello and Egan obtained a search warrant without probable cause, and plaintiffs' home was entered and searched erroneously.  (PSAMF ¶¶ 15-16, 18-20, 22-23).  Since the facts regarding Egan's supervisory liability are undisputed, the Court should enter summary judgment for plaintiffs.  Sgt. Egan is not entitled to qualified immunity for the reasons set forth in Section B above and because his supervisory responsibility - and the consequence of abdicating same when Cappello was a new officer, had never been an affiant, and struggled to conduct investigations - was clear.  (PSAM ¶¶ 15, 17-19).

### D. The Material Facts for Plaintiffs' Count IV Warrantless Entry/Failure to Retreat Claim Are Undisputed for Plaintiffs

The Court should also enter summary judgment for plaintiffs because the objective BWC video/audio show all defendant officers failed to stop searching and depart after being repeatedly confronted with evidence that the warrant was for the wrong residence. (PSAMF ¶¶ 50-61). There are no facts for a jury to decide. Even if probable cause supported defendants' search warrant initially, upon discovering they were in the wrong home defendants had an independent legal duty to stop searching and leave immediately.

The law is clear about both the *degree of notice* that triggers officers' duty to stop searching and leave and the *timeframe* in which they must stop: officers are required to discontinue their search "*as soon as* they… were put on notice of the *risk that they might be in a unit erroneously included within the terms of the warrant.*" *Maryland v. Garrison*, 480 U.S. 79, 87 (1987). The Seventh Circuit has consistently applied this rule. *Jones v. Wilhelm*, 425 F.3d 455, 463 (7th Cir. 2005)("if an officer obtains information while executing a warrant that puts him on notice of *a risk that he could be targeting the wrong location*, then the officer must terminate his search")(emphasis added); *Jacobs v. City of Chicago*, 215 F.3d at 769 ("*At the moment* the Defendant Officers discovered the defect in the description of the place to be searched, they were obligated to cease that search if they could not determine which apartment was properly subject of the warrant")(emphasis added).

Based on the objective evidence, it is undisputed that, after receiving notice repeatedly that they might be in the wrong apartment, defendants nevertheless not only remained in the Mendez's apartment but continued to search it, in violation of the family's Fourth Amendment rights. (PSAMF ¶¶ 50-59, 61). The BWC videos show that, starting within seconds after officers entered, they were not only confronted repeatedly with multiple facts that the warrant might have been obtained for the wrong unit, but each defendant *stated on video* that he doubts they are in the right place or that he *knew* they were not. (Id.). Sgt. Egan, the supervisor, admitted that he *concluded,*

45

*just four (4) minutes after entry, that there was "nothing" that connected the targets to the apartment.* (Id. ¶ 54).

Nevertheless, the BWC videos show that he did not order his officers to stop searching and leave. (PSAMF ¶¶ 55, 59, 61). Officers' real time statements to each other on BWC prove they all realized almost immediately after entry that the warrant was for the wrong unit yet continued searching anyway:

- When officers entered, they immediately saw that Mr. Mendez was not African American or bald, that Mrs. Mendez was not Latino, 165 pounds or 5'8", and that neither resembled the targets described in the search warrant and depicted in the photos that the officers had just viewed (PSAMF ¶¶ 50-51);

- When officers entered, they encountered packed-up boxes throughout the apartment, but the Doe, who claimed to have visited the targets' apartment three days earlier, had not mentioned that the targets were moving (PSAMF ¶¶ 13, 52; PSAMF Exhibits Q, S, T and U);

- Less than two (2) minutes after entering the apartment, officer Cappello told officer Guzman that Mr. and Mrs. Mendez are not "target"; nevertheless, Sgt. Egan then gives the order to "START SEARCHING, BOYS" and all officers, including Cappello and Guzman, comply (PSAMF ¶ 50; PSAMF Exhibit Q);

- Three (3) minutes after entering the apartment, officer Hernandez says to officer Sehner, "IS THIS GOING TO BE A GOOD WARRANT OR A BAD WARRANT?" and, within five minutes, he goes outside on the back porch and gestures a "thumbs down" motion to perimeter officers, signaling that "*I was believing that this was going to be a negative search warrant*"; nevertheless, he then re-enters and continues searching (PSAMF ¶ 52; PSAMF Exhibit T);

- Less than four (4) minutes after entry, officer Donnelly told plaintiffs, "THIS COULD BE A MIX-UP"; nevertheless, he continued searching their apartment (PSAMF ¶ 53; PSAMF Exhibit U);

- Within five (5) minutes after entry and after Mrs. Mendez told officers they are in the wrong apartment, Sgt. Egan replies, "ALRIGHT, WELL, JUST LET THESE GUYS *FINISH UP FIRST* AND THEN WE'LL ALL GET OUT OF YOUR WAY," but he in fact did not give orders to: release plaintiffs from detention and Mr. Mendez from handcuffs, stop searching and leave the apartment; rather, officers continued to search (PSAMF ¶¶ 55, 59, 61; PSAMF Exhibit U)(emphasis added);

- Within six minutes (6) after entry, officer Guzman confided in officer Hernandez privately: "DUDE, HE GAVE US THE WRONG FUCKING APARTMENT. HE GAVE US THE WRONG APARTMENT. HE GAVE US THE WRONG APARTMENT. HE SAID UP THE STAIRS, AND ITS THE FIRST DOOR RIGHT THERE. HE GAVE US THE WRONG APARTMENT. REMEMBER THE PICTURES I GAVE YOU? THEY

ARE [OF] UPSTAIRS [pointing to the ceiling to indicate the third floor]. I THINK ITS UPSTAIRS. I'M SAYING UPSTAIRS BASED ON THE WINDOWS AND THE PICTURE." Nevertheless, officers Guzman and Hernandez continued searching the apartment (PSAMF ¶ 56; PSAMF Exhibits Q and T);

- Within six (6) minutes after entry, officer Sehner told plaintiffs "YOU'RE NOT THE PERSON WE'RE LOOKING FOR" and "WE'RE NOT HERE FOR YOU GUYS," but he continues to detain plaintiffs in the living room and to keep Mr. Mendez handcuffed (PSAMF ¶¶ 57, 61; Exhibit S and U);

