**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| HESTER MENDEZ, et al | ) | Case No. 18-cv-5560 |
|  | ) |  |
| Plaintiffs, | ) | Judge Steven C. Seeger |
|  | ) |  |
| v. | ) | Magistrate Judge Young B. Kim |
|  | ) |  |
| THE CITY OF CHICAGO, et al | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## DEFENDANTS' JOINT MOTION TO BAR PLAINTIFFS' EXPERTS

NOW COME Defendants, OFFICERS JOSEPH T. CAPELLO IV (#10626); LIEUTENANT SAMUEL DARI (#603); MICHAEL W. DONNELLY (#13784); SERGEANT RUSSELL A. EGAN (#998); MICHAEL J. GUZMAN (#15911); JOSE M. HERNANDEZ (#15925); and ERIC M. SEHNER (#11641), ("Defendant Officers") by and through their attorneys, Querrey & Harrow, Ltd., and Defendant CITY OF CHICAGO, by and through one of its attorneys, Marion C. Moore, Chief Assistant Corporation Counsel, (collectively, "Defendants"), for their joint motion to bar Plaintiffs' experts, stating as follows:

## Table of Contents

## Contents

Table of Authorities............................................................................................................ii

INTRODUCTION................................................................................................................1

LEGAL STANDARD..........................................................................................................1

ARGUMENT.......................................................................................................................3

   I.    THE OPINIONS OF JOHN J. RYAN SHOULD BE BARRED. ...........................................3

      A.   Ryan's Opinions are Based on Unreliable Reasoning and Methodology...................................4

      i.   Ryan's Reasoning and Methodology is Unsound Because his Opinions Attempt to Place a Greater Duty on Defendants than the Law Requires…………………………………………4

      ii.   Ryan's Methodology and Reasoning is Unsound Because he Makes Improper Credibility Determinations and Ignores Inconvenient Facts in his Speculative and Conclusory Opinions. ..9

      iii.   Ryan's Analysis of Complaint Registers is Built on Unreliable Methodology.......................11

      iv.   Ryan Provides an Insufficient Basis for his Opinions. ...............................................12

      B.   Ryan's Opinions will not Assist the Trier of Fact and will Prejudice Defendants. ..................14

   II.   THE OPINIONS OF LISA THURAU SHOULD BE BARRED. .........................................15

      A.   Thurau is not Qualified to Testify as an Expert on Police Policy or Childhood Trauma.......15

      B.   Thurau's Opinions are not Relevant to Evaluating any Factual Matters in the Case, and None of her Opinions Concern Matters Beyond the Understanding of the Average Layperson. .............16

      C.   Thurau's Opinions are Inadmissible Legal Conclusions. ..............................................18

      D.   Thurau's Opinions are Unfairly Prejudicial and Confuse the Issues. ....................................19

      E.   Thurau's Opinions Lack Reliable Methodology. ........................................................20

      F.   Thurau Makes Impermissible Credibility Determinations. .............................................20

 III.   THE OPINIONS OF PROF. MAX SCHAZENBACH'S SHOULD BE BARRED. ...........21

      A.   Schanzenbach's Opinions for which he Lacks Qualification should be Barred. ......................21

      B.   Schanzenbach's Methodology is Unreliable. ............................................................23

      C.   Schanzenbach has Insufficient Basis for his Conclusions Relating to "Adequate" Discipline, how Seriously Complaints are Taken, Addressing Problem Officers, Problematic Practices, and Investigation Length.............................................................................................26

      D.   Schanzenbach's Opinions are so Fundamentally Misleading that they are Unhelpful, will Cause Juror Confusion, and will Prejudice the Defendants. ..................................................27

CONCLUSION.................................................................................................................29

## Table of Authorities

### Cases

*Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 869-70 (7th Cir. 2011) ............................................ 9

*Bielsksis v. Louisville Ladder, Inc.* 663 F.3d 887, 893-4 (7th Cir. 2011). .......................................... 2

*Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990).............................................. 16, 17

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)........................................................18

*Connick v. Thompson*, 563 U.S. 51, 61 (2011) .........................................................................10

*Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) ...........................................................3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) .................................... 1, 3, 20, 30

*Davis v. Duran*, 277 F.R.D. 362, 366-67 (N.D. Ill. June 10, 2011)....................................... 18, 19, 30

*DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) ............................................... 21

*Dukes v. Illinois Cent. R. Co.*, 934 F. Supp. 939, 951 (N.D. Ill. 1996) .......................................... 22

*Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1058 (7th Cir. 2018) ..................................................... 5

*Estate of Loury v. City of Chicago*, 2019 WL 1112260 at * 5 (N.D.Ill. March 11, 2019) ................... 15

*Estate of Smart by Smart v. Chaffee*, 2020 WL 7643505 at *14-15 (December 23, 2020 D. Kan) ......... 15

*Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000) ........................................... 18, 19, 21

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997) .............................................................. 2, 20

*Graham v. Connor* ..................................................................................................... 10, 12

*J.K.J. v. Polk County*, 960 F.3d 367, 380 (7th Cir. 2020) ........................................................ 18

*Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) ................................................. 3, 5

*Jones v. City of Chi.*, 856 F.2d 985, 992-93 (7th Cir. 1988) ...................................................... 9

*Jones v. Wilhem*, 425 F.3d 455, 467 (7th Cir. 2005) .............................................................. 8

*Keegan v. Minneapolis* & St. L. R. Co., 76 Minn. 90, 95 (1899) ................................................ 21

*Kenosha v. Heublein*, 895 F.2d 418, 420 (7th Cir. 1990) ......................................................... 29

*Kumbo Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 152 (1999) ................................................ 21

*Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) ............... 30

*Minasian v. Standard Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997) ......................... 2

*Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010) ............................................................ 3

*Muehler v. Mena*, 544 U.S. 93, 98 (2005) ........................................................................... 9

*Nimely v. City of New York*, 414 F.3d 381, 391 (2nd Cir. 2005) ............................................... 20

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 382 (7th Cir. 1986) ................ 21, 30

*Porter v. Whitehall Labs.*, 9 F.3d 607, 616 (7th Cir. 1993) ....................................................... 3

*Richman v. Sheahan*, 415 F. Supp. 2d 929, 941–42 (N.D. Ill. 2006) ......................................... 23

*Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648 (7th Cir. 2011) ................................................. 19

*Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998) ..................... 2

*Sanders v. City of Chicago Heights*, 2016 WL 4417257, No. 13 C 0221, at *6-8 (N.D.Ill. August 19, 2016) ......... 15

*See United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999) ........................................... 2, 22

*Simmons v. City of Chi.*, No. 14 CV 9087, 2017 WL 497755, at *4 (N.D. Ill. Feb. 7, 2017) ................ 9

*Smith v. Ford Motor Co.*, 215 F.3d 713, 720 (7th Cir. 2000) .................................................. 17

*State of Illinois v. City of Chicago*, No. 17 CV 6260 ............................................................. 10

*U.S. v. Johnson*, 125 F. Supp. 2d 308, 311 (N.D. Ill. 2000) ..................................................... 6

*U.S. v. Mamah,* 332 F.3d 475, 478 (7th Cir. 2003) ............................................................. 29

*U.S. v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996) ........................................................... 19

*United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) ................................................... 10

*United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017) .................................................... 18

*United States v. Koerth*, 312 F.3d 862, 867 (7th Cir. 2002) ..................................................... 6

*United States v. Lloyd*, 71 F.3d 1256, 1263 (7th Cir. 1995) ..................................................... 6

*United States v. Singer*, 943 F.2d 758, 751 (7th Cir. 1991) ..................................................... 8

*Wendler & Ezra, P.C. v. American Intern. Group, Inc.*, 521 F.3d 790, 791 (7th Cir. 2008) ............... 30

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ........................... 25

## Statutes

Federal Rule of Civil Procedure 26 .......................................................................................... 2

Federal Rule of Evidence 702 ...................................................................................... passim

## INTRODUCTION

Defendants are challenging three of Plaintiffs' experts in support of their claim that their constitutional rights were damaged by the procurement and execution of a legally valid search warrant at their home. John J. Ryan, Plaintiffs' police practices expert, opines in summary that the officers acted in multiple respects contrary to established law enforcement procedure in procuring and executing the search warrant, and that the City has numerous policies that caused the officers to act in those respects. Lisa Thurau, who heads a non-profit called Strategies for Youth, opines that the City did not sufficiently employ a "trauma-informed" approach to training its officers about interacting with children. Professor Max Schanzenbach, a statistics expert, opines that the statistics as to complaint registers show that any given misconduct complaint against an officer is unlikely to be sustained[1] and therefore the accountability system was a failure. Each of these three experts falls far short of the applicable standard for admissibility for multiple reasons outlined below.

