**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| HESTER MENDEZ and GILBERT MENDEZ, for themselves and on behalf of their minor children, PETER MENDEZ and JACK MENDEZ, | ) ) ) ) | |
| | ) | No. 1:18-cv-05560 |
| Plaintiffs, | ) | |
| v. | ) | Judge Franklin U. Valderrama |
| | ) | |
| | ) | Magistrate Judge Young B. Kim |
| THE CITY OF CHICAGO; Chicago police officers JOSEPH T. CAPELLO IV (#10626); LIEUTENANT SAMUEL DARI (#603); MICHAEL W. DONNELLY (#13784); SERGEANT RUSSELL A. EGAN (#998); MICHAEL J. GUZMAN (#15911); JOSE M. HERNANDEZ (#15925); and ERIC M. SEHNER (#11641), | ) ) ) ) ) ) ) ) | |
| | ) | Jury Demanded |
| Defendants. | ) ) | |

**PLAINTIFFS' RESPONSES TO DEFENDANTS' MOTIONS _IN LIMINE_**

*Plaintiffs' Attorneys*
Al Hofeld, Jr.
Zachary J. Hofeld
LAW OFFICES OF AL HOFELD, JR., LLC
53 W. Jackson Blvd., Suite 204
Chicago, IL 60604
al@alhofeldlaw.com
zach@alhofeldlaw.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iv

1. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 1 .............. 1
2. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 2 .............. 6
3. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 3 .............. 8

    I. Defendants' Motion Should Be Denied Because It Is Vague and Asks for Exclusion of a Broad Category of Evidence ................................................................ 8

    II. Other Complaints, Investigations (or Lack Thereof), and Discipline (or Lack thereof) Against Defendant Officers Is Admissible to Prove Plaintiffs' *Monell* Claim .............. 10

    III. Other Complaints Against Defendant Officers Are Also Admissible Under FRE 404(b) ................................................................................................................. 13

    IV. Evidence of Egan's Sustained CR is Admissible for a Variety of Non-Propensity Reasons ............................................................................................................. 17

    V. Defendants' Motion Should Be Denied as Premature ...................................... 19

4. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 4 ............ 20

    I. The Evidence at Issue May Well Become Admissible at Trial .................................... 20

    II. COPA's Report Contains Party Admissions .................................................... 22

    III. FRE 407 Does Not Apply .......................................................................... 22

5. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 5 ............ 23
6. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 6 ............ 26
7. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 7 ............ 28
8. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 8 ............ 32
9. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 9 ............ 39
10. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 10 [AGREED IN PART] ........................................................................................... 41
11. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 11 ......... 44
12. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 12 ......... 45
13. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 13 ......... 46
14. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 14 ......... 48
15. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 15 ......... 48
16. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 16 ......... 50
17. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 17 [AGREED] ...................................................................................................... 51
18. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 18 ......... 51

19. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 19..........53

20. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 20..........58

21. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 21..........58

22. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 22..........59

    I. Defendants' Motion Should Be Denied Because It Is Vague and Asks for Exclusion of a Huge Category of Evidence ......................................................................60

    II. The City's CR Files, Including Full CR Files, May Be Admissible for Many Purposes ......................................................................................................................60

    III. Defendants' Arguments to the Contrary Fail ..................................................61

23. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 23..........63

24. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 24..........64

    I. Defendants' FRE 401 and FRE 403 Arguments Fail ......................................65

    II. Incidents that Occurred *After* March 7, 2017 Are Admissible to Prove Both the Existence of a City Policy or Custom Prior to March 7, 2017 and the City's Deliberate Indifference ..........................................................................................69

    III. FRE 408 Does Not Apply, and the Fact that a Few Pattern Witnesses Have Settled Their *Monell* Claims Against the City Has No Bearing on Their Testimony at Trial .71

    IV. Defendants' Request to Bar Children from Testifying or Describing Their Injuries Is Frivolous ............................................................................................................72

25. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 25..........73

26. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 26..........73

27. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 27..........79

28. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 28..........81

29. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 29..........84

30. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 30..........87

31. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 31..........89

    A. The DOJ and PATF Reports Are Relevant and Otherwise Admissible ....................89

        1. DOJ Report ..........................................................................................90

        2. The PATF Report ................................................................................93

    B. The DOJ and PATF Reports are Admissible Under Fed. R. Evid. 403 ....................95

32. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 32........ 100

33. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 33........ 104

34. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 34........ 106

35. PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 35........ 108

36.    PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 36........ 109

37.    PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 37........ 110

38.    PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 38........ 112

# TABLE OF AUTHORITIES

**Cases**

*Akbar v. City of Chi.*, 2009 WL 3335364 (N.D. Ill. Oct. 14, 2009) ..........................................20

*Alexander v. City of Milwaukee*, 474 F. 3d 437 (7th Cir. 2007)..................................................20

*Alexian Bros. Health Providers Ass'n, Inc. v. Humana Health Plan, Inc.*, 608 F. Supp. 2d 1018 (N.D. Ill. 2009)...............................................................................................................................................46

*Archie v. City of Chicago*, 2020 U. S. Dist. LEXIS 176221 (N. D. Ill. Sept. 25, 2020)..............................96

*Arrington v. City of Chicago*, 2018 U. S. Dist. LEXIS 14168 (N. D. Ill. Jan. 30, 2018)..........................102

*Austin v. Cook County*, No. 07-c-3184, 2009 WL 7999488 (N.D.Ill. March 25, 2009)............14, 64, 109

*Beck v. City of Pittsburgh*, 89 F. 3d 966 (3rd Cir. 1996)..................................................................75

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) ....................................................................94

*Below v. Yokohama Tire Corp.*, no. 15-cv-529, 2017 WL 764824 (W.D.Wis. Feb. 27, 2017) .................63

*Betts v. City of Chicago*, 784 F. Supp. 2d 1020 (N.D.Ill. 2011)..................................................*passim*

*Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989) ...........................................................31, 75

*Braun v. Lorillard*, No. 94 C 976, 1996 WL 14033 (N.D.Ill. Jan.11, 1996) ...............................48

*Brooks v. City of Chicago*, No. 13-cv-03090, 2015 WL 354386 (N.D.Ill. June 5, 2015).....................39, 42

*Bruce v. City of Chicago*, No. 09 C 4837, 2011 WL 3471074 (N.D. Ill. July 29, 2011)...........9, 57, 87, 116

*Calusinksi v. Kruger*, 24 F.3d 931 (7th Cir. 1994)..................................................................74, 75

*Cazares v. Frugoli*, No. 13-cv-5626, 2017 WL 4150719 (N.D.Ill. Sept. 19, 2019) ..................................37

*Christmas v. City of Chicago*, 691 F. Supp. 2d 811 (N.D.Ill. Feb. 11, 2010)..........................................*passim*

*Crecy v. Kankakee School Dist.* #111, 15-CV-1014, 2017 WL 6945336 (C.D.Ill. Feb. 6, 2017) ........48, 55

*Dahlstrand v. FCA US, LLC*, No. 15 CV 7603, 2021 WL 4318322 (N.D. Ill. Jan. 14, 2021)..........*passim*

*Daniel v. Cook Cty.*, 833 F.3d 728 (7th Cir. 2016) ....................................................94, 95, 99, 102

*Delgado v. Mak*, No. 06 C 3757, 2008 WL 4367458 (N.D. Ill. March 31, 2008) .............................. 46, 57

*Dyson v. SharkNinja Operating LLC*, No. 14-cv-0779, 2016 WL 1613489 (N.D. Ill. Sep. 30, 2016) .....83

*Edwards v. Thomas*, 31 F.Supp.2d 1069 (N.D.Ill.1999) ................................................................22

*Estate of Loury v. City of Chicago*, 2019 U.S. Dist. LEXIS 38029 (N.D. Ill. Mar. 11, 2019).....95, 102, 104

*Estate of Moreland v. Dieter*, 395 F. 3d 747 (7th Cir. 1995) ...........................................................20

*First Midwest Bank v. City of Chi.*, 337 F. Supp. 3d 749 (N.D. Ill. Aug. 29, 2018) ................................ 103

*Foley v. City of Lowell*, 948 F.2d 10, (1st Cir.1991)..................................................................... 72, 74

*Gaines v. Chicago Board of Education*, no. 19 C 775, 2024 WL 640802 (N.D.Ill. Feb. 15, 2024) ........*passim*

*Galvan v. Norberg*, No. 04 C 4003, 2006 WL 1343680 (N.D. Ill. May 10, 2006)....................................57

*Galvan v. Norberg*, No. 10 C 739, 2006 WL 1343680 (N.D. Ill. May 10, 2006) ........................... 10, 88

*Garcia v. City of Chi.*, No. 08 C 5354, 2010 WL 11713400 (N.D. Ill. Apr. 15, 2010) .......................*passim*

*Gavin v. Life Ins. Co. of N. America*, No. 12 C 6178, 2013 WL 2242230 (N.D. Ill. May 21, 2013).. 10, 87

*Glenwood Halsted LLC v. Village of Glenwood*, 2014 WL 2862613 (N. D. Ill. June 24, 2014) ..................20

*Godinez ex rel. Godinez v. City of Chicago*, 2019 U.S. Dist. LEXIS 187994 (N.D. Ill. Oct., 2019) ......... 102

*Gonzales v. Olson*, 2015 WL 3671641 (N.D.Ill. June 12, 2015) ........................................... 30, 57, 89, 109

*Gonzalez v. City of Elgin*, 2010 WL 3306917 (N.D. Ill. Aug. 19, 2010) ...........................................20

*Gonzalez v. Olson*, No. 11 C 8356, 2015 WL 3671641 (N.D. Ill. June 12, 2015) .......................14, 40, 64

*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)..................................................... 31, 75

*Hawthorne Partners v. AT & T Techs., Inc.*, 831 F. Supp. 1398 (N.D. Ill. 1993)........................................46

*Hendrickson v. Cooper*, 589 F.3d 887 (7th Cir. 2009) ............................................................. 48, 53

*Henry v. County of Shasta*, 132 F. 3d 512 (9th Cir. 1997) ..............................................................75

*Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 3205304 (N.D. Ill. July 28, 2011).................................57

*Hillard v. City of Chi.*, No. CIVA 09C2017, 2010 WL 1664941 (N.D. Ill. Apr. 23, 2010) ...............*passim*

*Hoskin v. City of Milwaukee*, 994 F. Supp. 2d 972 (E.D. wis. 2014)............................................................80

*Huckaba v. CSX Transportation, Inc.*, 2015 WL 672334 (S.D. Ill. Feb. 17, 2015) ...............................32

*Hudson v. City of Chicago*, 378 Ill. App. 3d 373 (1ˢᵗ Dist. 2007).....................................................38

*Hyung Hye Yano v. City Colleges of Chicago*, 2014 WL 7450559 (N.D. Ill. Dec. 31, 2012) ........................57

*In re Depakote*, No. 14-CV-1052-MJR-SCW, 2018 WL 9732116 (S.D. Ill. Jan. 22, 2018)...............*passim*

*J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920 (E.D. Wis. 2017).....................................................31

*Jackson v. Marion County*, 66 F. 3d 151 (7th Cir. 1995) ................................................................16

*Jones v. Walters*, 12-cv-5283, 2016 WL 1756908 (N.D.Ill. April 29, 2016).......................................38

*Jordan v. Binns*, 712 F.3d 1123 (7th Cir. 2013) ....................................................................... 101

*Karney v. City of Naperville*, No. 15 C 4608, 2016 WL 6082354 (N. D. Ill. Oct. 18, 2016) .........28, 74, 80

*Kenny v. Se. Pennsylvania Transp. Auth.*, 581 F.2d 351 (3d Cir. 1978) ...........................................32

*Keys v. City of Harvey*, No. 92 C 2177, 1996 WL 34422 (N.D. Ill. Jan. 26, 1996) .............................74

*Kolodziej v. Justice Park District*, 2020 IL App. (1st) 191032-U (1ˢᵗ Dist. 2020).................................38

*LaPorta v. City of Chi.*, No. 14 C 9665, 2016 WL 4429746 (N.D. Ill. Aug. 22, 2016) .................. 86, 103

*Larez v. Los Angeles*, 946 F.2d 630 (9th Cir. 1991) ...............................................................31, 75

*Lawson v. Trowbridge*, 153 F.3d 368 (7ᵗʰ Cir. 1998) ...............................................................58

*Luce v. United States,* 469 U.S. 38 (1984)........................................................................*passim*

*Lynn v. City of Indianapolis*, 2015 U.S. Dist. LEXIS 4045 (S. D. Ind. Jan. 14, 2015) .............................37

*Macon v. City of Fort Wayne*, No. 1:11-cv-119, 2012 WL 3745375 (N.D. Ind. Aug. 28, 2012) ........ 47, 53

*Martin v. City of Chicago*, 2017 WL 2908770 (N.D.Ill. July 7, 2017) ...................................... 30, 108

*Mays v. Dart*, No. 20 C 2134, 2020 WL 1987007 (N.D.Ill April 27, 2020) ......................................... 106

*Mays v. Jackson*, No. 20 C 2134, 2020 WL 2796082 (N.D.Ill. May 29, 2020)...........................................37

*McCallister v. Price*, 615 F.3d 877 (7th Cir. 2010) ...............................................................47, 53

*McNabla v. Chicago Transit* Authority, 10 F.3d 501 (7th Cir. 1993)..................................................87

*Medina v. City of Chi,* 100 F. Supp. 2d 893 (N.D. Ill. 2000)...................................................67, 73

*Monell v. New York City Dept. of Social Services*, 436 U. S. 658 (1978) ..........................................15

*Moore v. City of Chi.*, No. 02 C 5130, 2008 WL 4549137 (N.D. Ill. Apr. 15, 2008) ...............................22

*Native Am. Arts v. Earthdweller, Ltd.*, 2002 WL 1173513 (N.D. Ill. May 31, 2002)............................*passim*

*Noble v. Sheahan*, 116 F. Supp. 2d 966 (N.D. Ill. 2000) ...........................................................14

*Obrycka v. City of Chicago*, 07 C 2372, 913 F.Supp.2d 598 (N.D.Ill. 2012) ...................................29, 86, 89

*Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841 (7th Cir. 1998)........................................*passim*

*Padilla v. City of Chicago*, 06 C 5462, 2009 WL 4891943 (N.D.Ill. Dec. 14, 2009)......................28, 74, 80

*Patterson v. City of Chicago*, No. 15-cv-4139, 2017 WL 770991 (N.D.Ill. Feb. 28, 2017) ..................... 115

*Petrovic v. City of Chi.*, 2008 WL 818309 (N.D. Ill. Mar. 21, 2008) ..............................................22

*Ratliff v. City of Chi.*, No. 10 C 739, 2012 WL 5845551 (N.D. Ill. Nov. 19, 2012) .............. 10, 38, 39, 87

*Rivera v. City of Chicago*, 401 Ill. App.3d 602 (1st Dist. 2010) ..................................................38

*Robles v. City of Fort Wayne*, 113 F. 3d 732 (7th Cir. 1991) .....................................................16

*Rosenberg v. Cottrell, Inc.*, No. 05-545-MJR, 2007 WL 2028789 (S.D. Ill. July 12, 2007)...................*passim*

*Rothwell v. City of Chicago*, No. 10 C 1338, 2011 WL 5169419 (N.D.Ill. Oct. 31, 2011) ..........................39

*Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015) ..................................................................75

*Saunders v. City of Chicago,* 320 F. Supp. 2d 735 (N.D. Ill. 2004) .........................................*passim*

*Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034188 (N.D.Ill. July 27, 2010)...........................38, 39, 43

*Sherrod v. Berry*, 827 F.2d 195 (7th Cir. 1987) ..................................................... 28, 31, 74, 80

*Simmons v. City of Chicago*, 2017 U.S. Dist. LEXIS 137395 (N.D. Ill. Aug. 29, 2017)...........99, 103, 116

*Smith v. Garcia*, 2018 WL 461230 (N.D. Ill. Jan. 18, 2018)........................................................43

*Smith v. Northeastern Ill. Univ.*, 388 F.3d 559 (7th Cir. 2004) ............................................ 51, 62

*Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226 (7th Cir. 1982).........................................63

*Suvanski v. Village of Lombard*, 342 Ill. App. 3d 248 (2nd Dist. 2003)...........................................38

*Terrell v. Childers*, 1996 WL 385310 (N.D. Ill. July 3, 1996) ...............................................67, 73

*Thomas v. Cook Cty. Sheriff's Dept.*, 604 F. 3d 293 (7th Cir. 2009) ................................................15

*Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006) ......................................................37

*Tolliver v. Gonzalez*, 10 C 1879, 2011 WL 5169428 (N.D.Ill. Oct. 31, 2011) ...........................56

*Torres v. City of Chi.*, 2015 WL 12843889 (N.D. Ill. Oct. 28, 2015) .........................................13

*Townsend v. Benya*, 287 F. Supp. 2d 868 (N.D. Ill. 2003) .........................................................57

*Traylor v. Husqvarna Motor*, 988 F.2d 729 (7th Cir. 1993) ......................................................32

*United States v. Abel*, 469 U.S. 45 (1984) ........................................................................ 9, 87

*United States v. Anifowoshe*, 307 F. 3d 643 (7th Cir. 2002) .....................................................40

*United States v. Asher*, 178 F. 3d 486 (7th Cir. 1999) ............................................................19

*United States v. Baker*, 655 F. 3d 677 (7th Cir. 2011) ............................................................19

*United States v. Brooks*, 125 F. 3d 484 (7th Cir. Cir. 1997) ....................................................21

*United States v. Brown*, 871 F.3d 532 (7th Cir. 2017) ....................................................37, 41, 43

*United States v. Dish Network LLC*, No. 09-3073, 2017 WL 2427297 (C.D. Ill. June 5, 2017)..............89

*United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014)....................................................19, 67, 73

*United States v. Gypsum Co. v. Lafarge No. Am. Inc.*, 2009 WL 3871823 (N.D. Ill. 2009)........................20

*United States v. Harris*, 536 F. 3d 798 (7th Cir. 2008).............................................................21

*United States v. Medina*, 755 F.2d 1269 (7th Cir. 1985).......................................................*passim*

*United States v. Perkins*, 548 F.3d 510 (7th Cir. 2008) ........................................................ 100

*United States v. Proano*, No. 17-3466, 912 F. 3d 431 (7th Cir. 2019)....................................37, 38, 39

*United States v. Richards*, 719 F.3d 746 (7th Cir. 2013) ...................................................... 100

*United States v. Robinson*, 161 F. 3d 463 (7th Cir. 1998) .......................................................18

*United States v. Thompson*, 359 F. 3d 470 (7th Cir. 2004) .......................................................21

*United States v. Zahursky*, 580 F. 3d 515 (7th Cir. 2009) .......................................................21

*Van Bumble v.Wal-Mart Stores, Inc.*, 407 F.3d 823 (7th Cir. 2004).............................................55

*Via v. Lagrand*, No. 03 C 3278, 2007 WL 495287 (N.D. Ill. Feb. 12, 2007) ............................................. 39

*Westmoreland v. CBS Inc.*, 601 F. Supp. 66 (S.D.N.Y. 1984) ........................................................... 32

*Wilbon v. Plovanich*, 2016 WL 890671, 2016 WL 3922906 (N.D.Ill. July 21, 2016) ........................ 43, 58

*Wilson v. City of Chi.*, 6 F. 3d 1233 (7th Cir. 1993) ...................................................................... 20

**Rules**

Federal Rule of Civil Procedure 26 .......................................................................................... 29, 46

Federal Rule of Civil Procedure 30 .......................................................................................... 42

Federal Rule of Civil Procedure 37 .......................................................................................... 71

Federal Rule of Evidence 105 ................................................................................................... 73

Federal Rule of  Evidence 401 ............................................................................................... *passim*

Federal Rule of Evidence 402 ................................................................................................. *passim*

Federal Rule of Evidence 403 ................................................................................................. *passim*

Federal Rule of Evidence 404 .......................................................................................... 16, 18, 29

Federal Rule of Evidence 407 ....................................................................................... 85, 112, 113

Federal Rule of Evidence 602 ....................................................................................... 47, 103, 108

Federal Rule of Evidence 607 ................................................................................................... 81

Federal Rule of Evidence 608 ................................................................................................... 26

Federal Rule of Evidence. 702 ................................................................................................. 108

Federal Rule of Evidence 703 ................................................................................................. 108

Federal Rule of Evidence 801 ....................................................................................... 26, 99, 103, 105

Federal Rule of Evidence 803 ....................................................................................... 94, 108

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 1**

Defendants' motion *in limine* no. 1 ignores the central relevance and high probative value of the crucial moments on BWC video and audio (including still shots and slow motion) when defendants enter plaintiffs' building and apartment, including the video and audio that is *missing* from defendants' Cappello and Egan who, plaintiffs testified, pointed guns at them immediately following entry. (Dkt. #632-1, at 1); Sehner, Donnelly, Hernandez and Guzman BWCs attached as <u>Group Exhibit 1</u>; Fed. R. Evid. 401 and 403. For the following reasons, granting any part of defendants' motion would cause severe, *unfair* prejudice to plaintiffs. Fed. R. Evid. 403. Defendants' motion must, therefore, be denied.

Contrary to defendants' misrepresentations, the BWC of defendants' entry, including *the lack* of BWC from Cappello, Egan, and Guzman, is extremely relevant and probative evidence of plaintiffs' federal and state law claims, including the cause of their psychological damages. Fed. R. Evid. 401, 402 and 403. The BWC video and audio that defendants seek to bar shows: Hernandez and Donnelly breaching both security doors of plaintiffs' building without knocking or announcing then ascending the stairs to plaintiffs' apartment while screaming "CHICAGO POLICE SEARCH WARRANT!"; Cappello, Sehner, Donnelly and Hernandez with *guns drawn* as they climb the stairs up to plaintiffs' apartment and as they enter plaintiffs' apartment; all defendant officers breaching and entering the front door to plaintiffs' apartment without knocking or announcing; (despite all officers testifying that they kept their firearms in "the low ready" position at all times) Cappello and Donnelly raising their guns up and preparing to point them as they cross the threshold into plaintiffs' apartment; officers repeatedly screaming "GET ON THE GROUND!" and "GET ON THE FUCKING GROUND!" as Peter is visible behind the apartment front door (on Sehner's BWC), and plaintiffs' first verbal reaction occurs ("OH MY GOD, THEY'RE GOING TO KILL

US!"); defendant Cappello standing in the kitchen, with right elbow outstretched, in a stance that is consistent with pointing his assault rifle at Mr. Mendez who is on the kitchen floor.

In particular, this segment of video and audio – in which officers are seen with guns drawn, Cappello is seen raising his rifle up and then pointing at Mr. Mendez, and Donnelly is seen pointing his firearm straight ahead – is relevant, first, because it impeaches defendants' testimony that they kept their firearms at the low-ready at all times and is direct or circumstantial evidence that Cappello and Egan pointed their firearms at Mr. Mendez, Mrs. Mendez, Peter and Jack. This evidence is directly relevant to the minor plaintiffs' *Monell* and IIED claims, Mr. and Mrs. Mendez's state law false arrest/false imprisonment claims, and all plaintiffs' assault claims. Fed. R. Evid. 401, 402 and 403.

Second, this segment of video and audio – in which defendants force their entry into plaintiffs' building and home, without knocking and announcing and waiting a reasonable time as required, when they expected to encounter children, with guns drawn and pointed while they repeatedly screamed "GET ON THE FUCKING GROUND!" - is directly relevant to plaintiffs' state law claims for assault, false arrest/false imprisonment, and IIED. Fed. R. Evid. 401 and 402. Defendants ignore the high probative value of their failure to knock and announce for plaintiffs' state law of claims. Fed. R. Evid. 403. While the court granted summary judgment for defendants on qualified immunity grounds on the failure-to-knock-and-announce portion of plaintiffs' unlawful search/invalid warrant claim under 42 U.S.C. § 1983, it specifically reserved on whether that unlawful practice is a basis for defendants' liability under plaintiffs' state law claims. (Dkt. #623, at 18-19) ("[T]his Order does not address the merits of [plaintiffs' state law claims] to the extent they are based on Defendants' failure to knock and announce"). This evidence is relevant, highly probative, and admissible to prove assault and IIED. Fed. R. Evid. 401, 402 and 403.

Third, this segment of the BWC video and audio – in which the jury can see and hear what the event was really like and what plaintiffs' initial reactions were – is highly probative evidence of defendants' liability under state law and plaintiffs' psychological damages under all counts. Fed. R. Evid. 401, 402 and 403. The event of rapid, loud, violent, forced entry into plaintiffs' building and apartment with guns drawn and screaming orders and curses – and plaintiffs' initial reaction to the event ("Oh my God, they're going to kill us!) – is direct evidence of defendants' liability for assault and intentional infliction of emotional distress and of the causation of plaintiffs' traumatic distress damages. *Id.* The fact that defendant officers' entry was "loud" and that plaintiffs were "screaming" when defendants entered is highly probative both of defendants' actions and of the traumatic character of the event for plaintiffs. (Dkt. #632-1, at 1); Fed. R. Evid. 403. The fact that Peter and Jack were near the front door when officers breached the apartment – and that Peter can be seen on BWC behind the front door as officers are streaming in – is highly probative of defendants' liability for assaulting and inflicting distress on them as well as of their traumatic distress. *Id.*

The fact that the BWC video and audio are unpleasant to watch and hear, while not reflecting well on defendants, does not constitute *unfair* prejudice to the defendants. Fed. R. Evid. 403; *United States v. Medina,* 755 F.2d 1269, 1274 (7th Cir. 1985) ("Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403") (emphasis in original). The probative value of the BWC video and audio is far higher than the risk of any *unfair* prejudice to defendants. Fed. R. Evid. 403. Defendants' BWCs recorded the incident as it actually happened and as it actually harmed plaintiffs.

Defendants' proposal to simply bar "all BWC video and audio of Officers' entry into the residence" – including all of the events and statements set forth above - is as ludicrous as it is arrogant: it is nothing but a blatant attempt to hide the evidence of defendants' misconduct from the

3

jury. The Court should not allow it. Defendants' proposal would censor all portions of the BWC video and audio that plaintiffs need in order to prove the defendants' liability and plaintiffs' damages under their *Monell* and state law counts. The BWC video and audio that defendants propose to keep "of Officers interactions with Plaintiffs" is the castrated, cleaned-up version that would hide the truth from the jury, make defendants look much better, and kill plaintiffs' case. The Court should deny defendants motion in full.

Next, while defendants also seek to bar the facts the video and audio from Cappello, Egan, and Guzman's BWCs is missing – missing because they did not wear (Cappello), did not activate (Egan) or activated late (Guzman) their BWCs – in fact, the *missing* BWC is crucial evidence for the minor plaintiffs' *Monell* claim. First, it is directly relevant to plaintiffs' claim that Cappello and Egan pointed guns at Peter and Jack, which is the predicate violation for their *Monell* claim. Defendants will argue to the jury that no BWC video shows Egan and Cappello pointing their guns at plaintiffs, especially Peter and Jack. Plaintiffs must be able to respond and explain that the reason no objective video shows them pointing at Peter and Jack is because Cappello did not wear his camera, Egan did not turn on his camera, and because, during the crucial seconds after entry when they pointed at plaintiffs, Cappello and Egan are not visible on any other officers' BWC video, including that of Guzman, who turned his BWC on too late to capture Egan and Cappello's actions during entry. Again, the defense will argue Egan and Cappello did not point at Peter or Jack because *"it is not on video,"* so plaintiffs mut be able to explain to the jury that *no video captured Egan and Cappello when they were pointing because they (Guzman) didn't wear or activate their videos when they were supposed to.*

The fact that Egan, Cappello, and Guzman did not wear or timely activate their BWCs is also crucial evidence for the minor plaintiffs' *Monell* claim in another sense. While defendants claim their failure to turn on their BWCs was innocent, plaintiffs have presented evidence of a code of silence within both CPD and IPRA/COPA; plaintiffs allege that, pursuant to the code of

4

silence, officers concealed their misconduct and were not investigated for alleged misconduct and, therefore, were led to believe, on November 7, 2017, that they could commit misconduct with impunity. (Dkt. #125, at ¶¶ 121, 123). Here, the facts that Egan, Cappello, and Guzman didn't activate their BWCs on November 7, 2017, that Egan never reported Cappello's, Guzman's or his own violations of the BWC Directive to CPD supervisors or COPA and that, ultimately, no defendant was ever disciplined for violating the BWC mandate is evidence of the code of silence at work within CPD and COPA. *Id.* at ¶¶ 35-39, 123 ("Crucially, the missing bodycam footage is from… the officers who…pointed guns at the children"; "CPD did not discipline" Cappello, Egan or Guzman for failing to timely activate their BWCs). It is also evidence of COPA's failure to investigate officer misconduct. *Id.* On November 7, 2017, Egan, Cappello, and Guzman's acts of not timely activating their BWCs served to conceal their conduct of pointing guns at Mrs. Mendez, Peter and Jack. Their efforts to defeat the BWC mandate that is supposed to foster transparency was an attempt to hide that misconduct.