- At eight (8) minutes after entry and when Cappello had not found any Adidas bag with heroin in the master bedroom, he said to officer Donnelly, "BAD FUCKIN' SEARCH WARRANT" or "BAD FUCKIN' INFO" *as he continues to search* the master bedroom (PSAMF ¶ 58; PSAMF Exhibit U);

- At eight (8) and-a-half minutes after entry, Sgt. Egan, referring to contraband and any signs of a link to the targets, asked officers Hernandez and Guzman privately, "WHAT WE GOT?" They reply, "NOTHIN. YEA, NOTHIN"; Sgt. Egan nevertheless re-enters the apartment and continues searching while the family is still detained in the living room and Mr. Mendez is still handcuffed (PSAMF ¶ 59; Exhibits Q and T);

- After Mrs. Mendez told officers that Curtis Roberts lives upstairs and physically described him and after officer Sehner says, "THE GUY GOT THE FUCKIN' ADDRESS WRONG?" Sergeant Egan nevertheless ordered officers to "*FINISH SEARCHING, GUYS*," and defendant officers continued searching the apartment and did not immediately uncuff Mr. Mendez (PSAMF ¶ 61; Exhibits S-U).

To summarize, BWC video/audio shows that, within four minutes after entry, each defendant officer verbalized concern that they might be in a unit wrongly included in the warrant, and Egan had concluded it was the wrong apartment. (PSAMF ¶ 54). Officer Guzman's and Cappello's statements above at six (6) and (8) eight minutes after entry, respectively, show that, by these times, these officers were *certain* they were in the wrong residence. (Id.). However, instead of immediately ceasing their search and leaving within four minutes (or even six or eight minutes), *for another 10 minutes all defendants continued to search, to detain the crying children and their parents in the living room, and to keep Mr. Mendez handcuffed in front of his children, which traumatized them.* (PSAMF ¶¶ 43, 48-49, 61). This was a clear violation of plaintiffs' Fourth Amendment rights.

Defendants' argument that they acted reasonably when they stopped searching and left after 15 minutes glosses over both the crystal clear, Seventh Circuit rule and the undisputed evidence: all defendant officers, including Egan, were aware *immediately* - or no later than four (4) minutes after entry - that they *might be* in a residence wrongly included in the warrant, and, under the Seventh Circuit law, *that* was the moment they were required to immediately stop searching and leave. (Memo. at 20); *Guzman v. City of Chicago*, 565 F.3d 393, 398 (7th Cir. 2009)(defendants "should have known early on that the warrant did not accurately describe the premises to be searched" and "should have called off the search. Not doing so violated [plaintiff's] constitutional rights"). But they *did not* stop or leave.[42] That was wrong.[43]

Defendants blame plaintiffs for the fact that the officers were not *certain* they were in the wrong apartment until Mrs. Mendez read the search warrant and immediately exclaimed, "They live upstairs!" (Memo. at 22). But defendants were required to stop searching and leave *immediately once they were aware they might be in the wrong apartment*, not once they were certain. Moreover, defendant officers prolonged plaintiffs' detention and emotional trauma by unreasonably failing to "promptly present" plaintiffs with a copy of the search warrant, as required by CPD's search warrants policy. (PSAMF ¶ 60). Egan left it in the car and did not present it until over 10 minutes after entry. (Id.). Had defendant officers presented it promptly, Mrs. Mendez would have made the same exclamation earlier, and defendants would have saved plaintiffs from experiencing another 10 minutes' worth of traumatic distress in detention, handcuffs, and anxious uncertainty. (PSAMF ¶¶ 43, 48-49, 60, 61).

---

[42] Instead, they acted as though their job was to first satisfy themselves by gaining certitude that they were in the wrong apartment as well as to "FINISH SEARCHING," i.e., "complete the job" they had come to do; they continued searching until they had thoroughly searched the entire apartment. (PSAMF. ¶¶ 55, 61).

[43] This is not a case where officers mistakenly battered open the door to the wrong apartment but *immediately* realized their mistake and left; on those facts, officers do not conduct an unreasonable search. *Balthazar v. City of Chi.*, 735 F.3d 634, 638 (7th Cir. 2013).

Finally, defendants are not entitled to qualified immunity because their legal duty to immediately stop searching and retreat was clearly established law for decades before November 7, 2017. (See *Supra*).

### E. The Material Facts for Count VI, Assault, Are Disputed

Because there is evidence that defendants entered plaintiffs' apartment violently without warning and pointed firearms at plaintiffs when they were not legally authorized to do so, a reasonable jury could find that officers assaulted all plaintiffs, regardless of whether officers entered their apartment pursuant to a valid search warrant. The existence of a valid warrant does not eliminate state-law claims, including but not limited to assault and intentional infliction of emotional distress. *Doe v. City of Chi.*, No 95 C 2117, 1995 U.S. Dist. LEXIS 14517, at *18-19 (N.D. Ill. Oct. 2, 1995).[44] Moreover, qualified immunity, even if granted as to a § 1983 claim, does not immunize officers from state-law claims.[45]

There is evidence for each element of each plaintiff's assault claim. A person commits assault when he creates a reasonable apprehension of an imminent [unauthorized] battery in another person. *Rosenberg v. Packerland Packing Co.*, 55 Ill. App. 3d 959, 964 (1st Dist. 1977).[46] While a search warrant authorizes the use of "reasonable force to effectuate the detention" of individuals in the area, that force must still be objectively reasonable under the circumstances.

---

[44] See also *Boone v. City of Chicago*, No. 16-CV-11510, 2018 U.S. Dist. LEXIS 28408, *6-7 (N.D. Ill. Feb. 22, 2018).

[45] *Herion v. Vill. of Bensenville*, No. 00 C 1026, 2000 U.S. Dist. LEXIS 16745, at *12-14 (N.D. Ill. Oct. 31, 2000)(*citing Grossmeyer v. McDonald*, 128 F.3d 481, 486 (7th Cir. 1997)); *see also White v. Olig.* 56 F.3d 817, 818-821 (7th Cir. 1995).

[46] *See also Toothman v. Hardee's Food Sys.*, 304 Ill. App. 3d 521, 534 (1999)(citing Restatement (Second) of Torts § 21 Am. L. Inst. 1996); *Markel Int'l Ins. Co. v. Montgomery*, 2020 IL App (1st) 191175, ¶ 46.