## LEGAL STANDARD

The benchmark for the admissibility of expert testimony has been established by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Rule 702 permits testimony by an expert, or someone with the necessary "knowledge, skill, experience, training, or education," to help the trier of fact "understand the evidence or [] determine a fact in issue. Rule 702. Such a witness may testify when: (1) the testimony is "based on sufficient facts or data," (2) the testimony is "the product of reliable principles and methods," and (3) the witness has "reliably applied the principles and methods to the facts of the case." *Id.* Under *Daubert*, a court should ensure that experts satisfy Rule 702's requirements of reliability and relevance before allowing their testimony.

---

[1] Plaintiffs have retained a fourth expert, Dr. Steven Berkowitz, a psychiatrist who has conducted examinations of Plaintiffs Peter and Jack Mendez. Defendants are not challenging Dr. Berkowitz at this time because he is not relevant to summary judgment, but reserve the right to move *in limine* to limit some of his opinions should this case proceed to trial.

District courts have broad discretion in determining the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). In deciding whether to admit expert testimony, district courts examine whether: (1) the expert is qualified by knowledge, skill, experience, training, or education; (2) the reasoning or methodology underlying the expert's testimony is reliable; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a factual issue. *See Bielsksis v. Louisville Ladder, Inc.* 663 F.3d 887, 893-4 (7th Cir. 2011).

Under Fed. R. Civ. P. 26(a)(2)(B), a party must disclose all opinions to be offered by a specially retained expert as well as the reasons therefore. Expert reports must include how and why the expert reached a particular result, not merely the expert's conclusory opinions. *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998). This is because an expert who supplies only an ultimate conclusion with no analysis supplies nothing of value to the judicial process. *Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997). Experts cannot offer opinions as to the believability or truthfulness of witness testimony. *See United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999).

An expert witness cannot merely present his qualifications alongside his opinion; rather, he must explain why the application of his prior experience to the facts at hand compel his final conclusions. *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010). The Court must ensure that the testimony "assists the trier of fact in understanding the evidence or in determining a fact in issue." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (quoting *Porter v. Whitehall Labs.*, 9 F.3d 607, 616 (7th Cir. 1993)). An expert cannot offer legal opinions or conclusions. *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013).

**ARGUMENT**

**I.      THE OPINIONS OF JOHN J. RYAN SHOULD BE BARRED.**

Plaintiffs' expert John J. Ryan ("Ryan") is a former police captain with the Providence, Rhode Island police department with 20 years of law enforcement experience. He is a licensed attorney who has taught graduate courses in the Administration of Justice and written manuals for police officers and has trained thousands of police officers from various agencies. Defendants thus do not challenge Ryan's qualifications under *Daubert*, generally, to speak to police practices. A copy of Ryan's 26(a)(2) report ("Ryan Report"), which spans 164 pages, is attached hereto as Exhibit ("Ex.") A. A copy of Mr. Ryan's Deposition ("Ryan Deposition") is attached hereto as Ex. B. A copy of Ryan's Rebuttal Report ("Ryan Rebuttal"), which spans 26 pages, is attached hereto as Ex. C.

Ryan offers a variety of opinions that the actions of the Defendant Officers were allegedly inconsistent with generally accepted policies, practices and legal mandates, including the procurement of the warrant, the supervisors' oversight of the procurement of the warrant, how the warrant was executed, that guns were pointed at the Plaintiffs, the handcuffing of Mr. Mendez, and the officers' remaining in the Mendez apartment for as long as they did.  Ryan Report at, *e.g*, ¶¶ 428, 438, 440, 446, 449, 450, 460, 488, 499, 503, 504.   Ryan further opines that the City has a number of allegedly widespread customs and practices, including improper searches of residences, improper use of force on children, a failure to direct officers to consider the vulnerabilities of children, failure to train officers or create policies to properly treat children during enforcement actions. *Id.* at, e.g., ¶¶ 505, 531. Ryan purports to base these opinions "on [his] specialized background, education, training and experience as well as [his] continued research, authoring, auditing, consulting and training on law enforcement practices nationwide." *Id.* at, *e.g*, ¶¶ 428, 440, 446, 450, 460, 488, 499, 505, 531.

However, most, if not all, of Ryan's opinions suffer from shortcomings that should result in his being barred in this case. Ryan's reasoning and methodology is suspect in many ways and his

opinions will not be helpful to the jury because they either are based on materials readily within the understanding of laypeople or because they either will serve to confuse the issues. Because Ryan lays out numerous opinions in both his report and rebuttal, spanning hundreds of paragraphs and over 150 pages, it would be unwieldly to address every single opinion in detail in this brief. Instead, Defendants attack general categories of opinions. To aid the Court, however, a more detailed list of each opinion and Defendants' objections is laid out in a document attached as Ex. D. Defendants do not seek for the Court to rule on each item in the list, but rather add this as an exhibit for clarification on the categories of opinions they seek to exclude.

### A. Ryan's Opinions are Based on Unreliable Reasoning and Methodology.

#### i. Ryan's Reasoning and Methodology is Unsound Because his Opinions Attempt to Place a Greater Duty on Defendants than the Law Requires.

Throughout his Report, Ryan attempts to impose greater obligations on the Defendants than the law requires. This is true, among other areas, in his opinions relative to the investigation and procurement of the search warrant (Ryan Report at ¶¶ 435, 438), the no knock entry (¶¶ 450-455), the cuffing of Gilbert Mendez (¶¶ 488-497), and supervisors' duties (¶¶ 440-449). He similarly seeks to impose greater duties on the City in terms of training officers and instituting policy than is required by law. *Id* at, *e.g.*, ¶¶ 505, 531. Despite repeating that his opinions are based on various factors, Mr. Ryan failed in his report and in his deposition to provide any support for these positions beyond his say-so. Indeed, when pressed at his deposition, he had to admit that there was no Supreme Court case supporting many of his criticisms of the officers' or the City's actions. Ryan Deposition at, *e.g.*, pp. 77-78 (admitted no Supreme Court case says officers can't have guns out while clearing a residence or cannot serve search warrants when children may be present), pp. 260-261 (admits there is no legal requirement to arrest parents outside the view of their children or to offer specialized training

programs as to children's vulnerability to trauma). Defendants compare and contrast Mr. Ryan's opinions with the applicable legal standards in various areas below.

By suggesting that the officers and the City have far greater responsibilities than they do under the law, Mr. Ryan's methodology and reasoning is unsound. Moreover, because he is effectively offering legal conclusions in these opinions, they should be barred. *Jimenez*, 732 F.3d at 710, 721. Because Mr. Ryan is a licensed attorney, there is a much greater danger that his statements that fail to address the relevant case law will confuse the jury.