This evidence of a code of silence is probative not only of plaintiffs' *Monell* claim but, in addition, defendant officers' bias as witnesses. "[P]roof of bias is almost always relevant," and it would be relevant here even absent a *Monell* claim. *See Bruce v. City of Chicago*, No. 09 C 4837, 2011 WL 3471074, at *4 (N.D. Ill. July 29, 2011) (quoting *United States v. Abel*, 469 U.S. 45, 52 (1984)); *accord Gavin v. Life Ins. Co. of North America*, No. 12 C 6178, 2013 WL 2242230, at *2 (N.D. Ill. May 21, 2013); *Ratliff v. City of Chicago*, No. 10 C 739, 2012 WL 5845551, at *4 (N.D. Ill. Nov. 19, 2012). With regard to police officers, courts in this district have long recognized that "code of silence" evidence is evidence of bias and should be admissible for that purpose alone. *Saunders v. City of Chicago,* 320 F. Supp. 2d 735, 740 (N.D. Ill. 2004) ("Defendants' motion to bar testimony that police officers in general or these officers in particular conspire to cover up one another's bad acts through a 'code of silence' is denied as overly broad. The plaintiff may

explore the possibility that the defense witnesses in this case are biased because of loyalty to one another."); *Galvan v. Norberg*, No. 10 C 739, 2006 WL 1343680, *3 (N.D. Ill. May 10, 2006) (denying similar motion because "evidence or argument of this type can go to the issue of the bias or motivation of witnesses. This is a matter that calls for Rule 403 balancing, so that the blanket motion *in limine* is denied for now, without prejudice to the reassertion of any objections on this score in the context of specific evidence when proffered at trial.").

Defendants argue that admitting evidence of defendants' failures to properly operate their BWCs to record critical portions of the incident would prejudice them by suggesting that they must also have violated plaintiffs' constitutional rights. (Dkt.#632-1, at 1). However, the Court can simply instruct the jury that defendants' failure to properly activate their BWCs does not constitute evidence that defendants violated plaintiffs' constitutional rights. Finally, defendants argue that admitting the BWC video and audio would "compound" the "substantial prejudice" defendants will experience from plaintiffs' *Monell* evidence at trial, but this Court has already made clear that it will instruct the jury regarding the difference between the minor plaintiffs' *Monell* claim against the City and plaintiffs' other claims. (Dkt. #620).

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 2

Defendants move to bar any evidence of *Defendant Officers'* "past medical conditions," "past [] results" on the State law enforcement exam, and past "discipline at non-CPD jobs[.]" DM at 2-3.[1] While Defendants do not clearly specify the evidence they seek to bar, it appears, as best Plaintiffs can tell, that Defendants seek to exclude the following evidence, all of which relates to *Defendant Cappello*:

---

[1] Plaintiffs' Motions *In Limine* (dkts. 617, 641) are cited as "PM at XXX," Defendants' Motions *In Limine* (dkt. 637) as "DM at XXX," and Defendants' Joint Responses to Plaintiffs' Motions *In Limine* (dkt. 638) as "DR at XXX."

- Defendant Cappello's deposition testimony that, after leaving the military, he was ███████████ ████████████████████████████ Exhibit 2 (Cappello Dep.) at 305:23–307:3;

- Defendant Cappello's deposition testimony that, during his deployment to Afghanistan, he ███████████████████████████████████████████████ ███████████████████ Exhibit 2 (Cappello Dep.) at 335:2–19;

- Evidence that, prior to his employment with CPD, Defendant Cappello worked as a private security guard at the Federal Reserve Bank of Chicago, where, in September 2014, he received a two-day suspension for insubordination,, unprofessional conduct, and disrespectful behavior towards his supervisor and a member of human resources, prompting Cappello to resign in October 2014, *see* Pls.' Trial Ex. No. 59;

- Evidence that, in January and March 2015, Defendant Cappello, then a recruit at the CPD Academy, received mandatory counseling after failing multiple times to attain a passing score on several CPD exams, *see* Pls.' Trial Ex. No. 58; and

- Evidence that, in April 2015, Defendant Cappello, took the State Law Enforcement Certification Exam administered by the Illinois Law Enforcement Training and Standards Board (ILETSB) but failed to obtain a passing score, including failures in the specific categories of "[j]uvenile law and processing" and "[c]ommunication in the police environment," among other categories, *see* Pls.' Trial Ex. No. 58.

Plaintiffs agree that evidence relating to Cappello's physical and psychological injuries resulting from his military service, his disciplinary infractions at his prior employment with the Federal Reserve Bank of Chicago, and his poor performance on various CPD exams and the State ILETSB exam while enrolled at the CPD Academy are generally not admissible, unless Defendant Cappello (or another Defendant) makes this evidence admissible by "opening the door," such as by volunteering testimony that he had never been disciplined in connection with any job (including prior to his employment with CPD) or by injecting testimony that he had zero difficulty becoming a CPD officer. Such testimony would render this otherwise irrelevant evidence relevant to rebut Cappello's claims and would be probative of Cappello's credibility and truthfulness.

Importantly, however, consistent with the title of Defendants' motion, any grant of this motion would necessarily apply to all parties, precluding not only Plaintiffs but also Defendants

from attempting to introduce evidence of Cappello's physical or psychological injuries suffered in combat, for all of the same reasons set forth in Defendants' motion *in limine* 2.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 3

Defendants' motion *in limine* no. 3 should be denied because it is vague and overbroad, and Defendants do not satisfy their obligation to demonstrate that the evidence they seek to bar is inadmissible for all purposes. Crucially, Defendants ignore the myriad ways in which the evidence is admissible to prove Plaintiffs' *Monell* claim. Also, contrary to Defendants' suggestion, the evidence of other complaints of misconduct against police officers have many permissible purposes under Rule 404(b), and evidence of sustained Complaint Registers (CRs) filed against the Defendants speak to many issues in this matter apart from propensity. Courts routinely admit sustained CRs at trial. Finally, the motion is premature. It should be denied.

## I. Defendants' Motion Should Be Denied Because It Is Vague and Asks for Exclusion of a Broad Category of Evidence

From its title to its substance, Defendants' MIL 3 does not clearly define the evidence sought to be barred. DM at 3-5. Its title targets "[e]vidence" of "[c]ivilian [c]omplaints," "[o]ther [l]awsuits," "[e]mployee or [o]ther [d]isciplinary [p]roceedings," and "[p]ending or [p]ast [c]laims [a]gainst Defendants." *Id.* at 3. Its first paragraphs moves to bar "Plaintiffs" from offering any "testimony, evidence, or argument regarding their disciplinary histories, disciplinary records, and other lawsuits of the Defendant Officers." *Id.* Its final paragraph asks the Court to bar Plaintiffs from "attempting to elicit testimony or otherwise introduce evidence relating to any prior discipline or other complaints of misconduct against Defendants Officers" and furthermore to "bar Plaintiffs' Trial Exhibits 57, 126-129, 131-133, 135-137, 139-140, 142-143, 145, 147-148." *Id.* at 5. Significantly, seemingly acknowledging the ambiguity as to what specific evidence is at issue in the motion, Defendants write, in the last paragraph of page 3, that the evidence at issue "would most likely be,

8

but not necessarily be limited to, prior or pending lawsuits, citizens' complaints, internal investigations and discipline against Defendant Officers." *Id.* at 3.

Defendants' motion should be denied because it is overbroad, ambiguous, and, at bottom, fails sufficiently specify the evidence sought to be barred. Notably, Defendants do not identify specific complaints of prior misconduct for exclusion, specific disciplinary outcomes for exclusion, or specific CR files or records for exclusion. Rather, Defendants are simply attempting to impose a general proposition over a broad category of evidence they have summarily labeled as "irrelevant," "prejudicial," and "propensity."

But the parties cannot before trial anticipate all of the different contexts in which evidence of prior misconduct, specifically evidence of sustained complaint registers, may be relevant to these proceedings. For example, Plaintiff could seek to introduce past CRs to impeach the Defendants or refresh the recollections of witnesses. *Torres v. City of Chi.*, 2015 WL 12843889 (N.D. Ill. Oct. 28, 2015) (evidence of CRs may be used to impeach or refresh the recollection of witnesses). What is clear, however, is that the evidence will be admissible for numerous reasons as relevant to Plaintiffs' *Monell* claim, as discussed new. The evidence might also be admissible for a variety of permissible purposes under Rule 404(b), as discussed below.

In *Austin v. Cook County*, defendants asked the court to bar any argument or testimony regarding the prior conduct or reputation of the defendants or defendants' witnesses. No. 07-c-3184, 2009 WL 7999488, at *4 (N.D.Ill. March 25, 2009). As in this case, the defendants in Austin asserted that such evidence was irrelevant and outweighed by the danger of unfair prejudice under Rule 404(b). Id. Reviewing the motion, the Court stated that "the defendants do not explain or describe what specific evidence they are referring to," and dismissed the motion as "vague and undefined." Id. The Defendants in this matter have been similarly vague and undefined. They have not objected to specific evidence or claimed as irrelevant specific claims levied against the Defendant Officers. As

9

in *Austin*, the Defendants' requests are "so vague the court has no basis on which to rule." *Id.* The Defendants have asked the Court to summarily exclude categories of evidence.

Defendants have fallen far short of their burden to demonstrate that the evidence they seek to exclude is inadmissible for all purposes. *Noble v. Sheahan*, 116 F. Supp. 2d 966, 969 (N.D. Ill. 2000) ("[A] motion *in limine* should be granted only if the evidence sought to be excluded is clearly inadmissible for any purpose."). Their general request to exclude a huge category of evidence is not an appropriate request for a motion *in limine*. *Gonzalez v. Olson*, No. 11 C 8356, 2015 WL 3671641, at *26 (N.D. Ill. June 12, 2015) (in the absence of more specific information, the court will not bar an entire category of evidence at this juncture).

Moreover, to the extent the motion's final sentence asks the Court to "bar Plaintiffs' Trial Exhibits 57, 126-129, 131-133, 135-137, 139-140, 142-143, 145, 147-148," that request should likewise be denied, because Defendants' motion nowhere identifies the specific records contained in those exhibits—let alone discuss each exhibit and explain why each has no path to admissibility. *Luce,* 469 U.S. at 41 n.4 (1984) (Court may exclude evidence in advance of trial only when clearly inadmissible).

## II.     Other Complaints, Investigations (or Lack Thereof), and Discipline (or Lack thereof) Against Defendant Officers Is Admissible to Prove Plaintiffs' *Monell* Claim

To the extent Defendants' motion discusses certain broad categories of evidence, the motion should be denied because it ignores the plain admissibility of these evidentiary categories. Simply put, Defendants' entire argument ignores Plaintiffs' *Monell* claim.

Minor Plaintiffs Jack and Peter Mendez allege that Defendants Cappello and Egan violated their Fourth Amendment right to be free from excessive force, and that the violation of their rights was caused by the City's policies and practices. Specifically, Plaintiffs' *Monell* claim alleges that the constitutional violations were caused by the City's following customs: (1) a widespread practice of allowing officers to use excessive force against children (the "widespread practice" theory); (2) the

10

absence of official policy instructing officers to not point firearms at children who are nonthreatening (the "policy gap" theory); (3) a failure to properly train police officers to avoid pointing their firearms at children who are nonthreatening (the "failure-to-train-or-discipline" theory); (4) failure to adequately investigate or discipline officer misconduct (the "failure to discipline" theory); and (5) a code of silence that allowed these customs to persist (the "code of silence" theory). At trial, Plaintiffs must prove that these customs existed and was the "moving force" behind Defendant Officers' violations of Jack and Peter's rights. *Monell v. New York City Dept. of Social Services*, 436 U. S. 658, 694 (1978). Plaintiffs must also show that City was on notice of these failures and did nothing to correct or stop them before they resulted in the Minor Plaintiffs' injuries on March 7, 2017.

To prove that the City failed in these respects, Plaintiffs must be able to present evidence of the City's deficient investigative, disciplinary, and supervisory practices. The City's deliberate indifference may be established by showing that it had knowledge of these deficient practices and failed to take steps to remedy them. *Thomas v. Cook Cty. Sheriff's Dept.*, 604 F. 3d 293, 303 (7th Cir. 2009) (policymakers deliberately indifferent when they were "aware of the risk created by the custom or practice" and "failed to take appropriate steps to protect the plaintiff"). For jurors to understand how the Defendant Officers could feel confident that they could violate Minor Plaintiffs' constitutional rights, they must hear evidence of the ways in which CPD (BIA) and IPRA/COPA investigations of officer misconduct allegations were routinely deficient. To illustrate deficiencies in specific investigative, disciplinary and supervisory practices, Plaintiffs must present examples and evidence of particular CPD (BIA) and IPRA/COPA complaint investigations and outcomes.

In addition, to show that the City was on notice of particular alleged violations and patterns of violations, Plaintiffs must present evidence of how the City failed to properly handle particular, prior misconduct allegations against particular police officers, including the Defendant Officers.

This evidence, too, is relevant to proving the City's deliberate indifference: the complaint files for Defendant Officers are, therefore, a necessary a part of this case. *Robles v. City of Fort Wayne*, 113 F. 3d 732, 735 (7th Cir. 1991)(failure to act after learning of pattern of violations would be deliberately indifferent); *Jackson v. Marion County*, 66 F. 3d 151, 152 (7th Cir. 1995) ("The usual way in which an unconstitutional policy is inferred… is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of the subordinate officers").

The evidence of Defendant Officers' prior misconduct that Defendants ask this Court to bar is admissible to prove Plaintiffs' *Monell* claim. Importantly, Defendants appear to concede this point, because their only developed argument is that the evidence is impermissible propensity evidence under FRE 404. DM at 3-5. But when offered for purposes of proving *Monell*, this evidence does not implicate FRE 404 because that rule only prohibits introduction of prior bad acts to prove "a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). For their *Monell* claim, Plaintiffs offer evidence of Defendant Officers' CR histories, CR investigations (and files), and disciplinary histories not only as further proof of the City's custom of failing to investigate or discipline officers and of a code of silence within CPD, but also as important evidence to show that the Defendant Officers in this case, especially Defendants Egan and Cappello, *knew* that the City had a custom of generally failing to investigate or discipline citizen complaints of officer misconduct, and further *knew* that a code of silence existed within CPD's rank and within the City's police accountability system, such that Defendant Officers felt knew they could violate constitutional rights with impunity—*not* to prove any of the Defendant Officers' character.

12

Accordingly, and without revealing too much of Plaintiffs' trial strategy, it is sufficient to say, for purposes of responding to this motion, that Plaintiffs plan to use Defendant Officers' CR histories, disciplinary histories, and a limited number of records from their CR files in the following three ways:

1. First, Plaintiffs plan to present the summary, career complaint histories of Defendant Officers to show that 50 citizens had separately submitted misconduct complaints against them as of the incident date (March 7, 2017), that the overwhelming majority of those complaints were closed without investigation, and that not one Defendant Officer had a complaint against him that was both sustained and not ultimately reversed by CPD.

2. Second, to demonstrate that Defendant Officers (and especially Egan and Cappello) were *aware* that CRs against them were generally not investigated and never disciplined, Plaintiffs intend to present a few illustrative records from a few CR files, as necessary to demonstrate that Defendant Officers generally received formal, written notice of citizen complaints against them (such that, when combined with the absence of investigation and/or discipline, they generally were aware that they would not be held accountable for any citizen complaint).

3. Third, to illustrate CPD's and IPRA/COPA's deficient investigative and disciplinary practices, Plaintiffs intend to present evidence regarding a couple of complaint investigations involving Defendant Officers.

4. Fourth, to illustrate the existence of the code of silence within CPD, Plaintiffs intend to introduce evidence of a few complaint investigations involving Defendant Officers (likely the same as the ones referenced in #3), as necessary to illustrate to the jury how the code of silence operated in the context of a CR investigation.

Evidence of the City's customs and how those customs manifested specifically with respect to Defendant Officers (and especially Egan and Cappello) is not merely probative of Plaintiffs' *Monell* claim but goes to the very heart of that claim because it establishes that Egan and Cappello were aware of the code of silence and of the City's general failure to investigate or discipline citizens' misconduct complaints, thereby signaling to them that they could violated Jack and Peter's constitutional rights with impunity on March 7, 2017. Fed. R. Evid. 401 and 403.

## III. Other Complaints Against Defendant Officers Are Also Admissible Under FRE 404(b)

Evidence from Defendants Officers' CR histories and CR files may also be admissible at trial for Plaintiffs' individual claims under FRE 404(b). Plaintiffs may seek to admit Defendant Officers' alleged past misconduct to explain to the jury how sworn police officers, tasked with policing in a way that respects citizens' constitutional rights, nevertheless had the opportunity, emboldened state of mind (intent) and *modus operandi* to violate Plaintiffs' constitutional rights. This evidence is also relevant for punitive damages because an officer's past misconduct is a factor in determining the reprehensibility of his conduct. Both purposes are allowed by FRE 404(b).

Under 404(b), "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but is admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." FRE 404(b). Importantly, the categories listed in the text of Rule 404(b) are not exclusive. *United States v. Robinson*, 161 F. 3d 463, 466-67 (7th Cir. 1998). "Indeed, Rule 404(b) does not require the party offering the evidence to force the evidence into a particular listed category, but simply to show any relevant purpose other than proving conduct by means of a general propensity inference." *Id.*

The Seventh Circuit has embraced an approach to Rule 404(b) evidence that focuses on the principle behind the rule rather than a specific set of factors. *United States v. Gomez*, 763 F. 3d 845, 860 (7th Cir. 2014), abrogating the four-factor test of *United States v. Baker*, 655 F. 3d 677, 681-82 (7th Cir. 2011). To evaluate whether proffered evidence is forbidden propensity evidence, courts must consider the purpose for which the evidence is offered. *Gomez* at 856. Other-acts evidence need not be excluded whenever a propensity inference can be drawn; rather, such evidence may still be used "when its admission is supported by some propensity-free chain of reasoning." *Id.* Put another way, 404(b) "excludes the evidence if its relevance to 'another purpose' is established only through the forbidden propensity evidence." *Id.* If the proponent of the evidence can make an initial

14

showing that the evidence is admissible for a non-propensity purpose, then the court must consider whether the probative value of the other-acts evidence is substantially outweighed by the risk of unfair prejudice under Rule 403. *Id.* The court must consider whether the non-propensity purpose of the evidence is actually at issue or in controversy in the case. *Id.* at 860.

In this case, the Defendant Officers' considerable complaint histories, some of which includes precisely the types of alleged misconduct Plaintiffs were victims of (excessive force, unnecessary use/display of a gun, making false statements) without ever having a single complaint sustained *and* being disciplined is the necessary context for explaining to jurors how Defendant Officers had the opportunity, the state of mind, and the *modus operandi* to violate Plaintiffs' rights on March 7, 2017. Evidence of misconduct can be admissible to put the party's later conduct in context. *United States v. Asher*, 178 F. 3d 486, 491 (7th Cir. 1999) (13 uncharged criminal acts were admissible to shed light on the party's state of mind and place his conduct in context). Many jurors may initially believe that Defendant Officers would not use excessive force against two defenseless, visibly nonthreatening children. But in the context of specific prior allegations of similar misconduct for which officers were never properly investigated or disciplined, the jury could understand how officers may have felt confident that they would never be effectively investigated or disciplined for anything they might do to the plaintiffs. The jury must understand that, before March 7, 2017, the Defendant Officers had never had a complaint against them sustained *and* disciplined. *See, e.g., Glenwood Halsted LLC v. Village of Glenwood*, 2014 WL 2862613, at *4 (N. D. Ill. June 24, 2014) (recognizing that evidence related to a defendant's "experience and expertise" would be admissible "state of mind" evidence under Rule 404(b); and *Wilson v. City of Chi.*, 6 F. 3d 1233, 1238 (7th Cir. 1993) (evidence that police officer committed similar acts of torture toward other arrestees was admissible as evidence of "intent, opportunity, preparation and plan").

Finally, the evidence is also relevant and admissible to show intent because Plaintiffs seek punitive damages. Intent or mental state is at issue where a plaintiff seeks punitive damages. *Gonzalez v. City of Elgin*, 2010 WL 3306917, at *2 (N.D. Ill. Aug. 19, 2010)("Plaintiffs also seek punitive damages… so [defendant's] intent is relevant to a matter at issue in this lawsuit.") (citing *Alexander v. City of Milwaukee*, 474 F. 3d 437, 453 (7th Cir. 2007)); *United States v. Gypsum Co. v. Lafarge No. Am. Inc.*, 2009 WL 3871823, at *5 (N.D. Ill. 2009) ("Mental state is a fact of consequence because at least some of plaintiff's claims may support an award of punitive damages, should the jury determine that defendants acted willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.")(internal citations omitted); *Akbar v. City of Chi.*, 2009 WL 3335364, at *1 (N.D. Ill. Oct. 14, 2009) ("A plaintiff's claim for punitive damages puts a §1983 plaintiff's intent at issue"). Moreover, "[t]he degree of reprehensibility [of a defendant's conduct] is the most significant factor" in determining punitive damages, and "whether the conduct involved repeated actions" is a factor to be considered when determining reprehensibility. *Estate of Moreland v. Dieter*, 395 F. 3d 747, 756-57 (7th Cir. 1995). Using excessive force against a defenseless, nonthreatening citizen is reprehensible, and Defendant Officers had been accused of it several times.

In this case, the probative value of the evidence of Defendant Officers' past conduct is not substantially outweighed by any danger of unfair prejudice. First, the probative value of defendants' past conduct is very high; without it, jurors will not understand or believe that officers could think they were at liberty to violate Plaintiffs' constitutional rights with impunity. Second, although the evidence of Defendant Officers' past conduct may be prejudicial to defendants, that prejudice does not substantially outweighed the high probative value of this evidence. FRE 403 only protects against *unfair* prejudice; it is not enough to argue that the evidence would be prejudicial or would cast defendants in a bad light. *United States v. Thompson*, 359 F. 3d 470, 479 (7th Cir. 2004)("all probative evidence is prejudicial to the party against whom it is offered"). Evidence is only unfairly

16

prejudicial if it would induce the jury to decide the case on an improper basis, commonly an emotional one. *United States v. Harris*, 536 F. 3d 798, 809 (7th Cir. 2008) (quotation omitted). Here, the evidence is not inflammatory, and therefore, will not result in a verdict that is based on emotion. *United States v. Zahursky*, 580 F. 3d 515, 525-26 (7th Cir. 2009). Finally, any potential unfair prejudice can be mitigated by an appropriate jury instruction. *See Gomez*, 763 F. 3d at 861; *see also United States v. Brooks*, 125 F. 3d 484, 500 (7th Cir. Cir. 1997) ("limiting instructions are sufficient to cure any potential prejudice resulting from the admission of Rule 404(b) evidence"). Defendants' motion should be denied.

As this evidence addresses a variety of relevant, non-propensity related issues, it should not be barred from trial as a category. Instead, Plaintiffs will identify particular CRs that they intend to use at trial, outside of the presence of the jury, and explain why those CRs are admissible under Rule 404(b). At that point, the Court can assess whether there is any danger of unfair prejudice from the CRs identified. *United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir. 1985) ("Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matters under Rule 403.").

## IV. Evidence of Egan's Sustained CR is Admissible for a Variety of Non-Propensity Reasons

Evidence of a defendant officer's sustained CRs has been deemed admissible for the abovementioned non-propensity reasons and for additional reasons in numerous cases. *E.g.*, *Petrovic v. City of Chi.*, 2008 WL 818309, at *2 (N.D. Ill. Mar. 21, 2008); *Edwards v. Thomas*, 31 F.Supp.2d 1069, 1074 (N.D.Ill.1999). Moreover, sustained CRs have been distinguished from unsubstantiated complaints as more likely to be found admissible. *Moore v. City of Chi.*, No. 02 C 5130, 2008 WL 4549137, at *5 (N.D. Ill. Apr. 15, 2008).

In Complaint Register No. 234924, a female accused Defendant Egan of excessive force, unlawful search, verbal abuse, and abuse of authority. In sum, when Egan was questioned by an

investigator, Egan made demonstrably false statements in an effort to conceal his misconduct. Finding that 9-1-1 audio recordings that had been made by the victim *during* her encounter with Egan uncontrovertibly refuted Egan's statements to the investigator, the misconduct complaint was sustained against Egan. Egan was also found to have violated CPD Rule 14 by *making false verbal statements* when he spoke to the investigator.

Notably, the investigation also revealed that Egan had taken further steps in an effort to conceal his misconduct. Specifically, the investigation revealed: the female victim dialed 9-1-1 and asked to speak with a uniformed supervisor to make a complaint. After Egan and his partner left the female's home and heard that a supervisor was being dispatched to the female's house regarding a complaint that two men broke into her home (Egan and his partner were in plainclothes and did not identify themselves as police officers), Egan and his partner called the supervisor assigned to respond to the female's home and asked the supervisor to meet before he spoke to the victim. The supervisor agreed, and Egan and his partner then met the supervisor at a specific intersection in Chicago, where Egan and his partner gave the supervisor their version of events. (Only then did the supervisor respond to the female's 9-1-1 call and speak with the victim about the incident. Later, when questioned about this conversation, the supervisor told the investigator that the victim did not say Egan did anything wrong.)

Evidence related to Defendant Egan's sustained CR may be admissible at trial for various non-propensity purposes, including, but not limited to: intent, absence of mistake or accident, knowledge, opportunity, identity, and impeachment. As one concrete example, if Plaintiffs were to probe Egan's character for truthfulness (*see* FRE 606(b)) and Egan were to testify he has never made a false statement about what transpired during a warrant execution (or that he would never do so), Plaintiffs would be entitled to impeach Egan using his sustained CR for making false statements about what happened during the above-referenced warrant execution. Because Defendants have

failed to prove that the evidence at issue (to the extent they even identify it) is inadmissible on all grounds, their motion should be denied.

## V.      Defendants' Motion Should Be Denied as Premature

Finally, in the event that this Court were inclined to grant any part of Defendants' MIL 3, it should nevertheless deny the motion because the motion is premature since Defendants have not yet finished supplementing their production of CR records for the Defendant Officers. Specifically, on February 17, 2025, Defendants produced supplemental CR histories for each Defendant Officers. *See* Exhibit 3 (Email from L. Kowalczyk to A. Hofeld, Feb. 17, 2025) at 2. The supplemental CR histories disclosed that Defendant Officer have received a significant number of additional CRs since they were deposed in this case, including several CRs (i.e., misconduct allegations) that have been SUSTAINED against them. Specifically, the CR histories reflected an additional 43 CRs against Defendant Donnelly (5 sustained), an additional 13 CRs against Defendant Hernandez (2 sustained), an additional 20 CRs against Defendant Cappello (4 sustained), an additional 6 CRs against Defendant Egan, and an additional 4 CRs against Defendant Guzman. *See* Exhibit 4 (Summary List of Recently Disclosed CRs against Defendant Officers) at 1-4. Because the supplemental CR histories do not identify the nature of the misconduct complained of in each CR (as necessary to determine whether the CR is relevant to this case and, if so, whether it is probative), Plaintiffs prepared a list of those additional, newly-disclosed CRs that may be relevant/probative in this case, sent that list to Defendants, and requested that Defendants produce the CR files for those CRs pursuant to Federal Rule of Civil Procedure 26(e). *Id.* at 1. On March 13, 2025, Defendants responded, confirming receipt of the list of undisclosed CR allegations and advised they would review the list and get back to Plaintiffs. *Id.* Accordingly, Defendants have not finished producing the records that they preemptively seek to bar now, and Plaintiffs have not yet had a full or at least

fair opportunity to review the records. Because these records may be relevant/probative in all of the ways discussed above, the motion should be denied as premature.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 4

Plaintiffs' motion *in limine* no. 8 addressed COPA's investigation of the incident in this case, moving specifically to bar evidence, examination, testimony, argument, and allusion to COPA's eight findings of "not sustained," "unfounded," or "exonerated" under Rules 402 and 403. PM at 11-15. Because Defendant Officers gave statements to COPA during the course of COPA's investigation, Plaintiffs' motion *in limine* 8 further sought an order barring reference to COPA's investigation during the course of any impeachment using Defendant Officers' COPA statements. Defendants evidently agree with Plaintiffs' narrow motion *in limine* No. 8. *See* Defs. Joint Resp. at 4-6; Defs.' MILs at 5-7.

Defendants' motion *in limine* 4 goes much further, asking this Court to also (1) bar any evidence that COPA sustained eight misconduct allegations against the Defendant Officers; (2) bar any evidence that COPA recommended that all of the Defendant Officers be disciplined in connection with their participation in the incident; (3) bar any evidence that certain Defendant Officer were *in fact* disciplined in connection with their participation in the incident; and (4) bar Plaintiffs "from calling any COPA investigator to testify at trial or from introducing any investigator's deposition testimony." Defs. Mot. at 5-7. Defendants argue this evidence should because it is "irrelevant and prejudicial." *Id.* Defendants' further reason that evidence of COPA's *investigation* should be barred as a subsequent remedial measure under Rule 407. *Id.*

This Court should deny Defendants' motion *in limine* No. 4 for two broad reasons. First, it wholly ignores the myriad ways this evidence may become admissible at trial. Second, Rule Evid. 408 does not apply to the evidence sought to be barred.

## I. The Evidence at Issue May Well Become Admissible at Trial

Numerous ways exist in which these statements may be admissible at trial here based on how trial unfolds.