*Muehler v. Mena*, 544 U.S. 93, 99 (2005). If the force used is unreasonable, then it is legally unauthorized. (Citations *infra*).

First, all defendants committed assault when they knew that children were in plaintiffs' apartment and yet, suddenly and without warning, forcibly smashed open plaintiffs' apartment door, screaming and with guns drawn, *as Peter and Jack were playing on the floor inches from that door*, causing them to leap up in shock and terror. (PSAMF ¶¶ 28, 31, 33-36). Officers had not knocked on *any* door or announced themselves *to plaintiffs* as they ran up the stairs of the multi-unit apartment building. (Id. ¶¶ 30-32). Defendants were required to knock and announce and wait a reasonable amount of time.[47] Officers did not have a no-knock warrant, a particularized reasonable suspicion of a threat of physical violence or a particularized reasonable suspicion that evidence may be destroyed. (Id. ¶¶ 13, 22, 30, 31); PSAMF Exhibit B ¶¶ 455-459).[48] In fact, officers were expecting the targets to be *unarmed*, and Mrs. Mendez, who did not stick her head out of the window, did not even resemble the female target, Cavazos. (PSAMF ¶¶ 13, 30). Thus, defendants' failure to knock and announce was *unauthorized*.

Second, Cappello committed assault when he pointed his assault rifle directly at Mr. Mendez at close range in the kitchen, and Egan and Cappello committed assault when they consecutively pointed their firearms at Mrs. Mendez, Peter and Jack in the living room - all when each plaintiff had immediately and fully complied with officers' commands at the start and posed no safety threat. (PSAMF ¶¶ 33, 36, 38, 39, 44-47). Forensic review of frames from the BWC videos confirms that all defendant officers had their guns drawn and pointed as they entered plaintiffs'

---

[47] *Green v. Butler*, 420 F.3d 689, 695-96 (7th Cir. 2009); *United States v. Brown*, 333 F.3d 850, 852 (7th Cir. 2003); *United States v. Jones*, 208 F.3d 603, 610 (7th Cir. 2000).

[48] *Wilson v. Ark.*, 514 U.S. 927, 929, 936; *Richards v. Wisconsin*, 520 U.S. 385, 394-95 (1997); *United States v. Gillaum*, 372 F.3d 848, 854 (7th Cir. 2004).

apartment *and shows* that Cappello pointed his rifle directly at Mr. Mendez immediately after entering the apartment while officers screamed threatening commands at him. (Id. ¶¶ 33, 35, 36, 38)("GET ON THE FUCKING GROUND!"). As shown, temporal and spatial gaps in officers' BWC videos - neither Cappello nor Egan turned theirs on, Guzman turned his on late, and Cappello and Egan are not visible on other officers' BWCs for 11-25 seconds - are consistent with the two officers pointing at plaintiffs in the living room. (PSAMF ¶¶ 29, 37, 40-44).

Third, when the door suddenly crashed open near them and screaming officers with guns drawn ran into the apartment, Peter and Jack jumped off the floor in shock and terror and ran off, and when plaintiffs saw Cappello and Egan pointing at them, each was terrified he/she was going to be shot. (PSAMF ¶¶ 33-36, 48). A reasonable juror could infer that, in these circumstances, plaintiffs' apprehension of an imminent battery was reasonable: when an officer, who has the legal authority and physical ability to use deadly force, points his gun with finger on the trigger directly at a person at close range while simultaneously screaming at the top of his lungs, it is reasonable for any person, especially a child, to believe that he is about to be shot at and struck by a bullet. (PSAMF ¶¶ 33, 35, 36, 38, 45-48).

While officers are legally authorized in specified circumstances to point their guns at citizens, they were not authorized to do so here. Force that is unnecessary or excessive under the circumstances is not legally authorized (even if officers had probable cause to be in plaintiffs' home and were allowed to use some degree of force). *Walker v. Witherspoon*, 2017 U. S. Dist. LEXIS 129182, at *20 (N. D. Ill. Aug. 15, 2017), citing *Baird*, 576 F. 3d at 345.[49] Summary judgment is denied to police officers where the evidence shows they committed assault by using unauthorized force, including pointing guns at children. *Callahan v. Aldridge*, No. 10 C 0864, 2011 U.S. Dist.

---

[49] See also *Lombardi v. Range*, 2003 U. S. LEXIS 12812, at *15 (N. D. Ill. July 22, 2003).

LEXIS 12756, at *11-13 (N.D. Ill. Feb. 9, 2011)(summary judgment denied where evidence showed officers pointed guns at minor children).[50]  In this case, it is undisputed that all plaintiffs were immediately and fully compliant from the start and posed no hint of danger to officers, such that there was no need to point at them.  (PSAMF ¶¶ 38-39, 44-46).  Further, if the Court finds that Cappello's search warrant lacked probable cause, then defendants' seizures of plaintiffs, even if they may otherwise have been reasonable under the circumstances (i.e., if done pursuant to a valid search warrant), were unauthorized.  *Jacobs v. City of Chicago*, 215 F. 3d at 772; *Cain v. Rinehart*, 2021 U. S. Dist. LEXIS 192470, at *13.[51]

Finally, a reasonable jury could infer that defendants, who suddenly bashed in the front door to an apartment where they knew children lived and pointed loaded guns directly at immediately compliant people, including children, consciously disregarded the obvious danger to plaintiffs' physical safety and emotional well-being, including the risk that the guns could discharge and the traumatic distress that would likely result from seeing guns aimed directly at them. [52] 745 ILCS 10/2-202; *Owusu v. Grzyb*, 749 F. Supp. 1389, 1390 (N.D. Ill. 1989).[53]  Defendants thus acted willfully and wantonly.

---

[50] *Horan v. City of Chi.*, No. 09 C 0505, 2010 U.S. Dist. LEXIS 72633, at *16-18 (N.D. Ill. July 16, 2010)(summary judgment denied where there was evidence that officers struck plaintiff in the face while he was on the ground, handcuffed him, then dragged his face across the ground and hung him on a wrought iron fence); *Rogers v. Cook*, No. 08 C 2270, 2008 U.S. Dist. LEXIS 103702, at *5-6 (N.D. Ill. Dec. 23, 2008)(SJ denied where there was evidence school guard pushed student through a glass door).