### 1.    Procurement/John Doe

In brief, Ryan opines that Defendant Cappello and the other Defendant Officers were under a duty to corroborate the informant's information, that the fact that the informant had not provided information before meant that he was not reliable, and that any reasonable officer would know that he had not done sufficient work to corroborate the warrant. *Id.* at ¶¶ 428, 429, 436, 438.

All this, however, misstates what the legal requirements are to procure a search warrant. As the *Edwards* Court reasoned, "statements from an informant of unknown reliability may serve to establish probable cause 'if, under the totality of the circumstances, a reasonable person might consider that the statements are worthy of credence.'" *See Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1058 (7th Cir. 2018) (quoting *United States v. Koerth*, 312 F.3d 862, 867 (7th Cir. 2002);*See also U.S. v. Johnson*, 125 F. Supp. 2d 308, 311 (N.D. Ill. 2000);*United States v. Lloyd*, 71 F.3d 1256, 1263 (7th Cir. 1995).

Here, the informant was brought before the judge. (Ryan Deposition p. 44). Ryan acknowledged that Officer Cappello testified that he told the judge about the J. Doe's arrest the day before and admitted that bringing the informant before the judge would give the judge an opportunity to ask questions of the informant, (Ryan Deposition, p. 36-37). Significantly, great deference is given to the probable cause finding made by the judge who evaluated the warrant application, and it will be

upheld if "there is a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Id.*

With respect to Officer Cappello and Sgt. Egan's investigation to corroborate the information provided by the J. Doe, Ryan agreed in his deposition that the large amount of narcotics found in the informant's trunk suggested he was in the business of distributing narcotics. (p. 59). Of note, the J. Doe provided information regarding Curtis Roberts that was consistent with gang intelligence known to Officer Capello, a fact that Ryan completely ignores. Ryan did admit that a controlled buy would be extremely difficult with an informant who had already tried to flee the police. (Ryan Deposition, pp. 58-59). He further conceded that the J. Doe identified both Curtis Roberts and Patricka Cavazos from their booking photographs that were pulled from the CPD database, and that he identified the second floor as the floor where Curtis Roberts lived when Officers drove him past the building. (Ryan Deposition, p. 60). Finally, he agreed that Officer Capello looked through a realtor website to get the interior layout of the building. (p. 60). However, he ignored Cappello's testimony that the layout matched the pathway the J. Doe told them to take to get to the second-floor apartment. (Ryan Deposition, p. 60).

Rather than acknowledging that Cappello and Egan's investigation was sufficient under the law, Ryan instead criticizes certain investigative steps they did not take. The law, however, does not require an officer to take particular steps to corroborate information and certainly does not require the investigative steps Ryan proposes. In fact, Ryan's deposition testimony highlights the futility of such investigative steps. He admitted that he has never attempted to obtain utility information in Cook County, and he does not know how long it typically takes to obtain that type of information. (Ryan Deposition, p. 62). Even more telling, he completely ignores the fact that a People's Gas response obtained in this case lists "NYLAS Yoga Services", and not Curtis Roberts or Patricka Cavazos, as the third-floor apartment resident. (Ryan Deposition, p. 63). With respect to his opinion that officers

6

could have contacted the landlord, Ryan agrees that would widen the circle of who knows about the warrant investigation. (Ryan Deposition, p. 64). Next, although Ryan is critical of the fact that Officers did not check the mail, he completely ignores how difficult it was to open the exterior door to the building and he ignores that Sgt. Egan went up to the door but was unable to see names on the mailboxes or loose mail. (Ryan Deposition, p. 57-58).

One of the biggest details that Ryan ignores is the fact that Curtis Roberts was indeed tied to the building located at 3557 S. Damen. He even goes so far as to downplay Ms. Mendez's statements regarding the fact that Curtis Roberts lived on the third floor because his connection to the building undermines Ryan's opinions regarding the search warrant investigation. (Ryan Deposition, p. 52). In fact, he concedes that if Curtis Roberts lived on the third floor of 3557 S. Damen, the official I-Clear or CPD database did not have that information. Tellingly, Ryan has not identified any database, official or otherwise, for which the result would have been any different. Mr. Ryan's opinions are further undermined by his concession that criminals can reside in more than one location, (Ryan Deposition, p. 54), and don't want to be found, particularly when they have warrants. (Ryan Deposition, p. 55).

In short, Ryan's opinions regarding the J. Doe and the procurement of the search warrant should be barred because they attempt to impose a higher duty of care on the officers than what the law requires and because they fail to take into account critical facts.

2.      Failure to Knock/Exigent Circumstances

Similarly, Mr. Ryan opines that the circumstances did not justify the officers failing to knock on the Mendez's door. Ryan Report at ¶ 450-458. However, case law establishes that the existence of exigent circumstances can excuse an officer's failure to knock. *United States v. Singer*, 943 F.2d 758, 751 (7th Cir. 1991). Exigent circumstances include "a particularized risk to the officers executing a warrant" and the risk that the occupants of the residence will destroy evidence before the officers are able to enter. *Jones v. Wilhem*, 425 F.3d 455, 467 (7th Cir. 2005). Ryan agrees that Officers outside the

building observed who they believed to be a Hispanic female looking out the target second floor window down on their activities and that Ms. Mendez testified she looked out the second-floor window and saw officers looking at her. (Ryan Deposition, p. 82). Moreover, Ryan notably agrees that the risk of danger to officers' safety increases when a target is tipped off as to police presence coming to the building. (Ryan Deposition, p. 84). Ryan's opinions on this issue, therefore, are contrary not only to the applicable case law but also the circumstances Ryan admits the Officers encountered.

3.      Handcuffing/Detention

Ryan opines that maintaining Mr. Mendez in handcuffs for approximately 10 minutes during the incident was contrary to generally accepted police practices. Ryan Report at ¶¶ 488-498. However, handcuffing Mr. Mendez for the brief 10 minutes while Officers were executing the valid search warrant was constitutional. Police officers' authority to detain the occupants of a residence incident to a search is categorical. *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (finding that defendant officers acted reasonably when they handcuffed the plaintiff in a garage for *two to three hours* during the execution of the search warrant). Officers may "detain occupants of the premises without probable cause or particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers." *Simmons v. City of Chi.*, No. 14 CV 9087, 2017 WL 497755, at *4 (N.D. Ill. Feb. 7, 2017) (citing *Michigan v. Summers,* 452 U.S. 692, 702-705 (1981); *Muehler*, 544 U.S. at 98). Ryan's opinion, therefore, runs afoul of clearly established law.

4.      Supervisory Responsibilities

Ryan opines that Defendants Egan and Dari fell short of the acceptable law enforcement practices for supervisors. Ryan Report at ¶¶ 440-449. However, to be found liable under supervisory liability, supervisors must act either knowingly or with deliberate, reckless indifference in that they "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 869-70 (7th Cir. 2011) (quoting *Jones*

*v. City of Chi.*, 856 F.2d 985, 992-93 (7th Cir. 1988)) (internal quotations omitted). Supervisors who are merely negligent, or even grossly negligent, are not liable under § 1983. *Jones*, 856 F.2d at 992. *Id.*

In reaching his opinions, Ryan blatantly ignores that Lt. Dari did not review and approve the search warrant until *after* it had been approved by an Assistant Cook County State's Attorney and the judge. Notably, he ignores the fact that the time stamps on the search warrant signatures of the ASA, the Judge, and Lt. Dari show that Lt. Dari approved the search warrant after the assistant state's attorney and judge. Mr. Ryan even admitted that he was "not so clear on that" regarding the clear testimony and SW documentation that Lt. Dari was given the SW after it had already been approved by both the ASA and the judge. (Ryan Deposition, p. 121-22).