To be sure, Plaintiffs do not contend that COPA's sustained findings and disciplinary recommendations related to its investigation of the incident in this case are facially relevant to Plaintiffs' claims. They are not. But, of course, irrelevant evidence sometimes becomes relevant to rebut claims made by another party. Here, there are numerous ways in which Defendants may "open the door" to this evidence. For example, if Defendants Cappello or Egan were deny that they failed to record the incident or to deny that such failure violated CPD policy, Plaintiffs would be entitled to rebut their testimony by introducing COPA's finding that they fail to record the incident, in violation of CPD policy. Similarly, if City were to deny that its officers engaged in any misconduct in connection with the incident, Plaintiffs would be entitled to introduce the City's official findings that its officer indeed engaged in conduct that violated CPD policy, Illinois law, and the U.S. Constitution. Or if any Defendant Officer suggests no none of them did anything wrong, Plaintiffs would be entitled to introduce the fact that the City formally found that *all* Defendant Officers engaged in at least some form of police misconduct in connection with the incident. *See* Exhibit 5 (COPA Summary Report of Investigation) at 1-5 (indicating that seven misconduct allegations were sustained against Egan, four were sustained against Cappello, two were sustained against Guzman, and one each was sustained against Hernandez, Donnelly, Sehner, and Dari). As a final example, if Defendants suggest that no discipline was recommended are warranted in connection with the underlying incident, Plaintiffs would be entitled to rebut such testimony by introducing the fact that COPA recommended that *all* of the Defendant Officers be disciplined for their role in the underlying incident. *See id.* at 27-9 (recommending Egan receive "a minimum" sixty-day suspension, Cappello a thirty-day suspension, Guzman a five-day suspension, Hernandez a five-day suspension, Donnelly a five-day suspension, and Sehner a three-day suspension).

Because Defendants open the door to this evidence in one of the ways described above or otherwise, Plaintiffs should not be denied the right to introduce evidence to rebut their testimony. Such rebuttal evidence is probative of Defendants' character for truthfulness. FED. R. EVID. 608(b). Because the admissibility of this evidence cannot be decided yet, Defendants' motion should be denied.

## II.     COPA's Report Contains Party Admissions

More fundamentally, virtually any statement made by COPA in its Summary Report of Investigation may properly be admitted at trial under FRE 801(d)(2). FED. R. EVID. 801(d)(2) (providing that out-of-court statements made by a party-opponent are not hearsay if (i) "the statement is offered against an opposing party" and (ii) "(A) was made by the party in a representative capacity; (B) is one the party manifested that it adopted or believed to be true; (C) was made by a person whom the party authorized to make a statement on the subject; (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; *or* (E) was made by the party's coconspirator during and in furtherance of the conspiracy." (emphasis added)). Defendants would be hard pressed to argue that COPA's Deputy Chief Administrator, who signed the Report, was not acting in a representative capacity on behalf of the City or was not authorized by the City to make statements about the issues involved in its investigation, or was not acting as the City's agent or employee. Put simply, any one of the Board's statements in the Report, such as its statement acknowledging the "resulting trauma to the Mendez family" may be admitted as an admission at trial.

## III.    FRE 407 Does Not Apply

Defendants suggest in half of a sentence that FRE 407 bars COPA's entire investigation. DM at 5. Again, the argument is moot, because Plaintiffs agree that evidence of COPA's investigation is generally not admissible unless Defendants open the door in one of the ways

22

described above or otherwise. But the argument should not be credited, because Defendants fail to make any showing that FRE 407 applies and, even if it did apply, what specific evidence it would exclude.

For all of the foregoing reasons, the Court should deny Defendants' motion *in limine* 4.

## **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 5**

Defendants' motion *in limine* no. 5 seeks to bar all mention of other incidents of police misconduct and other lawsuits filed by plaintiffs' counsel. Defendants argue that such incidents and suits are not relevant to plaintiffs' claims and have "no probative value."

Defendants' motion, which barely mentions any specific evidence, is overly broad and general as drafted and, if granted, would exclude relevant evidence. *See Dahlstrand v. FCA US, LLC*, No. 15 CV 7603, 2021 WL 4318322, at *6-7 (N.D. Ill. Jan. 14, 2021) (summarily denying several of defendants' MILs as "overly broad"); *see also Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (Court may exclude evidence in advance of trial only when clearly inadmissible). To succeed on a motion *in limine*, defendants must show that the evidence is not admissible under any circumstances. *Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1023 (N.D.Ill. 2011).

Defendants' motion essential ignores the minor plaintiffs' *Monell* claim. In this case, multiple other incidents of police misconduct, including lawsuits about those incidents, are directly relevant to the minor plaintiffs' *Monell* claim in multiple ways. First, defendants have produced numerous CR files in which one or more children ages 0-14 allege that one or more officers used excessive force against them, including pointing guns at them in circumstances where they posed no threat. (Plaintiffs' Exhibit 120). Each individual incident – as well the pattern across similar incidents - constitutes highly probative evidence of notice to the City of a practice of excessive force against children. Fed. R. Evid. 401 and 403. In addition to discussing the pattern evident from these similar

23

incidents, plaintiffs will have their police practices expert talk about some of the incidents in specific CR files as typical examples of the broader pattern of excessive force against children. *Id.*

Second, the fact that lawsuits, some of which received news coverage, were filed by children who allege that officers used excessive against them is also relevant and highly probative evidence of notice to defendant City of a widespread practice. Fed. R. Evid. 401 and 403. The incidents underlying those lawsuits, especially witnesses' testimony about those incidents, constitute relevant and highly probative evidence that a widespread practice existed on the incident date. "[S]ubsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy." *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir. 1987), *vacated on other grounds*, 835 F.2d 1222 (7th Cir. 1988); *Karney v. City of Naperville*, No. 15 C 4608, 2016 WL 6082354, at *10-11 (N. D. Ill. Oct. 18, 2016)(allegations of similar incidents of illegal search and seizure that occurred approximately one (1) and two (2) years following incident date were sufficient to plausibly allege a preexisting custom or practice); *Padilla v. City of Chicago*, 06 C 5462, 2009 WL 4891943, at *7 (N.D.Ill. Dec. 14, 2009) (evidence of a program to monitor officers with numerous CR files that was implemented two (2) years after the underlying incident is discoverable). In this case, some of plaintiffs' pattern witnesses had guns pointed at them in 2018, 2019, and early 2020 – in all cases no more than 27 months following the underlying incident on November 7, 2017. Thus, this evidence is admissible. Fed. R. Evid. 401 and 403.

Third, as set forth in response to defendants' motion *in limine* no. 31, the DOJ and PATF reports, which are relevant and otherwise admissible, contain summaries of several incidents of police excessive force that serve to illustrate DOJ's and PATF's findings, including incidents in which officers allegedly pointed their firearms at children or minors. Among other purposes, these discussions are relevant evidence of the reliability of the reports' findings, especially given defendant City's arguments that the reports' findings are not reliable. (*See* defendants' motion *in limine* No. 31).

24

Plaintiffs plan for their police practices expert, U.S. Attorney Patrick Johnson, and/or their PATF witnesses to briefly allude to them.

As a fourth example, lawsuits that have, within the 2012-2017 *Monell* period in this case, resulted in jury verdicts finding that defendant City had a code of silence and/or a failure to investigate and discipline officers may be relevant evidence of notice to the City in this case regarding the existence of those policies, especially if defendant City denies it had a code of silence or failed to investigate and discipline officer misconduct during 2012-2017. Fed. R. Evid. 401 and 403. One such example is the November 13, 2012, jury verdict in *Obrycka v. City of Chicago*, 07 C 2372, Dkt. ## 683 and 684, as explained by 913 F.Supp.2d 598, 603-605 (N.D.Ill. 2012) (denying motion to vacate jury verdict on *Monell* claim).

Fifth, instances of alleged or confirmed misconduct by defendants may be relevant under Fed. R. Evid. 404(b) and/or to impeach defendants' testimony. For example, defendant Egan, who denies that he pointed guns at Mrs. Mendez, Peter and Jack, has a sustained CR for lying to a police misconduct investigator about his conduct. Other defendants have received sustained CRs since the dates of their depositions in this case, and plaintiffs have asked defendants pursuant to Fed. R. Civ. Pro 26 (e)(1)(A) to supplement their discovery responses to produce those CR files. Defendants have acknowledged plaintiffs' request but have not produced any CR files.

Finally, while the foregoing examples of evidence may be inherently prejudicial to defendant City, they are not *unfairly* so. *United States v. Medina,* 755 F.2d 1269, 1274 (7th Cir. 1985) ("Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice… which permits exclusion of relevant matter under Rule 403") (emphasis in original). Similarly, the *Martin* and *Gonzales* decisions cited by defendants both expressly involved "unrelated" alleged police conduct, not probative instances of alleged or confirmed misconduct that are relevant to the plaintiffs' *Monell* claim or their claims against the defendant officers. *Martin v. City of Chicago*, 2017 WL 2908770, at \*6-7 (N.D.Ill. July 7,

2017); *Gonzales v. Olson*, 2015 WL 3671641, *19-20 (N.D.Ill. June 12, 2015). The court should deny defendants' motion.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 6

Defendants seek to bar "any testimony, argument, or evidence regarding subsequent remedial measures." DM at 8. But Defendants identify only two subsequent remedial measures for exclusion—"revised CPD directives" and "the Peter Mendez Act." Yet Defendants do not specify what, specifically, they seek to exclude (i.e., the fact that the Peter Mendez Act was passed, the substance of the law, the City's involvement or lack thereof in the passage of the Act, etc.). Nor do Defendants cite a single authority in support. *Id.* For these reasons alone, the motion should be denied. *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments); *Native Am. Arts v. Earthdweller, Ltd.*, No. 01 C 2370, 2002 WL 1173513, at *5 (N.D. Ill. May 31, 2002) (summarily denying defendant's MILs in part as "vague" and "overbroad" "because [defendant]" among other things "fails to sufficiently explain the evidence it seeks to exclude"); *In re Depakote*, No. 14-CV-1052-MJR-SCW, 2018 WL 9732116, at *1 (S.D. Ill. Jan. 22, 2018) (denying vague MIL to "exclude evidence and testimony about legal standards, duties, and obligations" as overbroad); *see also Luce v. United States,* 469 U.S. 38, 41 n.4 (1984) (Court may exclude evidence in advance of trial only when clearly inadmissible).

Second, Defendants fail to show that the evidence is a remedial measure that is necessarily barred by FRE 407. For failure to carry their burden, the Court should deny the motion. *See J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920, 931 (E.D. Wis. 2017) (holding that a discharge recommendation for a police officer was "not itself a remedial measure; the remedial measure was [an officer's] termination").

Third, even assuming for argument's sake that the evidence is barred by FRE 407, the Rule nevertheless permits evidence of remedial measures for purposes other than to show culpable

26

conduct. Here, evidence of revised CPD directives may become admissible at trial for authorized, for all the reasons discussed in Plaintiffs' Response to Defendants' MIL No. 27. It also may be admissible as evidence of subsequent conduct by a municipal policymaker for purposes of *Monell*. As the Seventh Circuit and numerous other courts have recognized, "subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy[.]" *Sherrod v. Berry*, 827 F.2d 827 F.2d 195, 205 (7th Cir 1987), *vacated on other grounds*, 835 F.2d 1222 (7th Cir. 1988). Here, evidence of revisions to CPD directives that occurred *after* the March 7, 2017 incident may become admissible at trial in support of Plaintiffs' *Monell* claim. *Grandstaff v. City of Borger*, 767 F.2d 161, 171-72 (5th Cir. 1985) (finding subsequent conduct by municipal policymaker sufficient to prove preexisting disposition and policy)*cert. denied*, 480 U.S. 916 (1987); *Larez v. Los Angeles*, 946 F.2d 630, 644 (9th Cir. 1991); *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right.").

Similarly, if Defendants offer evidence or argument that the interviews that Peter or Jack Mendez gave to reporters after the incident exacerbated their psychological injuries, Plaintiffs are entitled to rebut any such argument by introducing evidence that that news coverage led to the Illinois Legislature's passage of the Peter Mendez Act in 2020, which Plaintiffs' damages expert opines was, if anything, a positive experience for Peter. This is important rebuttal evidence for Plaintiffs. To the extent Defendants invoke FRE 403, they fail to make any specific showing of prejudice, let alone *undue* prejudice, as required by FRE 403.

Furthermore, either piece of evidence may become admissible for purposes of impeachment, which FRE 407 permits. *See Traylor v. Husqvarna Motor*, 988 F.2d 729, 733-34 (7th Cir. 1993) (finding that even if judge properly excluded evidence under FRE 407, "he had no basis for excluding its use to impeach testimony by defendants' expert witnesses" because "Rule 407 expressly permits the use

of evidence of subsequent repairs for purposes of impeachment"); *Westmoreland v. CBS Inc.*, 601 F. Supp. 66, 67 (S.D.N.Y. 1984) ("The fact that subsequent remedial measures are excluded as admissions of fault does not mean that competent evidence resulting from an internal investigation of a mishap must also be excluded."); *Kenny v. Se. Pennsylvania Transp. Auth.*, 581 F.2d 351, 356 (3d Cir. 1978) (explaining that despite the "general rule" that "evidence of remedial measures taken after the event is not admissible to prove culpable conduct," that rule does not apply "when the defendant opens up the issue by claiming that all reasonable care was being exercised at the time," in which case " the plaintiff may attack that contention by showing later repairs which are inconsistent with it" (citing See 2 J. Weinstein & N. Berger, Weinstein's Evidence PP 407(03), (04) (1977))); *Huckaba v. CSX Transportation, Inc.*, No. 3:13-CV-0586-SMY-PMF, 2015 WL 672334, at *5 (S.D. Ill. Feb. 17, 2015) (admitting subsequent remedial measure for purpose of impeachment).

Finally, Defendants' two-sentence argument seeking to "bar any arguments, testimony, and evidence relating to whether or not Officers later obtained a search warrant for the third-floor apartment or returned at a later time for the targets in question" under FRE 401 and 403 should be denied as moot, because Plaintiffs do not intend to introduce this evidence, and because the evidence nevertheless could become admissible at trial if Defendants open the door. For all of the foregoing reasons, Defendants' ML No. 8 should be denied.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 7

Defendants' motion *in limine* no. 7 seeks to bar all evidence and argument regarding the validity of the search warrant "and the Officers' entry." (Dkt. #632-1 at 8). Defendants' motion is agreed in part but is also overly broad, vague and, if granted in full, would cause severe unfair prejudice to plaintiffs by excluding relevant and probative evidence of plaintiffs' state law claims, the cause of plaintiffs' damages, and plaintiffs' claims for punitive damages.

Plaintiffs agree that the Court has ruled that the search warrant was valid and, accordingly, plaintiffs do not plan to present any evidence or argument that it was not valid. Dkt. #610. For the same reason, plaintiffs do not plan to present any evidence or argument that defendants did not have the legal right to enter plaintiffs' apartment. To this extent, defendants' motion is agreed.

However, plaintiffs, who were not the targets of defendants' search warrant and were not even suspects of any kind but rather an innocent, law-abiding, family of bystanders, must be able to present evidence to explain to the jury that the targets of the search warrant for "crack cocaine" were people in the third-floor apartment and that the search warrant was obtained for their second-floor apartment based on inaccurate information received and relied on by police. Similarly, plaintiffs must be able to present evidence to explain to the jury that defendant officers were not at plaintiffs' second-floor apartment because they had any suspicions about plaintiffs, that defendants did not find crack cocaine or any other contraband in plaintiffs' apartment and did not arrest, cite, charge or suspect any plaintiff of any illegal activity at any time. These facts are indispensable as case background for the jury. They were also undisputed on summary judgment. They require introduction of the complaint for search warrant and search warrant and testimony from plaintiffs and defendants. (Plaintiffs' exhibit 1 attached as <u>Exhibit 6</u>). Unless plaintiffs can explain with evidence and argument that the defendant officers obtained the search warrant for the incorrect apartment, then the jury will be left to infer (from the fact that police were executing a search warrant in *plaintiffs'* apartment or were present in *plaintiffs'* apartment) that plaintiffs must have given defendants a reason to target them or be in their apartment; in other words, there will be a cloud of suspicion over the plaintiffs' heads, the jury will wonder if plaintiffs were doing something wrong, and this would unfairly destroy plaintiffs' credibility. This would constitute severe, *unfair* prejudice to plaintiffs that would devastate their case. Fed. R. Evid. 403.

For this reason, defendants motion to bar "*any* evidence" or argument "regarding the search warrant investigation" is overly broad. (Dkt. #632-1, at 9). The fact that the police were given and relied on inaccurate information for the location of the search warrant target's apartment is indispensable information for the jury; without knowing this information, the jury will suspect, entirely erroneously, that the plaintiffs did something wrong to give police a reason to enter or be present at their apartment. That would unfairly destroy plaintiffs' credibility. Fed. R. Evid. 403. Since the court ruled that the search warrant was valid, such that count II will not go to the jury, plaintiffs do not plan to dwell on evidence or argument that defendants' search warrant investigation was deficient, but plaintiffs must be able to introduce evidence that the warrant for their apartment was based on inaccurate information about the targets' location. While defendant officers may suffer some prejudice from the jury knowing that they obtained a warrant for plaintiffs' apartment based on inaccurate information, the option of excluding this evidence altogether, as defendants advocate, would cause extreme *unfair* prejudice to plaintiffs. Fed. R. Evid. 403. Therefore, it must be admitted.

Next, defendants move to bar all evidence and argument regarding the "Officers entry" and "the *appropriateness* of the Officers' entry into their residence." (Dkt. #632-1, at 9) (emphasis added). Defendants' motion on this point is vague. While plaintiffs do not plan to present evidence or argument that defendants lacked the right to enter plaintiffs' apartment or that their entry *per se* was unlawful, *the manner or way in which defendants entered* is directly relevant to and highly probative of plaintiffs' claims in multiple ways. Fed. R. Evid. 401 and 403.

For example, while defendants move to bar, for all purposes, evidence of defendants' failure to knock and announce and wait a reasonable time, that evidence remains relevant to plaintiffs' state law claims, counts VI-XII, and plaintiffs' claims for punitive damages. Though the court granted summary judgment for defendants on qualified immunity grounds on that portion of plaintiffs' unlawful search/invalid warrant claim under 42 U.S.C. § 1983, it specifically reserved on whether

that unlawful practice is a basis for defendants' liability under plaintiffs' state law claims. (Dkt. #623, at 18-19) ("[T]his Order does not address the merits of [plaintiffs' state law claims] to the extent they are based on Defendants' failure to knock and announce"). Thus, while plaintiffs may no longer offer such evidence to prove count II, evidence of defendants' failure to knock and announce, especially in combination with forcibly entering, screaking curse words and brandishing firearms, remains directly relevant to and highly probative of plaintiffs' claims that defendant officers committed assault and intentional infliction of emotional distress. Moreover, because defendants' dismissal of the knock and announce and wait requirement is evidence of intentional, reckless and/or willful and wanton conduct, it is also relevant to plaintiffs' claims for punitive damages under their state law counts. Thus, the probative value of the evidence substantially outweighs any unfair prejudice to defendants. Fed. R. Evid. 403.

Related, defendants move to bar all evidence, including BWC video and audio, and all argument regarding defendant officers' "quick entry," including the facts that Peter and Jack were close to the front door when officers broke in, that Peter is visible behind the door on BWC, and that the entry was scary and traumatic for plaintiffs. (Dkt. # 632-1, at 9). "Quick entry" is defendants' euphemism for defendant officers' forcibly entry into plaintiffs' home without knocking or announcing or waiting a reasonable time and doing so rapidly, with guns drawn and pointed and while screaming at plaintiffs to "GET THE FUCK ON THE GROUND!" Defendants claim this evidence will cause them "severe prejudice." *Id.* at 10. Defendants' request to exclude it is brash. The evidence will not cause *unfair* prejudice to defendants. *United States v. Medina,* 755 F.2d 1269, 1274 (7th Cir. 1985) ("Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice… which permits exclusion"). As argued on summary judgment and in response to defendants' motion *in limine* no. 1, this evidence is highly probative of the minor plaintiffs' *Monell* claim, plaintiffs' state law claims, and plaintiffs' claims for punitive damages. Defendants are correct that this conduct also

"factors into" plaintiffs "emotional and property damages." (Dkt. # 632-1, at 9). For example, plaintiffs plan to argue that defendants committed assault when they were required to knock and announce but, though expecting children to be in the apartment, bashed open plaintiffs' apartment door with no advance warning, ran inside and pointed firearms directly at plaintiffs while screaming, "GET THE FUCK ON THE GROUND! As another example, defendants intentionally or recklessly inflicted emotional distress on plaintiffs when they expected to encounter children but, suddenly and without knocking or announcing and waiting, rammed open the door to plaintiffs' apartment, ran inside with guns drawn and screamed curse words while pointing guns directly at plaintiffs' heads and bodies, including children, even though plaintiffs were fully compliant and posed no danger. This conduct, including officers pointing guns directly at 5- and 9-year-old children at close range, is evidence of extreme and outrageous conduct. Because the foregoing acts are also evidence of intentional, reckless, and/or willful and wanton conduct, all evidence of these acts, including BWC video, audio and still shots, are directly relevant to plaintiffs' claims for punitive damages. Fed. R. Evid. 401. Because this evidence is more probative than unfairly prejudicial, defendants' motion should be denied. Fed. R. Evid. 403. To exclude any of this evidence would be to cause severe unfair prejudice to plaintiffs. *Id.*

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 8

Defendants stock motion *in limine* no. 8 seeks to bar plaintiffs from presenting any evidence or argument that the defendant officers violated CPD's general orders, special orders, rules, and regulations (collectively, "CPD policies"). However, defendants' policy violations are relevant and admissible to prove plaintiff's federal and state law claims, including plaintiffs' claims for punitive damages.

While it is true that violations of police regulations cannot be equated with constitutional violations, *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006), "evidence regarding policies,

32

including expert testimony, is not *per se* inadmissible." *Gaines v. Chicago Board of Education*, no. 19 C 775, 2024 WL 640802, at \*18-19 (N.D.Ill. Feb. 15, 2024) (collecting cases); *Cazares v. Frugoli*, No. 13-cv-5626, 2017 WL 4150719 (N.D.Ill. Sept. 19, 2019), *citing United States v. Brown*, No. 16-1603, 2017 WL 3947160, at \*3 (7th Cir. 2017) ("Despite its strong language, *Thompson* should not be understood as establishing a rule that evidence of police policy or procedure will *never* be relevant to the objective-reasonableness inquiry" (emphasis in original)); *see also United States v. Proano*, No. 17-3466, 912 F. 3d 431, 439 (7th Cir. 2019) ("Since *Thompson*, however, we have clarified that there is no *per se* rule against the admission of police policies or training"). In fact, evidence of defendants' policy violations can be admissible for multiple other purposes, subject to a limiting instruction such as the Seventh Circuit Pattern Instruction 7.04, which addresses rule violations in the context of section 1983 cases.

First, while a state actor's violations of agency policy are not, *ipso facto,* constitutional violations, they are nevertheless relevant to determining *whether the state actor's conduct was objectively reasonable under the Fourth Amendment. Mays v. Jackson*, No. 20 C 2134, 2020 WL 2796082, \*3 (N.D.Ill. May 29, 2020) ("…[T]he law in this circuit is that such guidelines are relevant in determining objective reasonableness, but not determinative") (emphasis added); *Lynn v. City of Indianapolis*, 2015 U.S. Dist. LEXIS 4045, at \*10 (S. D. Ind. Jan. 14, 2015) (Evidence that officers violated policy is relevant and probative of whether officers acted reasonably). Put differently, "the use of… policies may clarify for the jury what the evidence [of the individual defendant's conduct] means." *Ratliff v. City of Chi.*, No. 10 C 739, 2012 WL 5845551, at \*1-3 (N.D. Ill. Nov. 19, 2012). Here, plaintiff does not intend to admit evidence of defendants' violations of CPD policy to prove or argue that they were violations of plaintiffs' constitutional rights. However, if defendants' conduct in pointing guns at Peter and Jack violated some aspect of the City's use of force policy or training, then that

information would be relevant to the reasonableness of their conduct in light of the totality of the circumstances.

Second, evidence of defendant officers' policy violations may be relevant and admissible to prove that defendants conduct was willful and wanton or intentional under plaintiffs' state law claims. *United States v. Proano*, No. 17-3466, 912 F.3d 431, 438-440 (7th Cir. 2019) (Evidence of officer's departures from his training was relevant and admissible on the issue of his intent); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034188, *1-2 (N.D.Ill. July 27, 2010)(denying defendant's motion *in limine* to exclude police policies because they "may be considered in determining whether claimed officer misconduct is willful and wanton" and "may be relevant… to state law claims"); *Jones v. Walters*, 12-cv-5283, 2016 WL 1756908, *8 (N.D.Ill. April 29, 2016)("Such evidence may be relevant for other purposes, however, including to prove state law claims"); *Hudson v. City of Chicago*, 378 Ill. App. 3d 373, 405 (1st Dist. 2007) ("a violation of an internal police department rule can constitute some evidence of willful and wanton conduct"); *Rivera v. City of Chicago*, 401 Ill. App.3d 602, 613, 616, note 4 (1st Dist. 2010) (same); *Kolodziej v. Justice Park District*, 2020 IL App. (1st) 191032-U, ¶ 76 (1st Dist. 2020)(jury was allowed to consider violations of internal rules and policies along with other evidence in reaching a determination of willful and wanton conduct); *Suwanski v. Village of Lombard*, 342 Ill. App. 3d 248, 250-252 (2nd Dist. 2003)(jury was allowed to consider a policy that the defendant officer ignored because it was relevant to proximate causation). In this case, plaintiffs allege that the defendant officers committed intentional torts of assault, battery, false arrest/false imprisonment, intentional infliction of emotional distress, and trespass. (Dkt. #125, ¶¶ 180-223). Additionally, in each state law count, plaintiffs allege in the alternative that the defendant officers' conduct was willful and wanton or reckless. (Dkt. #125, ¶¶ 183-184, 190-191, 198-199, 204, 208-209, and 214-215). As an example, the fact that defendants' failure to knock and announce violated the text of CPD's search warrant special order is evidence that defendants conduct was

intentional or reckless. Plaintiffs should be able to introduce this requirement in the policy in order to show that defendants knowingly violated it.

Third, defendant officers' policy violations are relevant and admissible on plaintiffs' claims for punitive damages under both their § 1983 federal and state law claims. *United States v. Proano*, 912 F. 3d at 439 ("*Thompson* did not address whether evidence of police policy or training can be relevant to intent….."); *Rothwell v. City of Chicago*, No. 10 C 1338, 2011 WL 5169419, at *1 (N.D.Ill. Oct. 31, 2011)(evidence of policy violations "may be relevant to the punitive damages if liability is found as to federal or state law claims"); *Brooks v. City of Chicago*, No. 13-cv-03090, 2015 WL 354386, *5 (N.D.Ill. June 5, 2015) (denying defendants' motion *in limine* to exclude use of force guidelines, ruling that they were "relevant at a minimum to plaintiff's claim for punitive damages"); *Ratliff v. City of Chi.*, No. 10 C 739, 2012 WL 5845551, at *1-3 (N.D. Ill. Nov. 19, 2012)("…[T]he court reserves its decision as to any such testimony, evidence, or argument in support of a punitive damages claim… not foreclosed by *Thompson* and *Morton*."); *Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034188, *1-2 (N.D.Ill. July 27, 2010)(denying defendant's motion *in limine* to exclude police policies because they "may be considered in determining whether claimed officer misconduct is willful and wanton" and "may be relevant as to the potential imposition of punitive damages as to federal claims… as well as to state law claims"); *Via v. Lagrand*, No. 03 C 3278, 2007 WL 495287, at *6 (N.D. Ill. Feb. 12, 2007) ("*Thompson* did not address the potential admissibility of evidence showing a violation of internal agency rules and procedures with regard to a claim for punitive damages. The considerations may not be the same; a claim for punitive damages typically requires a showing that the defendant acted maliciously."). In this case, except for the minor plaintiffs' *Monell* claim against the City, plaintiffs expressly seek punitive damages against all defendant officers under their remaining federal claims and their state claims where they plead the standard for punitive damages and include a request for punitive damages in their prayer for relief. (Dkt. 125, ¶¶ 169, 178, 183-184,

190-191, 198-199, 204, 208-209, and 214-215, and prayer for relief at 37). Plaintiff specifically alleges that defendant officers harmed them, including Peter and Jack intentionally, deliberately, maliciously, and/or in a willful and wanton manner. *Id.*

Fourth, evidence of defendant officers' violations of CPD policy may be relevant for impeachment. If a defendant testifies that her actions complied with and did not violate policy, then plaintiffs may introduce relevant policies to impeach or rebut her testimony. *Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 818 (N.D.Ill. Feb. 11, 2010)("However, if developments at trial make evidence about police department rules and regulations relevant to an issue other than plaintiffs' constitutional rights, the court will address at that time whether the proffered evidence is admissible."); *see also United States v. Anifowoshe*, 307 F. 3d 643, 649 (7ᵗʰ Cir. 2002)("The district court is within its discretion in allowing testimony if the objecting party has already opened the door for such testimony.") (internal quotation omitted). For example, evidence that an officer had previously violated a General Order governing execution of search warrants could serve to impeach an officer who claims he always performs his duties in an identical manner in every search and in accord with CPD rules. *See Gonzalez v. Olson*, No. 11 C 8356, 2015 WL 3671641, at *13 (N.D. Ill. June 12, 2015) ("Central to Plaintiff's theory of the case, for example, is that Defendants and other officers did not properly handle the gun purportedly recovered from Gonzalez after the shooting. Evidence of CPD General Orders or other policies and procedures may be relevant to that inquiry.").