[51] If a search is not supported by probable cause, then "the justification for the search as a foundation for the seizure disappears…. Where there is no longer probable cause to believe that criminal activity is taking place at the location where an individual is found, the mere presence of the individual in that place is no justification for seizing that individual." *Jacobs*, at 772.

[52] A gun drawn and pointed at someone may easily lead to accidental discharge if the officer is startled, distracted or loses his balance.  *Stamps v. Town of Framingham*, 813 F. 3d at 31.

[53] Since child detainees were present, defendants had an additional duty here to not create a situation that harms their physical safety or emotional well-being, as CPD eventually articulated in its 2020 search warrant policy and training.  *White v. Rochford*, 592 F.2d 381, 383-86 (7th Cir. 1979); (PSAMF ¶¶ 83, 85).

**F.      Most of the Material Facts for Plaintiffs' Count IX, Intentional Infliction of Emotional Distress, Are Undisputed for Plaintiffs**

The undisputed facts show that the defendants intentionally or knowingly inflicted severe emotional distress on all plaintiffs, especially 5- and 9-year-old Jack and Peter.[54]  Under Illinois law, a person is liable for intentional infliction of emotional distress if his conduct: (1) was truly extreme and outrageous; (2) was intended to inflict severe emotional distress or he knew there was a high probability that it would; and (3) actually caused severe emotional distress.  *Schweihs v. Chase Home Fin., LLC*, 2016 IL 120041, ¶ 50.[55]

Moreover, conduct is extreme and outrageous if it goes beyond all possible bounds of decency and is utterly intolerable in a civilized society.  *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 90 (1976).  It is well-established that the extreme and outrageous character of a defendant's conduct can derive from abuse of an official position of power, including that of a police officer.  *Doe v. Calumet City*, 161 Ill. 2d 374, 392-93 (1994)(police officers are traditionally in a position of power over others and "can become liable for abuses of their positions").[56]  In assessing whether conduct is extreme and outrageous, courts consider whether the defendant is in a position of power that gives him authority over the plaintiff.  *Schweihs*, 2016 IL 120041, ¶ 52.  The degree of authority or power that a defendant has over a plaintiff can determine whether that defendant's conduct is outrageous: the more control over a plaintiff, the more likely the defendant's conduct is outrageous, especially when that defendant made a threat that he had the power to carry out.  *Feltmeier v. Feltmeier*, 207 Ill.

---

[54] Plaintiffs agree to voluntarily dismiss their claim of negligent infliction of emotional distress.

[55] See also *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 269-71 (2003); *Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017); *Breneisen v. Motorola, Inc.*, 512 F.3d 983 (7th Cir. 2008).

[56] See also *Southern v. City of Harvey*, 2006 U. S. Dist. LEXIS 99816, *13-14 (N. D. Ill. Nov. 13, 2006); *Lynch v. Young*, 2005 U. S. Dist. LEXIS 7603, *12 (N. D. Ill. March 9, 2005); *Comments to § 46 of the Restatement (Second) of Torts* (expressly mentioning "police officers").

2d at 273. Officers have singular authority to threaten and use deadly force against citizens, including pointing guns at them.

What is more, officers' personal knowledge and observations that a plaintiff was especially susceptible to emotional distress can render officers' conduct in inflicting such distress in disregard of that vulnerability, extreme and outrageous. *Black v. Wrigley*, 2017 U. S. Dist. LEXIS 202260, *39 (N. D. Ill. Dec. 8, 2017). In assessing whether conduct was extreme and outrageous, courts consider whether the defendant was aware that a plaintiff was particularly vulnerable to emotional distress. *Id.*; *Schweihs*, 2016 IL 120041, ¶ 52. Children in particular are recognized as being especially vulnerable to emotional distress. Id. Courts deny summary judgment to officers when there is evidence that they inflicted emotional distress on someone they knew was especially vulnerable to distress.[57]

Finally, in the search warrant context children's vulnerability is spotlighted for officers by the additional legal duty they have to not place any children present in physical or emotional danger or distress; if child detainees are present, officers may not create a situation that harms their physical safety or emotional well-being. *White v. Rochford*, 592 F.2d 381, 383-86 (7th Cir. 1979).[58] In 2020, CPD articulated this long-standing duty in its search warrant policy and training. (PSAMF ¶¶ 83, 85).

---

[57] *Lark v. City of Evanston*, No. 16 C 4630, 2017 U.S. Dist. LEXIS 12653, at *18-19 (N.D. Ill. Jan. 31, 2017)(officer shot plaintiffs' non-aggressive dog in front of them); *Carmona v. City of Chi.*, No. 15 C 462, 2019 U.S. Dist. LEXIS 149318, at *33-49 (N.D. Ill. Sep. 3, 2019)(officers interrogated hospitalized victim of arson, threatened him with life imprisonment, accused him of trafficking drugs, and got so close to the victim that the victim feared for his safety).

[58] *See also Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 917 (7th Cir. 2015); *Maglaya v. Kumiga*, No. 14-cv-3619, 2015 U.S. Dist. LEXIS 101217, *2-6, 20-21 (N.D. Ill. Aug. 3, 2015)(officer created a situation where he exhibited a reckless disregard for a five-year-old's safety by shooting the child's dog to death while the child was mere feet away); *B.H. v. Johnson*, 715 F. Supp. 1387 (N.D. Ill. 1989) (director of Department of Child and Family Services violated children's 14th Amendment rights by failing to ensure foster homes were safe); *Aristotle P. v. Johnson*, 721 F. Supp. 1002 (N.D. Ill. 1989) (child plaintiffs stated Due Process and First

In this case, sworn peace officers, public officials with legal authority and elevated public trust, especially in the eyes of children and law-abiding citizens like plaintiffs, nevertheless engaged in extreme and outrageous conduct when:

- Cappello and Egan knew that young children would be present in the targets' apartment yet made no effort to corroborate any of the untested Doe's statements, including the apartment number, before violently executing a search warrant (PSAMF ¶¶ 4-6, 9, 12-14, 18-20, 22, 28)(undisputed);