5.      City Policies

Ryan opines that the fact that the City is under a Consent Decree suggests that the City's practices were deficient. Ryan Report at ¶¶ 487, 508. However, the Consent Decree by its own terms is not meant to be used to "create, establish or support a claim of liability." *See State of Illinois v. City of Chicago*, No. 17 CV 6260 at Dkt. 703, p. 219.  Ryan further opines that various of the City's policies, including a specific written policy that says when pointing officers may point firearms, are insufficient. Ryan Report at ¶¶ 486. But that fails to recognize that the leading case on use of force, *Graham v. Connor*, specifically states that the use of force cannot be mechanically defined. Moreover, his opinion fails to recognize that the Supreme Court has held that a municipality's culpability for deprivation of rights is "at its most tenuous" with failure-to-train claims. *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

ii.      *Ryan's Methodology and Reasoning is Unsound Because he Makes Improper Credibility Determinations and Ignores Inconvenient Facts in his Speculative and Conclusory Opinions.*

While feigning neutrality, Ryan makes numerous improper credibility determinations and turns a blind eye to facts in the record that contradict his desired outcome. Credibility determinations are not something that are within the purview of admissible expert testimony. The jury "does not need

an expert to tell it whom to believe" and such determinations should be left only to them. *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991).

Defendants have already discussed some examples of Ryan purposely ignoring facts above. One of the central issues of the case is whether any officers pointed their guns at any of the Plaintiffs. The Defendant Officers say that none of them at any time pointed their guns at any plaintiff. The Plaintiffs say that two of the officers did. Ryan disregards the Defendant Officers' testimony out of hand to conclude that constitutional violations occurred. Ryan Report at ¶¶ 467-483. Here, Ryan attempts to force his own credibility determination that officers somehow pointed guns at the minor plaintiffs. In paragraph 467, Ryan states in conclusory fashion: "While many of the officers deny having pointed their firearms, a review of the objective body worn camera videos leads to a conclusion that at least some of the officers positioned their firearms in a manner that all policy and training would consider pointing." Ryan goes on to point out isolated screenshots from the Body Worn Camera footage as purported evidence of gun-pointing. He shows two screenshots of an officer proceeding up the stairs just prior to entering the apartment, both of which show a firearm pointed towards the floor. (¶¶ 468-470). He similarly shows two screenshots of an officer who has just entered the apartment, with his firearm pointed downward. (¶¶ 479-481). Ryan further speculates regarding screenshots of an officer's elbow as if it is somehow definitive of anything beyond seeing one's elbow. (¶¶ 473-475). Finally, Ryan disingenuously shows a momentary screenshot again of an officer entering the apartment who is not pointing his weapon at anyone, let alone a plaintiff. (¶¶ 476-477). This same officer, Donnelly, holsters his weapon seconds later after clearing the bathroom directly off the front hallway. Ryan's reliance of split-second screenshots to make an improper credibility determination on the issue of gun-pointing is speculative and conclusory at best. A jury can review the Body Worn Camera and draw their own conclusions without Ryan's unhelpful and unsubstantiated commentary.

Similarly, Ryan makes the same improper credibility determination on when Officers purportedly "knew" they were in the wrong apartment but allegedly continued searching. Ryan also employs the same speculative and conclusory technique in his opinions relative to the length of the search (¶ 503). Ryan ignores the respective Officers' testimony on this issue. Again, a reasonable jury can watch the Body Worn Camera, hear the testimony of the officers and make their own determination without Ryan's slanted suggestions.

Such credibility determinations then become the foundation for further questionable opinions about the prevalence of misuse of informants, the prevalence of the use of force and so forth. While making these supposed "expert" opinions, Ryan picks and chooses which facts he considers and completely ignores relevant facts and testimony in the record. For instance, although he talks about how it is commonplace that police departments base their use of force policies on *Graham v. Connor*. Ryan Report at ¶¶ 462. But he ignores that the City's use of force policy and its training of officers is also based on that case.

        *iii.*        *Ryan's Analysis of Complaint Registers is Built on Unreliable Methodology.*

Ryan bases a number of his opinions on his analysis of 70 complaint registers (CRs) from 2012 to 2018, containing accusations of wrongdoing against police officers involving children. From his analysis he attempts to claim that there is a widespread practice in the City of violence against children, a failure to investigate such allegations, and so forth. Ryan Report at ¶¶ 505, 506, 513.

However, Ryan's analysis of these CRs is fatally flawed on numerous grounds. As a first matter, the CRs generally represent mere <u>allegations</u> of wrongdoing, rather than actual <u>proof</u> of wrongdoing. Indeed, Ryan conceded at his deposition that he has no idea if there was actually misconduct in any of these complaints. Ryan Deposition at p. 195. It is improper to extrapolate from the mere existence of a CR that the allegations contained in the CR are true, as Ryan implicitly does to conclude that the CRs show a pattern of excessive force. Second, 70 complaints against the backdrop of hundreds of

11

thousands of interactions between Chicago police officers and youths during that time frame cannot reasonably be said to be a sufficient and representative sample to show what the custom is as to the use of force. Ryan states no methodology on how he concludes that this number somehow shows a pattern. Third, many of the CRs examined clearly should have been excluded from any responsible analysis. For instance, at least eight involved allegations of unrelated off-duty domestic complaints, which cannot reasonably be said to reflect how officers treat civilians they encounter while on-duty. Fourth, Ryan did no independent analysis of the CRs to see if the allegations were valid, or if the investigators took reasonable steps to determine if they were. Fifth, many of the CRs were not investigated because the complaining witness either decided to not cooperate and/or did not sign a sworn affidavit that was required under state law at the time. However, Ryan assumes without basis that the City could and should have ignored this requirement and investigated anyway. Indeed, Ryan stated in his deposition that if there was any evidence that a complaining witness interacted with the police that should be enough for there to be an investigation without a sworn affidavit. Ryan Deposition, p. 205. It is unreasonable to conclude that the City should have violated state law by investigating CRs without a sworn affidavit. Sixth, it is unreasonable for Ryan to opine that these specific cases – which were mere allegations – should have put the City's final policymakers on notice that there was a widespread problem with either the investigations being done or the use of force against children. Seventh, Ryan never fully analyzes what happened in the cases where there was a sworn affidavit and cooperative complaining witnesses, downplaying that even among his sample, several CRs were sustained. Because Ryan's analysis of the CRs was so flawed and undeveloped, his opinions on the CRs and the opinions based on that analysis should be barred.

iv.    <em>Ryan Provides an Insufficient Basis for his Opinions.</em>

Throughout his report, Ryan simply supplies his conclusory opinions. *See* Ryan Report at, *e.g.*, ¶¶ 428, 430, 445, 449, 450-459, 504. Ryan is never able to say, for example, details to support that

most law enforcement agencies engage in such practices that he claims to be routine, such as corroborating informants' accounts by checking with landlords or utility companies before presenting informants to judges for warrants, handcuffing adult relatives outside the presence of their children, having "trauma-informed" policies and training for youth, and so forth. He often refers to there being many examples of something but provides only one. The times he quotes specific policies, they are significantly different from what he suggests the City should have. For instance, he cites two departments – Denver and Redding – as having training that search warrants should not be executed when children are likely to be present if possible. Ryan Deposition at p. 269. He then recanted and said it was only Denver that had a policy along those lines. Ryan Deposition at p. 274-275. It is obviously insufficient to be able to name only one example of a policy that is supposedly general practice. At his deposition, Ryan repeatedly claimed that he did not remember the data to support his opinions but that it was in his report, or he was sure it existed, or that it could be determined if he were to conduct a survey of law enforcement officers. Ryan Deposition at, *e.g.*, pp. 148, 150, 154, 156, 269-270. His actual report contained little data beyond the analysis of the CRs, which was deficient for the reasons described above, and a summary of information he gleaned from reading the Department of Justice's Report.