Finally, defendants' motion completely ignores that defendant officers' violations of CPD policy may be relevant and admissible to proving plaintiffs' *Monell* claim. In fact, Egan, Cappello and Guzman's violations of the CPD BWC policy are relevant and probative evidence of plaintiffs' *Monell* claim. Fed. R. Evid. 401 and 403. First, as argued in plaintiffs' response to defendants' motion *in limine* no. 1, defendants will argue to the jury that Egan and Cappello did not point their guns at Peter and Jack because no video shows them doing so. Plaintiffs must be able to explain to the jury

36

that the reason no objective video shows them pointing at Peter and Jack is because Cappello did not wear his camera, Egan did not turn on his camera, and because, during the crucial seconds after entry when they pointed at plaintiffs, Cappello and Egan are not visible on any other officers' BWC video, including that of Guzman, who turned his BWC on too late to capture the actions of Egan and Cappello during entry. In order provide this explanation to the jury, it is necessary to present evidence that Egan, Cappello, and Guzman did not turn on their cameras when they were mandated to do so. (CPD BWC Directive attached as Exhibit 7).

Second, Egan, Cappello, and Guzman's violation of CPD's bodycam mandate is relevant to plaintiffs' *Monell* claim in another way. Plaintiffs' *Monell* claim alleges that defendant officers' conduct towards Peter and Jack was in part the result of a code of silence that pervaded CPD and IPRA/COPA during 2012-2017. (Dkt. 125 at ¶ 123). Plaintiffs intend to present evidence that the actions of the three defendant officers in failing to activate their BWCs as required by CPD's BWC directive – as well as Egan's failure to report any of these violations of the BWC policy to COPA - was an attempt to hide defendants' misconduct during the crucial moments of entering and clearing plaintiffs' apartment when they are alleged to have pointed their firearms at plaintiffs. *Id.* at ¶¶ 35-39 ("[T]he 'missing' bodycam footage is from the bodycams of officers who were with or near Mrs. Mendez and Peter and Jack in the living room at the time that plaintiffs allege officers pointed guns at the children"). To prove that the code of silence operated in this manner in this case, plaintiffs must be able to briefly present evidence of CPD's BWC directive and the fact that three defendant officers violated it. *United States v. Brown*, 871 F.3d 532, 538 (7th Cir. 2017) (policy evidence admissible in civil context in factually complex cases where explanation regarding policies or procedures can help jurors understanding of key issues). Additionally, there is evidence in the form of other CRs that Egan violated the BWC order on multiple occasions. Finally, the fact that none of the defendant

officers were ultimately ever disciplined for violating the BWC order is relevant to plaintiffs' *Monell*-related allegation that the defendant City failed to discipline officer misconduct.

Finally, plaintiffs note, in passing (since they are not allowed to use footnotes per court standing order), that the text of some of defendant City's official policies, including the use of force and search warrant policies during 2012-2017, are relevant to the minor plaintiffs' *Monell* claim. In particular, the *Monell* claim alleges that there were gaps in the City's official use of force and search warrant policies that the City failed to remediate even after notice of a pattern of officer excessive force against children, including pointing guns at them. The text of these policies and the gaps in the text were the subject of plaintiffs' Fed. R. Civ. Pro. 30(b)(6) depositions of the City's witnesses and will be the subject of their testimony at trial. In addition, the text of defendant City's policies is relevant to plaintiffs' *Monell* allegation that defendant City was deliberately indifferent to a pattern of excessive force against children: to prove that the City failed to change its policies after notice, plaintiffs may need to show the City's use of force and search warrant policies to the City's 30(b)(6) witnesses and to the jury and to ask the witnesses about them.

Given the high probative value of defendant officers' policy violations, any risk of unfair prejudice to defendants can be mitigated by clear, limiting instructions. Fed. R. Evid. 401 and 403. In fact, it is common practice to admit evidence of policy violations with a limiting instruction. *Brooks v. City of Chicago*, 2015 WL 354386, *5 (denying motion *in limine* but ruling that "The Court will give the jury a limiting instruction to make clear that compliance (or non-compliance) with the police department's "Use of Force Guidelines" is immaterial to whether a constitutional violation occurred"); *see also Scott v. City of Chicago*, 07 C 3684, 2010 WL 3034188, *1-2 (N.D.Ill. July 27, 2010)(denying defendant's motion *in limine* to exclude police policies but ruling that "any such evidence during trial will be subject to an appropriately cautionary jury instruction"); *Wilbon v. Plovanich*, 2016 WL 890671, at *9 ("If plaintiffs seek to introduce a rule, regulation or order at trial,

Defendants may object or seek a limiting instruction. Defendants' motion *in limine*… is denied"), *report and recommendation adopted*, No. 12 C 1132, 2016 WL 3922906 (N.D.Ill. July 21, 2016). The Court can address any potential for unfair prejudice through limiting instructions. *Smith v. Garcia*, 2018 WL 461230, at *4, n. 1.; *Wilbon v. Plovanich*, No. 12 C 1132, 2016 WL 890671, at *9 (N.D.Ill. March 9, 2016)("…Defendants' request to bar any reference to all police department rules, policies, and general orders is overly broad… If plaintiffs seek to introduce a rule, regulation or order at trial, Defendants may object or seek a limiting instruction.  Defendants' motion *in limine*… is denied without prejudice."), *report and recommendation adopted*, No. 12 C 1132, 2016 WL 3922906 (N.D.Ill. July 21, 2016). Accordingly, the Court should deny defendants' motion *in limine* #8 and determine the admissibility of defendants' violations of CPD General Orders, Special Orders, Rules and Regulations in the context of trial.

However, defendants should be barred from arguing that the fact that the defendant officers complied with use of force, search warrant or other CPD policies is evidence they did not engage in excessive force against plaintiffs. *See U.S. v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017) (a police officer's compliance with department rules is neither sufficient nor necessary to satisfy the constitution's reasonableness requirement when determining whether the officer used excessive force).

### **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 9**

Defendants previously filed a *Daubert* motion seeking to bar Plaintiffs' experts, including the opinions of Jack Ryan, Plaintiffs' police practices and *Monell* expert. Dkt. 543. In September 2024, this Court granted in part and denied in part the motion, rejecting the overwhelming majority of Defendants' requests, including those related to Ryan. Dkt. 577. Defendants' instant motion concerns one aspect of the Court's ruling related to Ryan at pages 21-22 of the opinion,

where there Court concluded that Ryan's testimony about what the body-worn camera (BWC) video shows respecting Defendant Officers' pointing guns at Plaintiffs was inadmissible:

> The Court [] [] agrees with Defendants that Plaintiffs have not met their burden of showing that Ryan's testimony regarding the play-by-play of the body worn camera (BWC) footage would be helpful to the jury. . . . Here, the Court agrees with Defendants that Ryan's opinions regarding the still shots from the BWC footage are more akin to a 'play-by-play' of what he sees than separate opinions that are supported by the footage. Accordingly, the Court finds that Plaintiffs have not met their burden of establishing that Ryan's testimony regarding what the BWC footage shows in relation to the Defendant Officers' pointing is admissible.

Dkt. 577 at 21-22 (internal citation omitted).

Defendants' MIL No. 9 now asks the Court to prohibit Ryan "from offering any 'play-by-play' testimony and opinions." DM at 11.

To the extent that Defendants are seeking to go beyond the Court's ruling, the motion should be denied. Specifically, the Court's ruling was cabined to testimony about pointing seen on BWC. *See* Dkt. 577 at 21-22. Importantly, however, the Court's ruling did not exclude Ryan's broader opinion that the manner in which Defendant Officers handled their firearms inside Plaintiffs' apartment on March 7, 2017 was contrary to nationally-accepted standards of police policy, practice, and training. Dkt. 577 at 5-32 (not excluding this opinion). Moreover, to the extent Ryan discusses and defines various firearm-handling positions and shooter's stances, the Court did not preclude Ryan from offering testimony to help the jury to understand those opinions. Specifically, the Court did not preclude Ryan from defining what it means, as a matter of police policy, training, and practice, to have a firearm "holstered," to have a firearm in a "downward position," to have a firearm in the "low-ready position," and to take a "shooter's stance." Nor did it preclude Ryan from demonstrating for the jury the difference between these various positions. (Separately but relatedly, is important to note that the Court's *Daubert* ruling of course did not preclude Plaintiffs from introducing Defendant Officers' BWCs videos,

showing them portions and/or still shots of those videos, and asking a Defendant Officer if he agrees it shows him doing X, Y, or Z.) Next, to the extent that portions or still shots of Defendant Officers' BWC videos have already been admitted into evidence by the time Ryan testifies, the Court's *Daubert* ruling did not preclude Plaintiffs from probing his testimony about what constitutes a shooter's stance by asking him if an admitted still shot is consistent with a shooter's stance or another gun maneuver. To be clear, such testimony would occur not in the context of any play-by-play review of the BWC footage to explain what the video shows regarding gun-pointing at Plaintiffs. Rather, it would occur in the context of clarifying what, as a matter of police practice and training, is a shooter's stance and what the various other gun maneuvers are. If Defendants intend by their motion to preclude any of this evidence or testimony, it should be denied.

Finally, Defendants' motion should be denied to the extent that it seeks to preclude Ryan from presenting *all* of the underlying still shots cited in Ryan's report in the event that one of Defendants' lines of attack opens the door to such evidence. The Committee Comments to Rule 702 dictate that result. *See* FED. R. EVID. 702, Committee Comments ("[A]n adversary's attack on an expert's basis will often open the door to a proponent's rebuttal with information that was reasonably relied upon by the expert, even if that information would not have been discloseable initially under the balancing test provided by this amendment."). In sum, to the extent defendants motion attempts to go beyond the scope of the Court's ruling, the Court should deny the motion.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 10 [AGREED IN PART]

Defendants' motion *in limine* no. 10 seeks to bar all testimony and evidence of lost income, medical bills above an amount that defendants claim is the total, and any of plaintiffs' medical records that have not already been produced. (Dkt. #632-1, at 11-13). Defendants are correct that

their motion is agreed in part. Plaintiffs have never claimed lost income in this case and so they have no plans to do so at trial.

However, defendants' claims regarding bills that plaintiffs produced for Peter and Jack Mendez's medical/mental health treatment are inaccurate. Plaintiffs produced medical bills for Jack's treatment, PLAINTIFF 3741-3767, that total $12,358, and plaintiffs produced medical bills for Peter's treatment, PLAINTIFF 2345-2347, that total $1,265.00. Therefore, the total of plaintiffs' medical bills produced in discovery is $13,623.00, not $2,363. Thus, defendants' motion to bar medical bills or amounts above $2,363 should be denied.

Next, plaintiffs do not believe there are any medical or mental health records for Peter or Jack that have not already been produced. However, plaintiffs are in the process of checking with their clients and the University of Chicago to ensure that all records for all assessment and treatment services for both Peter and Jack have been produced. In the event that plaintiffs receive or become aware of any records that were not previously received and produced, then plaintiffs will promptly supplement pursuant to their Fed. R. Civ. Pro. 26(e) obligation. At this time, since defendants' motion does not identify any specific bills or mental health records that should be barred (and since in any event there is no further discovery defendants could do as to medical bills), defendants' arguments regarding justification and harm are hypothetical and speculative. "[E]vidence should be excluded only when inadmissible on all possible grounds." *Delgado v. Mak*, No. 06 C 3757, 2008 WL 4367458, at *1 (N.D. Ill. March 31, 2008) citing *Hawthorne Partners v. AT & T Techs., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993); *Alexian Brothers Health Providers Ass'n, Inc. v. Humana Health Plan, Inc.*, 608 F. Supp. 2d 1018, 1021 (N.D. Ill. 2009) (same). The Court should determine admissibility of additional medical/mental health records and bills, if any, at the final pretrial conference or at trial. In the event there are additional records of assessment or treatment, the Court should not bar them. Disclosure of a modest number of additional records is harmless because the parties' medical

experts can easily review them before testifying and, therefore, there is no prejudice. With bills, there is no further discovery that could be done. In the event there are additional records of treatment and the Court barred them, then in fairness it should also bar defendants from arguing (falsely) that plaintiffs did not receive any further assessment or treatment after 2020 for their trauma from the police raid.

Next, defendants seek to bar plaintiffs Hester and Gilbert Mendez from testifying that they were recommended to obtain mental health treatment. Defendants' only argument is that plaintiffs have not produced any records to support that they were told this. (Dkt. #632-1 at 12-13). However, that is not required, and it does not mean that their testimony "lacks foundation." Under Fed. R. Evid. 602, "Evidence to prove personal knowledge may consist of the witness's own testimony." That is the only foundational requirement. Similarly, courts in the Seventh Circuit permit lay witnesses to testify about their own perceptions, including physical and emotional symptoms, so long as they do not provide expert opinions such as medical diagnoses. *Christmas v. City of Chicago*, 691 F.Supp.2d 811, 821 (N.D. Ill. 2010) (lay witnesses may testify about their own perceptions, including physical and emotional effects of defendants' alleged conduct without giving any medical diagnoses or opining on long term medical conditions.); *Macon v. City of Fort Wayne*, No. 1:11-cv-119, 2012 WL 3745375 at *8 (N.D. Ind. Aug. 28, 2012) (civil rights plaintiff could testify about his own perception of his physical and emotional health before and after the incident). The Seventh Circuit in *McCallister v. Price*, 615 F.3d 877 (7th Cir. 2010), explained that it has "never held that a plaintiff bears any burden (beyond relevance) before the plaintiff's injuries may be considered in an excessive-force case." *Id.* at 881. And no expert testimony is required to assist jurors in determining the cause of injuries that are within their common experiences or observations, including injuries caused by excessive force. *Hendrickson v. Cooper,* 589 F.3d 887, 892 (7th Cir. 2009) ("No expert testimony is required to assist jurors in determining the cause of injuries that are within

their common experiences or observations…Here, the cause of Hendrickson's pain was perfectly clear: Cooper beat him."). Finally, defendants had the opportunity to conduct discovery into the treatment recommendation that Hester and Gilbert Mendez received by subpoenaing records and testimony, but they did neither. Defendants' motion should be denied.

Finally, defendants seek to bar plaintiffs and their attorneys from presenting evidence or argument of any lack of health insurance coverage. However, defendants misleadingly cite a decision holding that evidence of *liability indemnity* coverage is inadmissible. *Braun v. Lorillard*, No. 94 C 976, 1996 WL 14033, at *2 (N.D.Ill. Jan.11, 1996) (holding that "evidence of defendants' indemnity is both irrelevant and potentially prejudicial" and "is likely to distract the jury from essential issues which it is to resolve in detached manner"). That is a wholly different issue. Here, the question is whether a *lack* of coverage due to an inability to afford it is admissible. Here, if plaintiffs were unable to obtain or follow through on prescribed treatment because they were unable to afford health insurance coverage, then that is relevant as a reason for why they did not complete a course of treatment. If defendants argue that any failure on plaintiffs' part to seek or obtain treatment is evidence that plaintiffs were not seriously injured, then plaintiffs may introduce evidence that the reason they did not seek treatment is because they faced the financial obstacle of affordability. *Crey v. Kankakee School Dist.* #111, 15-CV-1014, 2017 WL 6945336, at *6 (C.D.Ill. Feb. 6, 2017) ("[I]f defendants suggest that Plaintiff's injuries were not serious because he did not seek certain medical treatment the door would be open for Plaintiff to respond as to *why* that treatment was not sought, and, if the reason is that Plaintiff could not afford treatment, such testimony would certainly be admissible) (emphasis in original). Defendants' motion should, therefore, be denied.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 11

In motion *in limine* no. 11, defendants ask this Court to categorically bar all witnesses, including expert witnesses, from offering opinions about the credibility or accuracy of other

witnesses' testimony, arguing that such opinions are disallowed by Rules 702 and 403. DM at 13-14. But Defendants' terse, six-sentence motion is not developed in a way that permits a response. Defendants fail to identify a single piece of opinion testimony that they seek to have exclude, leaving it to Plaintiffs and the Court to guess. Without knowing what specific testimony Defendants are referring to, Plaintiffs cannot possible explain why the evidence is admissible on some ground. The motion to exclude a category of evidence without further explanation is improper. *Gonzalez*, 2015 WL 3671641, at *26; *see Noble*, 116 F. Supp. 2d at 969. For this reason alone, the motion should be denied.

It is also meritless. From what little explanation Defendants provide, their motion to exclude testimony about "accuracy" would mean Jack and Peter Mendez could not testify that Defendants Egan and Cappello are incorrect and that both pointed firearms directly at their heads and faces and chests. Defendants' argument to the contrary is absurd and detached from the Federal Rules of Evidence.

To the extent Defendants' motion targets expert opinions, a *Daubert* motion is the proper way to make any such argument. Needless to say, defendants' six-sentence argument is not a *Daubert* motion. It should be denied. *Cf. Native Am. Arts*, 2002 WL 1173513, at *5; *Christmas*, 691 F. Supp. 2d at 821; *In re Depakote*, 2018 WL 9732116, at *1; *Dahlstrand*, 2021 WL 4318322, at *6-7; *Hillard v. City of Chi.*, 2010 WL 1664941, at *3; *Saunders v. City of Chi.*, 320 F. Supp. 2d at 740; *Garcia*, 2010 WL 11713400, at *2; *Rosenberg*, 2007 WL 2028789, at *4.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 12

Defendants' motion *in limine* no. 12 seeks to bar plaintiffs and their witnesses from mentioning that defendants failed to call particular witnesses or to present certain evidence. Defendants' motion should be denied for at least two reasons. First, defendants' motion fails to mention any specific witness or evidence and, thus, is impossible to evaluate. *Gaines v. City of Chicago*,

2024 WL 640802, at *19 (N.D.Ill. Feb. 15, 2024)("[B]ecause defendants have not sufficiently identified the specific evidence for which this is the only purpose, the motion is denied), *citing Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1023 (N.D.Ill. 2011) (appropriate to exclude evidence *in limine* "only when movant shows that the evidence is inadmissible on all potential grounds"). Second, defendants' motion should be denied because such argument is the essence of trial advocacy. Regarding the second point, defendants' motion conflates two different concepts. Seventh Circuit pattern instruction 1.18 is a statement about how the law does not require the parties to present all witnesses or evidence; it also contains a suggestion that to do so would be cumulative or unnecessary. It does not limit the arguments about the evidence that the parties can make or the inferences that the jury can draw. Plaintiffs are allowed to point out to the jury that defendants failed to call one or more important witnesses or failed to present or one or more important pieces of evidence. Indeed, the very next instruction in the Seventh Circuit, 1.19, recognizes that the jury may draw just such an adverse inference from a party's failure to call a witness: "[Witness] was mentioned at trial but did not testify. You may, but are not required to, assume that [Witness's] testimony would have been unfavorable to [Plaintiff] [Defendant]." (Federal Civil Jury Instructions of the Seventh Circuit (2917 rev.)), at 25. Thus, defendants motion should be denied.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 13

In their motion *in limine* no. 13, Defendants seek a sweeping order barring "any evidence or argument[] [] [] relating to [any Plaintiff's] 'good' character." DM at 14. Again, Defendants motion is overbroad and generalized. The only evidence specifically identified for exclusion is "Plaintiff Gilbert Mendez's award from the 14th Police District's CAPS Advisory Council" and "letters of recommendation from the 14th District." *Id.* But Plaintiffs agree this evidence is typically inadmissible and therefore do not intend to introduce it, provided, however, that Defendants do

open the door by arguing that Plaintiffs are biased against police officers or otherwise impugning, directly or indirectly, Mr. Mendez's character. Therefore, the motion should be denied as moot.

To the extent Defendants' motion *in limine* 13 also seeks to bar "any testimony bolstering Plaintiffs' credibility," it should be denied. Again, Plaintiffs are unsure what evidence Defendants are referencing, and Defendants notably do not identify any evidence in support, leaving it to Plaintiffs and the Court to guess. As such, the request is not developed in a way that allows a response and is therefore forfeited. *See Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (holding that an undeveloped argument is forfeited); *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments). In short, the Court should deny Defendants' motion as overly broad and lacking in specificity as to the evidence sought to be barred. *See Native Am. Arts v. Earthdweller, Ltd.*, No. 01 C 2370, 2002 WL 1173513, at *5 (N.D. Ill. May 31, 2002) (summarily denying defendant's MILs in part as "vague" and "overbroad" "because [defendant]" among other things "fails to sufficiently explain the evidence it seeks to exclude"); *Christmas v. City of Chi.*, 691 F. Supp. 2d 811, 821 (N.D. Ill. 2010) (summarily denying MIL as over broad); *In re Depakote*, No. 14-CV-1052-MJR-SCW, 2018 WL 9732116, at *1 (S.D. Ill. Jan. 22, 2018) (denying vague MIL to "exclude evidence and testimony about legal standards, duties, and obligations" as overbroad); *Dahlstrand v. FCA US, LLC*, No. 15 CV 7603, 2021 WL 4318322, at *6-7 (N.D. Ill. Jan. 14, 2021) (summarily denying several of defendants' MILs as "overly broad"); *Hillard v. City of Chi.*, No. CIVA 09C2017, 2010 WL 1664941, at *3 (N.D. Ill. Apr. 23, 2010) (same); *Saunders v. City of Chi.*, 320 F. Supp. 2d 735. 740 (N.D. Ill. 2004) (same); *Garcia v. City of Chi.*, No. 08 C 5354, 2010 WL 11713400, at *2 (N.D. Ill. Apr. 15, 2010) (same); *Rosenberg v. Cottrell, Inc.*, No. 05-545-MJR, 2007 WL 2028789, at *4 (S.D. Ill. July 12, 2007) (denying numerous MILs as "over broad" and "lacking the specificity required of a motion in limine"); *see also Luce v. United States,* 469 U.S. 38, 41 n.4 (1984) (Court may exclude evidence in advance of trial only when clearly inadmissible).

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 14**

Defendants' one-sentence motion to bar Plaintiffs from opining that Defendant Officers should have been disciplined or fired as a result of the November 7, 2017 incident (*see* DM at 14) is not developed in a way that permits a response. *Otto*, 134 F.3d at 854 (refusing to consider unsupported or cursory arguments). Even if were not undeveloped, the motion should still be denied as premature because the admissibly of any such testimony cannot be decided now. Plaintiffs' feelings about what happened to them on March 7, 2017—particularly the minor Plaintiffs' feelings surrounding having guns pointed at their heads and chests—combined with their desire to hold Defendant Officers to account for their misconduct, is certainly relevant to Plaintiffs' damages in this case. It may also become relevant to other issues at trial, depending on the issues Defendants raise on cross-examination. Any determination of the admissibility of such a line of questioning now is far too premature. Defendants' motion should be denied.

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 15**

In a single paragraph, Defendants move to bar Plaintiffs and any lay witnesses from "offering evidence, testimony, arguments, or innuendo regarding any medical or psychological causation, permanency, future disability, or future pain and suffering relating to any health or psychological injuries they claim they suffered as a result of the underlying incident." DM at 15. Defendants' request is overbroad. In accord with FRE 701 and well-settled law, Plaintiffs should be permitted to testify about their own experiences of pain, injury, and psychological trauma, including but not limited to Jack and Peter's psychological injuries, resulting from Defendants' conduct. Of course, Plaintiffs will not testify that they have made any complex medical diagnoses—such as Jack or Peter's PTSD diagnoses - though they may testify about each of their emotional symptoms.

Courts in the Seventh Circuit permit lay witnesses to testify about their own perceptions, including physical and emotional symptoms, so long as they do not provide expert opinions such as

48

medical diagnoses. *Christmas v. City of Chi.*, 691 F.Supp.2d 811, 821 (N.D. Ill. 2010) (lay witnesses may testify about their own perceptions, including physical and emotional effects of defendants' alleged conduct without giving any medical diagnoses or opining on long term medical conditions); *Macon v. City of Fort Wayne*, No. 1:11-cv-119, 2012 WL 3745375 at *8 (N.D. Ind. Aug. 28, 2012) (allowing civil rights plaintiff to testify about his own perception of his physical and emotional health before and after the incident).

Contrary to Defendants' assertion, Plaintiffs are not required to establish the *cause* of their injuries—through expert testimony or otherwise—in order to introduce evidence of their injuries. *McCallister v. Price*, 615 F.3d 877, 881-82 (7th Cir. 2010) (explaining that the Seventh Circuit has "never held that a plaintiff bears any burden (beyond relevance) before the plaintiff's injuries may be considered in an excessive-force case"). And no expert testimony is required to assist jurors in determining the cause of injuries that are within their common experiences or observations, including injuries caused by excessive force. *Hendrickson v. Cooper,* 589 F.3d 887, 892 (7th Cir. 2009) ("No expert testimony is required to assist jurors in determining the cause of injuries that are within their common experiences or observations…Here, the cause of Hendrickson's pain was perfectly clear: Cooper beat him."). Here, the evidence of Plaintiffs' trauma, combined with the absence of any probative evidence other sources of significant trauma, make it equally clear that Plaintiffs' psychological injuries and emotional distress resulted from the trauma they had to endure on November 7, 2017.

Defendants do not specify a single lay opinion they wish to exclude at trial, only referring generally to various topics. However, Plaintiffs intend to abide by Federal Rule of Evidence 701 and provide testimony related to their own experiences, not medical diagnoses. Accordingly, Defendants' motion should be denied.

49

In a final sentence, Defendants further move to bar Plaintiffs and any lay witnesses from "offering any opinions on police practices these [sic]." DM at 15. It is unclear what Defendants are referencing. Again, they do not identify any specific opinion to which they are referencing. *Id.* Nor do the offer any discussion beyond their one-sentence request. *Id.* Defendants' request should be denied as overbroad and for failing to carry their burden of demonstrating that the evidence at issue (which, again, is unclear) has *zero* pathways to admissibility. Plaintiffs cannot fairly respond to an argument that is so vague and undeveloped. It should be denied.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 16

Defendants' motion *in limine* no. 16, which seems to be a reprise of defendants' motion in *limine* no. 10, seeks to bar all evidence of plaintiffs' wealth or poverty. (Dkt. #632-1, at 11-12 and 15-16). Defendants' motion is overly broad, short on specifics, and should be denied on this basis alone. *See Native Am. Arts v. Earthdweller, Ltd.*, No. 01 C 2370, 2002 WL 1173513, at *5 (N.D. Ill. May 31, 2002) (summarily denying defendant's MILs in part as "vague" and "overbroad"); *Christmas v. City of Chi.*, 691 F. Supp. 2d 811, 821 (N.D. Ill. 2010) (summarily denying MIL as over broad); *In re Depakote*, No. 14-CV-1052-MJR-SCW, 2018 WL 9732116, at *1 (S.D. Ill. Jan. 22, 2018) (denying vague MIL as overbroad); *Dahlstrand v. FCA US, LLC*, No. 15 CV 7603, 2021 WL 4318322, at *6-7 (N.D. Ill. Jan. 14, 2021) (summarily denying several of defendants' MILs as "overly broad"); *Hillard v. City of Chi.*, No. CIVA 09C2017, 2010 WL 1664941, at *3 (N.D. Ill. Apr. 23, 2010) (same); *Saunders v. City of Chi.*, 320 F. Supp. 2d 735. 740 (N.D. Ill. 2004) (same); *Garcia v. City of Chi.*, No. 08 C 5354, 2010 WL 11713400, at *2 (N.D. Ill. Apr. 15, 2010) (same); *Rosenberg v. Cottrell, Inc.*, No. 05-545-MJR, 2007 WL 2028789, at *4 (S.D. Ill. July 12, 2007) (denying numerous MILs as "over broad" and "lacking the specificity required of a motion in limine"): *see also Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (Court may exclude evidence in advance of trial only when clearly inadmissible).

Defendants mention only one, specific piece of evidence – plaintiffs' inability to afford health insurance. (Dkt. #632-1, at 15). However, this may be admissible. As argued in response to defendants' motion *in limine* 10, if plaintiffs were unable to obtain or follow through on recommended or prescribed psychotherapy because they were unable to afford health insurance coverage, then that is relevant as a reason for why they did not seek or complete the treatment. Fed. R. Evid. 401. If defendants argue that any failure on plaintiffs' part to seek or obtain treatment is evidence that plaintiffs were not seriously injured, then plaintiffs are allowed to introduce evidence that the reason they did not seek treatment is because they faced the financial obstacle of affordability. *Crecy v. Kankakee School Dist.* #111, 15-CV-1014, 2017 WL 6945336, at *6 (C.D.Ill. Feb. 6, 2017) ("[I]f defendants suggest that Plaintiff's injuries were not serious because he did not seek certain medical treatment the door would be open for Plaintiff to respond as to *why* that treatment was not sought, and, if the reason is that Plaintiff could not afford treatment, such testimony would certainly be admissible) (emphasis in original); *Van Bumble v.Wal-Mart Stores, Inc.*, 407 F.3d 823, 826-27 (7th Cir. 2004)( affirming trial court's ruling that, "if Wal-Mart opened the door by eliciting testimony as to why Helen did not seek treatment for that two-year period, then plaintiffs would be given the opportunity to explain their insurance situation"). Defendants' motion should, therefore, be denied.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 17 [AGREED]

Defendants' motion *in limine* No. 17 is agreed.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 18

Defendants motion in *limine* No. 18 seeks to bar plaintiffs from making any reference to defendant City's indemnification of defendant officers.