- All defendant officers knew that young children were present and, nevertheless, suddenly and without knocking or announcing to the occupants of *plaintiffs'* apartment, rammed open the apartment front door when they knew the children were located somewhere close by, and ran inside with guns drawn and pointed while screaming curse words (PSAMF ¶¶ 28, 31-32, 34-35)(undisputed);

- Egan and Cappello consecutively pointed their firearms at close range directly at the heads and bodies of Jack and Peter when officers had immediately perceived that they were fully compliant, young children who did not pose a hint of danger (PSAMF ¶¶ 44-47);

- All officers knew young children were close by in the apartment and yet Cappello pointed his rifle directly at Peter and Jack's father, Mr. Mendez, in front of Peter while he watched from behind the broken apartment front door (PSAMF ¶¶ 28, 36, 38);

- Egan and Cappello saw young children immediately in front of them and yet they pointed firearms directly and at close range at Peter and Jack's mother, Mrs. Mendez, while Peter was next to her and while she held Jack in her arms (PSAMF ¶¶ 44-47); and

- Sehner handcuffed Mr. Mendez, paraded him handcuffed in front of Jack and Peter, and confined him handcuffed in front of the boys for ten minutes, even though he was immediately and fully compliant at all times (PSAMF ¶¶ 39, 49, 55, 57, 59, 61)(undisputed).

It is difficult to imagine behavior more extreme and outrageous than police officers pointing guns directly at a 5- and 9-year-old children at close range, and it simply cannot be tolerated in a civilized society. Defendants' argument that a jury could never find such conduct extreme and outrageous is morally absurd and was recently roundly rejected on highly similar facts.[59] (Memo. at 48).

---

Amendment claims where director of DCFS allowed children to be placed in foster homes separate from their siblings).

[59] *Archie v. City of Chicago*, 2020 U. S. Dist. LEXIS 176221, *22. In response to the same argument that the same attorneys make here, Judge Gettleman wrote:

Second, there is copious evidence from which a reasonable jury could infer that the officers intended to inflict or knew were highly likely to inflict distress on Jack and Peter because:

- Cappello and Egan were aware they had failed to corroborate the target's address or any other information provided by an untested John Doe, so they knew the probability of hitting the wrong residence was high (PSAMF ¶¶ 4-6, 8-9, 12, 14, 16-20, 22);

- all of the officers knew they were going to encounter young children in the apartment (PSAMF ¶ 28);

- all of the officers knew that young children are especially susceptible to emotional distress (PSAMF ¶ 64);

- all of the officers knew they had a clearly established legal duty to not create a situation that placed the children in physical danger or harmed their emotional well-being;

- All of the officers were aware they were going to make a forced and violent entry that included not knocking or announcing to the occupants, ramming the door open, having guns drawn and pointed, and screaming commands (PSAMF ¶¶ 31-33, 35);

- Egan and Cappello clearly perceived young children in front of them before they pointed their guns at Jack and Peter (PSAMF ¶¶ 44-47); and

- Egan and Cappello clearly perceived young children in front of them before they pointed their guns at their mother, Mrs. Mendez (Id.).

Third, defendants' actions caused severe emotional distress for all plaintiffs, especially the children. (PSAMF ¶¶ 36, 45-49). Finally, there is evidence officers consciously disregarded the obvious danger posed by their conduct above to plaintiffs' physical safety and emotional well-being, including the risk that the guns could discharge and the traumatic distress that would likely result

---

Holding a prone, unarmed fourteen-year-old girl at gunpoint while she begs for life and cries for her mother might or might not be routine for officers executing search warrants, but their doing so would violate more than a few laws and would outrage anyone living in a civilized society with any sense of decency. Such conduct is extreme. Breaking down an apartment door and taunting a crying mother of three children, ages fourteen, eleven, and seven, while shattering their belongings, is also extreme. Plaintiffs' allegations easily raise an inference that the officers are liable for intentional infliction of emotional distress.

*See also*, *Tate v. City of Chicago*, 2020 U. S. Dist. LEXIS 213712, at *25.

56

from seeing guns pointed at them and at their mother and father. 745 ILCS 10/2-202; *Owusu v. Grzyb*, 749 F. Supp. at 1390. A jury could infer defendants acted willfully and wantonly.

### G. The Material Facts for Mr. Mendez's Count VII, Battery, Are Undisputed for Plaintiffs

The objective, undisputed evidence shows that defendant officers Cappello and Sehner committed batteries against Mr. Mendez when they handcuffed him when it was unreasonable to do so initially and when they continued to keep him handcuffed far longer than necessary. (PSAMF ¶¶ 39, 49-61). In Illinois, police excessive force can amount to a battery. *Amos v. State*, 55 Ill. Ct. Cl. 368, 379 (Ill. Ct. Cl. May 8, 2003). An officer commits a battery if (1) he acts intending to cause a harmful or offensive contact to a person, and one results or (2) he simply engages in "the unauthorized touching of another's person." *Cohen v. Smith*, 269 Ill. App. 3d 1087, 1090 (1995).[60] In other words, a battery can arise from *contact* that is harmful or offensive, even if the contact was not intended to be harmful or offensive. *Pechan v. DynaPro, Inc.*, 251 Ill. App. 3d 1072, 1084 (2d Dist. 1993); *Bakes*, 2011 IL App (1st) 101646, ¶ 21. As with assault, a claim of battery against a police officer is premised on a use of force or a touching that is not authorized because it is excessive or unnecessary under the circumstances. Summary judgment is denied to police officers where there is evidence that they committed a battery by using unauthorized force, including the unreasonable application of handcuffs. *Karkoszka v. Dart*, No. 13 C 1635, 2016 U.S. Dist. LEXIS 4454, at *5-6, *16-18 (N.D. Ill. Jan. 14, 2016).[61]

---

[60] See also *Gaskin v. Goldwasser*, 166 Ill. App. 3d 996, 1011-1012 (1988); *Bakes v. St. Alexius Med. Ctr.*, 2011 IL App (1st) 101646, ¶ 21, ¶ 23; *Boyd v. City of Chicago*, 378 Ill. App. 57, 69 (1st Dist. 2007); *Fiala v. Bickford Senior Living Grp, LLC*, 2015 IL App (2d) 150067, ¶ 20; *Curtis v. Jaskey*, 326 Ill. App. 3d 90, 93 (2001).