Further, Mr. Ryan uses the improper conclusion that the Defendant Officers engaged in various forms of misconduct as the main basis for that the City has widespread policies of engaging in such conduct, and that the policies were the "moving force" behind what happened here. Ryan Report at, *e.g.*, ¶¶ 513, 523, 530. Similarly, in his deposition, Ryan repeatedly cited to the events of the underlying case as the chief basis for his opinions as to the pattern and practice of the City. Ryan Deposition at, e.g., pp. 153-6, But this sort of circular logic is unacceptable. Even assuming for argument's sake that the Defendant Officers here engaged in misconduct, that is not a sufficient basis to opine that such behavior was typical of how the City's more than 11,000 officers operated over the

course of five years. Because Ryan fails to supply his reasoning for his opinions, his opinions should be barred.

**B.      Ryan's Opinions will not Assist the Trier of Fact and will Prejudice Defendants.**

In most cases, Ryan's opinions will not assist the trier of fact because there is no special expertise needed for a lay person to perceive what is going on. For example, Ryan's expertise is not needed to explain what is stated in reports like those issued by the Department of Justice, the City's Office of Inspector General or the Police Accountability Task Force. Such reports speak for themselves. His expertise is not needed to analyze the bodyworn camera. Again, jurors will be able to view the footage and come to their own conclusions. Indeed, courts have barred police-practice experts for failing to provide independent research. See, *e.g.*, *Estate of Loury v. City of Chicago*, 2019 WL 1112260 at * 5 (N.D.Ill. March 11, 2019)(barring expert who only would convey the findings of the DOJ and PATF reports)

Because Ryan's opinions often suggest or state that the Defendant Officers or the City should have done more than what the law requires, such opinions will likely cause jury confusion. That is doubly so because Mr. Ryan's credentials as a licensed attorney may make jurors believe him when he misconstrues the law.  This will give his dubious opinions more weight than they deserve, and will cause undue prejudice to the Defendants. Notably, other courts have barred some of Ryan's opinions because they have found that they would usurp the province of the jury, cause jury confusion and/or were outcome-determinative. *See Sanders v. City of Chicago Heights*, 2016 WL 4417257, No. 13 C 0221, at *6-8 (N.D.Ill. August 19, 2016)(St. Eve, J.)(barring several of Ryan's opinions as outcome determinative with "real potential of confusing or misleading the jury" or having an insufficient basis.); *Estate of Smart by Smart v. Chaffee*, 2020 WL 7643505 at *14-15 (December 23, 2020 D. Kan)(barring Ryan's opinion that the force used in a fatal shooting was reasonable as impermissible legal conclusion.). For the foregoing reasons, Mr. Ryan's opinions should be barred.

## II.     THE OPINIONS OF LISA THURAU SHOULD BE BARRED.

Plaintiffs hired Lisa Thurau ("Thurau") to testify regarding the Chicago Police Department's training and written policy during the 2012-2017 *Monell* period. Report of Lisa Thurau, attached as Ex. E; Deposition of Lisa Thurau ("Thurau Dep"), attached as Exhibit F. Thurau broadly opines that the training and policies of the CPD were inadequate to protect children from being traumatized by officer conduct. Thurau's testimony should be excluded in its entirety for several reasons.

### A.     Thurau is not Qualified to Testify as an Expert on Police Policy or Childhood Trauma.

Whether "a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); Fed. R. Evid. 702. Thurau has a J.D. and a master's degree in anthropology. Thurau Report, pg. 8. Thurau has never been hired as an expert witness in a civil lawsuit before this case. Thurau Dep., 23:12-18. Thurau has never worked as a law enforcement officer. Thurau Dep., 18:4-6. She has never been trained as a law enforcement officer. Thurau Dep, 18:7-9. She has never been employed by a law enforcement agency in any capacity. Thurau Dep, 18:10-12. She has never trained officers in use of force. Thurau Dep, 18:16-18. She has never trained officers in how to obtain a search warrant. Thurau Dep, 19:9-11.

Thurau has never attended school to become any kind of mental health professional. Thurau Dep, 22:19-21. She does not have any kind of degree or certificate in mental health treatment. Thurau Dep, 22:22-24. She has never worked as a therapist, counselor, or psychologist, and has never diagnosed anyone with a trauma-related disorder. Thurau Dep, 23:1-10. Thurau received her "training" in trauma and children by attending CLEs and presentations between 2000 and 2004. Thurau Dep, 37:1-39:1]. She does not know how many hours of training she received.  *Id.* She gain experience in reviewing and assessing law enforcement policy by "reading what policies do exist by standard setting organizations like [the Commission on Accreditation for Law Enforcement Agencies,

"CELEA"] and [the International Association of Chiefs of Police, "IACP"], and then reading the policies of law enforcement agencies we worked with." Thurau Dep, 39:17-40:7.

Simply put, Thurau is not qualified to testify as an expert on police policy, police training, or on childhood trauma. She does not have the knowledge, skill, experience, training, or education to give any of the opinions in her report. Fed. R. Evid. 702. She does not have any specialized knowledge in law enforcement policy as she has never worked in law enforcement in any capacity. *Carroll*, 896 F.2d at 212. She does not have any specialized knowledge in childhood trauma as she has never worked as a counselor, therapist, or psychologist, and has never diagnosed any mental health condition. *Id.* The only experience she has comes from attending CLEs and being a plaintiff's lawyer in a lawsuit brough against a law enforcement agency. Because Thurau is not qualified to testify as to police policies or childhood trauma, her opinions should be excluded in their entirety.

### B. Thurau's Opinions are not Relevant to Evaluating any Factual Matters in the Case, and None of her Opinions Concern Matters Beyond the Understanding of the Average Layperson.

Expert testimony "need only be relevant to evaluating a factual matter in the case. That testimony need not relate directly to the ultimate issue that is to be resolved by the trier of fact." *Smith v. Ford Motor Co.,* 215 F.3d 713, 720 (7th Cir. 2000). However, for expert testimony to be helpful, it "must concern a matter **beyond the understanding of the average person**." *Davis v. Duran*, 277 F.R.D. 362, 366-67 (N.D. Ill. June 10, 2011) (emphasis added). It is proper for a trial court to exclude portions of an expert witness' expected testimony if that testimony is "irrelevant or unreliable" *Id.* at n.3.

In the present case, Plaintiffs have filed a §1983 *Monell* claim against the City of Chicago, based in part on the inadequacy of the City's police policies and training. The inadequacy of police training "may serve as the basis for § 1983 liability **only where the failure to train amounts to <u>deliberate indifference</u>** to the rights of persons with whom the police come into contact." *City of Canton, Ohio v.*

*Harris*, 489 U.S. 378, 388 (1989) (emphasis added). It is true that "a risk of constitutional violations can be so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability . . ." *J.K.J. v. Polk County*, 960 F.3d 367, 380 (7th Cir. 2020). However, the mere "existence or possibility of other better policies which might have been used **does not necessarily mean that the defendant was being deliberately indifferent**." *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000) (emphasis added). Police policies "are **not nationally uniform**; nor are they static." *United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017) (emphasis added).