The City is a defendant in this case both by virtue of plaintiffs' *Monell* claim and plaintiffs' *respondeat superior* (count 11) and indemnification counts (count 12). (Dkt. # 125, at 36-37).

Moreover, defendant City is not contesting that the defendant officers acted at all times within the scope of their employment. (Dkt. #133, at 5, ¶ 20). Since jurors will be reluctant to award significant compensatory damages against the defendant officers given scant public awareness of a municipality's obligation to indemnify, it is only fair that jurors be informed of the defendant City's duty to indemnify the defendant officers for any award of compensatory damages. *Tolliver v. Gonzalez*, 10 C 1879, 2011 WL 5169428 (N.D.Ill. Oct. 31, 2011), at *3 (citing "danger that a jury, uninformed about any right of indemnification and aware of the comparatively modest income of police officers, could be inclined to lowball a damage award because of that awareness"). Instead of being left in the dark and risking prejudice to plaintiffs, the jury should be instructed regarding the City's duty to indemnify for compensatory damages. *Id.* The risk of any unfair prejudice to defendants can be mitigated by an instruction to the jury that no consideration of the fact of indemnification is permitted to enter into the jury's determination of reasonable damages. *Id.*

In the alternative, since plaintiffs recognize that evidence of indemnification is generally inadmissible, if the defendant officers offer testimony suggesting that any damages award against them (whether compensatory or punitive) would work a financial hardship on them, then this would open the door to evidence from plaintiffs that any compensatory damage award against defendant officers would be indemnified by the City. *See Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1030-31 (N.D. Ill. 2011) ("Betts is barred from … presenting any evidence or testimony that the defendants may be indemnified by the City of Chicago for damages. However, if the defendants plead poverty as to any damages, Betts may offer evidence of indemnification."); *see also Hillard v. City of Chicago*, No. 09 C 2017, 2010 WL 1664941, at *4 (N.D. Ill. Apr. 23, 2010) ("If defendants open the door by introducing evidence that they are personally responsible for punitive damages, judges in this district generally permit plaintiffs to inform the jury that defendants will be indemnified for compensatory damages.") (citing *Delgado v. Mack*, No. 06 C 3757, 2008 WL 4367458, at *4-5) (N.D. Ill. Mar. 31,

2008); *Galvan v. Norberg*, No. 04 C 4003, 2006 WL 1343680, at *2 (N.D. Ill. May 10, 2006); *Townsend v. Benya*, 287 F. Supp. 2d 868, 875 (N.D. Ill. 2003); *Hill v. City of Chicago*, No. 06 C 6772, 2011 WL 3205304, at *4 (N.D. Ill. July 28, 2011) (noting that a defendant who improperly puts on evidence of his or her financial condition opens the door to the admission of evidence about indemnification).

In this case, then, in the event plaintiff is not permitted to introduce evidence of the City's duty to indemnify defendant officers, then, if any defense counsel or defendant officers, who benefit from their right of indemnification by defendant City, "opens the door" by testifying or arguing that 1) his financial circumstances render him personally unable to pay damages or 2) that he will have to pay punitive damages out of his pocket, then at that point plaintiffs must have the right to admit evidence about how any judgment against defendant officers for compensatory damages will be paid by defendant City of Chicago. *Gonzalez v. Olson*, No. 11 C 8356, 2015 WL 3671641, at *7 (N.D. Ill. June 12, 2015) ("But if Defendants plead poverty as to punitive damages, they open the door for Plaintiff to offer evidence of indemnification as to compensatory damages."); *Hyung Hye Yano v. City Colleges of Chicago*, No. 08–cv–04492, 2014 WL 7450559, at *8 (N.D. Ill. Dec. 31, 2012) ("If Defendants 'open the door' by introducing evidence that they would be personally responsible for damages, or that they would face financial hardship or otherwise have an inability to pay damages, Plaintiff may inform the jury that Defendants will be indemnified for compensatory damages."); *see also Bruce v. City of Chicago*, 09 C 4837, 2011 WL 3471074, *3 (N.D.Ill. July 29, 2011), at *3; *Wilbon v. Plovanich*, No. 12 C 1132, 2016 WL 890671, at *3 (N.D.Ill. March 9, 2016), *citing Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998).

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 19

Defendants' motion *in limine* no. 19 seeks to bar certain opinions of plaintiffs' medical expert, Dr. Berkowitz. (Dkt. #632-1, at 17-19). For the following reasons, defendants' motion should be denied.

Dr. Berkowitz is board-certified in Child and Adolescent Psychiatry and has decades of experience assessing and treating PTSD and related disorders in children and adolescents. He did his internship, residency and post-residency fellowship at Yale University, where he was subsequently a Professor in Child and Adolescent Psychiatry for 18 years. He staffed and supervised fellows at the Yale Child Study Center for 15 years and directed Yale's Child and Adolescent Forensic Programs and Yale's Child Violent Trauma Center. He was also a professor of clinical psychiatry at the University of Pennsylvania medical school for 9 years and directed the Penn Center for youth and Family Traumatic Stress Recovery. He founded and currently directs the Stress, Trauma & Adversity Research and Treatment (START) Center at the University of Colorado where he is also a Professor in Psychiatry in the medical school. (Dr. Berkowitz's report for Peter (including CV), report for Jack (including CV), rebuttal report, and dep transcript, attached as Group Exhibit 8).

In this case, Dr. Berkowitz: 1) interviewed Peter, Jack and their parents more than once; 2) administered standardized psychometric scales; 3) reviewed all available medical, mental health, and school records for Jack and Peter; 4) reviewed all plaintiffs' and their medical treaters' deposition testimony and 5) and reviewed accounts of the underlying incident, including the BWC videos and other materials. Dr. Berkowitz found that, as the result of the police raid and of defendants pointing guns at him and handcuffing his father in front of him, Jack now suffers from severe Post-Traumatic Stress Disorder (PTSD), exacerbated ADHD symptoms and learning deficits, his mental health prognosis is poor, and he will require psychotherapy and psychiatric support throughout life. (Report for Jack at 8-14; rebuttal at 11). Dr. Berkowitz concluded that Peter suffers from Trauma and Stressor Related Disorder and anxiety, his prognosis is guarded, and he will require additional psychotherapy and psychiatric support at various times in life. (Report for Peter at 9-12).

Defendants move to bar Dr. Berkowitz's rebuttal report for containing new opinions, evidence and/or arguments rather than true rebuttal opinion. Defendants' motion should be denied

54

for three reasons. First, defendants fail to identify a single, specific new opinion or "argument" in the report and, thus, the motion must be denied as too broad and vague. *Native Am. Arts v. Earthdweller, Ltd.*, No. 1 C 2370, 2002 WL 1173513, at *5 (N.D.Ill. May 31, 2002) (denying defendant's motions *in limine* in part as "vague" and "overbroad" because defendant "fails to sufficiently explain the evidence it seeks to exclude"). Second, defendants, who already moved to strike Dr. Berkowitz's rebuttal opinions based on this same argument, seek a second bite at the apple. Defendants previously moved to strike Dr. Berkowitz's rebuttal opinions 1, 4, 5 and 12, claiming they were new opinions. (Dkt. # 422). The Court considered each of defendants' arguments and rejected them all, finding that Dr. Berkowitz's rebuttal opinions were true rebuttal that "in response" to Dr. Kraus' opinions, including Dr. Berkowitz's rebuttal opinions relating to BWC video and school records, some of which were not available when he prepared his initial report and some of which he did review but inadvertently failed to list at first. (Dkt. #424, at 9-10).

Defendants also attack as "speculative" and "unscientific" Dr. Berkowitz's opinions that Peter and Jack's post-traumatic stress symptoms make them statistically more likely to develop other psychiatric disorders. However, this opinion, which is relevant to damages, is precisely the kind of fact that a child psychiatrist is qualified to give based on his professional education, training, and experience. Defendants ignore the fact that Dr. Berkowitz cited to published psychiatric research for this opinion. (Report for Jack, at 13, note 4). Additionally, Dr. Berkowitz's CV shows he has published peer-reviewed work regarding this correlation. (At 17). His opinions in this regard are clearly based on extensive, published research; the Court may take judicial notice that there are hundreds of scientific research articles finding a positive correlation between PTSD and the other psychiatric disorders that Dr. Berkowitz addresses. (*See, e.g.,*

https://www.nctsn.org/sites/default/files/resources/making_the_connection_trauma_substance_abuse.pdf (PTSD and substance abuse); https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3051362/

(PTSD and substance abuse); https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7314975/ (PTSD and substance abuse); https://www.sciencedirect.com/science/article/pii/S0145213414000350 (PTSD and depression and anxiety);

https://www.sciencedirect.com/science/article/pii/S0165032722007182; (PTSD and Depression and anxiety); https://www.sciencedirect.com/science/article/pii/S0145213414000350 (PTSD and Depression and anxiety). Finally, this court last year rejected defendants' argument when leveled at this same opinion of Dr. Berkowitz's. In *Gaines v. Chicago Board of Education*, No. 19-C-775, 2024 WL 640802, at *18 (N.D.Ill. Feb. 15, 2024), in which Dr. Berkowitz examined and diagnosed a boy with PTSD and exacerbated ADHD, defendants sought "to bar Dr. Berkowitz's opinions about [the minor's] potential for suicide, substance abuse disorder, and major anxiety disorder as purely speculative and irrelevant." *Id.* The Court rejected defendants' argument, finding that "the opinions are not speculative because an understanding of a correlation between PTSD and suicidality is well within the realm of a child psychiatrist based on his professional education, training, and experience, and he backs the opinions up with published research. *Id.* Therefore, the Court concluded, "[i]f the jury finds that defendants caused or exacerbated [plaintiff's] mental health problems, then they may consider the possible effects of those problems when considering how to compensate him." *Id.* The Court should reach the same result here.

Defendants also seek to bar Dr. Berkowitz from giving "police practices opinions." This is a mischaracterization: in fact, Dr. Berkowitz does not give any "police practices opinions." As a child psychiatrist, however, Dr. Berkowitz's is qualified to give opinions on *the psychological impact on children of police procedures or practices*. In fact, Dr. Berkowitz is highly qualified in this sub-area: he has accompanied law enforcement on police raids and has published and lectured extensively on police and first responder's treatment of children. (Deposition transcript at 97:7-11; *see also* CV at 6, 17). Dr. Berkowitz's opinions that Jack's PTSD is "the result of officers pointing guns at him and…

56

handcuffing his father in front of him" and that "bringing their handcuffed father into the room with them was inappropriate and increased both Jack and Peter's distress" are psychiatric opinions that draw on his education, qualifications, and experience as a child psychiatrist who has worked with law enforcement and children exposed to violence. (Report for Jack at 8, 13). He is well-qualified to give these opinions.

Defendants also attack Dr. Berkowitz's medical explanation of the changes that occur in the human brain as the result of the brain's physiological response to traumatic stress. Using layman's terms, Dr. Berkowitz first explains that "trauma-related disorders and symptoms are issues of the brain and are best understood as Stress Injuries." (Report for Jack, at 11). He then elaborates by explaining how the brain's over-production of cortisol that results from the human "Freeze Response" is toxic because it causes shrinkage in the areas of the brain responsible for: learning and emotional processing, judgment and assessment, verbal memory, social interaction and emotional regulation. (Report for Jack, at 11-13). Dr. Berkowitz then notes that children are especially vulnerable to these changes because their brains are still developing, and excess cortisol interferes with this development. (Report for Jack at 11). With respect to Jack, Dr. Berkowitz finds that "over 2 years of traumatic stress symptoms have injured Jack's already impaired central nervous system and have exacerbated his intellectual deficit." *Id.*; rebuttal at 11. Defendants invoke the dramatic phrase "brain damage" but these words do not appear anywhere in Dr. Berkowitz's reports. (Report for Jack, at 11-13).

These opinions are well within the purview of Dr. Berkowitz's education, qualifications, and experience: Dr. Berkowitz is a medical doctor and child psychiatrist with specialized knowledge of the brain's response to traumatic stress. There is nothing speculative or unscientific about his explanation of brain physiology in response to traumatic stress. Dr. Berkowitz is explaining a universal response, one that applies to any brain that suffers traumatic distress, including but not

57

limited to Peter and Jack's. He is simply describing physiological facts. Defendants' argument that Dr. Berkowitz does not cite studies or data to support these opinions is false: Dr. Berkowitz specifically supports his opinions with citation to current psychiatric research. (*see, e.g.,* Report for Jack, at 13, note 4) ("Herrington RJ. 'Trauma, PTSD, and the developing brain," *Current Psychiatry Reports*, 2017 Oct. 1:19 (10): 69").

Dr. Berkowitz's explanation of the physical basis of post-traumatic stress symptoms will be helpful to the jury in understanding how and why defendants' conduct caused mental injury to Peter and Jack. Moreover, Dr. Berkowitz's explanation is critical for plaintiffs' damages case. Plaintiffs will not be able to convey to the jury the full extent of Peter and Jack's traumatic stress injuries unless Dr. Berkowitz is free to explain the physical bases for them. The fact that children's brains are especially vulnerable to these changes is a physiological fact with crucial relevance for this case. Finally, defendants vaguely attack Dr. Berkowitz for not performing "a physical assessment" of Peter and Jack, but it is not at all clear what defendants are referring to and, therefore, the Court should disregard this argument as undeveloped. *See Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (holding that an undeveloped argument is forfeited); *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider cursory arguments).

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 20

Plaintiffs do not intend to introduce evidence that City witnesses are being paid to testify at trial, unless Defendants open the door to such evidence, such as by suggesting that they are testifying out of a personal desire to support the Defendant Officers. However, CPD witnesses should be permitted to explain that testifying in court in general is a routine part of their job duties and that they have received training regarding how to give effective testimony. The Court should deny this motion as moot.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 21

Defendants' motion *in limine* No. 21 seeks to bar all "golden rule" appeals as well as arguments that jurors are the "guardians of the community" whose role is to protect the public. Plaintiffs agree that golden rule appeals – in which the jury is asked to put itself in plaintiff's position or to decide the case based on personal self-interest - are improper. *Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226, 1246 (7th Cir. 1982). However, beyond that, defendants' argument is overly broad and undeveloped, and defendants cite no authority for their assertion that jurors may not consider the interests of the community at large; defendants cite *Below v. Yokohama Tire Corp.*, no. 15-cv-529, 2017 WL 764824, at *8 (W.D.Wis. Feb. 27, 2017), but in *Below* the court did not foreclose plaintiffs from discussing the community's larger interests in the case. *Id.* And, indeed, in this case, where the minor plaintiffs' *Monell* claim seeks to address a widespread practice of excessive force against young children in Chicago, a significant concern for the community's larger interests is implicit. Therefore, this portion of defendants' motion should be denied. *Gaines v. Chicago Board of Education*, No. 19 C 775, 2024 WL 640802, at *19 (N.D.Ill. Feb.15, 2024) (denying defendants' motions *in limine* where their "Rule 403 arguments are simply too broad and vague").

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 22**

In motion *in limine* no. 22, defendants seek to bar the "use" of Complaint Register (CR) files as exhibits. (Evidently, it is the City who brings this motion, to bar use of its CR files (i.e., CRs against *nondefendant officers*), whereas it was Defendant Officers who brought MIL No. 3, to bar use of *Defendant Officers'* CR files (i.e., CRs against them.) Defendants argue that the full CR files (related to complaints against nondefendant officers) contains inadmissible hearsay, would mislead the jury, and would be more prejudicial than probative under Rule 403. DM at 20-21. The motion should be denied because it is vague and overbroad, and Defendants come nowhere close to carrying their burden of demonstrating that the evidence is inadmissible for all purposes. Contrary to Defendants' suggestion, the CR files against other officers are admissible (essential, really) to prove Plaintiffs'

*Monell* claim. The allegations against Defendant Officers are admissible non-hearsay because they are being offered for reasons (largely *Monell*-related) other than their truth. The jury will not be misled; if anything, it would be confusing for the jury to hear much testimony about CRs but never see one, as necessary to understand what it is. And Defendants' Rule 403 objection misses the mark. The Court should deny Defendants' motion.

## I. Defendants' Motion Should Be Denied Because It Is Vague and Asks for Exclusion of a Huge Category of Evidence

Defendants' motion should be denied as vague and overbroad. Again, Defendants motion fail to identify specific evidence sought to be barred or to identify specific CR files to which they object. Instead, Defendants are simply attempting to impose a general proposition over a broad category of evidence they have summarily labeled as "problematic" and "unduly prejudicial." A general request to exclude a huge category of evidence is not an appropriate request for a motion *in limine. See Gonzalez v. Olson*, 2015 WL 3671641, at *26 (in the absence of more specific information, the court will not bar an entire category of evidence at this juncture). For these reasons alone, the motion should be denied. *Austin v. Cook County*, No. 07-c-3184, 2009 WL 7999488, at *4 (N.D. Ill. Mar. 25, 2009) (denying analogous motion, stating "defendants do not explain or describe what specific evidence they are referring to"); *Native Am. Arts*, No. 2002 WL 1173513, at *5 (summarily denying defendant's MILs in part as "vague" and "overbroad" "because [defendant]" among other things "fails to sufficiently explain the evidence it seeks to exclude"); *In re Depakote*, 2018 WL 9732116, at *1 (denying vague MIL to "exclude evidence and testimony about legal standards, duties, and obligations" as overbroad); *see also Luce*, 469 U.S. at 41 n.4 (Court may exclude evidence in advance of trial only when clearly inadmissible).

## II. The City's CR Files, Including Full CR Files, May Be Admissible for Many Purposes

To be clear, hundreds of CR files have been produced in this case, but Plaintiffs do not intend to introduce hundreds of CR files. Rather, Plaintiffs intend to present a limited number of

CR files, likely to be selected from the list of CRs attached hereto as Exhibit 9, as necessary to prove Plaintiffs' *Monell* claim (*see* Pls.' Resp. to Defs.' MIL No. 3, *supra* (describing specifically what Plaintiffs must prove at trial)), particularly their failure-to-investigate-or-discipline and code-of-silence theories. This evidence is necessary not only relevant to but indeed highly probative of Plaintiffs' *Monell* theories and will be very helpful to the jury. First, for all the talk of CRs the jury will hear at trial, it will be helpful for them to actually see one and understand what it contains, so they are not left to guess. Second, the limited number of CR files is necessary show the jury evidence of the specific types of investigatory, disciplinary, and supervisory deficiencies that plagued the City's police accountability system during the *Monell* period (and about which Plaintiffs' *Monell* expert will be testifying). Third, it is necessary to show the jury illustrative examples of the code of silence in action in the specific context of misconduct investigation, so that can see just how it operated. Finally, it is necessary to show the jury specific examples of its failure to investigate specific allegations of excessive force against children.

Contrary to Defendants' suggestion, use of "the spreadsheet" of CRs most certainly does not have the "same effect" as using the CR files. The spreadsheet was created by counsel and contains broad categorical data. The CR files contain the actual language of the complaint against its officer that the City received, shows the actual investigative steps that the City took (or did not take) in responding to citizens' complaints, and much, much more. Without the full CR files, the jury would never see specific examples of the City's failure to investigate and discipline officers generally and officers accused of excessive force against children specifically. In short, the limited CR files are admissible—indeed highly probative—to prove several of Plaintiffs' *Monell* theories.

## III. Defendants' Arguments to the Contrary Fail

First, Defendants argue in a single sentence at the top of page 21 that full CR files are inadmissible because each contains inadmissible hearsay. But this argument should be rejected

outright because it is not developed in a way that permits a response. *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments). Defendants do not cite a specific example of the statements they contend are hearsay. And to the extent they are arguing that allegations against the City's police officers are inadmissible hearsay, they are wrong. The allegations are not being offered for their truth but rather for purposes of showing notice to the City of a pattern of similar allegations against its police officers accusing them of using excessive force against children, as well as to show how the City responded to those allegations. The argument is without merit.

The City's second argument (in the second half of the first paragraph on page 21) is nothing more than an attempt to relitigate its position concerning the affidavit requirement. While the City is wrong (indeed, the DOJ found that the City's failure to seek affidavit overrides was part of the problem), the more important point here is that the City's argument about the affidavit requirement goes to the *weight* of the evidence, not its admissibility.

Finally, the City contends, in the last paragraph on page 21, that full CR files *about other officers* are unduly prejudicial to Defendant Officers and would confuse the jury and waste time. But the entire argument repeatedly assumes Plaintiffs intend to introduce *every* CR file produce in this case related to *other officers. See* DM at 21 (suggesting the jury would need to "go through each of the files" and that jurors would need to "keep track of the ins and outs of *each* of the various investigations"). But, again, Plaintiffs are not introducing all of the CR files. Far from it, they may introduce examples necessary to prove their *Monell* claim in all the ways just discussed above. Moreover, no one is expecting jurors to parse results. Finally, Defendants fail to show any prejudice, let alone substantial prejudice that far outweighs the immense probative value of the selected CR files. Even if there were a risk of prejudice, Defendants ignore that the jury will be properly instructed regarding the limited purposes for which the CR files are being offered. FED. R. EVID. 105 (directing district courts to

62

provide instructions to jury "restrict[ing] the evidence to its proper scope"); *United States v. Gomez*, 763 F.3d 845, 860-61 (7th Cir. 2014) (*en banc*) (limiting instructions sufficiently manage any prejudice caused by admission of other-acts evidence, and "[l]ay people are capable of understanding the foundational principle in our system of justice that we try cases, rather than persons"). Limiting instructions are taken very seriously in this Circuit as a tool for reducing or eliminating prejudice, and it has long been the law that juries are presumed to follow them. *Medina v. City of Chi*, 100 F. Supp. 2d 893, 897 (N.D. Ill. 2000) ("our system generally trusts jurors to understand and follow limiting instructions regarding consideration of evidence against some defendants and not others"); *Terrell v. Childers*, 1996 WL 385310, at *14 (N.D. Ill. July 3, 1996) (rejecting argument that prejudicial evidence against one defendant would "spill over" onto others because court "will not try the case with the notion that jurors will not faithfully undertake their obligations"). Defendants have not and cannot offer any compelling reason why a limiting instruction would be insufficient to address any potential prejudice to Defendant Officers. If anything, it is Plaintiffs who would suffer unfair prejudice if they could not present some of the most powerful evidence supporting their *Monell* theories. If evidence is introduced at trial that is relevant only to claims against the City and is inadmissible *and* unfairly prejudicial as to the Officers, the proper course of action is to instruct the jury that the evidence is to be considered only for purposes of Plaintiffs' policy claim against the City. The Court should deny the motion.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 23

Defendants' motion *in limine* no. 23 seeks to bar all evidence and argument "expanding plaintiffs' *Monell* claims." (Dkt. #632-1, at 22). Plaintiffs do not plan to expand their *Monell* claim beyond the scope of their pleading and the *Monell* discovery record in this case. To address defendants' examples, plaintiffs do not plan to present evidence or argument that defendant City had a widespread practice of procuring search warrants without appropriate vetting or that CPD

officers used excessive force against more often against children of color more than against white children. However, beyond this, defendants' motion is overly broad.

With respect to officers not activating their BWCs to record law enforcement encounters as required, plaintiffs do not allege as part of their *Monell* claim that this was a widespread practice. However, as explained above, in their *Monell* claim plaintiffs do allege that both CPD and the agencies that were supposed to investigate and discipline police misconduct were pervaded by a code of silence. (Dkt. #125, at ¶ 123). In this case, plaintiffs allege that the code of silence was at work when defendants Cappello, Egan and Guzman failed to timely activate their BWCs to record Cappello and Egan's conduct when they entered plaintiffs' apartment, when Egan failed to report these violations of the BWC mandate, when Egan violated the BWC order on another occasion, and when no defendant was ultimately ever disciplined for violating the BWC requirement in November 7, 2017. Thus, defendant officers' BWC violations are relevant and highly probative evidence of a code of silence. Fed. R. Evid. 401 and 403. Defendants fail to argue how or why this evidence would *unfairly* prejudicial. Fed. R. Evid. 403.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 24

Next, in their motion *in limine* no. 24, Defendants move to exclude Plaintiffs' thirty-one pattern witnesses—twenty children and eleven adults—from testifying at trial. Plaintiffs' will-call list identifies nineteen pattern witnesses—twelve children and seven adults—who either have bravely already or are prepared to testify that Chicago police officers used excessive force against them (or their children). Dkt. 615 (Pls.' Pre-Trial Statement) at 1-3 (see Entry Nos. 11-29). (Plaintiffs' may-call list identifies another twelve pattern witnesses—eight children and four adults—who likewise have bravely already testified (or are prepared to testify) that Chicago police officers used excessive force against them (or their children) between 2015 and 2020. *Id.* at 5 (see Entry Nos. 2-13)). The excessive force used against these twelve child-pattern witnesses occurred across nine "other

incidents" between 2015 and 2020. In all of them, Chicago police officers pointed their guns at each of these children when they clearly posed zero threat. Most of the incidents occurred in the context of a search warrant execution, while some occurred in the context of a warrantless home entry or a *Terry* stop (i.e., consistent with Plaintiffs' *Monell* claim that the widespread practice was not limited to any specific force context). Because the police officers involved in many of these other incidents either were not wearing body-worn cameras or were not recording, proof of these other incidents requires testimony of the child-victims themselves and/or those parents who witnessed the incident. While there is other evidence in the record from which a jury could infer that there were incidents in which Chicago police officers used excessive force against children during the *Monell* period (i.e., CR data, DOJ and PATF Reports), Defendants will no doubt argue at trial, as they have throughout this case, that this other evidence fails to prove much of anything. At the end of the day, it is the testimony of Plaintiffs' pattern witnesses—especially the children—that is most probative of the occurrence of other incidents and the operation of the widespread practice. Fed. R. Evid. 401 and 403.

In a conceited attempt to prevent the jury from hearing any of this powerful testimony, Defendants boldly ask this Court to bar *all* pattern witnesses, arguing that their testimony is inadmissible under FRE 401, 403, and 408. DM at 22-26. But their arguments are without merit and should be rejected in their entirety. Plaintiffs address each in turn.

## I.  Defendants' FRE 401 and FRE 403 Arguments Fail

In a series of rapid-fire, undeveloped arguments based on FRE 401 and 403, Defendants contend—without citing a single authority—that the testimony of Plaintiffs' pattern witnesses is "not relevant," would cause multiple different mini-trials that would [] []confuse the jury," "could lead the jury to improperly find against the Defendant [Officers in this case] based on the actions of officers in th[e] other [incidents]," and is "unnecessary" and "cumulative" since Plaintiffs' possess a

65

"spreadsheet listing all of the CR files [during the *Monell* period]." DM at 23. But Defendants'
arguments are woefully misguided. For starters, pattern testimony about other incidents of similar
misconduct is unequivocally relevant to prove that the City's police officers had a widespread
practice of using excessive force against children during the *Monell* period. Moreover, Defendants'
attempt to minimize these other incidents by suggesting that "many" of them are "quite
distinguishable" is unavailing: they offer no explanation why they are distinguishable and merely
reference their objections to Plaintiffs' witnesses is unavailing, which, in turn, offer no explanation
other than asserting that a handful of the other incidents occurred *after* March 7, 2017. (For the
reasons discussed below, observations that occur *after* an event are probative of municipal policies
and practices in existence prior to the event.) But as will be discussed next, that is an argument about
*weight*, not admissibility.

Defendants argue that allowing this pattern testimony "would cause multiple different mini-
trials that would [] [] confuse the jury." DM at 23. But they incorrectly assume that Plaintiffs will be
calling all of these witnesses and that Defendants will be calling numerous rebuttal witnesses.
Neither assumption is true. First, though Plaintiffs initially anticipated calling roughly six pattern
witnesses (*see* DM at 26), that changed after they reviewed the deposition testimony of each pattern
witness and realized that their examinations were remarkably short (i.e., nowhere near the seven-
hour limit allowed under the Rules). Indeed, the length of the primary examination, in minutes and
number of transcript pages, of the children at their party-depositions in their respective cases was as
follows:

- Davianna Simmons – 22 minutes, 14 pages

- Legend Booth – 31 minutes, 27 pages

- E'Monie Booth – 44 minutes, 42 pages

- La'Niya Booth – 61 minutes, 54 pages

- Savannah Brown – 60 minutes, 54 pages

What's more, defense counsel's exams were even shorter. Put simply, whereas Plaintiffs previously anticipated a fewer number of more extensive examinations, Plaintiffs now intend to call eleven pattern witnesses and to conduct short, efficient examinations narrowly focused on what happened, the excessive force to which they were subjected, and the injuries, if any, they suffered as a result. Second, Defendants will not be calling many (or any) rebuttal pattern witnesses because they did not disclose any in their Rule 26(a)(1) disclosures. *See* Group Exhibit 10 (Defendants' Disclosures). Indeed, not until Defendants' pre-trial statement submission did they disclose a single rebuttal pattern witnesses. *See* Dkt. 631 at 9-16. Needless to say, the disclosure is untimely. Federal Rule of Civil Procedure 37 dictates that their witnesses be barred from trial unless Defendants demonstrate that their failure to timely disclose these witnesses was justified or harmless. FED. R. EVID. 37. Notably, Defendants' motion *in limine* 24 makes no such showing.