[61] *See also Horan v. City of Chi.*, No. 09 C 0505, 2010 U.S. Dist. LEXIS 72633, at *16-18 (N.D. Ill. July 16, 2010)(officers struck plaintiff in the face while he was on the ground, handcuffed him, and then dragged his face across the ground and hung him on a wrought iron fence); *McCauley v. Sinnot*, No 13 CV 522, 2014 U.S. Dist. LEXIS 152429, at *3-4, *8-9 (N.D. Ill. Oct. 23, 2014)(officer grabbed the plaintiff's arm and pulled it upwards causing the plaintiff's shoulder to fracture, despite plaintiff telling officer that it was unnecessary to do so because he was not resisting); *Coleman v. City of Chi.*, No. 09 C 6700, 2011 U.S. Dist. LEXIS 43675, at

### 1. The Use of Handcuffs Was Unreasonable

The use of handcuffs when executing a search warrant can be unreasonable. Police officers have a "*limited* authority to detain the occupants of the premises while a proper search is conducted" pursuant to a valid search warrant. *Michigan v. Summers*, 452 U. S. 692, 705 (1981) (emphasis added). This "limited" authority to detain is always circumscribed by the standard of reasonableness. *Stainback v. Dixon*, 569 F. 3d 767, 772 (7ᵗʰ Cir. 2009). In executing a search warrant, officers may take reasonable action to secure the premises and to ensure their own safety, and the test of whether those measures are reasonable under the Fourth Amendment is an objective one. *Los Angeles County v. Rettele*, 550 U. S. 609, 614 (2007). For example, people may not be detained incident to a search for an unreasonable length of time under the circumstances. *Id.*; *Michigan v. Summers*, 452 U. S. at 705, note 21; *Mena v. City of Simi Valley*, 226 F. 3d 1031, 1039-1041 (9ᵗʰ Cir. 2000). In particular, the use of handcuffs is only reasonable when "the governmental interests outweigh the marginal intrusion on a detainee's liberty." *Muehler v. Mena*, 544 U.S. 93, 99, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005). It may not be reasonable to detain and/or handcuff and/or search people present on scene who are *not the targets of the warrant*. *Archie v. City of Chicago*, 2020 U. S. Dist. LEXIS 176221, *16 (officers had little need to handcuff Archie when she was not the subject of the search warrant and did not present a threat).⁶² The use of guns and/or handcuffs to detain people during a search can be unwarranted. *Day v. Wooten*, 947 F. 3d 453, 461-63 (7ᵗʰ Cir. 2020)(collecting cases)(officers violate the Fourth Amendment when they handcuff detainees, especially persons who

---

*16-17 (N.D. Ill. Apr. 22, 2011)(Officer intentionally applied handcuffs on plaintiff in a way to cause pain and then refused to remove them); *Martinez v. Dart*, No. 19 C 4359, 2021 U.S. Dist. LEXIS 145832, at *10-11 (N.D. Ill. Aug. 4, 2021)(officer struck plaintiff, who was on the ground, with enough force to drive a stick through plaintiff's ear).

⁶² *See also Ingram v. City of Columbus*, 185 F. 3d 579, 592 (6ᵗʰ Cir. 1999)(handcuffing, at gunpoint, occupants of house police entered in pursuit of alleged drug dealer was not justified where police had no reason to fear for their personal safety).

present little risk of flight or threat of injury).  Similarly, in Illinois the use of handcuffs is not

justified on grounds of officer safety where police have no indication that the individual is armed.

*People v. Johnson*, 408 Ill. App. 3d 107, 113 (1ˢᵗ Dist. 2010).  Thus, handcuffing when executing a

search warrant can be unreasonable *even when it does not cause pain*.[63]

      The facts defendants faced upon entering plaintiffs' apartment did not authorize

them to handcuff Mr. Mendez.  Officers expected that the targets would *not* be armed.  (PSAMF ¶

13).  The moment that Cappello and Sehner entered and saw Mr. Mendez in the kitchen, they

immediately saw that he was not the bald, African American male target.  (PSAMF ¶¶ 22, 28, 50-51).

They also saw that he was immediately and fully compliant from their first command, posing no

threat to officer safety at any time.  (PSAMF ¶ 39).  And he was never a suspect.  (PSAMF ¶ 2).  He

confessed to have been smoking a joint, but defendant officers did not even care.  (Id.).  That day, as

usual, Mr. Mendez carried a tiny penknife in his pocket that he immediately disclosed to officer

Sehner upon being asked, all as shown on BWC.  (PSAMF ¶ 39).  There was no reason for officers

to cuff Mr. Mendez initially.

      Second, there were not only no facts that officers confronted that authorized the

officers to keep Mr. Mendez handcuffed, and there were legal reasons to uncuff him quickly.  As

shown above, all officers knew within four (4) minutes that the targets were not present, that they

had no connection to the apartment, and that the apartment had been wrongly included within the

search warrant.  (PSAMF ¶¶ 50-61).  After that, there was no objective reason to keep Mr. Mendez

cuffed.  *L.A. County v. Rettele*, 550 U. S. 609, 615 (2007)(holding search warrant detainees longer than

necessary violates their rights); *Archie v. City of Chicago*, 2020 U. S. Dist. LEXIS 176221, *16

---

[63] "Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain *or are imposed for a prolonged and unnecessary period of time*…."  *Rettele* at 614 (internal citations omitted)(emphasis added); *Wordlow v. Chicago Board of Education*, No. 18-cv-8040, 2018 U.S. Dist. LEXIS 199701, at *20 (N.D. Ill. Nov. 26, 2018); *Jones v. Webb*, No. 92 C 20198, 1999 U.S. Dist. LEXIS 15828, n. 8 (N.D. Ill. Oct. 28, 1993).

("whatever governmental interest there was in keeping [plaintiff] in handcuffs evaporated within minutes when the officers realized that the target… was not in the apartment and there were no signs of him ever being there").  Moreover, by keeping Mr. Mendez handcuffed when there was no threat, officers were inflicting distress on the children, who believed officers were taking him to jail. (PSAMF ¶ 49).