Thurau's opinions do not aid the trier of fact in evaluating any factual matter in the case. Most of her opinions boil down to existence of policies, practices, or training methods that are different that those employed by the Chicago Police Department. Thurau Report. For example, she opines that: "CPD does not appear to have availed itself of opportunities to integrate policies and practices that were publicly available to law enforcement agencies as of 2014 from the Bureau of Justice Assistance (BJA) and International Association of Chiefs of Police (IACP). Doing so would have affirmatively protected children . . ." Thurau Report, pg. 27. However, the existence of different or even better policies does not mean that a municipality was deliberately indifferent. *Frake*, 210 F. 3d at 782. All of Thurau's opinions that a different or better policy exist are not helpful for evaluating a factual matter in the case, and in fact put a higher burden on the City than the law requires.

Further, none of Thurau's opinions concern matters "beyond the understanding of the average person." *Davis,* 277 F.R.D. at 366-67. There is nothing in Thurau's report that could not be determined by the trier of fact examining the evidence themselves. For example, Thurau opines that CPD policies "do not explicitly direct officers to view children as exempt from use of force." Thurau Report, pg. 24. A layperson could read the policies in question and determine whether the policies make explicit mention of this or not. The trier of fact does not need Thurau to read the policies and training

materials for them. Further, this evidence is not relevant to determining whether the City of Chicago was "deliberately indifferent." Because Thurau's opinions are not relevant to evaluating any factual matters in the case, and because none of her opinions concern matters beyond the understanding of the average layperson, all of her opinions should be excluded.

### C. Thurau's Opinions are Inadmissible Legal Conclusions.

Expert testimony that gives opinions on "'legal issues that will determine the outcome of a case" are prohibited. *Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648 (7th Cir. 2011) (quoting *U.S. v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996)). It is improper for an expert witness to give opinions that instruct the jury on the applicable and relevant portions of the law. *Davis*, 277 F.R.D. at 371. Claiming that role "'does not aid the jury in making a decision; rather it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's.'" *Id.* (quoting *Nimely v. City of New York*, 414 F.3d 381, 391 (2nd Cir. 2005)).

In the present case, many of Thurau's opinions "tell the jury what result to reach" instead of allowing the trier of fact to make factual determinations for themselves. For example, Thurau opines that "the Chicago Police Department's use of force and search warrant policies during the *Monell* period were not adequate to protect children from officers' use of unnecessary or excessive force or to inform officers of their potential to inflict trauma on children by their actions." Thurau Report, pg. 19. Thurau also opines that:

> the lack of policy and training regarding how to shield children from exposure to officers' use of force during the execution of search warrants, and the lack of system accountability to ensure such protections observed and enforced, largely explains the harms experienced by the Mendez children on November 7, 2017.

Thurau Report, pg. 47. Thurau's opinions lack any factual foundation premised on a reliable methodology and instead attempt to determine the outcome of the case. Nothing "in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply **too great**

an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*, 522 U.S. at 146 (emphasis added). Thurau's opinions not only impermissibly attempt to reach the ultimate conclusion of the case, but are also not supported by proper analysis. They should be barred.

### D. Thurau's Opinions are Unfairly Prejudicial and Confuse the Issues.

Expert evidence that is otherwise relevant may be excluded when the probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. *See Daubert.,* 509 U.S. at 595. The Court's gatekeeping function "make[s] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. V. Carmichael,* 526 U.S. 137, 152 (1999). Courts "must be careful to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves." *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998). There is an "old problem of expert witnesses who are 'often the mere paid advocates or partisans of those who employ and pay them, as much so as the attorneys who conduct the suit. There is hardly anything, not palpably absurd on its face, that cannot now be proved by some so-called 'experts.'" *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 382 (7th Cir. 1986) (quoting *Keegan v. Minneapolis* & St. L. R. Co., 76 Minn. 90, 95 (1899))

Thurau's opinions confuse these issues, and attempt to hold the City responsible under a standard that goes beyond what the law requires. Thurau Report; *Frake*, 210 F.3d at 782. Thurau begins the substance of her report by stating that: "For this case, plaintiffs' counsel asked me to answer the following questions: . . ." Thurau then spends the remainder of the report answering the specific questions asked by Plaintiffs' counsel designed to paint the City of Chicago in a negative light. The answers to the questions do **not** rely on the expertise of Thurau to aid the trier of fact is assessing complex factual issues in the case. Instead, Thurau is merely a "paid advocate" whose opinions are designed to confuse the jury about the issues in the case. Because any probative value of Thurau's

opinions is substantially outweighed by the danger of unfair prejudice to the Defendants, Thurau's opinions should be excluded in their entirety.

### E.  Thurau's Opinions Lack Reliable Methodology.

When an expert does not employ **any** articulable methodology, their testimony should be barred:

> Accordingly, the Court finds that [expert's] testimony is inadmissible. He has not conducted an independent investigation or research . . . He has articulated no technique or methodology by which his conclusions can be scientifically and objectively tested or subjected to peer review. He prepared his testimony specifically for this litigation . . .

*Dukes v. Illinois Cent. R. Co.*, 934 F. Supp. 939, 951 (N.D. Ill. 1996).

In the present case, Thurau presents her opinions with no articulable methodology. Thurau Report. She conducted no independent investigation or research. *Id.* None of Thurau's opinions can be scientifically or objectively tested. *Id.* Instead, Thurau merely compares policies and training materials for the Chicago Police Department to other existing and model policies. *Id.* As stated *supra*, Thurau does not even have the training or experience to conduct scientific research regarding police practices. *Id.* Because Lisa Thurau does not use recognized methods of police practices or psychology in arriving at any of her expert opinions, her opinions should be barred in their entirety.

### F.  Thurau Makes Impermissible Credibility Determinations.

The "credibility of eyewitness testimony is generally not an appropriate subject matter for expert testimony." *Hall*, 165 F.3d at 1107. In the present case, Thurau makes inappropriate credibility determinations throughout her report. For example, she opines that: "the absence of any provisions in CPD policy or training directing officers to prepare for encounters with children led directly to the Mendez boys' traumatic exposure to the use of force when guns were pointed at them . . ." Thurau Report, pg. 70. In rendering this opinion, Thurau disregards the testimony of every Defendant Officer

who stated that no guns were pointed at any of the children. Thurau is essentially making a determination that Plaintiffs are more credible than the Defendants. This is improper.

Thurau makes similar determinations throughout, also opining that "CPD should have had developmentally appropriate, trauma-informed policies and training in place that required officers to . . . [minimize] officers' use of force, specifically avoiding points guns at children..." Thurau Report, pg. 76. By crediting Plaintiffs' version of events as true (and by necessity finding Defendants' version of events to be false) Thurau is performing a function that should be left to the trier of fact. *Richman v. Sheahan*, 415 F. Supp. 2d 929, 941–42 (N.D. Ill. 2006). Because credibility determinations should be left to the trier of fact, Thurau's opinions that make credibility determinations must be barred.

## III. THE OPINIONS OF PROF. MAX SCHAZENBACH'S SHOULD BE BARRED.

Plaintiffs retained Professor Max Schanzenbach ("Schanzenbach"), a professor of law and economics, to render opinions the probability of allegations of misconduct being sustained and discipline being imposed. *See* Schanzenbach Report, attached at Ex. G. Schanzenbach goes beyond his expertise, however, to opine on matters of police accountability and uses a flawed and unreliable methodology. His opinions should be barred in their entirety for the reasons outlined below.

### A. Schanzenbach's Opinions for which he Lacks Qualification should be Barred.

Schanzenbach issues several broad opinions that qualitatively assess the City's disciplinary system: that he agrees with the findings of the PATF and DOJ reports as they pertain to IPRA's performance; that the City did not take civilian complaints seriously because they were not resolved in a timely fashion or did not result in "sufficient" discipline; that the City did not address problematic officers, that the accountability system was "not designed to detect or deter misconduct, nor was it designed to produce and make use of information regarding problematic patterns of officer conduct;" "the IPRA/COPA civilian complaint system maintained by the City of Chicago did not create an environment in which the detection and discipline of misconduct in excessive force and improper

search involving children 0-14 was treated with the seriousness it merited;" and that there was a "systemic failure of the City of Chicago to use civilian allegations to detect, deter, and address misconduct on the part of its officers." Schanzenbach is not qualified to make these opinions.