Nor is the pattern testimony "unnecessary" and "cumulative" of the CR data set forth in Plaintiffs' expert's spreadsheet. DM at 23. If Plaintiffs' pattern witnesses were excluded, Defendants no doubt would argue that Plaintiffs statistical data fails to demonstrate that a single other incident of officer excessive force against a child ever occurred. In other words, the statistical analysis and pattern testimony, while both relevant to proving that the City had a widespread practice of allowing its police officers to use excessive force against children, are relevant in different ways—the pattern testimony, to the fact that such other incidents *actually occurred* (i.e, they were more than mere allegations), and the statistical analysis, to the *volume* of such other incidents during the *Monell* period. What's more, the number of other incident witnesses is powerful evidence, too, of the degree of the City's widespread practice. The greater the number, the more likely there was a widespread practice. However, should the Court limit the number of pattern witnesses who can testify, then it should

also bar defendants from arguing that plaintiffs have not presented sufficient witnesses to prove there was a widespread practice.

Defendants final 403 argument—that it would be "unduly prejudicial . . . to Defendants to [allow] a *witness* [to] testify about *their experience* rather than just have [Plaintiffs'] *expert* talk about the *numbers*" (DM at 23 (emphasis added))—is unadulterated sophistry. As a threshold matter, Defendants fail to make any real showing of prejudice, much less *unfair* prejudice, as required. FED. R. EVID. 403. (In reality, Defendants are simply rehashing their bifurcation argument that evidence admissible against the City may be wrongly attributed to Defendants Officers, which this Court has already rejected three times). More fundamentally, there is no comparing the probative value of showing the jury a spreadsheet containing second- or third-hand data about other incidents, with offering firsthand, eyewitness testimony concerning those other incidents in order to prove that they actually occurred. *See Foley v. City of Lowell*, 948 F.2d 10, 12, 15-16 (1st Cir.1991) (forcefully rejecting municipality's 403 contention that "plaintiff should have been made to minimize the inflammatory effect of the testimony [of other incidents of misconduct] by offering in its stead a police report of the incident"). Such firsthand, eyewitness testimony is precisely the type of testimony that the Federal Rules admit, leaving it to the jury to decide for themselves whether it is credible. *See United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir. 1985) ("Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403." (emphasis in original)).

Even if there were any prejudice to Defendants (there is not), that alone would not justify excluding Plaintiffs' pattern witnesses. That is because a limiting instruction would properly address any such prejudice concerns. FED. R. EVID. 105 (directing district courts to provide instructions to jury "restrict[ing] the evidence to its proper scope"); *United States v. Gomez*, 763 F.3d 845, 860-61 (7th Cir. 2014) (*en banc*) (limiting instructions sufficiently manage any prejudice caused by admission of

68

other-acts evidence, and "[l]ay people are capable of understanding the foundational principle in our system of justice that we try cases, rather than persons"). Limiting instructions are taken very seriously in this Circuit as a tool for reducing or eliminating prejudice, and it has long been the law that juries are presumed to follow them. *Medina v. City of Chi,* 100 F. Supp. 2d 893, 897 (N.D. Ill. 2000) ("our system generally trusts jurors to understand and follow limiting instructions regarding consideration of evidence against some defendants and not others"); *Terrell v. Childers*, 1996 WL 385310, at *14 (N.D. Ill. July 3, 1996) (rejecting argument that prejudicial evidence against one defendant would "spill over" onto others because court "will not try the case with the notion that jurors will not faithfully undertake their obligations"). Defendants have not and cannot offer any compelling reason why a limiting instruction would be insufficient to address any potential prejudice to Defendants. If anything, it is Plaintiffs who would suffer unfair prejudice if their pattern witnesses, especially the children, were barred from testifying at trial because it would strip Plaintiffs of the evidence most probative of other incidents of similar misconduct and CPD's widespread practice of using excessive force against children. If evidence is introduced at trial that is relevant only to claims against the City and is inadmissible *and* unfairly prejudicial as to the Officers, the proper course of action is to instruct the jury that the evidence is to be considered only for purposes of Plaintiffs' policy claim against the City.

## II. Incidents that Occurred *After* March 7, 2017 Are Admissible to Prove Both the Existence of a City Policy or Custom Prior to March 7, 2017 and the City's Deliberate Indifference

Relying exclusively on *Calusinksi v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994), Defendants ask this Court to bar twenty-two of Plaintiffs' thirty-one pattern witnesses strictly because the other incident about which they would testify occurred *after* March 7, 2017. DM at 23-24. The request is meritless. As the Seventh Circuit and numerous other courts have recognized, incidents that post-date a particular case are probative of both the policies and practices in place at the time of the case

69

and City policymakers' deliberate indifference. *Sherrod v. Berry*, 827 F.2d 827 F.2d 195, 205 (7th Cir 1987), *vacated on other grounds*, 835 F.2d 1222 (7th Cir. 1988) ("[S]ubsequent conduct by a municipal policymaker may be used to prove *preexisting* [1] disposition *and* [2] *policy*[.]" (emphasis added)); *Karney v. City of Naperville*, No. 15 C 4608, 2016 WL 6082354, at *10-11 (N. D. Ill. Oct. 18, 2016) (finding **one**- and **two**-*year*-later-alleged similar misconduct sufficiently pled a preexisting *Monell* custom or practice); *Foley v. City of Lowell*, 948 F.2d 10, 12 (1st Cir.1991) (affirming trial court's admission of "a particularly vile incident of [] police brutality" that occurred "six months" post-incident, reasoning that "subsequent [actions] are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident"; and finding misconduct six months after incident "bore upon the policy in effect six month prior" given that the incident "had noticeable similarities" to the underlying event); *Padilla v. City of Chi.*, No. 06-C-5462, 2009 WL 4891943, at *7 (N.D. Ill. Dec. 14, 2009) (expressly "agree[ing] with the First Circuit's persuasive reasoning [in *Foley*]" that "post-event evidence" is not "de facto irrelevant" and instead may be admissible "to prove a policy or custom of ignoring complaints of excessive force"); *Keys v. City of Harvey*, No. 92 C 2177, 1996 WL 34422, at *4 (N.D. Ill. Jan. 26, 1996) (denying city's motion to exclude evidence of its failure to enact any policies or procedures *after* underlying incident, citing *Foley* with approval); *Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015) (observing that *post*-incident evidence may be probative of the existence of a policy at the time of a constitutional violation); *Henry v. County of Shasta*, 132 F. 3d 512, 518-519 (9th Cir. 1997) (finding evidence of similar treatment at jail 10 months post-incident admissible at summary judgment to prove existence of municipal policy on incident date); *Beck v. City of Pittsburgh*, 89 F. 3d 966, 972-973 (3rd Cir. 1996) (reversing trial court's grant of judgment as a matter of law in favor of city, where plaintiff presented "a series of actual written civilian complaints of similar nature, most of them before and some *after* the [underlying] incident," finding jury could infer in part from misconduct alleged to have occurred two months *after* incident that city's

policymakers had a custom of "tacitly approving the use of excessive force"); *Grandstaff v. City of Borger*, 767 F.2d 161, 171-72 (5th Cir. 1985) (finding subsequent conduct by municipal policymaker sufficient to prove preexisting disposition and policy, citing "difficulties" plaintiff may encounter in proving the existence of an municipal "policy or disposition"), *cert. denied*, 480 U.S. 916 (1987); *Larez v. Los Angeles*, 946 F.2d 630, 644 (9th Cir. 1991); *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right.").

Defendants' contrary position (*see* DM at 24) is not supported by their citation to a *dictum* in *Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994), in which the court concluded that a lower court had properly excluded a single instance of later alleged misconduct where *no* pre-incident evidence existed. *See Padilla*, 2009 WL 4891943, at *7 (distinguishing *Calusinski*).

In other words, later-alleged misconduct, particularly highly analogous misconduct, as here, may be relevant and indeed probative of the City's practices and disposition on and prior to March 7, 2017. Defendants' argument to the contrary merely goes to the weight of these other incidents, but not their admissibility. Defendants' request to bar 22 pattern witnesses as outside the *Monell* period should be rejected. That Plaintiffs sought to bar certain *Monell* evidence that was too far removed in time and substance from Plaintiffs' *Monell* claim does not change this outcome. The evidence at issue in that motion was simply not probative of any fact at issue, whereas the evidence Defendants seek to bar is remarkably probative.

### III.    FRE 408 Does Not Apply, and the Fact that a Few Pattern Witnesses Have Settled Their *Monell* Claims Against the City Has No Bearing on Their Testimony at Trial

Seemingly recognizing the folly of their position, Defendants next move to bar thirteen of Plaintiffs' thirty-one pattern witnesses on the separate ground that they have "signed settlement documents stating that their settlements were not admissions of liability and that the settlement shall not be used as evidence of wrongdoing." DM at 24-25. The argument is nonsensical and, again,

Defendants do not cite a single decision granting such a request. The entire argument erroneously assumes (a) that the jury will know that the witnesses settled their *Monell* claims against the City and (b) that introduction of a settlement agreement would impeach the witnesses testimony. Neither is true. The jury will not hear evidence of settlement because it is not relevant and is excluded by FRE 408. What's more, the settlement agreement merely says it cannot be used as affirmative evidence of an admission of wrongdoing. It does not preclude a witness from testifying about what happened.

## IV.    Defendants' Request to Bar Children from Testifying or Describing Their Injuries Is Frivolous

In a last-ditch effort to avoid Plaintiffs child-pattern witness's powerful testimony, Defendants ask that the Court allow only the adult pattern witnesses *and not the minors* to testify, arguing that "[i]t would be unduly prejudicial to the defendants to parade children in front of the jury when the exact same testimony could be given by the adult plaintiffs." DM at 25. The request is wildly improper. That the testimony could be given by an adult rather than a child does not mean that is must. That is Plaintiffs' decision. Here, where Plaintiffs' *Monell* claim concerns excessive force against children, the probative value of a child's testimony may dwarf that of an adult, provided that the child is competent to testify. Defendants raise no argument that any child is incompetent to testify. The request should be rejected as frivolous.

Defendants additional request at the bottom of page 25 to limit the topics of testimony should likewise be denied. Defendants offer no explanation why ach topic could never be inadmissible. To be sure, Plaintiffs intend to focus narrowly on the pattern witnesses experience and observation in the other incident and any injuries that suffered or observed. But it simply cannot be resolved now whether the other topics could ever become admissible.

Finally, to the extent Defendants' motion makes a curt, one-sentence request to "naturally bar any exhibits associated with" the testimony of these pattern witnesses (*see* DM at 22), that request should be summarily denied, because it is overbroad, fails to specify the evidence sought to barred (let alone

explain why it is inadmissible), and is simply not developed in a way that permits a response. *Smith*, 388 F.3d at 569; *Otto*, 134 F.3d at 854; *Native Am. Arts*, 2002 WL 1173513, at *5; *Christmas*, 691 F. Supp. 2d at 821; *In re Depakote*, 2018 WL 9732116, at *1; *Dahlstrand*, 2021 WL 4318322, at *6-7; *Hillard*, 2010 WL 1664941, at *3; *Saunders*, 320 F. Supp. 2d at 740; *Garcia*, 2010 WL 11713400, at *2; *Rosenberg*, 2007 WL 2028789, at *4: *see also Luce*, 469 U.S. at 41 n.4 (court may exclude evidence prior to trial only when clearly inadmissible). Defendants' MIL 24 should be denied.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 25

Defendants' "motion *in limine*" no. 25 is not a motion *in limine* regarding evidence or argument at all but a motion for the court to include "sufficient limiting instructions" before, during, and after the testimony of each of plaintiffs' *Monell* pattern witnesses. Defendants' motion improperly asserts that they "will suffer" "undue prejudice," regardless of any limiting instructions. While the Court has ruled that it will use limiting instructions to ensure the jury understands the distinctions between the claims against the defendant officers and the City, defendants' motion, which does not propose or attach any specific cautionary instructions, should be denied as overly vague and general. (Dkt. #620, at 2). Moreover, defendants' proposal is excessive; the Court should not give limiting instructions so often that it causes the jury to become distracted. Finally, the overlap between plaintiffs' *Monell* claim and their individual claims is quite clear: defendant officers pointing of their guns directly at the minor plaintiffs' heads and bodies when they posed no hint of danger was done pursuant to the City's widespread practice of excessive force against children and officers beliefs that they would never be investigated or disciplined for doing so.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 26

Defendants' motion *in limine* no. 26 seeks to bar all argument and evidence relating to the consent decree, including testimony from consent decree independent monitor Maggie Hickey. (Dkt. #632-1, at 26-28). For the reasons set forth below, defendants' motion should be denied.

The consent decree is directly relevant to and highly probative evidence of the minor plaintiffs' *Monell* claim that the City was deliberate indifferent to a known pattern of excessive against children. Fed. R. Evid. 401 and 403; (Consent decree attached as <u>Exhibit 11</u>). The consent decree was drafted by September 13, 2018, subjected to hundreds of comments, and then signed by the City and filed on January 31, 2019. (17-cv-6260, Dkt. ##107 and 702). First, as plaintiffs' complaint alleges, the text of the consent decree shows that the City failed to adopt any policy or training to address the practice of excessive force against children, including but not limited to the practice of pointing guns at them. Dkt. #125, ¶¶ 23, 119 f. ("This lack of official policies, training reforms includes…the City's CPD's refusal or failure to propose or agree to any explicit protections for children from excessive force or any provisions requiring a trauma-informed approach to policing children in the federal consent decree it negotiated with the State of Illinois"); Fed. R. Evid. 401 and 403. Similarly, plaintiffs' police practices expert Mr. Ryan's opinions regarding the City's deliberate indifference during the *Monell* period are based in part on the fact that, in the consent decree, "the CPD disregarded the findings and recommendations of the USDOJ with respect to excessive force and children, making or committing to only minor changes in policy and training related to TASER, OC, and use of canines, and developmentally appropriate interactions with youth." (Ryan initial report at ¶ 513).

Second, in what is crucial evidence of deliberate indifference for the minor plaintiffs' *Monell* case, the City has in fact breached its commitment in the consent decree to *"clarify in policy that officers will only point a firearm at a person when objectively reasonable under the totality of circumstances."* (17-cv-06260, dkt. #703-1, at 55, <u>Exhibit 12</u>). Six years on, the City has still not implemented this reform. On the contrary, *the City recently refused to adopt a policy that would have prohibited officers from pointing guns at children ages 0-14 unless they pose an immediate threat of death or great bodily harm to an officer or other person. Id.*, dkt. #1166, at 9-13 (Pallmeyer, J.) (copy of the Court's Order attached as Exhibit _). This is clear

evidence that the City was paying mere lip-service to the concept of reform when it agreed in 2018 to adopt a new gun-pointing policy.

Third, the monitor's reports show that the city has failed to implement a large percentage of the reforms it agreed to, especially use of force reforms, and that it is far behind in implementing others – in other words, the monitor's reports show that the City has merely paid lip-service to the concept of reform. Fed. R. Evid. 401 and 403. For example, the most recent Independent Monitoring Report indicates that, by June 30, 2024, six years after

the City agreed to the Consent Decree, *the City had only achieved full compliance with a mere 14 percent of the Decree's 96 use of force paragraphs.* (Independent Monitoring Report 10, at 44, Dkt. 1233, at 51). CPD fell further and further behind on its use of force reviews in the fifth, sixth and seventh reporting periods and still has not caught up. *Id.* at 43, 50. The extent of the City's non-compliance with consent decree reforms is not *unfairly* prejudicial: if the City has failed to implement use of force reforms, then that tends to show that its agreement to these reforms in 2018 and 2019 was mere lip-service. Relevant evidence is inherently prejudicial, and the City has failed to identify any *unfair* prejudice that would result from the admission of this evidence. (Dkt. #632-1, at 27).

Fourth, the consent decree is relevant to plaintiffs' *Monell* claim of deliberate indifference because *defendant City has chosen to rely on the consent decree as evidence that it was not deliberately indifferent*, thus "opening the door"; citing to defendants' Fed. R. Civ. Pro. 56 statement, ¶ 136, defendants' joint motion for summary judgement twice invokes the consent decree to defeat plaintiffs' claim of deliberate indifference. (Dkt. #438, at 8, 41) ("the City Council… express commitment to proposed reforms and entering into a consent decree"). If the City is going to rely on the fact that it agreed to a consent decree to show that it was not deliberately indifferent, then plaintiffs can show that the text of the consent decree does not include reforms to address the pattern of excessive force against

children and that the City has largely failed to comply with it. Barring plaintiffs from admitting this evidence would unfairly prejudice them. Fed. R. Evid. 403.

Even though the City relies on the consent decree as relevant evidence that it was not deliberately indifferent, the City nevertheless argues in its motion *in limine* that the consent decree is not relevant because it is outside plaintiffs' *Monell* period. It is well-established, however, that "subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy." *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir. 1987), *vacated on other grounds*, 835 F.2d 1222 (7th Cir. 1988); *Karney v. City of Naperville*, No. 15 C 4608, 2016 WL 6082354, at *10-11 (N. D. Ill. Oct. 18, 2016)(allegations of similar incidents of illegal search and seizure that occurred approximately one (1) and two (2) years following incident date were sufficient to plausibly allege a preexisting custom or practice), *citing Hoskin v. City of Milwaukee*, 994 F. Supp. 2d 972, 981 (E.D. wis. 2014); *Padilla v. City of Chicago*, 06 C 5462, 2009 WL 4891943, at *7 (N.D.Ill. Dec. 14, 2009) (evidence of a program to monitor officers with numerous CR files that was implemented two (2) years after the underlying incident is discoverable). In this case, in which the consent decree was drafted only 10 months after plaintiffs' incident and signed by the City only 14 months after, the consent decree's content and the City's degree of compliance is highly probative of whether the City was deliberately indifferent to a pattern of excessive force against children on and before November 7, 2017. Thus, the consent decree is well within the timeframe set by case law for post-incident evidence to be relevant and admissible. Fed. R. Evid. 401 and 403.

Defendants argue that the consent decree is inadmissible under Fed. R. Evid. 407 and 408 because it was a remedial measure. First, however, defendants have waived any protection afforded by Fed. R. Evid. 407 or 408 by touting the consent decree as evidence that the City was not deliberately indifferent. (Dkt. #438, at 8, 41). Second, the consent decree does not meet the definition of a remedial measure precisely because it did not remediate or even address the cause of

the minor plaintiffs' injuries: CPD's widespread practice of excessive force against children, including pointing guns at them. The consent decree contains not one provision that requires new policy or training regarding the use of force against children or youth or the drawing and pointing of firearms at civilians. Defendants' Fed. R. Evid. 408 argument is undeveloped and, thus, waived. In any event, Fed. R. Evid. 408 is inapplicable here for multiple reasons, including: 1) the text of the agreement and the monitoring reports are public, not confidential and 2) plaintiffs are not seeking to admit evidence of statements, conduct offers or promises made in the context of settlement negotiations.

Next, the City moves to bar Ms. Hickey, the Independent Monitor, as a witness. While Ms. Hickey may not have been appointed until early 2019, she has personal knowledge of the text of the consent decree which includes the reforms that the City agreed to when the consent decree was prepared in 2018, the consent decree reforms that the City has implemented and those that it has failed to implement, and the timetable for implementation and compliance, including how far behind the City is in implementing mandated reforms. Fed. R. Evid. 401, 403, and 607. Thus, her testimony is directly relevant to plaintiff's deliberate indifference claim in the ways set forth above. *Id.* Citing a discovery ruling by Judge Kennelly in another case, defendants argue no witness is needed because the consent decree and the monitor's reports are public documents. However, in a jury trial, it is far more efficient and effective for a live witness to briefly explain to the jury the key points. To address defendants Fed. R. Evid. 403 concerns about "confusion," Ms. Hickey can easily and briefly first explain what the consent decree is – simply an agreement between the city and the state for the city to make specified reforms to CPD practices. To address concerns about prejudice, on cross examination the City will certainly have Ms. Hickey acknowledge that in the consent decree the City denies all wrongdoing. The Court can also provide a similar limiting instruction. While defendants dwell on the length and complexity of the consent decree (apparently suggesting that any

examination would be cumulative and cause delay), plaintiffs plan to focus Ms. Hickey on a couple of key points, including the absence of any required reforms bearing on the use of force against children and the continued lack of any policy or training regarding drawing and pointing firearms at children.

The City's argument that the apex doctrine shields Ms. Hickey from testifying is wrong in two ways. First, Ms. Hickey is not a City employee, so defendants do not have standing to assert any objections on her behalf and, indeed, defendants do not attach a declaration from Ms. Hickey explaining that she is too important or too busy to testify or that she lacks personal knowledge of the consent decree. Second, the apex doctrine simply does not apply to Ms. Hickey. The apex doctrine applies to high-ranking government officials, such as governors, mayors, city managers, and police chiefs. Not only is Ms. Hickey not a high-ranking government official, but it is indisputable that she has personal knowledge of the consent decree that is relevant to plaintiffs' *Monell* claim. Defendants fail to cite any authority for their assumption that the apex doctrine covers Ms. Hickey. Nor does common sense support defendants' argument. Ms. Hickey is not at the apex of any organizational structure. Moreover, unlike most top government officials, Ms. Hickey has unique, personal knowledge of the consent decree and the progress (or lack thereof) in the City's implementation of consent decree reforms. Therefore, defendants have failed to meet their burden to show that the apex doctrine shields Ms. Hickey from testifying. *Dyson v. SharkNinja Operating LLC*, No. 14-cv-0779, 2016 WL 1613489, at *1 (The party seeking to avoid discovery based on the apex principle bears the burden of showing that good cause exists to prevent it). Finally, there is no reason to think that, if Ms. Hickey testifies at trial, she will suddenly have to testify in a raft of *Monell* trials.

The City next argues that, if evidence of the consent decree is admitted, then plaintiffs should be prevented from arguing that its provisions did not go far enough. (Dkt. #632-1, at 28).

Granting that part of motion would cause severe unfair prejudice to plaintiffs. Fed. R. Evid. 403. In this case, the City has argued and will argue that it was not deliberately indifferent to officers using excessive force against Peter and Jack on November 7, 2017, because it made *general* reforms, including agreeing to reforms in the consent decree. (Dkt. #438, at 8, 41). In response, plaintiffs must be allowed to rebut this evidence by showing that, in fact, the reforms in the consent decree did not address the problem of excessive force against children, including the pattern of pointing guns at them and, therefore, that the City really was deliberately indifferent to that problem. Further, plaintiffs' argument about the consent decree and all of the City's alleged reform efforts is not that they did *not* go far enough but that the City literally did *nothing* about the specific widespread practice of excessive force against children, especially pointing guns at them.

Defendants' penultimate argument – that plaintiffs should be barred from presenting any evidence or argument that the City failed to make reforms after November 7, 2017 to address the pattern of excessive force against children – is vague, generalized, and overly broad. Defendants do not identify any specific evidence to be barred or cite any authority for why such evidence is inadmissible. Undeveloped motion *in limine* arguments that cite no evidence, reason or authority are waived. *Gaines v. Chicago Board of Education*, 2024 WL 640802, *4, *19 (N.D.Ill. Feb. 15, 2024). The same applies to defendants' final argument – that plaintiffs should be barred from arguing that the City's reform efforts *prior* to November 7, 2017 did not show deliberate indifference. This argument also does not even make legal or logical sense. Plaintiffs must be allowed to present evidence that on and prior to November 7, 2017, the City was deliberately indifferent to CPD's widespread practice of excessive force against children. Fed. R. Evid. 403.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 27

Defendants' motion *in limine* no. 27 seeks to bar plaintiffs from presenting any evidence or argument regarding official CPD policies that became effective after the November 7, 2017, incident

date in this case, including but not limited to: CPD's firearm pointing incidents policy from 2019 (plaintiffs' exhibit 65), CPD's search warrant orders from 2020 and 2021 (plaintiff's exhibits 73-74), and the 2020 search warrant training (plaintiff's exhibit 75). The motion should be denied as overly broad. *Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1023 (N.D.Ill. May 13, 2011) (appropriate to exclude evidence in *limine* "only when the movant shows that the evidence is inadmissible on all potential grounds").

While plaintiffs have no plans to introduce any of these policies in their affirmative *Monell* case, that does not mean that they could become relevant and admissible for some purpose at trial. For example, if the City decides to argue that it took steps to address the problem of officers pointing guns at children, then exhibit 25, which does not contain any prohibition on officer gun-pointing, and exhibits 73 and 74, which contain new provisions about being sensitive to the presence of children but nothing about gun-pointing, would then become relevant to impeaching City's witnesses and rebutting City's argument by showing that, in fact, the City never put restrictions on officers' ability to point guns at children and, thus that it remained deliberately indifferent to this practice. Fed. R. Evid. 401 and 403. The same arguments hold true for the 2020 search warrant training, exhibit 75. *Id.* The search warrant orders, in particular, even though they are not use of force policies, could be relevant to showing that they do not contain any provisions prohibiting officers from pointing guns at children while executing search warrants in people's homes. Moreover, because the 2020 and 2021 search warrant policies and training began to reflect concerns about the presence of children, they could become relevant and admissible to show the concerns (about children) that were entirely missing in the search warrant policies and training that were in effect during the *Monell* period. Additionally, exhibits 65, 73-75 are not remedial measures because they would *not* "have made [Peter and Jack's] injury or harm any less likely to occur." Fed. R. Evid. 407. The gun-pointing incidents policy, for example, does not prohibit pointing guns at people,

including children. *Id.* Nor do the 2020 and 2021 search warrant orders or the 2020 search warrant training. *Id.* Finally, any concerns about *unfair* prejudice can be cured with clear, limiting instructions. Fed. R. Evid. 403. Because defendants have failed to meet their burden of showing that this evidence is inadmissible for any purpose, the motion should be denied.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 28

In motion *in limine* no. 28, Defendants seek to prevent Plaintiffs from calling former CPD Superintendent Eddie Johnson and former Chicago Mayor Rahm Emanual to testify at trial on three grounds: the apex doctrine, relevance, and Rule 403. DM at 29-31. But the apex doctrine does not apply here; Johnson's and Emmanuel's anticipated testimony is *profoundly* relevant (and indeed highly probative) to Plaintiffs' *Monell* claim; and their testimony is hardly prejudicial (let alone *unfairly* prejudicial) to Defendants. If anything, it would be allowing the City to prevent the jury from hearing its own admissions that would be unfairly prejudicial on Plaintiffs. The motion should be denied.

Defendants assert that "neither [Emanuel nor Johnson] has made relevant statements as to the issues pertinent to this case." DM at 30. Not so. Simply put, Superintendent Johnson and Mayor Emanuel each, in their former official capacities, made damming admissions that the code of silence *in fact existed* within CPD's ranks.

The relevance of these admission to Plaintiffs' code-of-silence *Monell* theory cannot be overstated. Evidence of the "code of silence" within CPD—including Mayor Emanuel's and Superintendent Johnson's statements on the subject—are plainly admissible in support of Plaintiffs' *Monell* theory that the "code of silence" that existed within CPD's ranks emboldened Defendant Officers to violate Jack and Peter Mendez's constitutional rights. It is also admissible as evidence of bias. And it is admissible under FRE 802(d) as the statements of a party opponent. Tellingly, Defendants do not suggest otherwise.

Plaintiffs' code-of-silence *Monell* theory is straightforward: because of the existence of a widespread practice of ignoring, denying, and covering up police misconduct, officers are emboldened to commit constitutional violations such as those alleged in this case. This is a well-recognized, viable *Monell* theory in this District. *See, e.g., Obrycka v. City of Chi.,* No. 07 C 2372, 2012 WL 601810, at *7-*8 (N.D. Ill. Feb.23, 2012) (considering "code of silence" evidence that officers "conceal each other's misconduct in contravention of their sworn duties" in support of *Monell* claim); *LaPorta v. City of Chi.,* No. 14 C 9665, 2016 WL 4429746 at *1 (N.D. Ill. Aug. 22, 2016) (Emanuel's comments relevant to a *Monell* "code of silence" theory related to 2010 incidents).

Emanuel's and Johnson's statements provide support for the theory that the "code of silence" has long existed within CPD and has emboldened officers to act without fear of discipline. Emanuel acknowledged a "longstanding" "tendency to ignore, deny or cover up the bad actions of a colleague or colleagues" within CPD. Exhibit 13 (Emanuel Remarks, Dec. 9, 2015). Emanuel explained that "police officers with repeated and multiple citizen complaints of excessive force have yet to face any meaningful disciplinary action." *Id.* Despite the Mayor's admission, the City has denied that such a "code of silence" exists within CPD. *See* City's Answer to Fourth Am. Compl., Dkt. 133 at ¶ 123 (denying the existence of a code of silence). If the City maintains this position at trial as expected, Plaintiffs are entitled to introduce these admissions to rebut the City's denial that a "code of silence" existed. It is also entitled to affirmatively introduce the statements through Emanuel and Johnson pursuant to FRE 802(d).

Defendants' assertion that "[c]ourts in this district have found Mayor Emanuel's statements [] insufficient to . . . state a plausible *Monell* claim" is nothing more than an observation that some courts have found that a plaintiff cannot *rely exclusively* on Emanuel's statements as the sole basis on which to plead a *Monell* claim. It is not an argument about admissibility. This evidence should be permitted at trial.

The existence of a "code of silence" is also evidence of the City's deliberate indifference. Namely, if Johnson and Emanuel were aware of a "longstanding" tendency within CPD to ignore misconduct, it makes it more likely that City policymakers were likewise aware in 2017 and did nothing to remedy the problem. *McNabla v. Chicago Transit* Authority, 10 F.3d 501, 511 (7th Cir. 1993) ("The longstanding or widespread nature of a particular practice would support the inference that policymaking officials must have known about it but failed to stop it.") (internal quotes and citations omitted).