Finally, since defendants entered plaintiffs' apartment without probable cause, the act of handcuffing Mr. Mendez, even if it may have been reasonable pursuant to a valid warrant, was an unauthorized touching.  *Jacobs v. City of Chicago*, 215 F. 3d at 772; *Cain v. Rinehart*, 2021 U. S. Dist. LEXIS 192470, at *13 ("the *Summers* rule allowing for detention of an occupant applies to a *proper search*")(emphasis added).  Since there is no genuine issue as to the circumstances in which Mr. Mendez was handcuffed and kept handcuffed, the Court should grant summary judgment for plaintiffs.

### H.  The Material Facts for Plaintiffs' Counts V and VIII, § 1983 and Illinois False Arrest/False Imprisonment, Are Undisputed for Plaintiffs

The objective, undisputed evidence shows that defendants falsely arrested and/or imprisoned all plaintiffs when they unreasonably detained them, handcuffed Mr. Mendez, and continued to keep plaintiffs detained and Mr. Mendez cuffed long after officers knew they was a risk they were in an apartment wrongly included in the search warrant.  (PSAMF ¶¶ 36, 39, 43, 49, 50-61).  Under Illinois law, false arrest is the unlawful restraining of a person's liberty or movement caused by another "without reasonable grounds to think that a crime is being committed." *Schroeder v. Lufthansa German Airlines*, 875 F. 2d 613, 621 (7th Cir. 1989).[64]  A defendant is liable when "plaintiff was restrained or arrested by the defendant, and… defendant acted without having reasonable

---

[64] See also *Fort v. Smith*, 85 Ill. App. 3d 479, 481 (1980); *Vincent v. Williams*, 279 Ill. App. 3d 1, 5-6 (1996).

grounds [or probable cause] to believe that an offense was committed by the plaintiff." *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 474 (1990).[65]  Police officers are liable for false imprisonment when they utilize the power to imprison without authority of law or without any of the forms or processes usually and necessarily employed. *People v. McGurn*, 341 Ill. 632, 637 (1930).  Claims of false arrest against an officer are premised on a seizure that is unauthorized because it is excessive or without probable cause.  Recently, the court again rejected the City of Chicago's argument that a plaintiff's state law false imprisonment claim should be dismissed merely because the officers were executing a valid warrant at the time.  *Boone v. City of Chicago*, No. 16-CV-11510, 2018 U.S. Dist. LEXIS 28408, *6-7 (N.D. Ill. Feb. 22, 2018).  Summary judgment is denied where there is evidence that officers falsely arrested someone by seizing, handcuffing and detaining them and maintaining them in that state.[66]  [67]

---

[65] *See also Mark v. Furay*, 769 F. 2d 1266, 1269 (7th Cir. 1985).

[66] *Williams v. City of Chi.*, No. 16 C 2303, 2018 U.S. Dist. LEXIS 145107, at *32 (N.D. Ill. Aug. 27, 2018)(denying summary judgment on false arrest claim where officers detained plaintiff while executing warrant based on a tip from a confidential informant; plaintiff proved he was not the target but officers continued detaining him and executing the warrant); and *Pearce v. Thiry*, No. 08 C 4483, 2009 U.S. Dist. LEXIS 92204, at *21-23 (N.D. Ill. Oct. 1, 2009) (denying summary judgment on § 1983 false arrest claim where officers relied on information from an arrestee to procure search warrant and detained plaintiffs at their home).

[67] *See also  s v. City of Chi.*, NO 12 C 10056, 2014 U.S. Dist. LEXIS 107660 (denying summary judgment on false arrest claim where parties disputed whether officers planted drugs in plaintiff's bedroom during warrant execution in order to arrest plaintiff); *Collier v. City of Chi.*, No. 14 C 2157, 2015 U.S. Dist. LEXIS 113336, at  (N.D. Ill. Aug. 26, 2015) (denying summary judgment on false arrest claim where officers executed warrant based on information from a John Doe informant and arrested plaintiff at the target location despite a lack of evidence); *Kraman v. Hoskinson*, NO. 16 C 4960, 2018 U.S. Dist. LEXIS 39457, at *9-13 (N.D. Ill. Mar. 12, 2018)(officer detained plaintiff during a traffic stop after reasonable suspicion for the stop had dissipated); *Cusack v. City of Des Plaines*, No. 06 C 2507, 2007 U.S. Dist. LEXIS 63717, at *14-18 (N.D. Ill. Aug. 29, 2007)(officers arrested plaintiff without probable cause); *Davis v. Thillman*, No. 93 C 3335, 1994 U.S. Dist. Lexis 368, at *15-17 (N.D. Ill. Jan. 18, 1994)(same); and *Lark v. City of Evanston*, No. 16 C 4630, 2017 U.S. Dist. LEXIS 12653, at *15-17 (N.D. Ill. Jan. 31, 2017)(officers restrained plaintiffs and kept them on their front porch without probable cause).

Because defendants entered plaintiffs' apartment, seized and detained them without a valid warrant or other probable cause, the acts of doing so, even if they would have been reasonable under a valid warrant, constituted false arrest and/or imprisonment of all plaintiffs. *Jacobs v. City of Chicago*, 215 F. 3d 758, 772 (7th Cir.); *Cain v. Rinehart*, 2021 U. S. Dist. LEXIS 192470, at *13. Because defendants' warrant lacked probable cause, their seizure of plaintiffs was unauthorized. Id.

Second, even if defendants entered plaintiffs' residence with probable cause, they were not authorized to seize and detain any plaintiff in the manner that they did. Defendant officers expected that the targets would *not* be armed or dangerous. (PSAMF ¶ 13). Within two to four minutes of entering the apartment, defendants immediately concluded that plaintiffs did not resemble the bald African American or the tall, Latino female targets. (PSAMF ¶¶ 28, 30, 50-52). Moreover, plaintiffs were never suspects. (Id. ¶¶ 2, 54). Finally, officers saw that all plaintiffs immediately and fully complied with their directives and that they posed zero threat to officer safety. (PSAMF ¶¶ 39, 43-47). In these circumstances, it was objectively unreasonable for officers to seize plaintiffs at gunpoint, handcuff Mr. Mendez, and detain and confine them in the living room.