Defendants have no doubt that Schanzenbach is an expert in law and economics. But that is where his expertise lies – *not* in policing, investigations, or police administrative data. Though he attempts to couch his opinions in terms of economic deterrence, many of his opinions are plainly and simply qualitative assessments of the City's disciplinary system which he has no basis for. Schanzenbach has a Juris Doctorate and a Ph.D in Economics, and is currently a professor at Northwestern Pritzker School of Law with a focus on trusts and estates, business associations, corporations, and economics. Schanzenbach Report at ¶¶ 2, 3. Schanzenbach does not hold any degrees in criminology, and has only published *one* peer-reviewed article that touches on the topic of police accountability. *See* Schanzenbach Report, generally. Schanzenbach has never been a law enforcement officer, has never investigated police misconduct, and has never even reviewed an IPRA investigatory file. Schanzenbach Deposition, attached as Ex. H, at 9:17-10:10; 54:21-55:14. Schanzenbach is not well-acquainted with the City's accountability systems (or any city's accountability systems for that matter) and does not appear to have any command over the relevant research literature on police complaints and discipline. *See* Report of Defense Expert Matthew Hickman[2], attached as Ex. I, at pp. 16-19; Schanzenbach Report. Simply put, Schanzenbach does not have the knowledge, skill, experience, training, or education to give opinions on these matters. Fed. R. Evid. 702. He does not have any specialized knowledge in police accountability policy and has never worked

---

[2] In response to Schanzenbach, Defendants retained Professor Matthew Hickman of Seattle University. Hickman is an expert criminologist and statistician with extensive experience in the field of law enforcement data and criminal justice, and actually conducted the one and only study that Schanzenbach refers to in his report. *See* Hickman Report. Hickman issued a report, attached hereto, that was highly critical of Schanzenbach's expertise and methods. This report provides much of the basis for the arguments made herein.

in law enforcement or investigations in any capacity. Schanzenbach himself admitted at his deposition that:

> you would want a police practices expert or a person with expertise in investigating police misconduct to review those files if what you're looking for is a qualitative assessment of those. I am not providing a qualitative assessment of those. I would not offer myself as an expert for a qualitative assessment of those files

Schanzenbach Dep at 55:20-56:3. But a "qualitative assessment" is exactly what he does with these opinions. Schanzenbach's whole basis for making sweeping opinions on the entire accountability system consists of numbers from a spreadsheet, experience applying public numerical data, one peer-reviewed article, one article that is not yet peer-reviewed, and an understanding of economic deterrence theory. *See* Hickman Report at 2; Schanzenbach Report; Schanzenbach Deposition at 17:5-24; 85:12-89:2. This is not sufficient, and these opinions should be excluded because Schanzenbach is not qualified to make them.

### B. Schanzenbach's Methodology is Unreliable.

Schanzenbach's opinions should be excluded because his methodology is unreliable. An expert's opinion "must be reasoned and founded on data. It must also **utilize the methods of the relevant discipline**..." *Bielskis.*, 663 F.3d at 894 (emphasis added). An expert "must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). Schanzenbach's analysis fails this test.

In coming to his opinions on sustained finding and discipline imposition rates, Schanzenbach looked only at excel spreadsheets[3] reflecting administrative data relative to complaint register files. See Schanzenbach Report. The data he examined contained information on log numbers (the way civilian complaints against officers are tracked) for allegations of illegal search and excessive force where a

---

[3] Schanzenbach looked at spreadsheets produced in this litigation as well as data he retrieved from the Invisible Institute.

child was a victim or a witness. *Id*. The data set included the log number, the number of allegations against each officer with allegations, the category code (type, i.e. excessive force) of the allegation, the recommended finding, and the discipline, if any, imposed. The methods Schanzenbach used to come to his conclusions on this data are unreliable for many reasons.

First, this type of data set is not reliable for the questions that Schanzenbach was trying to answer. *See* Hickman Report at pp. 5-8. Indeed, this limited data can only explain so much, and often does not tell the full story. *Id*. Moreover, the limitations on what can be inputted and the possibility for human error in data entry mean that the data can contain errors. Defense Expert Matthew Hickman looked at summary reports (summaries of investigations written at the end of investigations to explain findings) for five individual log number files (commonly referred to as complaint registers, or "CRs") to see whether the information on the spreadsheet reflected what actually happened in the investigation and outcome. In many cases, it did not. *See* Hickman Report at pp. 5-8. So, while the data is "reliable" in that it is an accurate reflection of what was contained in the City's database, it is unreliable because it is limited and can contain inaccuracies. Schanzenbach attempts to get around this in his rebuttal report by stating that Hickman's number of "officer complaints" is substantially similar to his own and comparable to the data publicly posted by the Invisible Institute. *See* Schanzenbach Rebuttal Report, attached as Ex. J. This misses the point. The issue is not that the spreadsheets were generated incorrectly: the issue is that this limited data set cannot address the questions that Schanzenbach sought out to answer.

As Defense Expert Hickman put it, "[t]he bottom line is that the spreadsheet records are, at best, a far removed and abstract representation of what is alleged to have occurred, and at worst, a wholly inaccurate information source for purposes of answering the questions that Schanzenbach sought to answer." Hickman Report at p. 8. Schanzenbach's methodology and analysis are therefore

unreliable because the data sets he used are not useful and cannot result in meaningful statistics. Hickman Report at p. 9.

Second, assuming the data itself was reliable to answer the questions presented (and it was not), the methodology employed to analyze the data was also unreliable. To come to his conclusions, Schanzenbach counted each officer in each log number as its own individual "officer complaint." So, if a particular log number had ten officers with allegations against them, Schanzenbach would count this as *ten* officer complaints – instead of *one* log number. This inflates the number of complaints because it does not take into account, for instance, unfounded allegations that may be included against particular officers in a given incident if a group of officers is named.

Notably, conventional approach and reporting practice for this type of data is not done at the "officer" level, but rather at the "case" (log number) and "allegation" level. *See* Hickman Report at p. 9. Looking at the rates by log number and by allegation creates a more accurate picture. Moreover, as one can see when comparing the Hickman and Schanzenbach reports, each method of analysis results in different sustained and disciplinary rates. *See* Hickman Report at 15. Because Schanzenbach's analysis looked only at numbers, and not at what the allegations consisted of (whether they were warranted), this results in a heightened and skewed number of complaints, thereby making the sustain and discipline rate appear lower than it is.

Third, Schanzenbach's method of analysis is unreliable because of what he chose to include and exclude. *See* Hickman Report at p. 11-16. For instance, Schanzenbach includes log numbers that were closed for "no affidavit," which at the time could not be investigated, unless under limited circumstances, pursuant to Illinois law. Moreover, some log numbers had allegations against an unclear number of officers (for instance, several allegations against an officer with an unknown star). Instead of including this unknown as one "officer complaint," Schanzenbach counted each "blank" star number as its own "officer complaint." Both of these tactics skew the data set. Moreover, in calculating

the average length of investigation, Schanzenbach again uses the "officer complaint" level, which necessarily makes the average investigation length appear to be longer. Hickman Report at 15-16. Simply put, the methods employed are misleading and unreliable.