Evidence of a "code of silence" is also probative of Defendant Officers' bias. "[P]roof of bias is almost always relevant," and it would be relevant here even absent a *Monell* claim. *See Bruce v. City of Chi.*, No. 09 C 4837, 2011 WL 3471074, at *4 (N.D. Ill. July 29, 2011) (quoting *United States v. Abel*, 469 U.S. 45, 52 (1984)); *accord Gavin v. Life Ins. Co. of North America*, No. 12 C 6178, 2013 WL 2242230, at *2 (N.D. Ill. May 21, 2013); *Ratliff v. City of Chi.*, No. 10 C 739, 2012 WL 5845551, at *4 (N.D. Ill. Nov. 19, 2012). With regard to police officers, courts in this district have long recognized that "code of silence" evidence is evidence of bias and should be admissible for that purpose. *Saunders v. City of Chi.,* 320 F. Supp. 2d 735, 740 (N.D. Ill. 2004) ("Defendants' motion to bar testimony that police officers in general or these officers in particular conspire to cover up one another's bad acts through a 'code of silence' is denied as overly broad. The plaintiff may explore the possibility that the defense witnesses in this case are biased because of loyalty to one another."); *Galvan v. Norberg*, No. 10 C 739, 2006 WL 1343680, *3 (N.D. Ill. May 10, 2006) (denying similar motion because "evidence or argument of this type can go to the issue of the bias or motivation of witnesses. This is a matter that calls for Rule 403 balancing, so that the blanket motion *in limine* is denied for now, without prejudice to the reassertion of any objections on this score in the context of specific evidence when proffered at trial."). Defendants' motion should be denied.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 29

Next, in motion *in limine* no. 29, Defendants seek to bar Plaintiffs from introducing evidence of "*any* past verdict or settlement" in support of their *Monell* claim against the City, arguing—without reference to a single past verdict or settlement, and without citation to any authority—that *any* past verdict or settlement is inadmissible under FRE 401, 402, 403, and 408. DM at 31-32. The motion should be denied.

For starters, Defendants' motion is, again, so overbroad and underdeveloped that it is difficult to meaningfully respond. For instance, the second and third sentences of the motion effectively argue that this case is factually *distinguishable* from the facts underlying *every other* verdict and settlement against the City—without citing a single other verdict or settlement, as would be necessary to make any factual comparison. DM at 31. In doing so, Defendants improperly turn the motion-*in-limine* standard on its head, leaving it to Plaintiffs to identify the evidence at issue and explain how it may be admissible at trial. For failure to carry *its* burden, Defendants' motion should be denied. *Gonzalez*, 2015 WL 3671641, at *26 (absent more specific information, the court will not bar an entire category of evidence at this juncture); *Native Am. Arts*, 2002 WL 1173513, at *5; *In re Depakote*, 2018 WL 9732116, at *1; *Dahlstrand*, 2021 WL 4318322, at *6-7; *Hillard*, 2010 WL 1664941, at *3; *Saunders*, 320 F. Supp. 2d at 740; *Garcia*, 2010 WL 11713400, at *2; *Rosenberg*, 2007 WL 2028789, at *4.

More fundamentally, the motion is without merit. The jury's verdict in *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), illustrates the point. Obrycka sued the City and the CPD officer who beat her in February 2007 while she was bartending. 2012 WL 601810, at *2 (N.D. Ill. Feb. 23, 2012). Like the Minor Plaintiffs here, Obrycka alleged that the defendant officer felt free to use excessive force against her because of CPD's "code of silence" and/or the City's failure to investigate or discipline officers. *Id.* at *5-9. Both Obrycka's code-of-silence and failure-to-

84

investigate-or-discipline *Monell* theories were tried to a jury. 913 F. Supp. 2d 598, 600 (N.D. Ill.

2012). Relevant here, the *Monell* jury instruction required the jury to find that "the City of Chicago

had a widespread custom or practice of failing to adequately investigate and/or discipline its officers

and/or of a police code of silence" before it could enter a verdict for plaintiff. *Id.* at 604. The jury

returned a verdict of $850,000 for plaintiff and against the City on plaintiff's *Monell* claim. *See id.* at

600-01. To reach that verdict, the jury necessarily found that the City had a custom of a code-of-

silence and/or failure-to-investigate-and-discipline officers.

       Plaintiffs may seek to introduce the 2012 *Obrycka* verdict at trial as evidence that the City was

on notice of the existence of a custom of a code of silence and/or failure to adequately investigate

or discipline officers during the 2012-2017 *Monell* period in this case. This evidence could be

introduced in various ways, including by asking this Court to take judicial notice of the verdict,

which the Court is plainly authorized to do. *See, e.g., United States v. Dish Network LLC*, No. 09-3073,

2017 WL 2427297, at *66 (C.D. Ill. June 5, 2017) ("The Court may take judicial notice of the verdict,

transcripts, and filings in a public trial."). (However, if defendants attempt to argue at trial that the

*Obrycka* verdict did not put the City on notice of a custom of a code of silence or a failure to

investigate/discipline, Plaintiffs may seek to introduce Judge St. Eve's opinion refusing to vacate the

jury's verdict and explaining that the evidence in *Obrycka* supported both *Monell* theories. As noted,

this Court unquestionably may take judicial notice of that opinion. *E.g., Dish Network*, 2017 WL

2427297, at *66.). Defendants Importantly, Defendants offer no argument to the contrary. Instead,

Defendants offer only a conclusory argument that there are, "[i]n *general*," "problems" with past

verdicts and settlements, pointing only to "allegations happen[ing] [at a] different" "time frame" and

"ambiguity over what the verdict may represent." DM at 31. Needless to say, neither concern apply

to the *Obrycka* verdict, which occurred *within* the *Monell* period in this case and is relevant—indeed

quite probative—of the City's knowledge of the existence of a code of silence and/or failure to investigate and discipline officers prior to March 7, 2017.

To the extent that the City briefly references Rule 403 as a basis for excluding past jury verdicts against the City, the City fails to demonstrate—indeed, fails to even *attempt* to explain—how introducing a verdict like *Obrycka* would prejudice the *City*, let alone *unfairly* prejudice it. DM at 31-32. At minimum, a reasonable jury in this case could find that the *Obrycka* verdict in 2012—the start of the *Monell* period in this case—put the City on notice of the existence of a custom of a code of silence within CPD or failure to investigate and discipline officers (or both). At bottom, Defendants' motion fails. Other *Monell* verdicts may be admissible at trial.

To the extent Defendants also seek to exclude any prior "settlement" against the City, including "Rule 68 discussions and/or offers of judgment," DM at 31-32, that request should likewise be denied for failure to identify the specific evidence sought to be barred. It is also moot: Plaintiffs do not intend to offer any settlements, Rule 68 discussions, or offers of judgment into evidence at trial. Nevertheless, because such evidence conceivably could become admissible at trial under Rule 408(b) if Defendants open the door, Plaintiffs reserve the right to introduce such evidence if the door is opened. At bottom, the admissibility of any such evidence should be resolved only if it is in fact offered at trial (unlikely), when its admissibility will be easier to resolve by virtue of knowing what specific settlement is at issue. *Native Am. Arts*, 2002 WL 1173513, at *5; *Christmas*, 691 F. Supp. 2d at 821; *In re Depakote*, 2018 WL 9732116, at *1; *Dahlstrand*, 2021 WL 4318322, at *6-7; *Hillard*, 2010 WL 1664941, at *3; *Saunders*, 320 F. Supp. 2d at 740; *Garcia*, 2010 WL 11713400, at *2; *Rosenberg*, 2007 WL 2028789, at *4.

Finally, to the extent that Defendants move in the last sentence of their motion to further bar *any* verdicts or settlements against *Defendant Officers*, *see* DM at 32, that request should be denied outright. DM at 32. The entire rest of the motion concerns *Monell* verdicts and settlements against

the *City*. Evidently, it appears that Defendant Officers simply added this final sentence in an attempt to piggy-back on the City's cursory arguments above. But Defendant Officers fail to offer a single reason or authority in support of their request, referencing in passing only the "language of Rule 408." DM at 32. But Rule 408's language lends zero support to the exclusion of *jury verdicts*. As for settlements, the request should be denied for the same reasons just discussed above with respect to settlements involving the City. Defendants' MIL 28 should be denied.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 30

Defendants' motion *in limine* no. 30 seeks to bar plaintiffs from asking any and all 30(b)(1) questions of defendant City's Fed.R.Civ.Pro. 30(b)(6) witnesses and from asking any questions on topics other than the 30(b)(6) topics for which they were designated. (Dkt.# 632-1, at 32). Since defendants do not identify a single example of testimony they seek to bar, the motion should be denied as vague and overbroad. *Gaines v. Chicago Board of Education*, 19 C 775, 2024 WL 640802, at *19 (N.D.Ill. Feb. 15, 2024)(motion *in limine* denied because defendants Rule 402 and 403 arguments "are simply too broad and vague").

Nevertheless, it is well-established that, whether at deposition or trial, plaintiffs are allowed to ask a designated 30(b)(6) witness 30(b)(1) questions as well. In this case, plaintiffs noticed the depositions of all of City's 30(b)(6) witnesses under both Fed. R. Civ. Pro 30(b)(6) and 30(b)(1). Defendant City did not object. At the deposition of each of City's 30(b)(6) witnesses, plaintiffs asked a series of 30(b)(6) questions on the topic(s) for which the City designated the witness as well as a series of 30(b)(1) questions, mainly regarding the witnesses' background and experience. Plaintiffs announced on the record whenever they were switching from 30(b)(1) to 30(b)(6) questions and *vice versa*. The City did not object to plaintiffs' 30(b)(1) examinations. Defendants' suggestion that plaintiffs asked the City's witnesses questions on 30(b)(6) topics other than the ones they were not

designated and prepared for is false, and plaintiffs have no plans to do so at trial, subject of course to developments.

Defendants' argument that plaintiffs on summary judgment sought to its 30(b)(6) witness' 30(b)(1) testimony as 30(b)(6) testimony is also false. However, the witnesses' 30(b)(1) testimony is relevant and admissible. For example, during the 30(b)(1) portion of her testimony Alderman Michelle Harris admitted that she personally agreed with the DOJ report's conclusion that CPD had a pattern and practice of using excessive force against children. (Harris dep. transcript, 79:24-80:13; 82:1-83:21; 86:21-87:22; 101:21-102:15; 103:12-105:16; copy attached as Exhibit 14). This admission, from a sitting alderman, is both directly relevant to and highly probative of the minor plaintiffs' *Monell* claim that CPD had a widespread practice of using excessive force against children ages 0-14. Fed. R. Evid. 401, 402 and 403. Because her admission is relevant, it is inherently prejudicial to the City but not *unfairly* so. Fed. R. Evid. 403. The probative value of the evidence for plaintiffs' case far outweighs any unfair prejudice to the City. *Id.* To exclude this evidence, however, would unfairly prejudice plaintiffs. *Id.* The issue that the City raises goes to the weight of Harris' statement, not its admissibility. Defendants can be counted on, on re-direct, to make clear that her statement is based on her personal knowledge or opinion, not the City's knowledge. Nevertheless, any lingering potential for confusion about the weight or significance of her statement can be addressed easily through providing a limiting instruction to the jury that clearly distinguishes between the two types of testimony.

As another example, under questioning from *the City's counsel*, *not* plaintiffs' counsel, CPD's Director of Policy Development, Karen Conway, admitted that officers regularly point guns at people in their homes when executing search warrants. (Conway dep. transcript, 7:1-15; 13:10-14:17; 17:7-9; 19:3-20:14; 83:10-22; 85:7-86:15; 161:2-24; 168:15-19; 171:24-172:5; copy of transcript attached as Exhibit 15). Although defendants now seek to represent otherwise to this court, the

context of her testimony makes clear that Ms. Conway was answering questions as a 30(b)(6) witness

at that juncture, not as a 30(b)(1) witness. Plaintiffs believe her statement is binding on the City. Her

testimony in this regard is directly relevant to and highly probative of the minor plaintiffs' *Monell*

claim that CPD had a practice of using excessive force against children. Fed. R. Evid. 401, 402 and

403. Because her admission is relevant evidence, it is inherently prejudicial to the City but not *unfairly*

so. Fed. R. Evid. 403. The probative value of the evidence for plaintiffs' case far outweighs any

unfair prejudice to the City. *Id.* However, to exclude this evidence would unfairly prejudice plaintiffs.

*Id.* For at least the above-mentioned reasons, defendants' motion *in limine* no. 30 should be denied.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 31

Defendants' motion *in limine* no. 31seeks to bar the DOJ report, the PATF report, the OIG's

report on the use of the affidavit override provision, OIG reports regarding CPD's search warrant

practices, and the "Safer report." (Dkt. #632-1, at 32-34). Given the court's summary judgment

ruling that defendants' search warrant was valid, plaintiffs no longer plan to admit the three OIG

reports regarding search warrant practices (plaintiffs' exhibits 83-85). However, the other reports are

relevant, highly probative evidence of the minor plaintiffs' *Monell* claim, and otherwise admissible.

### A.    The DOJ and PATF Reports Are Relevant and Otherwise Admissible

Plaintiffs' summary judgment papers provided extensive explanation of why the DOJ and

PATF reports are relevant and admissible. (Dkt. #468, at 14-20 and #520, at 18-22). Defendants'

motion *in limine* no. 31 mostly regurgitates the admissibility arguments they made on summary

judgment. In sum, the DOJ and PATF reports are relevant because, first, they contain findings that

are highly similar to several of plaintiffs' *Monell*-related allegations: City has a pattern and practice of

using excessive force against children; City systematically failed to investigate, discipline or otherwise

correct allegations/incidents of excessive force, including excessive force against children; a code of

silence pervaded CPD and the City agencies responsible for investigating police misconduct; and

City had gaps in policy and training when it came to officers' interactions with children. (Dkt. #125, at ¶¶ 21, 114-116, 118, 120, 123). Second, the DOJ and PATF reports are relevant because, plaintiffs specifically allege, they provided notice to the City of each of the aforementioned widespread practices, and because some of the reforms that the City subsequently failed to adopt were DOJ and PATF-recommended reforms. *Id.* at ¶¶ 22, 23-27, 117, 119.

Federal Rule of Evidence 803(8) creates a hearsay exception for a record or statement of a public office setting out "factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(iii). The phrase "factual findings" in Rule 803 encompasses not only the bare recitation of facts, but also any conclusions and opinions derived from the investigation. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988) ("[P]ortions of investigatory reports otherwise admissible" under the exception "are not inadmissible merely because they state a conclusion or opinion."). "As long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report." *Id.* The Seventh Circuit has followed *Rainey*'s expansive approach to factual findings under Rule 803(8)(A)(iii). *See Daniel v. Cook Cty.*, 833 F.3d at 740.

### 1. DOJ Report

The Department of Justice undertook a thorough, detailed investigation of the Chicago Police Department and Independent Police Review Authority and published its Report in January 2017. (Copy of DOJ report attached as <u>Exhibit 16</u>). The Report's findings and conclusions speak directly to several of Plaintiffs' *Monell* theories in this case, includes the relevant time period (Aug. 29, 2008 – Aug. 29, 2013), and should be admitted at trial. Specifically, the Report addresses the City's failure to adequately investigate use of force complaints, failure to sustain complaints or discipline officers, failure to discipline or supervise Officers for use of force, and failure to adopt "early intervention" programs for its police officers. The Report also explains the existence of a

90

"Code of Silence" in the Chicago Police Department and the widespread use of force against children. As the Seventh Circuit recently explained, these types of Department of Justice reports "go a long way toward meeting a plaintiff's burden of proving an unconstitutional custom, policy, or practice under *Monell*." *Daniel v. Cook Cty.*, 833 F.3d 728, 731 (7th Cir. 2016). Because the Report is probative of Plaintiffs' *Monell* theories, fits squarely into the hearsay exception set forth in Federal Rule of Evidence 803 (8), and is not unduly prejudicial, it should be admitted.

In particular, the DOJ report's finding are sufficiently similar to plaintiffs *Monell* allegations and evidence to be relevant. The DOJ's systemic investigation focusing on CPD's use of force spanned the same period encompassed by plaintiffs' *Monell* claim; the DOJ report documents CPD practices during the same period when the constitutional torts against plaintiffs occurred. *Godinez*, 2019 U.S. Dist. LEXIS 187994 at *10; *Estate of Loury*, 2019 U.S. Dist. LEXIS 38029 at *4. The DOJ report was released in 2017, the same year Chicago police executed the search warrant at plaintiffs' apartment. The time period covered by the report, i.e., January, 2011 – April, 2016, is nearly identical with the *Monell* period in this case, i.e., January 1, 2012 – November 7, 2017. The DOJ found that CPD has a broad pattern and practice of using lethal and non-lethal excessive force of all types against citizens, including: citizens who do not present a threat, innocent bystanders, *and children*. (DOJ report at 22-45); *Archie v. City of Chicago*, 2020 U. S. Dist. LEXIS 176221, *8-9 ("[i]t is reasonable to infer from the DOJ report's findings – and from plaintiffs' allegations – that Chicago police officers have a widespread practice of using excessive force against children in *all sorts of contexts, including when officers execute residential search warrants*")(emphasis added). Moreover, as part of this overarching finding, in a stand-alone section the DOJ expressly concluded that CPD has a pattern and practice of using excessive force against children. *Id.* at 34-35. In two different examples cited in the report, Chicago police officers *pointed guns at close range at children,* precisely as plaintiffs and their pattern witnesses allege that the defendant officers did to them, and in other examples

cited in the report, officers used excessive force against *an 8-year-old girl* and *12-year-old boys. Id.* at 34-35, 45, 59, 110-111, 115, and 149. This conduct is sufficiently similar to what plaintiffs testified Sgt. Egan and officer Cappello did to them. *Archie v. City of Chicago*, 2020 U. S. Dist. LEXIS 176221, at *7 (N. D. Ill. Sept. 25, 2020)(DOJ findings "mirror what the defendant officers here allegedly did to [the minor plaintiffs]," which was to point guns at 7, 11 and 14-year-old children when they posed no threat and after they were already down on the floor).

In addition, the DOJ report contains numerous other specific findings that are sufficiently similar to plaintiffs' *Monell allegations* to be relevant. Plaintiffs would seek to introduce certain statements from the DOJ report to prove those allegations, including but not limited to the following examples:

- **The City had a custom of failing to investigate citizen complaints for excessive force**; "As a result of so few force incidents being even nominally investigated, and the low quality of the force investigations that do occur, there is no meaningful, systemic accountability for officers who use force in violation of the law or CPD policy…[t]he failure to review and investigate officer use of force has helped create a culture in which officers expect to use force and not be questioned about the need for or propriety of that use. In this way, CPD's failure to adequately review officer use of force on a regular basis has combined with CPD's failure to properly train and supervise officers to perpetuate a pattern of unlawful use of force within CPD.") Ex. 10 (Report) at 7; "CPD policy requires supervisors to investigate all reported uses of force, other than shootings, to determine whether they were in compliance with policy. In actuality, however, most force is not reviewed. As a result of so few force incidents being reported and even nominally investigated, and the low quality of the force investigations that do occur, there is no consistent, meaningful accountability for officers who use force in violation of the law or CPD policy…The failure to ensure the accurate reporting, review, and investigation of officers' use of force has helped create a culture in which officers expect to use force and never be carefully scrutinized about the propriety of that use." *Id.* at 41.

- **The City has a widespread custom of failing to discipline and supervise its officers**; "CPD…has failed to hold officers accountable when they use force contrary to CPD policy or otherwise commit misconduct…We found further that CPD's failure to meaningfully and routinely review or investigate officer use of force is a significant factor in perpetuating the practices that result in the pattern of unlawful conduct we found…" *Id.* at 5; "CPD does not sufficiently encourage or facilitate supervisors to provide meaningful supervision to officers." *Id.* at 11.

- **The City fails to maintain an early intervention program for the types of officer misconduct alleged by Plaintiffs**; "Compounding CPD's supervision problems, the Department does not use long-available supervisory tools, such as a comprehensive early intervention system (EIS), to identify patterns of concerning officer behavior and prevent patterns of misconduct and poor policing from developing or persisting." *Id.* at 111.

- **A "Code of Silence" exists within the Chicago Police Department**; "Investigative fact-finding into police misconduct and attempts to hold officers accountable are also frustrated by police officers' code of silence." *Id.* at 8.

The DOJ report's findings enables the minor plaintiffs to present evidence on several of their *Monell* theories to the jury in a way that is concise and straight to the point.

      **2.**      **The PATF Report**

Similarly, the findings of the PATF report, which covers almost the same time period as the DOJ report and plaintiffs' *Monell* claim, are also sufficiently similar to plaintiffs' widespread practice allegations to be relevant. (Copy of PATF report attached as Exhibit 17). Released in April 2016, the PATF report covers 2010-2016 (and, in some cases, 2007-2016), making it almost entirely coterminous with plaintiffs' 2012-2017 *Monell* period. (PATF at 7-17). Like DOJ PATF also found that Chicago police officers mistreat children. In a separate, stand-alone section discussing police interactions with youth, PATF found that rather than "protect[ing] the most vulnerable (children)," *Chicago police officers "mistreated" "youth of color," "humiliating them or worse."* (PATF at 14, 54-55). In addition, paralleling plaintiffs' failure to train *Monell*-related allegation, PATF also found that Chicago officers *"were not adequately trained or equipped to interact with youth" and, therefore, interacted with them in ways that traumatized them.* (Id., 14, 55). Further, in the section on police-youth interactions, PATF made a specific recommendation to the City for training, namely, that *CPD should "evaluate and improve the training officers receive with respect to youth so that they are prepared to engage in ways that are… trauma-informed…."* (Id. 17, 55, 154). It is clear that the PATF report findings regarding officers interactions are based on evidence. (Id. at 54)("[W]e heard story after story of officers treating youth

with disrespect, humiliating them, or worse"). Exactly as PATF describes, Peter and Jack are "youth of color" who were "mistreated" "and worse" by Sgt. Egan and officer Cappello, with the same result identified by PATF, namely, that they were severely "traumatized" when the two officers pointed guns at them. (PSAMF ¶ 31). Therefore, PATF's findings regarding CPD's interactions with youth are relevant.

Moreover, multiple other findings contained in the City's PATF report are sufficiently similar to plaintiffs' Monell allegations of a failure to investigate and code of silence theories to constitute relevant evidence. (PATF at 69-76, 77-83, 84-88, 96-117). The PATF report's findings will help present this case to the jury in the most concise and efficient manner possible. For example, PATF makes the following finding regarding officer discipline, a key part of Plaintiffs' *Monell* claim.

> Why is it so hard to impose discipline on an officer?
>
> A true police accountability system requires that individual officers who engage in misconduct face real consequences commensurate with the nature of the offense and any mitigating and aggravating circumstances. In its current form, Chicago's police oversight system is essentially structured to prevent this from happening in a meaningful way.

(PATF report at 84). Allowing plaintiffs to introduce excerpts such as this one will help address defendants' concerns that the trial in this case will be too long.

Nevertheless, defendants object that the contents of the DOJ and PATF reports is not relevant to plaintiffs' *Monell* claims. (Dkt. #632-1, at 34). Defendants first assert that the reports do address excessive force against children. As already shown, that is a false statement. The DOJ's finding that CPD has a pattern of practice of excessive force against children is based on evidence that it reviewed, and the report contains specific examples of officers using excessive force against an 8-year-old girl and several 12-year-old boys. (DOJ at 35, 45, 59, 149). Defendants next criticize the PATF for not discussing any examples of excessive force. It is clear, however, that PATF's finding that CPD officers mistreat youth is based on evidence. (PATF at 54-55) ("Throughout our

community engagement efforts, including during our youth panels, we heard story after story of officers treating youth with disrespect, humiliating them or worse"). Moreover, this is an argument about the PATF finding's weight, not its admissibility. In fact, the PATF report need not contain any specific examples of excessive force against children in order for its findings and *statements* about officers' conduct towards youth to be relevant party admissions. Under FRE 801(d)(2)(D), these statements are admissible on their own just because they were statements made by defendant City. *Simmons v. City of Chicago*, 2017 WL 3704844, at *8. If there is any ambiguity in the PATF's findings regarding officers' interactions with youth, then the jury can interpret the PATF's findings for itself and decide how much weight to give them.

**B.** **The DOJ and PATF Reports are Admissible Under Fed. R. Evid. 403**

Not only are the DOJ and PATF reports' conclusions regarding excessive force, discipline and supervision, and the "code of silence" relevant to plaintiffs' *Monell* claims, but they are more probative of those policies and practices than any other evidence plaintiffs could hope to introduce. *Daniel*, 833 F.3d at 742. (holding that the standard of proof for *Monell* claims "is difficult, time-consuming, and expensive for most private plaintiffs to meet," but that "such systemic failings are exactly what the Department of Justice experts were looking for and found in Cook County.") The DOJ and PATF reports are uniquely probative of and relevant to the Plaintiffs' *Monell* claims. They offer conclusions about the Chicago Police Department's use of non-lethal excessive force, including force used against children; the adequacy of their disciplinary system, training, and supervision; and the sufficiency of the City's attempted responses to these issues. Each one of these conclusions is highly relevant to plaintiffs' *Monell* claims, and they are precisely the sort of systemic conclusions based on a resource-intensive agency investigation that the Seventh Circuit in *Daniel* said deserve "considerable weight." *Daniel*, 833 F.3d at 742.

Both reports are critical to the Plaintiffs' *Monell* claims, and defendants have failed to articulate a risk of prejudice that substantially outweighs their probative value. The plaintiffs only seek to use the reports for their *Monell* claims, not for their claims against the defendant officers, and instructing the jury that the reports are only evidence of *Monell* liability would resolve any potential prejudice. *See United States v. Richards*, 719 F.3d 746 (7th Cir. 2013) ("[P]roperly administered limiting jury instructions cure the danger of unfair prejudice unless 'the jury could not follow the court's limiting instruction.'") (quoting *United States v. Perkins*, 548 F.3d 510, 515 (7th Cir. 2008)).

Defendants argue that the reports as a group should be barred on various Fed. R. Evid. 403 grounds. First, they blanketly object that the reports are unfairly prejudicial. However, defendants do not identify any specific portion of either report or explain precisely how it would cause *unfair* prejudice to any defendant. Rather, defendants' real complaint, again, is about the inherent prejudice flowing from the fact that the reports are relevant. *United States v. Medina,* 755 F.2d 1269, 1274 (7th Cir. 1985) ("Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice… which permits exclusion"). Even "highly prejudicial" evidence should not be excluded unless it is "unfairly prejudicial in that it may induce the jury to reach a verdict on an improper ground." *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Defendants also resurrect their argument that admitting the reports for plaintiffs' *Monell* claim will unfairly prejudice the defendant officers. However, the Court has ruled that it will mitigate or eliminate the risk of unfair prejudice to the defendant officers by using limiting instructions "to make sure the jury understands the distinctions between the claims against Defendant Officers and the City." (Dkt. #620, at 1).

Next, neither report will confuse the jury. Fed. R. Evid. 403. Defendants give the court a picture of plaintiffs simply tossing the reports into jurors' laps and leaving them to themselves to read and figure out their relevance, including their terminology. (Dkt. #632-1, at 34). Rather, plaintiffs plan to have Mr. Johnson, their PATF witness, and/or their police practices expert briefly

reference and discuss only those sections of the reports that are relevant to the minor plaintiffs' *Monell* claim. If necessary, this will include asking them to define any specialized terms ( - although the terms that defendants claim are confusing, "pattern" and "practice," are actually not significantly different in meaning from the "widespread practice" or "*de facto* policy" of the minor plaintiffs' *Monell* claim). Once the reports have been admitted, plaintiffs may briefly publish them to the jury at key points in the trial. Plaintiffs will do this in ways that are neither confusing nor cumulative. Again, admitting the reports' concise findings into evidence is an efficient way to present evidence on plaintiffs' *Monell* theories that will *save* time, not cause delay.

In sum, defendants suggest that admitting the reports will cause enormous inefficiency and delay. But contrary to the defendants' implication, admitting the reports does not require the plaintiffs to put on any additional evidence beyond the reports themselves and possibly one witness from DOJ and PATF. If anything, admitting the reports will simplify the *Monell* case. Moreover, the Seventh Circuit's holding in *Daniel* demonstrates that the conclusions and opinions of a legally authorized investigation are often vital to proving *Monell* claims. *Daniel*, 833 F.3d at 742.

Defendants also argue that introducing multiple reports will be cumulative and waste time. (Dkt. #632-1, at 34). However, the DOJ and PATF reports, while having some overlapping findings, also contain different findings, and their investigations were conducted at different times and concern different time periods. Moreover, each report is relevant and credible for different reasons. For example, the DOJ report is relevant in part because the investigation that it is based on was conducted by an outside agency with unmatched credibility that utilized vast resources to conduct its investigation (including investigators, subject matter experts, etc.). The PATF report is uniquely relevant because *it is the defendant City of Chicago itself speaking and admitting* that, among other things, its police officers were not trained to interact with youth in ways that did not cause them traumatic distress. Furthermore, each report was a separate event and source of notice to the City

that it had unconstitutional practices. Because they are relevant for different reasons, the admission

of some evidence from both reports will not be cumulative or waste time.