Third, defendant officers were not authorized to continue detaining plaintiffs or to keep Mr. Mendez cuffed after they were aware, within four minutes, of the risk that the search warrant had been drawn for the wrong apartment. (PSAMF ¶¶ 50-61); *Jacobs*, 215 F. 3d at 772.; *Archie v. City of Chicago*, 2020 U. S. Dist. LEXIS 176221, *16. As shown, within four (4) minutes, all defendants knew they were in the wrong apartment wrongly and were required to withdraw and leave immediately. (Id.). Additionally, it was obvious that the fully compliant Mr. Mendez posed no threat to officer safety as defendants searched the apartment. (PSAMF Exhibits Q and S-U; PSAMF ¶ 55 ("maintaining Mr. Mendez in handcuffs was contrary to generally accepted… legal mandates trained to officers for application in high-risk entries")). Officer Sehner, who had handcuffed Mr. Mendez initially, guarded the handcuffed Mr. Mendez and other plaintiffs in the living room and

acknowledged out loud he was not a target or suspect, nevertheless did not uncuff Mr. Mendez or advise plaintiffs they were free to move about. (PSAMF ¶¶ 57, 61). Nor does Egan order Mr. Mendez uncuffed or advise plaintiffs they were free until seconds before officers depart. (PSAMF ¶¶ 54, 55, 59, 61). Defendants' delay in uncuffing Mr. Mendez and releasing plaintiffs from confinement was not objectively reasonable, and defendants are not entitled to qualified immunity on plaintiffs' § 1983 false arrest claim because it was clearly established that officers 1) could not seize and detain people in a residence they did not have probable cause to enter and 2) could not continue to detain people after their probable cause had evaporated "even where no formal arrest is made." *Jacobs*, 215 F. 3d at 772.

## I.    The Material Facts for Plaintiffs' Count X Trespass Claim Are Undisputed

Because there is evidence that all defendant officers both entered and remained in plaintiffs' apartment when not legally authorized to do so, a reasonable jury could find that defendants committed two counts of trespass. Under Illinois law, a person commits a trespass by entering "onto the land of another without permission, invitation, or other right." *Schweihs v. Chase Home Fin. LLC*, 2021 IL App (1st) 191779, ¶ 37. A police officer who enters a home without a warrant or an exception to the warrant requirement is not authorized to be there and commits trespass. *Holt v. Lewsader*, 2020 U.S. Dist. LEXIS 2582456, at *77; *Finsel v. Hartshorn*, 200 F. Supp. 2d 960, 971 (C.D. Ill. 2002). Summary judgment on a trespass claim is denied to such an officer. *Callahan v. Aldridge*, 2011 U.S. Dist. LEXIS 12756 N. D. Ill. Feb. 9, 2011) at *16-18. Officers can also be liable for trespass when they enter onto land pursuant to a search warrant that was invalid for lack of probable cause; if officers obtained the warrant through wrongful conduct (of which the judge was not aware), then the warrant was invalid, and the landowner can prove a trespass.[68] A judge's signature

---

[68] *Lyons v. City of Chicago*, 2021 U.S. Dist. LEXIS 190453, *12-13 (N. D. Ill. Sept. 30, 2021); *Tate v. City of Chicago*, 2020 U. S. Dist. LEXIS 213712, at *20, note 2; *Archie v. City of Chicago*, 2020 U. S. Dist. 176221, at

on a search warrant does not "immunize" defendant officers from liability for trespass to land. *Skierkewiecz* at \*936; *Malley v. Briggs*, 475 U.S. at 344-45. Moreover, an officer commits a trespass when he exceeds the scope of a valid warrant.[69] Here, defendants trespassed in plaintiffs' apartment twice. First, defendants' search warrant was invalid because defendants did not corroborate an untested John Doe's information, including the target location, and failed to disclose to Judge Burns facts that undermined probable cause. (PSAMF ¶¶ 4-6, 8, 9 12, 14, 16, 18-20, 22-27). Because defendant officers entered plaintiffs' apartment on an invalid search warrant, they were not legally authorized to enter or search and committed a trespass. (Id. ¶ 31). Second, within two-to-four minutes after entry, once defendant officers became aware of the risk that they were in an apartment wrongly included in the warrant, such that they were not authorized to be there, they had a duty to cease searching immediately and leave. (PSAMF ¶¶ 50-61). When they remained and continued searching, they committed a trespass. Finally, because defendants consciously disregarded the obvious danger posed to innocent citizens, including children, by executing a search warrant based entirely on uncorroborated information from an unreliable John Doe, defendants are not entitled to tort immunity for trespass. Defendants acted willfully and wantonly.

### J. Summary Judgment Must Be Denied as to Counts X and XI

Because the defendant officers were employees of the City of Chicago who acted within the scope of employment, because there is evidence from which a reasonable jury could find they acted willfully and wantonly, and to the extent that Counts VI-IX survive summary judgment, all defendants must be denied summary judgment on counts X and XI.

## V. CONCLUSION

---

\*23; *Ortiz v. City of Chicago*, 686 F. Supp. 2d 782, 789; *Skierkewiecz v. Gonzalez*, 711 F. Supp. 931, 935-936 (N. D. Ill. 1989).

[69] *Gill v. United States*, No. 19-12441-NMG, 2021 U.S. Dist. LEXIS 18117, at \*25 (D. Mass. Jan. 29, 2021); *De La Torre v. City of Renton*, 164 F. Supp. 3d 1275, 1285 (W.D. Wash. 2016).

For at least the reasons set forth above, the Court should deny defendants' motion for summary judgment in its entirety and grant plaintiffs' cross motion for summary judgment where there is no genuine issue of material fact.

Respectfully submitted,

/s/ Al Hofeld, Jr.
Al Hofeld, Jr.

*Plaintiffs' counsel*
Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, IL 60602
Office:  (773) 241-5844
Fax:  (312) 372-1766
Email:  al@alhofeldlaw.com

## NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Al Hofeld, Jr., attorney for plaintiffs, hereby certify that on December 30, 2021, filing and service of the foregoing ***Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment*** was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

/s/ Al Hofeld, Jr.
Al Hofeld, Jr.

*Plaintiffs' counsel*
Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
30 N. LaSalle Street, Suite #3120
Chicago, IL 60602
Office:  (773) 241-5844
Fax:  (312) 372-1766
Email:  al@alhofeldlaw.com