**C.**  **Schanzenbach has Insufficient Basis for his Conclusions Relating to "Adequate" Discipline, how Seriously Complaints are Taken, Addressing Problem Officers, Problematic Practices, and Investigation Length.**

In paragraph 22 of his report, Schanzenbach re-states findings of the DOJ and PATF reports and states that he agrees with them. He then goes on to opine, in paragraph 23, that the City did not treat complaints involving children differently, and that "Chicago did not take civilian complaints seriously by resolving them in a timely fashion, imposing sufficient discipline on officers after a sustained allegation, addressing problematic officers who tally up significant allegations, or addressing problematic patterns and practices revealed by civilian complaints." Schanzenbach provides no basis for these opinions and they should be excluded.

Indeed, in coming to these sweeping conclusions, Schanzenbach relies solely on his (unreliable) number crunching and his understanding of deterrence theory. This does not suffice. Schanzenbach did not consider IPRA's intake standards. Schanzenbach Deposition at 59:13-60:3. He did not consider – and, in fact, does not know – IPRA's investigatory standards or the steps investigators would take to obtain an affidavit to continue an investigation. *Id.* at 59:13-60:15; 69:10-70:12. He did not consider witness cooperation or that some cases are more complicated than others. Id. at 69:10-70:2. Again, he has never even seen a full investigatory file. *Id.* at 88:8-17. Nor does he have any basis of knowledge for what "sufficient" discipline would or should be, *see e.g. Id.* at 64:18-65:3. What is more, Schanzenbach was not aware and therefore did not consider that in the relevant time-frame, the City did develop a disciplinary matrix with disciplinary guideposts.[4] *Id.* at 64:7-65:3;

---

[4] The City had to cease implementation of said matrix due to an order from the Illinois Labor Relations Board.

85:23-86:11. Nor did he take into consideration that, pursuant to Illinois law, the City had to negotiate with the Fraternal Order of Police over disciplinary issues. *Id.* at 70: 4-12. As for his statements regarding the DOJ and PATF, Schanzenbach does nothing more than re-state what is in the reports. He has no personal knowledge of the information these entities reviewed or who they interviewed, nor was he involved in the investigations and he does not know their methodology. Schanzenbach Report; Schanzenbach Deposition at 44:21-52:2. He has simply read the reports and come to the conclusion that he agrees. As Hickman put it, "[t]here is nothing in Schanzenbach's report that bears on the genesis or design of the CPD's accountability system, its ability to detect or deter misconduct, or its ability to produce and make use of information about patterns of officer conduct." Hickman Report at p. 19.

"'[E]xperts' opinions are worthless without data and reasons.'" *U.S. v. Mamah,* 332 F.3d 475, 478 (7th Cir. 2003) (quoting *Kenosha v. Heublein*, 895 F.2d 418, 420 (7th Cir. 1990)). "It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *Mamah,* 332 F.3d at 478. To make opinions such as these, Schanzenbach would have had to engage in a much more comprehensive approach and data collection to demonstrate this link. He did not do so, and these opinions should be excluded.

### D. Schanzenbach's Opinions are so Fundamentally Misleading that they are Unhelpful, will Cause Juror Confusion, and will Prejudice the Defendants.

As discussed at length above, Schanzenbach's opinions are fundamentally misleading and are supported by a shaky foundation. Not only should his opinions be excluded for those bases independently, but also because those issues with his opinions make them unhelpful, confusing, and prejudicial. Expert evidence that is otherwise relevant may be excluded when the probative value is substantially outweighed by the danger of unfair prejudice or confusing the issues. Fed. R. Evid. 403; *see also Daubert*, 509 U.S. at 595. Expert testimony should not be admitted to the trier of fact when the witness is "'the mere paid advocate[] or partisan of those who employ and pay them.'" *Davis*, 277

F.R.D. at 365 (quoting *Olympia Equipment Leasing Co.*, 797 F.2d at 382. Part of the Court's gatekeeping function is to prevent expert testimony from carrying more weight than it deserves. *Smith*, 215 F.3d at 718.

First, Schanzenbach's methodology is so unreliable that it could cause confusion with the jury and will therefore be unhelpful. Moreover, since both his data and his analysis are unreliable, his opinions are so fundamentally misleading that it will prejudice the Defendants.

Second, Schanzenbach's opinions related to the DOJ and PATF report are unhelpful and prejudicial for many reasons. Schanzenbach is a well-credentialled individual. This could cause the jury to give more weight than is deserved to both his own opinions *and* the opinions in the DOJ and PATF reports, without any basis for doing so other than Schanzenbach said so. His opinions on the "systemic failure" of the accountability system and length of investigations are flawed in this exact same way. He does not apply facts or data as to these opinions and rather just says so. But as mentioned previously, "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Obrycka,* 792 F.Supp.2d at 1025 (quoting *General Electric Co.*, 522 U.S. at 146). Indeed, "[w]e have said over and over that an expert's *ipse dixit* is inadmissible." *Wendler & Ezra, P.C. v. American Intern. Group, Inc.,* 521 F.3d 790, 791 (7th Cir. 2008) (quoting *Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)).

Lastly, it must be pointed out that Schanzenbach misuses and misapplies the one and only study that he cites to, which happens to have been written by Defense Expert Hickman. *See* Schanzenbach Report at p. 6 and Hickman Report at pp. 17-18. In finding that the City's sustained rates are lower than those of other cities, Schanzenbach relies on a study conducted by Hickman through the Bureau of Justice. But, as Hickman explains in this report, this data and methodology was

later determined to be unreliable. Hickman Report at pp. 17-18. Moreover, Schanzenbach fails to explain that the "large" agencies in the Hickman study was any agency with over 100 officers. *Id.* As Hickman points out, the rate is actually lower for agencies with more than 1000 officers, like Chicago. *Id.* Notably, Schanzenbach does not retract or explain his improper reliance on this study in his Rebuttal Report. Explaining, applying, and relying on research which is no longer deemed credible is unhelpful, misleading, and prejudicial.

Simply put, Schanzenbach has used his expertise in statistics and economics to make opinions on police accountability for which he has no basis. Not only is this unhelpful, but, due to his credentials, these opinions will likely carry unwarranted weight with the jury, causing prejudice to Defendants. Schanzenbach's opinions should be excluded.

## CONCLUSION

For the reasons stated herein, Plaintiffs' experts Ryan, Thurau, and Schanzenbach should be largely, if not completely, barred from testifying in this matter. Defendants therefore respectfully request this this Court grant their Joint Motion to Bar Plaintiffs' Experts and for any other relief this Court deems just.

Respectfully submitted,

CITY OF CHICAGO,
Celia Meza
Corporation Counsel

By: /s/ Marion C. Moore
Marion C. Moore, Chief Assistant Corporation Counsel
Raoul Vertick Mowatt, Assistant Corporation Counsel Supervisor
City of Chicago, Department of Law
2 N. LaSalle Street, Suite 420
Chicago, Illinois 60602
312.744.5170
Atty No. 6302566
**Attorneys for Defendant City**

/s/Larry S. Kowalczyk
Larry S. Kowalczyk, Special Assistant Corporation Counsel
Megan K. Monaghan, Special Assistant Corporation Counsel
QUERREY & HARROW, LTD.
120 N. LaSalle St., Suite 2600
Chicago, IL 60602
(312) 540-7000
**Attorneys for Defendant Officers**


## CERTIFICATE OF SERVICE

I, Larry S. Kowalczyk, an attorney, hereby certify that on October 7, 2022, I have caused to

be filed the foregoing Defendants' Joint Motion to Bar Plaintiffs' Experts with the Court's electronic

filing system, which will cause a copy to be served upon every attorney of record.

/s/ Larry S. Kowalczyk
Larry S. Kowalczyk