Defendants complain that plaintiffs have not identified which portions of the reports they

plan to admit, but plaintiffs have, above, just provided several examples of portions they will seek to

admit. (Dkt. #632-1, at 33). Plaintiffs' summary judgment papers also identified, cited to, and

discussed many of the portions of the DOJ and PATF reports that plaintiffs are relying on.

Defendants make blanket foundation and hearsay objections to the admission of the DOJ

and PATF reports. (Dkt. #632-1, at 33). However, defendants concede that the DOJ and PATF

reports are admissible either as government investigative reports (DOJ and PATF reports) and/or

admissions by a party opponent (PATF report). *Id.* The DOJ and PATF reports are clearly

admissible. *Daniel v. Cook County*, 833 F. 3d 728, 740-42 (7th Cir. 2016); *Arrington v. City of Chicago*,

2018 U. S. Dist. LEXIS 14168, *9-11 (N. D. Ill. Jan. 30, 2018); *Godinez ex rel. Godinez v. City of*

*Chicago*, No. 16-cv-07344, 2019 U.S. Dist. LEXIS 187994, *10-11 (N.D. Ill. Oct. 30, 2019); *Estate of*

*Loury v. City of Chicago*, at *16 ("the DOJ Report and the PATF Report are clearly admissible."); *First*

*Midwest Bank v. City of Chi.*, 337 F. Supp. 3d 749, 777-79 (N.D. Ill. Aug. 29, 2018); *Simmons v. City of*

*Chicago*, No. 14 C 9042, 2017 U.S. Dist. LEXIS 137395, *24-25 (N.D. Ill. Aug. 29, 2017). In these

cases, both the DOJ and PATF reports were held to be admissible under Federal Rule of Evidence

803(8)(A)(iii), the hearsay exception for "factual findings from a legally authorized investigation." *Id.*

Additionally, the PATF report is admissible against the City of Chicago as a statement of a party

opponent. Fed. R. Evid. 801(d)(2)(D); *LaPorta v. City of Chi.*, 277 F. Supp. 3d at 989. Moreover, the

reports are not excludable hearsay if plaintiffs offered them not for their truth but merely to show

that the City had notice of unconstitutional practices and failed to make reforms. Fed. R. Evid.

801(c)(2). Finally, defendants allude to "hearsay within hearsay" and legal conclusions but do not

identify a single example, and, therefore, this undeveloped argument should be disregarded. To be

clear, plaintiffs do not intend to introduce direct quotations from individuals interviewed by the DOJ or PATF or quoted portions of documents which may be included in the reports, unless the quotes are otherwise admissible, such as being statements of a party opponent, or for other uses, such as impeachment. Rather, plaintiffs seek to introduce certain opinions and conclusions from reports themselves.

With respect to U.S. Attorney Patrick Johnson, a disclosed witness who plaintiffs may call to briefly testify to the DOJ report's relevant findings, defendants never bothered to take his deposition, so they do not actually know the extent of his personal knowledge of the DOJ investigation and report. (Dkt. #632-1, at 33). Plaintiffs' counsel, on the other hand, has spoken to Mr. Johnson several times and knows that he has the requisite personal knowledge of DOJ's Chicago-based investigation and report to testify about them competently. Fed. R. Evid. 602. Moreover, plaintiffs' PATF witnesses are listed in the PATF report as persons with the relevant subject matter knowledge necessary to testify about the report's findings. That said, plaintiffs' police practices expert, who discusses both the DOJ and PATF reports in his initial expert report, may also testify about the reports' findings.

Defendants make numerous other blanket objections on various grounds – that the reports contain "stealth expert opinions" that do not satisfy Fed. R. Evid. 702 and 703 and Daubert, that they do not disclose the methodologies or the facts that the findings are based on, and that they do not indicate which individuals wrote or approved which sections. (Dkt. # 632-1, at 33). However, defendants do not identify any specific examples. Defendants' argument against admissibility may be that "the source of the information or other circumstances indicate a lack of trustworthiness," Fed. R. Evid. 803(8)(B), but under FRE 803(8)(B), "the opponent" has the burden of "showing" a lack of trustworthiness. Id. The City fails to point to a shred of evidence that would suggest that the DOJ or PATF reports are somehow not reliable. In any event, courts have rejected the City's arguments

about the unreliability of the DOJ and PATF reports. *Estate of Loury v. City of Chicago*, No. 16-cv-4452, 2019 U.S. Dist. LEXIS 38029, at *3-4. Finally, these and similar arguments attack the reports' weight or *credibility, not their admissibility.*

Finally, defendants do not actually make any specific arguments for why the Safer report and the OIG affidavit override report are inadmissible. The OIG report on affidavit overrides is directly relevant to the failure-to-investigate strand of plaintiffs' *Monell* claim. The City's defense to this allegation is that the reason it did not investigate 1/3 or half of all misconduct complaints is that the complainants refused to sign affidavits. However, during 2012-2017 the City had affidavit override provision in IPRA/COPA's operating procedures that allowed it to investigate misconduct complaints in the absence of signed affidavits. The OIG report, *which relies on data from 2017 and 2018*, supports plaintiffs' position that the City failed to investigate for other reasons (such as code of silence) by showing that the City rarely invoked the affidavit override provision to investigate police misconduct. (Plaintiffs' Exhibit 81, PLAINTIFF 7781-7842, at 4, 6) ("CPD, COPA, and IPRA (COPA's predecessor agency) did not pursue affidavit overrides and improperly closed investigations for lacking an affidavit" when they were eligible for overrides). The report is admissible for its truth, Fed. R. Evid. 801(d)(2) or 803(8)(a), or simply for notice to the City. Fed. R. Evid. 801(c)(2). Finally, the Safer report, from 2014, is relevant and admissible to show notice to the City at the start of plaintiffs' *Monell* period that it had numerous problems with its police disciplinary system, not for its truth. Fed. R. Evid. 801(c)(2). Plaintiffs do not necessarily need a witness to admit either report.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 32

Defendants' motion *in limine* no. 32 seeks to bar plaintiffs' exhibits 86-95 and 262, which defendants characterize as "alternative policies" and "trauma-informed policing." (Dkt. 632-1, at 34-36). For at least the following reasons, defendants' motion must be denied.

Defendants' motion is a roundabout way of moving to bar certain opinions of plaintiffs' experts Jack Ryan and Lisa Thurau for a second time after the Court largely denied their first motion *in limine*. (Dkt. #477, at 32-45). Mr. Ryan and Ms. Thurau's opinions are expressly based on, in part, and consistent with plaintiffs' exhibits 86-95 and 262 and the policies and training described in those and similar law enforcement policy and training publications. (*See, e.g.*, Thurau expert report, plaintiffs' trial exhibit 156, at pp. 12, listing as materials she reviewed the International Association of Chiefs of Police's publications "Safeguarding Children of Arrested Parents" and "Enhancing Police Responses to Children Exposed to Violence" and similar publications; *see also* Ryan initial report at ¶¶ 486, 490, 497, 533-540, noting that in February 2017 the International Association of Chiefs of Police "published a tool kit for law enforcement titled 'Enhancing Police Responses to Children Exposed to Violence" that included a 2015 article published by the National Tactical Officers' Association titled "The Officer's Role in Responding to Traumatized Children"). This Court has already held that Ms. Thurau is qualified as an expert "in trauma-informed police policies and training" and "on training officers and policies regarding trauma-informed policing relating to children." (Dkt. 477, at 37-38, 36). Neither Thurau nor Ryan's opinions that rely on plaintiffs' exhibits 86-95 and 262 and similar publications have been barred or limited in anyway by this Court. *Id.* at 5-45.

As plaintiffs' experts discuss in their reports, plaintiffs' exhibits 86-95 and 262 are part of a body of law enforcement publications that describe policies and training curriculum for policing children without causing them traumatic distress. This body constitutes evidence of an industry standard, and generally accepted standards may be relevant in determining the reasonableness of a government actor's conduct. *Mays v. Dart*, No. 20 C 2134, 2020 WL 1987007, at 26-27 (N.D.Ill April 27, 2020) (Kennelly, J.). In particular, this body is directly relevant to plaintiffs' *Monell*-related allegation that, after defendant City had notice of its pattern of excessive force against children, it

nevertheless failed to adopt available and generally accepted policies and training that would have remedied this pattern. (Dkt. #118, 119a-f); Fed. R. Evid. 401. These publications contain examples of the policies and training that CPD knew were available but failed to adopt or even consider. Fed. R. Evid. 401. Indeed, Ms. Thurau's opinion is that "CPD training and policies did not use existing resources or act on recommendations… to adopt trauma-informed practices." (Thurau expert report at 42-46, 54-62) (discussing plaintiffs' exhibits 86, 89 and similar publications and concluding that "The basic recognition of the harm that law enforcement can and did cause to children, even inadvertently, as well as the policy and training resources to avoid, abate, and mitigate that harm, existed for any law enforcement agency that sought to affirmatively improve and protect children during law enforcement actions. All that needed to be done was to collect and adapt those resources for the agency's use"). Therefore, this body is highly probative evidence that there was a way to police children that would not include the use of unnecessary or excessive force against them. Fed. R. Evid. 401, 403. In addition, this evidence of industry standard shows that the City was on notice during the *Monell* period of the impact of violence generally, including police violence, on children yet still failed to train officers to police children in ways that avoided inflicting trauma on them. *Id.* Both the failure to adopt any of these policies or training as well as the failure to incorporate their premise that exposure to violence harms children are evidence of the City's deliberate indifference to its ongoing pattern of excessive force against children ages 0-14. Fed. Rule Evid. 401 and 403.

Defendants misrepresent plaintiffs' exhibits 86-95 and 262 to suit their argument that they are not relevant. As a body, the policies and training discussed in these publications are based on a knowledge of the impact that exposure to violence (i.e., violence in general, including police violence) has on children. Accordingly, the policies and training curricula advocated in these publications are trauma-sensitive: they teach and require officers to avoid inflicting unnecessary or excessive trauma, including through their use of force, on children. *That would include not pointing guns*

*at children, not handcuffing children, and not using hand or foot control tactics on children.* If CPD had trained Egan and Cappello that pointing guns at Peter and Jack exposing them to their father in handcuffs would cause them lasting traumatic distress, then the officers would likely have been more careful with their actions. The absence of any such policy or training to restrain Egan and Cappello in these ways was, therefore, a moving force behind Egan and Cappello's actions. In fact, *the City acknowledges the relevance of policy and training that teaches trauma-informed policing with children in its own PATF report,* which recommended that

> CPD should evaluate and improve the training officers receive with respect to youths to ensure that all officers are prepared to engage with youth in ways that are age-appropriate, trauma-informed, based in a restorative justice model.

Defendants' final relevance argument – that the policies and training discussed in plaintiffs' exhibits 86-95 and 262 has no tendency to prove that the city was deliberately indifferent to its pattern of excessive force against children – was rejected by this Court when it denied defendants' first motion to bar Ms. Thurau. (Dkt. #477, at 39, 42) ("[T]he Court finds that Thurau's opinions about the differences between [other 'better' training and] policies and how they can affect officer conduct, compared to CPD's policies, is relevant and helpful to the jury in determining the fact in issue: namely, whether the City was deliberately indifferent").

Defendants' "foundation" argument is undeveloped, without citation to rules of evidence or case law, and is, therefore, waived. *Martin v. City of Chicago*, No. 15-cv-04576, 2017 WL 2908770, at *9 (N.D.Ill. July 7, 2017) (finding waiver where response to motion *in limine* objected "but cite[d] no reason or authority" for the objection). Nevertheless, if the argument is that plaintiffs' experts' Ms. Thurau and Mr. Ryan lack the personal knowledge of plaintiffs' exhibits 86-95 and 262, their reports, which cite them, make clear that they both have digested them and similar publications. Fed. R. Evid. 602; (Thurau expert report, at 42-46, 54-62, and Ryan initial report, at ¶¶ 486, 490, 497, 533-540). If the argument is that plaintiffs' experts are not qualified to give opinions about or

discuss plaintiffs' exhibits 86-95 and 262, then that argument was waived when defendants filed their first motion to bar Ms. Thurau and Mr. Ryan's opinions. Fed. R. Evid. 702 and 703. Ms. Thurau and Mr. Ryan certainly have the education, background and training to give their opinions and discuss plaintiffs' exhibits 86-95 and 262 and, in any event, the Court has found them both well-qualified. *Id.* If the "foundation" objection is hearsay, then it is black-letter law that plaintiffs' experts are allowed to rely on and give opinions about evidentiary materials that might not otherwise be admissible. Moreover, there is a clear, hearsay exception for these types of publications when experts are relying on, quoting from and/or testifying about them in the courtroom. Fed. R. Evid. 803(18).

Finally, defendants argue that evidence of these publications would unfairly prejudice the City and confuse the jury. Defendants have failed to specifically identify and describe any *unfair* prejudice to the City. Again, what defendants are really complaining about is the prejudice inherent in relevant evidence. But that type of prejudice is not unfair. Finally, the jury would have no problem understanding plaintiffs' experts clear and concise definition of "trauma-informed policing." The Court has already held that Ms. Thurau's opinions, which are based on these and other publications with a trauma-informed approach, "do not confuse the issues" in this case. (Dkt. #477, at 42). There is nothing complex or confusing about the concept of policing in a manner that avoids exposing children to unnecessary or excessive police violence – except to the Chicago Police Department.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 33

In a short motion citing zero authority, Defendants seek to bar nine of Plaintiffs trial exhibits as inadmissible hearsay disallowed by Rule 801(c). DM. at 26-37. The motion should be denied for three, independent reasons. First, as a threshold matter, it improperly seeks to bar an entire category of evidence without discussing each piece of evidence and demonstrating that each has no pathway to admissibility. As discussed above, a general request to exclude an entire category of evidence is not an appropriate request for a motion *in limine. See Gonzalez v. Olson*, 2015 WL

3671641, at *26 (in the absence of more specific information, the court will not bar an entire category of evidence at this juncture). For this reason alone, the motion should be denied. *See Austin*, 2009 WL 7999488, at *4 (N.D. Ill. Mar. 25, 2009) (denying motion where "defendants [did] not explain or describe what specific evidence they [were] referring to"); *Native Am. Arts*, No. 2002 WL 1173513, at *5 (summarily denying defendant's MILs in part as "vague" and "overbroad" "because [defendant]" among other things "fails to sufficiently explain the evidence it seeks to exclude"); *In re Depakote*, 2018 WL 9732116, at *1 (denying vague MIL to "exclude evidence and testimony about legal standards, duties, and obligations" as overbroad); *see also Luce,* 469 U.S. at 41 n.4 (Court may exclude evidence in advance of trial only when clearly inadmissible).

Second, contrary to Defendants' suggestion, numerous ways exist in which one or more of the nine exhibits targeted by the motion may become admissible at trial. For example, if Defendants impeach Jack Mendez, Peter Mendez, or Gilbert Mendez, Plaintiffs may introduce any number of clips from their 2018 (or later) interviews as evidence of prior consistent statements pursuant to FRE 108(d)(1)(B)(ii). As another example, because the BWC of the raid is limited and does not well depict Jack or Peter from close up or show them saying very much, Plaintiffs may introduce a clip (or perhaps a screenshot) from one of the 2018 videos in the nine exhibits as necessary to help the jury understand that Jack and Peter in 2017 were not the teenagers that they are today; rather, they were young children of 5 and 9 years, respectively. This is probative to show the degree to which Jack and Peter posed zero threat whatsoever to Defendant Officers. As a third example, Plaintiffs may use the video of the CBS 2 interview of Cline, one of the City's Rule 30(b)(6) witnesses in this case, to impeach Cline's testimony at trial.

Defendants' remaining arguments are not developed in a way that permits a response (i.e., Plaintiffs are unsure what Defendants are saying in the first sentence of the second paragraph on page 37). To the extent that the final sentence of Defendants' motion seeks to bar reference to the

title of any of the media reports (i.e., to bar reference to "wrong raid" or "botched raid"), the Court should deny the request as moot because Plaintiffs do not intend to introduce the title of any media reports. The motion should be denied.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 34

Defendants' motion *in limine* no. 34 seeks to bar all evidence and argument that the "fact that the City replaced [IPRA] with [COPA] shows that the City's police accountability system was deficient." (Dkt. 632-1, at 37). Defendants argue, first, that this evidence would be unfairly prejudicial to the City and, second, that COPA was a remedial measure. Because both arguments are wrong and because granting defendants' motion would cause severe unfair prejudice to plaintiffs, defendants' motion must be denied.

The fact that the City replaced IPRA with COPA because IPRA largely failed to investigate police misconduct is directly relevant to plaintiffs *Monell*-related allegation that defendant City had a widespread practice of failing to investigate and discipline officer excessive force against children and, thereby, sent defendant officers the message that they could engage in this kind of misconduct with impunity. (Dkt. #125, ¶¶ 114, 115-116, 121-122); Fed. R. Evid. 401 and 402. IPRA's and COPA's failure to investigate is also relevant evidence of plaintiffs' claim of deliberate indifference in the face of notice of a pattern of misconduct complaints of excessive force against children. Id. at ¶¶ 122, 124; Fed. R. Evid. 401 and 402. The fact that IPRA was replaced because it largely failed to investigate misconduct is an undisputed fact in this case; the City's own 30(b)(6) witness gave this testimony, and this was among the DOJ and PATF findings; defendant City tendered no contrary evidence on summary judgment, and its motion *in limine* provides no citations to any evidence either. (See generally Shannon Hayes dep. transcript attached as Exhibit 18 (discussing deficiencies in IPRA's investigations and COPA's limitations and low prioritization of gun-pointing misconduct);

Dkt. 632-1, at 37-38). Indeed, based solely on the public record evidence, the court could take judicial notice that IPRA was replaced because it failed to investigate officer misconduct.

Next, defendants' motion should be denied because it is highly probative of the minor plaintiffs' *Monell* claim and is not unfairly prejudicial to defendant City. The fact that COPA was intended to replace IPRA because IPRA failed to investigate is a fact that is highly probative of plaintiffs' claim that defendant City failed to investigate and discipline officer misconduct and, thereby, emboldened defendants to engage in excessive force against plaintiffs by pointing guns at them. Defendants fail to explain how this evidence would prejudice defendant City *unfairly*. Rather, it is the mere fact that this evidence is "prejudicial" because it is relevant that defendants take issue with. *United States v. Medina*, 755 F.2d 1269, at 1274 ("Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403"). Again, defendants merely seek to hide evidence of their culpability from the jury. That is insufficient reason for the Court to exclude the evidence. Even if this evidence were unfairly prejudicial, which it is not, any unfair prejudice to the City would not substantially outweigh its probative value for plaintiffs' *Monell* case. Finally, any unfair prejudice could be mitigated by allowing the City to introduce evidence of IPRA investigations that were not deficient and/or "full context of all relevant legislative considerations," which defendants fail to describe with any specificity. (Dkt. 632-1, at 37).

Finally, defendants argue that the fact of IPRA's replacement by COPA is inadmissible because it was a remedial measure. Plaintiffs note, first, that the City's argument in this regard contradicts their motion *in limine's* assertion that IPRA's investigations were *not* deficient and constitutes an admission that they *were*. Second, defendants' argument does not make any sense. A remedial measure is a remedy that would have made an *earlier* injury less likely to occur (and, therefore, the subsequent remedy is inadmissible); in other words, the remedy comes *after* the injury.

107

Fed.R.Evid. 407. Here, defendants ignore the fact that the remedy came *before* the injury: COPA replaced IPRA in *2016*, and defendant officers committed excessive force against the minor plaintiffs in November 2017. Thus, IPRA's replacement with COPA cannot even be considered a remedial measure. Defendants' argument is incoherent in another sense. Under Fed. R. Evid. 407's logic, COPA, not IPRA, is "the subsequent measure" that would be barred. However, COPA does not satisfy the definition of a remedial measure. By definition, a remedial measure "would have made an earlier injury or harm less likely to occur." Fed. R. Evid. 407. However, the evidence in this case shows that *COPA failed to investigate officer excessive force against children just as much as IPRA did* and, therefore, COPA would not have made (and, in actual fact, as plaintiffs' incident proves, did *not* make) the minor plaintiffs' injury any less likely to occur because it occurred. Therefore, Fed. R. Evid. 407 does not apply here to bar evidence of COPA's failure to investigate officer excessive force against children. No doubt for this reason, defendants' motion fails to cite any case authority where evidence of IPRA's replacement with COPA was barred as a remedial measure. Even if this Court found that COPA was a remedial measure, plaintiffs would still be allowed to introduce evidence that the entities (regardless of the names "IPRA" and "COPA") both failed to investigate and discipline officer excessive force against children. Not to admit this evidence would be to hamstring plaintiffs' ability to prove their *Monell* case. Fed. R. Evid. 403. Similarly, even if COPA was a remedial measure, plaintiffs could still introduce evidence that COPA replaced IPRA to 1) impeach the expected testimony by defendants' witnesses and experts that the City properly investigated and discipline alleged officer misconduct and/or 2) to prove that the City had "control" over (and, therefore, responsibility for) IPRA and COPA's failures to investigate police misconduct. Fed. R. Evid. 407.

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 35**

Next, defendants' motion *in limine* no. 35 seeks to bar all evidence and argument regarding "the City's conduct in discovery." (Dkt. #632-1, at 38). Defendants' motion, which fails to give any examples of specific conduct that defendants believe plaintiffs may seek to introduce or that should be barred, should be denied on vagueness grounds. *Gaines v. Chicago Board of Education*, 2024 WL 640802, at *19 ("Because defendants rule 402 and 403 arguments are simply too broad and vague, the motion is denied as to this evidence"). Barring new or unforeseen developments before or during trial, plaintiffs have no plans at this time to make arguments about defendant's City's conduct in discovery.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 36

Defendants' motion *in limine* no. 36 essentially asks the Court to prevent the jury from hearing that the City has itself retained plaintiffs' experts Jack Ryan and Lisa Thurau in *scores* of other cases and matters, arguing that this evidence is disallowed by Rules 401 and 403. Tellingly, Defendants do not cite a single authority in support. The motion should also be denied as frivolous. The simple fact is that the City has retained Jack Ryan more than a dozen times as an expert in civil rights cases involving allegations of police misconduct. A non-exhaustive list of case names provided by Mr. Ryan in which the City retained Mr. Ryan as an expert witness includes the following:

1. Hill & Woods v. City of Chicago
2. Richard Piecuch v. City of Chicago
3. Porter v. City of Chicago
4. Redding v. City of Chicago
5. Rivera v. City of Chicago
6. Johnson v. City of Chicago v Franklin
7. Tucker, Vincent v. City of Chicago
8. Banks v. City of Chicago
9. Island v. City of Chicago
10. Tena v. City of Chicago
11. Nathen Jones v. City of Chicago
12. William Bell v. City of Chicago and Petruno
13. Rodriguez and Maritzia Murillo v. City of Chicago

Plaintiffs' expert Lisa Thurau has similarly been retained by Defendant City, including as a trainer for CPD officers. The City will no doubt attempt to attack Ryan's and Thurau's expertise, methodology, opinions, credibility and alleged bias. Plaintiffs are entitled to rebut (or prebut) those attacks (and impeach the City) by introducing evidence that Ryan and Thurau have been retained by the City in these other cases and matters as necessary to demonstrate that the City *in fact* holds both experts in high regard. Plaintiffs are entitled to affirmatively elicit Ryan's and Thurau's prior and current engagements with the City because they are directly relevant to their qualifications, credibility and lack of bias.

Defendants' arguments to the contrary are unavailing. They suggest it would take a long time for them to explain the particulars of the department that hired Ryan once. But there's nothing to explain: as noted above, the City has hired him more than a dozen times, including at least a half dozen times by the Law Department. Plaintiffs will be able to elicit this information in less than twenty seconds. The information certainly is not prejudicial—it is factual. If Defendants wish to try to limit it by getting into the details of which department hired Plaintiffs' experts, that is their prerogative. The fact remains that the City has repeatedly hired both experts, and Defendants make no showing that this evidence is inadmissible. The motion should be denied.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE NO. 37

Defendants next argue that plaintiffs should be barred from asking the jury to "send a message to the City" or "to punish the City with its verdict." Dkt. # 632-1 at 39. Plaintiffs agree they cannot recover punitive damages from the City and, therefore, they cannot and will not ask the jury to send a message to the City in that way. However, with respect to punitive damages, plaintiffs are allowed to argue that punitive damages can serve as an example to other officers that "they should not do *what defendants did in this case*." *Patterson v. City of Chicago*, No. 15-cv-4139, 2017 WL 770991, at 5-6 (N.D.Ill. Feb. 28, 2017).

110

However, in this case the minor plaintiffs have a *Monell* claim against the City, and a verdict against the City on that claim would, by definition, be sending a message to the City that one or more of its widespread practices caused a violation of the children's constitutional rights. Defendants do not argue otherwise, instead limiting the scope of their motion to the assertion that "[s]ending a message or punishment cannot form the basis for any damages other than punitive damages." *Id.* That, however, does not mean that plaintiffs are or should be precluded from arguing that the jury should send a message to the City. For example, in *Christmas v. City of Chicago*, 691 F. Supp.2d 811 (N.D. Ill. 2010) (Manning, J.), the defendant City of Chicago sought the same *in limine* ruling that defendants seeks here. In denying the City's motion in *Christmas*, the Court explained:

> The plaintiffs disagree, noting that he is entitled to ask the jury to "send a message" by awarding full compensatory damages for their injuries, as well as by awarding punitive damages in their claims against the individual officers.

> The court agrees with the plaintiffs and denies the motion *in limine* with the caveat to the plaintiffs that any "message" or "punishment" arguments must be made in the context suggested above and must not imply that they are entitled to punitive damages from the City.

*Christmas*, 691 F.Supp.2d at 820; *see also Saunders v. City of Chicago*, 320 F.Supp.2d 735, 738 (N.D. Ill. 2004) (denying similar motion made by the City); *Simmons v. City of Chicago*, No. 14 C 9042, 2017 WL 3704844, at *6 (same). To the extent that Defendants' motion seeks to go beyond this particular scope, it should be denied.

Further, plaintiffs are allowed to ask the jury to *deter* the City and other Chicago police officers from committing misconduct in the future. In *Betts v. City of Chicago*, the Court denied in part a motion similar to defendants' motion *in limine* # 37, holding that, although the absence of a *Monell* claim meant that the plaintiff in that case could not argue that the jury should "send a message" to the City itself, the plaintiff was "permitted to argue that he is attempting to deter the defendant officers and other Chicago police officers from future misconduct." 784 F. Supp. 2d 1020, 1033 (N.D. Ill. 2011); *see also Bruce v. City of Chicago*, No. 09 C 4837, 2011 WL 3471074, at *5-*6 (N.D. Ill.

111

July 29, 2011) (following *Betts*). Similarly, plaintiffs are allowed to In this case, where the minor plaintiffs are trying *Monell* claims directly against the City, based on the reasoning in *Betts* plaintiffs can and should be allowed to argue that the jury "send a message" of deterrence to the City by way of rendering a verdict against it. In sum, the jury is allowed to send a message that neither officers nor the City should violate citizens' constitutional rights.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION *IN LIMINE* NO. 38

Defendants' motion *in limine* 38 seeks to "[b]ar [r]eference to [u]nidentified '[o]fficial [p]olicymaker' or '[f]inal [p]olicymaker' [o]f [t]he City." (Tellingly, only the title of Defendants' motion *in limine* 38 identifies the specific relief requested.) The request is overbroad and ambiguous. To the extent Defendants are arguing in this motion that the jury should be instructed on the elements of Plaintiffs' *Monell* claim, including as relevant to final policymakers, this Court will properly instruct the jury on those elements such that the jury will understand whose actions (or inactions) it must consider. To the extent Defendants are actually arguing in motion *in limine* 38 that Plaintiffs should be prohibited from using the term "final policymaker" or "official policymaker" during examinations or argument without referring to a specific policymaker, that is absurd. Requiring Plaintiffs to use the final policymakers' names or title every single time they ask a question about policymakers is unnecessary, would impede the flow of questioning, and would needlessly prolong the trial. Tellingly, Defendants cannot cite a single court that has granted such a request. DM at 39. The request should be denied.

 

 

Respectfully submitted,
GILBERT MENDEZ and HESTER MENDEZ,
individually and on behalf of their minor children, PETER
MENDEZ and JACK MENDEZ


BY:    /s/ Al Hofeld, Jr.
         Al Hofeld, Jr.

112

*Plaintiffs' Attorneys*
Al Hofeld, Jr.
Zachary J. Hofeld
LAW OFFICES OF AL HOFELD, JR., LLC
53 W. Jackson Blvd., Suite 432
Chicago, IL 60604
al@alhofeldlaw.com
zach@alhofeldlaw.com

## NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Al Hofeld, Jr., attorney for plaintiff, hereby certify that on March 18, 2025, filing and service of the foregoing ***PLAINTIFFS' RESPONSES TO DEFENDANTS' MOTIONS IN LIMINE*** was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

/s/ Al Hofeld, Jr.
Al Hofeld, Jr.

*Plaintiffs' counsel*
Al Hofeld, Jr.
Zachary J. Hofeld
THE LAW OFFICES OF AL HOFELD, JR., LLC
53 W. Jackson Blvd., Suite 204
Chicago, IL 60604
(773) 241-5844
al@alhofeldlaw.com
zach@alhofeldlaw.com

114